IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PURDUE PHARMA PRODUCTS L.P., NAPP )
PHARMACEUTICAL GROUP LTD., BIOVAIL )
LABORATORIES INTERNATIONAL SRL, and )
ORTHO-MCNEIL, INC., )
) C.A. No. 07-255-JJF
Plaintiffs, )
)
v. )
)
PAR PHARMACEUTICAL, INC. and PAR )
PHARMACEUTICAL COMPANIES, INC., )
)
Defendants. )

## REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERICAL MATTERS (ERIC-PAUL PAQUES, PH.D)

In conformity with Article 3 of the Hague Convention, the undersigned applicant has the honor to submit this request on behalf of the defendants in the above-entitled action, Par Pharmaceutical, Inc., located at One Ram Ridge Road, Spring Valley, New York 10977 and Par Pharmaceutical Companies, Inc., located at 300 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

The United States District Court for the District of Delaware presents its compliments to the judicial authorities of Germany and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter.

This Court requests the assistance described herein as necessary in the interests of justice. The assistance requested is that the appropriate judicial authority of Germany compel the appearance of the below-named individual to give evidence pertinent to the defendant's defenses in this matter.

1. **Sender:**

   The United States District Court for the District of Delaware, J. Caleb Boggs Federal Building, 844 N. King Street, Wilmington, Delaware 19801.

2. **Central Authority of the Receiving State:**

   Präsident des Oberlandesgerichts Düsseldorf, Cecilienallee 3, 40474 Düsseldorf, Federal Republic of Germany.

3. **Person to Whom the Executed Request is to be Returned, and Deadline for Return:**

   The executed request should be returned to the Sender as expeditiously as possible.

4. **Requesting Judicial Authority of the Requesting State, The United States of America (Article 3(a)):**

   The requesting judicial authority is the United States District Court for the District of Delaware, by the Honorable Joseph J. Farnan, Jr. of that Court.

5. **Competent Authority of the Requested State, the Federal Republic of Germany (Article 3(a)):**

   Präsident des Oberlandesgerichts Düsseldorf, Cecilienallee 3, 40474 Düsseldorf, Federal Republic of Germany.

6. **Names and Addresses of the Parties and their Representatives (Article 3(b)):**

| Party | Representatives |
|---|---|
| Par Pharmaceutical, Inc. One Ram Ridge Road Spring Valley, New York 10977 Par Pharmaceutical Companies, Inc. 300 Tice Boulevard Woodcliff Lake, New Jersey 07677 | Edgar H. Haug Daniel G. Brown Robert E. Colletti Frommer Lawrence & Haug LLP 745 Fifth Avenue New York, New York 10151 Frederick L. Cottrell, III Steven J. Fineman Richards, Layton & Finger One Rodney Square Wilmington, Delaware 19899 |

| | |
|---|---|
| Purdue Pharma Products L.P.<br>One Stamford Forum<br>201 Tresser Boulevard<br>Stamford, Connecticut 06901-3431<br><br>Napp Pharmaceutical Group Ltd.<br>Cambridge Science Park<br>Cambridge, CB4 0GW<br><br>Biovail Laboratories International SRL<br>Carolina, Puerto Rico<br><br>Ortho-McNeil, Inc.<br>1000 Route 202 South<br>Raritan, New Jersey 08869 | Jack B. Blumenfeld<br>Rodger D. Smith II<br>Morris, Nichols, Arsht & Tunnell<br>1201 North Market Street<br>P.O. Box 1347<br>Wilmington, Delaware 19899<br><br>Mary W. Bourke<br>Conolly Bove Lodge & Hutz LLP<br>The Nemours Building<br>1007 North Orange Street<br>P.O. Box 2207<br>Wilmington, Delaware 19899<br><br>Richard D. Kirk<br>The Bayard Firm<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, Delaware 19899<br><br>Herbert F. Schwartz<br>Richard A. Inz<br>Sona De<br>Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036<br><br>Robert J. Goldman<br>Ropes & Gray LLP<br>525 University Avenue<br>Suite 300<br>Palo Alto, California 94310 |

7.  **Nature and Purpose of the Proceedings and Summary of the Facts (Article 3(c)):**

This is a patent infringement action brought by plaintiffs Purdue Pharma Products L.P., Napp Pharmaceutical Group Ltd., Biovail Laboratories International SRL, and Ortho-McNeil, Inc. against defendants Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively "Par"). The patent-in-suit, U.S. Patent No. 6,254,887 ("the '887 patent"), issued to Euro-Celtique S.A. ("Euro-Celtique") on assignment from Ronald Brown Miller, Stewart Thomas

3

RLF1-3258430-1

Leslie, Sandra Therese Antoinette Malkowska, Kevin John Smith, Walter Wimmer, Horst Winkler, Udo Hahn, and Derek Allan Prater, the named inventors. Euro-Celtique subsequently assigned the patent-in-suit to Napp Pharmaceutical Group Ltd. and Purdue Pharma Products L.P.

This action is based on Par's filing of Abbreviated New Drug Application ("ANDA") No. 78-783 with the U.S. Food and Drug Administration ("FDA"). Par seeks FDA approval to market a generic version of Biovail's tramadol hydrochloride extended-release products, which Ortho-McNeil, Inc. and Purdue Pharma Products L.P. market under the brand name Ultram ER for the management of moderate to moderately severe chronic pain. Plaintiffs have brought this action contending that the commercial sale of Par's proposed product as described in Par's ANDA No. 78-783 would infringe one or more claims of the '887 patent.

Par contends that the commercial manufacture and/or sale of its proposed product will not infringe any valid claims of the '887 patent and that the claims of the '887 patent are invalid under one or more of the provisions of the United States Code, 35 U.S.C. § 101 *et seq.*

8.  **Judicial Action to be Taken and Documents and Other Property to be Inspected (Article 3(g)):**

To assist this Court in resolving this dispute in a prompt, fair and efficient manner, this Court respectfully requests that the Responding Authority issue an order compelling Dr. Eric-Paul Paques to appear at a witness hearing in this case. A list of specific questions that are to be posed to the witness is set forth in paragraph 13. The party affiliation and counsel for the designated individual is also given:

| Witness | Represented by Counsel |
| --- | --- |
| Dr. Eric-Paul Paques<br>Grünenthal GmbH<br>52099 Aachen<br>Germany | Unknown |

4

The above-identified individual appears to have information relevant to this case.

If the Responding Authority determines that the requested witness hearing is appropriate, this Court further requests that the Responding Authority order the above-identified individual to bring to the witness hearing the specific documents in his possession, custody, or control that are identified in paragraph 12 for the sole purpose of facilitating the examination of the witness at the witness hearing (e.g., to help the witness recall the facts and events about which he is questioned and to verify the accuracy of his responses).[1] If the Responding Authority determines that this separate request for the witness to bring documents to the witness hearing is precluded by Germany's reservation under Article 23 of the Hague Convention, then the Responding Authority may respond as provided under the Hague Convention. However, this Court respectfully requests that the Responding Authority nevertheless issue an order compelling the above-named individual to appear as a witness in a witness hearing.

This Court requests that the German Court set a date and time for the above deposition as soon as practicable.

### 9. Subject Matter and Relevance of This Request:

In 1962, Grunenthal GmbH ("Grunenthal") invented tramadol when one of its chemists, Dr. Kurt Flick, synthesized the molecule tramadol for the first time. After years of development, Grunenthal created a commercial tramadol product and in 1977, began marketing in Germany its tramadol product under the trade name Tramal®. Grunenthal has continued to develop its tramadol product and expand its market to other countries. In the early to mid 1990s, Grunenthal developed a controlled-release formulation for its tramadol product. Around the same time, a patent holding company for plaintiffs Purdue and Napp, Euro-Celtique, began filing patent

---

[1] In particular, counsel for defendant Par has brought to the Court's attention ZPO § 142, supporting the view that the witness can be requested to bring and submit documents.

applications around the world on controlled-release formulations for tramadol. Specifically, Euro-Celtique filed patent applications pertaining to controlled-release tramadol in the European Patent Office, including the application for EP 624 366 ("the '366 patent"). The '366 patent corresponds to the '887 patent, which is the patent-in-suit in this case. Seven companies in Europe, including Grunenthal, opposed the '366 patent. During Grunenthal's opposition proceeding, Grunenthal raised the objections of lack of novelty, lack of inventive step, and insufficiency of disclosure. Grunenthal's opposition proceedings led to settlement discussions. Grunenthal entered into a settlement agreement and in a July 16, 1997 letter, Grunenthal withdrew its opposition to the '366 patent in the European Patent Office. The other opposition proceedings against the '366 patent continued and ultimately, the '366 patent was revoked.

Par has learned, through its own investigation and discovery obtained from plaintiffs to date, that Dr. Paques has information relevant to this litigation, which he learned during his employment at Grunenthal. As the president of the Research and Development Division, and subsequently appointed to the Grunenthal Executive Board in 1998, Dr. Paques is likely to have relevant information concerning Grunenthal's use, development, and knowledge of controlled-release tramadol formulations. Dr. Paques is also likely to have relevant information concerning Grunenthal's opposition proceedings to plaintiff's patents for controlled-release tramadol and subsequent settlement discussions, which occurred during his employment at Grunenthal. Before the patent was revoked, Grunenthal agreed to license Euro-Celtique's '366 patent for controlled-release tramadol. The reasons for Grunenthal's withdrawing of the opposition proceeding concerning the '366 patent, the terms of the agreement, and Grunenthal's knowledge of the state of the art from the late-1980s to mid-1990s is important to Par's defense of patent invalidity for the corresponding '887 patent, and as evidence for submission at trial in this case.

In view of the foregoing, we therefore request, in the interests of justice, that you issue an order, in accordance with the laws and procedures of the courts of Germany for the acquisition of evidence for trial, and compel Dr. Paques to appear at a witness hearing to respond to the questions set forth in paragraph 13 and bring with him the specific documents identified in paragraph 12.

**10.    Methods and Procedures to be Followed for Deposition of Dr. Paques:**

This Court requests, pursuant to Article 3 of the Hague Convention, that the testimony given pursuant to this letter of request be given under oath.

This Court understands that the procedures to be followed will be determined in the exercise of discretion of the German Court. Within those limitations, however, this Court makes the following requests pursuant to Article 9 of the Hague convention for additional procedures to be followed:

a.    Counsel for Par has informed this Court that Germany's Code of Civil Procedure ("ZPO") permits a German Judge to authorize that questioning of the witness at a deposition taken under the Hague Convention may be conducted by the parties, counsel for whom may ask questions in the nature of direct, cross and redirect examination. It is this Court's understanding that such procedures may be requested by the Requesting Authority in the Letter of Request.[2]

This Court believes that the most effective way to obtain the witness's testimony in a form that will be useful to the Court would be to follow that procedure. Counsel for the defendant is familiar with the documents and the issues and it would be very advantageous to allow them to conduct the questioning rather than to have the questioning done by the German

---

[2] In particular, counsel for Par has brought to the Court's attention ZPO § 397, supporting the view that cross examination by the parties' counsel is permitted.

7

judge or other official of the German government. This Court requests that such a procedure be followed.

      b.      Par's attorneys, Frommer Lawrence & Haug LLP, request, under authorization of this Court, permission to attend and participate in the oral deposition of the abovementioned individual. It is also requested that Frommer Lawrence & Haug LLP be provided with the date, time and place of the deposition as soon as convenient.

      c.      Sometimes during depositions counsel raise objections to the admissibility in court of certain testimony or the manner in which questions are asked or answers are given. The usual practice in depositions in this country is that such objections are "reserved," which means that they are noted for the record but not resolved at the deposition. They are resolved by the trial court when the testimony is presented to the court. This Court requests that this procedure be followed in connection with this deposition to the extent objections are raised based on issues of United States law.

      d.      This Court requests that a full stenographic and/or videographic record (verbatim transcript) be taken of the proceedings.

      e.      It is fully acceptable to this Court that the hearing be conducted in German and that all questions be asked in German, and that the witness hear and respond to all questions in German. It is requested that United States counsel be allowed to bring a translator to the hearing, which shall be arranged and paid for by United States counsel, and that the translator be allowed to make simultaneous translation of the proceedings so that United States counsel may follow the hearing and be in a position to pose questions to the witness.

      f.      After the written transcript of each deposition is prepared the witness shall have the opportunity to review it and make any corrections required, stating the reasons therefore in an

errata sheet to be affixed to the original transcript of the hearing. The witness should be required to sign an acknowledgement of the accuracy of the transcript (as corrected) before a notary or comparable official, and the transcript so executed should be returned to the judicial officer appointed to conduct the proceedings, who should then forward it to the Sender.

   g. If the Responding Authority denies the procedure requested in paragraphs (a)-(f) above, and instead orders that the questioning of the witness be done by the German judge or other official of the German government, then this Court respectfully requests that the Responding Authority notify this Court and Par, in care of Frommer Lawrence & Haug LLP at the address listed in paragraph 6 above, as soon as possible of the denial and to allow Par to submit specific written questions to be asked by the German judge or other official of the German government. This case involves complex technical issues and issues unique to U.S. patent and procedural law with which Par's attorneys are familiar. In addition, it is impossible to know in advance how the witness will answer the specific questions set forth in paragraph 13. Answers to particular questions may require unanticipated follow-up questions or suggest unanticipated lines of questioning. Accordingly, Par's attorney's request, under authority of this Court, that they be allowed to ask additional questions not set forth in paragraph 13 in response to the witness' answers relating to the subject-matter.

**11.** **Request for Notification of Examination:**

This Court respectfully requests, pursuant to Article 7 of the Hague Convention, that it be informed in writing of the time when, and the place where, the proceeding will take place, and that such information should also be sent to the parties' representatives at the addresses listed in paragraph 6 above.

**12.   Identification and Description of Documents Sought From Dr. Paques:**

1. All agreements between Grunenthal and any of the plaintiffs (affiliates and related companies including, but not limited to, Napp Research Centre Ltd., Mundipharma, and Euro-Celtique) concerning tramadol.

2. All settlement agreements between Grunenthal and any of the plaintiffs (affiliates and related companies including, but not limited to, Napp Research Centre Ltd., Mundipharma, and Euro-Celtique), concerning a controlled-release formulation for tramadol.

3. All documents including, but not limited to, memoranda, responses, communications, prior art, declarations, expert reports, and agreements from each opposition proceeding involving Grunenthal concerning a controlled-release formulation for tramadol.

4. Documents sufficient to show when Grunenthal first made a controlled-release formulation for tramadol.

5. Documents sufficient to show when Grunenthal first made Tramal Long.

6. Documents sufficient to show when Grunenthal first made Tramal SR.

7. Documents sufficient to show when Grunenthal first made Zydol SR.

8. All publications discussing controlled-release tramadol formulations prior to 1995.

9. Agreements showing the current commercial relationship between plaintiffs (including Mundipharma) and Grunenthal, concerning controlled-release tramadol formulations.

This Court requests that the German Court order Dr. Paques to bring all documents identified to the date scheduled for the witness hearing.

**13.   List of Questions to be Posed to Dr. Paques at his Witness Hearing**

    **A.   Topic No. 1: Introductory Questions**

These questions are important to learn the witness' qualifications, experience, the circumstances under which he learned of the request for his testimony, and his preparation for his testimony. This information may important in determining the witness' competence and credibility (i.e., the weight the Court should give to the witness' testimony).

**List of specific questions:**

1. Please state your full name.

2. What is your home address?

3. Do you have a medical condition or are you on any medication that would impair your ability to understand the questions you will be asked today and to answer them accurately?

4. What company do you currently work for?

5. What is your work address?

6. What is your position with the company?

7. What is your job title?

8. Are you an officer of the company?

9. Have you seen this Letter of Request/Order before?

10. When? Where? Who supplied it to you?

11. Did you discuss the Letter of Request/Order with anyone?

12. Who? When? Where? How long? What did you discuss?

13. Are you being represented by counsel in connection with today's deposition?

14. Who?

15. Are you paying for their representation?

16. Who is?

17. Are you being compensated in any way for your testimony today?

18. When did you first find out that your testimony had been requested in this lawsuit?

19. How did you find out?

20. What was your response when you found out?

21. What did you do to prepare for today's witness hearing?

22. Did you review any documents?

23. [If yes] What documents? When? Who supplied them to you?

24. Did you meet with anyone?

25. Who? When? Where? What did you discuss?

11

B.     **Topic No. 2: Education and Employment History**

These questions are important to learn the witness' qualifications and experience. This information may important in determining the witness' competence and credibility (i.e., the weight the Court should give to the witness' testimony).

**List of specific questions:**

1. Starting with college, please identify the schools you have attended and for each please provide:

    a. Years attended each school?

    b. Degrees you received from each school?

    c. The focus of your studies at each school?

2. Any other training relating to your work at Grunenthal?

3. Please describe your employment history starting with your earliest employment to the present. For each position you've held, please provide:

    a. The name of the company you worked for?

    b. The nature of the company's business?

    c. The period of time you worked for the company?

    d. Your position(s) at the company?

    e. Your duties and responsibilities at the company?

4. Focusing on the years you worked for Grunenthal, please provide the following information:

    a. Years worked for?

    b. Job titles?

    c. Duties and responsibilities?

    d. Who did you report to?

    e. Who reported to you?

    f. Current location?

C.  **Topic No. 3: Tramadol in General**

This topic is important because it will set the foundation for why Grunenthal opposed the '366 patent.

**List of specific questions:**

1. When was tramadol invented?

2. Was tramadol invented at Grunenthal?

3. When did Grunenthal first market its tramadol product?

4. Where did Grunenthal first market its tramadol product?

5. In what countries did Grunenthal market tramadol?

6. When did Grunenthal first market tramadol in the United States?

7. What was Grunenthal's trade name for its tramadol product when first marketed? In the United States?

8. How many different tramadol products does Grunenthal market?

9. Did Grunenthal protect its commercial products with patents?

10. Does Grunenthal have patents relating to tramadol? How many?

11. Were you involved in marketing Grunenthal's tramadol products? If yes, what were your responsibilities at Grunenthal concerning the marketing of tramadol?

12. Was Grunenthal concerned with other companies copying its formulation for tramadol?

13. What did Grunenthal do to protect its tramadol technology? Apply for patents? Keep the formulation as a trade secret? Filed opposition proceedings?

D.  **Topic No. 4: Grunenthal's Controlled-Release Formulation**

This topic is important because Grunenthal would have knowledge of when controlled-release formulations of tramadol first became known to the public, which is important to the determination of patent validity of the '887 patent.

**List of specific questions:**

1. Did there come a time when Grunenthal decided to manufacture a controlled-release formulation for tramadol? Who made that decision?

13

2. Were specific Grunenthal employees assigned the task of developing a controlled-release formulation for tramadol? If so, who?

3. Did Grunenthal maintain laboratory notebooks documenting its controlled-release tramadol formulations? If so, how and where were they maintained?

4. When did Grunenthal begin experimenting with a controlled-release formulation for tramadol?

5. Why did Grunenthal decide to prepare a controlled-release formulation for tramadol?

6. When did Grunenthal first prepare a controlled-release formulation for tramadol? For 24 hours? For 12 hours?

7. Was Grunenthal the first company to prepare a controlled-release tramadol formulation?

8. How many controlled-release tramadol formulations did Grunenthal develop?

9. How did Grunenthal develop its controlled-release tramadol formulations?

10. Did Grunenthal prepare any publications concerning its controlled-release formulations for tramadol prior to 1995? If yes, who authored these publications? Where were they published?

11. When was Grunenthal's first controlled-release formulation disclosed to anyone outside of Grunenthal?

12. How difficult was it for Grunenthal to prepare a controlled-release formulation for tramadol?

13. Do you know the names of any person at Grunenthal who worked on a controlled-release formulation for tramadol? What are their names?

14. Did Grunenthal file any patent applications on its controlled-release formulation for tramadol other than EP 642,788 ("the '788 patent")?

15. Did any companies oppose Grunenthal's EP 642,788 ("the '788 patent")? Which companies? What was the outcome of the '788 patent opposition proceedings? If agreements were reached, what were the terms of the agreements?

16. Were there any other opposition proceedings against a Grunenthal patent for controlled-release tramadol formulations? What was the outcome of the proceedings? If agreements were reached, what were the terms of the agreements?

17. Who would be the most knowledgeable person at Grunenthal concerning Grunenthal's development of its controlled-release formulation for tramadol?

RLF1-3258430-1

E. **Topic No. 5: Grunenthal's Opposition to EP 624 366 ("the '366 patent")**

This topic is important because positions taken by Grunenthal in it's opposition to the '366 patent with respect to lack of novelty, lack of inventive step, and insufficiency of disclosure are important to the determination of patent validity of the corresponding '887 patent.

**List of specific questions:**

1. When did Grunenthal first learn of Euro-Celtique's '366 patent?

2. Did Grunenthal have its own controlled release tramadol formulation at the time it filed opposition proceedings against the '366 patent?

3. Who made the decision to file opposition proceedings against the '366 patent?

4. Why did Grunenthal file opposition proceedings against the '366 patent?

5. Why did Grunenthal assert that the '366 patent was invalid for lack of novelty?

6. What was Grunenthal's basis for asserting that the '366 patent was invalid for lack of novelty?

7. Why did Grunenthal assert that the '366 patent was invalid for lack of inventive step?

8. What was Grunenthal's basis for asserting that the '366 patent was invalid for lack of inventive step?

9. Why did Grunenthal assert that the '366 patent was invalid for insufficiency of disclosure?

10. What was Grunenthal's basis for asserting that the '366 patent was invalid for insufficiency of disclosure?

11. Does Grunenthal still believe that the '366 patent is invalid for lack of novelty? Why or why not?

12. Does Grunenthal still believe that the '366 patent is invalid for lack of inventive step? Why or why not?

13. Does Grunenthal still believe that the '366 patent is invalid for insufficiency of disclosure? Why or why not?

14. Are you aware that Grunenthal conducted tests that reproduced Examples 2 and 3 of EP 0249347 ("the '347 patent") to show that the same dissolution results would be obtained when tramadol was used instead of dihydrocodeine?

15. Did Grunenthal rely on its experiments using tramadol in Examples 2 and 3 of the '347 patent for leverage during settlement discussions concerning the '366 patent?

16. Why did Grunenthal withdraw its opposition to the '366 patent?

17. Were you involved in settlement negotiations concerning the '366 patent opposition proceedings?

18. Who else was involved in the settlement discussions?

19. Did the opponents (Purdue, Napp, and Mundipharma) convince Grunenthal that the '366 patent was valid?

20. Did the opponents (Purdue, Napp, and Mundipharma) convince Grunenthal that its controlled-release tramadol product infringed the '366 patent?

21. Did Grunenthal obtain a non-infringement opinion concerning the '366 patent? If yes, was this opinion produced to the opposing side.

22. Did Grunenthal obtain an invalidity opinion concerning the '366 patent? If yes, was this opinion produced to the opposing side

### F.   Topic No. 6: Grunenthal's Settlement concerning the '366 Patent Opposition Proceeding

This topic is important because the reasons for Grunenthal's settling of the opposition proceeding concerning the '366 patent will provide further information about the patent validity of the corresponding '887 patent.

**List of specific questions:**

1. What was your role in the settlement discussions pertaining to the withdrawal of the opposition proceeding concerning the '366 patent?

2. Who did you meet with at Grunenthal to discuss the settlement?

3. Who did you meet with for the opponents (Purdue, Napp, and Mundipharma) concerning the settlement of the '366 patent opposition proceeding?

4. What were the terms of the settlement agreement?

5. What did Grunenthal receive for withdrawing the opposition proceeding concerning the '366 patent? Please be specific.

16

6. What did Grunenthal provide to the opponents (Purdue, Napp, and Mundipharma) in the settlement in addition to withdrawing the opposition proceeding concerning the '366 patent? Please be specific.

7. Did Grunenthal enter a license agreement with the opponents (Purdue, Napp, and Mundipharma) concerning controlled-release tramadol? What were the terms of the agreement?

8. Were any other pharmaceutical drugs involved in the settlement agreement?

9. What other patent and patent applications, other than the '366 patent, were involved in the settlement agreement?

10. Is the settlement agreement still in effect? Why or why not?

11. Are parts of the settlement agreement still in effect?

12. When the '366 patent was revoked, was the any part of the agreement between Grunenthal and the opponents (Purdue, Napp, and Mundipharma) voided?

13. What is the current relationship between Grunenthal and the opponents (Purdue, Napp, and Mundipharma) concerning tramadol?

14. Do Grunenthal and the opponents (Purdue, Napp, and Mundipharma) currently have agreements concerning a controlled-release formulation for tramadol? If no, why not? If yes, please identify the terms of those agreements.

15. Does Grunenthal currently license any of the opponents (Purdue, Napp, and Mundipharma (including Euro-Celtique)) patents concerning a controlled-release formulation for tramadol?

16. Does Grunenthal currently supply tramadol hydrochloride to Purdue, Napp, Biovail, Ortho-McNeil or Mundipharma? If yes, what are the terms of that agreement?

### G. Topic No. 7: Worldwide Oppositions to Controlled-Release Tramadol Formulation

This topic is important because the outcome of other patent proceedings concerning controlled-release tramadol will provide information about the state of the art at the time of the proceedings and may provide information on the validity of the '887 patent.

**List of specific questions:**

1. Other than the '366 patent opposition proceeding, was Grunenthal involved in any other opposition proceedings involving patents directed to controlled-release tramadol formulations?

17

2. What companies were involved in these opposition proceedings?

3. What patents were involved?

4. Did Grunenthal prepare expert reports in any of these oppositions? Were they produced to the opposing side?

5. Did Grunenthal obtain any opinions on patents involved in an opposition concerning controlled-release tramadol formulations? Were they produced to the opposing side?

6. Did Grunenthal receive any opinions on patents involved in an opposition concerning controlled-release tramadol formulations from the opposing side?

7. What were the outcomes of these opposition proceedings?

8. Did Grunenthal settle these opposition proceedings? If yes, what were the terms of the settlements?

9. Were any of the patents that Grunenthal opposed eventually revoked or ruled invalid or unenforceable? If yes, please identify the opposition proceeding.

### H. Topic No. 8: Grunenthal's Agreements Relating to Controlled-Release Tramadol Formulations

This topic is important to learn of Grunenthal's business relationships with the parties in this case concerning controlled-release formulations for tramadol. This information may affect the amount of weight the Court will give the witness' testimony.

**List of specific questions:**

1. Does Grunenthal currently have a business relationship with Purdue, Napp, Biovail, Ortho-McNeil, or Mundipharma concerning a controlled-release tramadol formulation?

2. Does Grunenthal currently supply tramadol to Purdue, Napp, Biovail, Ortho-McNeil or Mundipharma?

3. Does Grunenthal have any agreements with Purdue, Napp, Biovail, Ortho-McNeil, or Mundipharma concerning a controlled-release tramadol formulation? If yes, what are the terms of those agreements?

4. What is the current business relationship between Grunenthal and Purdue concerning tramadol?

5. What is the current business relationship between Grunenthal and Napp concerning tramadol?

RLF1-3258430-1

6. What is the current business relationship between Grunenthal and Biovail concerning tramadol?

7. What is the current business relationship between Grunenthal and Ortho-McNeil concerning tramadol?

8. What is the current business relationship between Grunenthal and Mundipharma concerning tramadol?

I. **Topic No. 9: Grunenthal's Current Relationship with Plaintiffs**

This topic is important to learn of Grunenthal's business relationships with the parties in this case. This information may affect the amount of weight the Court will give the witness' testimony.

**List of specific questions:**

1. Does Grunenthal presently have a business relationship with Purdue other than concerning tramadol? If yes, please identify that relationship and the product involved?

2. Does Grunenthal presently have a business relationship with Napp other than concerning tramadol? If yes, please identify that relationship and the product involved?

3. Does Grunenthal presently have a business relationship with Biovail other than concerning tramadol? If yes, please identify that relationship and the product involved?

4. Does Grunenthal presently have a business relationship with Ortho-McNeil other than concerning tramadol? If yes, please identify that relationship and the product involved?

5. Does Grunenthal presently have a business relationship with Mundipharma other than concerning tramadol? If yes, please identify that relationship and the product involved?

14. **Reciprocity:**

The courts of the United States are authorized by statute (see section 1782 of title 28 of the United States Code) to extend similar assistance to the courts of Germany and will gladly reciprocate the courtesies shown by the courts of Germany.

15. **Responsibility for Reimbursable Fees and Costs:**

The United States Court for the District of Delaware is prepared to reimburse the Responding Authority for all costs incurred in executing this letter of request. The United States

Court for the District of Delaware extends to the judicial authorities of Germany the assurance of its highest consideration.

**WITNESS, the Honorable Joseph J. Farnan, Jr., Judge of the United States District Court for the District of Delaware, this \_\_\_\_\_ day of _____, 2008.**

_____
**Joseph J. Farnan, Jr.
United States District Judge**

[seal of court]