IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PURDUE PHARMA PRODUCTS L.P., NAPP PHARMACEUTICAL GROUP LTD., BIOVAIL LABORATORIES INTERNATIONAL, SRL, and ORTHO-MCNEIL, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PAR PHARMACEUTICAL, INC. and PAR PHARMACEUTICAL COMPANIES, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 07-255 (JJF) (CONSOLIDATED) |

**PURDUE'S OPPOSITION TO PAR'S APPLICATION FOR
ISSUANCE OF A LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL
ASSISTANCE TO THE APPROPRIATE JUDICIAL AUTHORITY OF GERMANY
PURSUANT TO THE HAGUE CONVENTION**

OF COUNSEL:

Robert J. Goldman
ROPES & GRAY LLP
525 University Avenue
Suite 300
Palo Alto, CA 94301
(650) 617-4000

Richard A. Inz
Sona De
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Dated: March 17, 2008

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
*Attorneys for Plaintiffs*
  *Purdue Pharma Products L.P.*
  *and Napp Pharmaceutical Group Ltd.*

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ...................................................................................................1

II.   THE PERTINENT LAW ........................................................................................5

    A.    The Hague Convention Only Allows Discovery Directly Related
        To The Issues In Litigation ...................................................................... 5

    B.    German Law Further Requires That A Fact Sought To Be
        Discovered Be An Element Of A Claim Or Defense ............................... 6

III.  PAR'S LETTER OF REQUEST IS IMPROPER IN SCOPE ...........................7

    A.    Documents Related To Grunenthal Have Already Been Produced
        By Purdue And Are Publicly Available.................................................... 7

    B.    Documents Requested By Par Are Precluded Pursuant To German Law .............. 9

    C.    Par's Request For Deposition Testimony Should Be Denied.............................. 11

        1.    Par Does Not Contend That Topics 3, 8, and 9 Relate To
            Any Claim Or Defense In This Action ...................................... 12

        2.    Topics 5-7 Directed To Grunenthal's Opposition Should
            Also Be Stricken As Irrelevant To Any Claim Or Defense
            In This Action ................................................................. 14

        3.    Topic 4 Directed To Controlled-Release Tramadol Is
            Impermissibly Broad........................................................... 16

IV.   IF ORAL TESTIMONY IS ALLOWED, STANDARD GERMAN PROCEDURE
    SHOULD APPLY.................................................................................................19

V.    CONCLUSION....................................................................................................20

## TABLE OF AUTHORITIES

Page(s)

CASES

*Philadelphia Gear Corp. v. American Pfauter Corp.*,
    100 F.R.D. 58 (E.D. Pa 1983)..................................................................................5

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist. of Iowa*,
    482 U.S. 522 (1987)..................................................................................................5

STATUTES, RULES

35 U.S.C § 102..................................................................................................................3

35 U.S.C. § 102(a) ............................................................................................3, 11, 17, 19

35 U.S.C. § 102(b) ....................................................................................................3, 11

Fed. R. Civ. P. 26(b) ....................................................................................................5, 7

Fed. R. Civ. P. 26(b)(2)(C) ........................................................................................5, 9-10

Fed. R. Civ. P. 28(b) ........................................................................................................5

Fed. R. Civ. P. 28(b)(3)....................................................................................................5

Fed. R. Evid. 408 ............................................................................................................11

German Code of Civil Procedure........................................................................ *passim*

OTHER AUTHORITIES

David J. Gerber, *Extraterritorial Discovery and the Conflict of Procedural Systems: Germany and the United States*, 34 Am. J. Comp. L. 745, 762 (1986)............................ 6-7, 13

Samuel P. Baumgartner, *Is Transnational Litigation Different*, 25 U. Pa. J. Int'l Econ. L. 1297, 1324 (2004)..........................................................................................................5

Georg A. Wittuhn et al., Civil Procedure, *in* Business Transactions in Germany § 5.03, p. 2 (Bernd Ruster ed., Matthew Bender 2007) ...............................................................5, 6, 16

## I.    INTRODUCTION

Plaintiffs Purdue Pharma Products L.P. and Napp Pharmaceutical Group Ltd. (collectively "Purdue") oppose the application of Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (collectively "Par") for issuance of a letter of request to obtain evidence from non-party Grunenthal GmbH ("Grunenthal") in Germany pursuant to the Hague Convention.[1] Par's application (cited herein as "Request") seeks information that is, at best peripheral to the issues in this action, while ignoring the more pertinent information that has already been produced in discovery, and any remaining pertinent information that Par can obtain publicly, without subjecting the German Courts and Grunenthal to the burden and expense of burdensome – and ultimately irrelevant – document and deposition discovery.

The Hague Convention permits narrowly tailored discovery aimed at obtaining testimony that directly relates to the issues in litigation and that is expected to be used at trial. It is not for "fishing expeditions" or for the development of possible avenues of further investigation. The German courts similarly prohibit expansive examination of witnesses and allow testimony to be taken only of facts that are actually an element of a litigant's claim or defense. *See infra* pp. 5-7.

Par's request fails to meet this standard. This is an action for relief for infringement of Purdue's U.S. Patent No. 6,254,887 ("'887 patent") based on Par's filing of an Abbreviated New Drug Application for FDA approval to manufacture and sell controlled-release formulations of tramadol, an analgesic. The '887 patent discloses and claims controlled-release tramadol formulations developed in the early to mid 1990s. Par asserts the conventional defenses of patent invalidity over prior art. It is not contested that:

---

[1]    Plaintiff Ortho-McNeil, Inc. joins in this opposition.

- Before Purdue's work with controlled release tramadol, Grunenthal developed in Germany an immediate release form of tramadol;

- There are published documents, which predate the '887 patent, that describe Grunenthal's immediate release tramadol formulation;

- Purdue's associated company, Euro-Celtique S.A., sought patent protection for its controlled-release tramadol formulation in a European counterpart to the '887 patent in suit, which was the EP 624366 patent ("EP '366 patent"). The EP '366 patent had different claims and a different specification than the patent in suit;

- Grunenthal, among others, opposed the issuance of that patent under European law in the European Patent Office;

- Grunenthal ultimately withdrew its opposition; and

- The EP '366 patent was later revoked on a technicality of European law where a claim amendment impermissibly resulted in addition of subject matter to the specification. The revocation was unrelated to any prior art, and irrelevant to the U.S. law that this Court will apply in trying validity in this action.

The Grunenthal opposition to EP '366 patent was a public proceeding. During discovery in this case, Purdue produced the publicly filed papers relating to that opposition to the extent those papers were in the files of Purdue or Purdue's U.S. patent counsel. If there are additional papers from the opposition that Par wishes to obtain, they are publicly available from the European Patent Office.

Notwithstanding this extensive public record, Par seeks documents in Germany from Grunenthal and testimony from Dr. Eric-Paul Paques, a foreign, non-party witness who is allegedly an employee of Grunenthal. Par does not establish that Dr. Paques has any personal knowledge about the subject matter of Par's Request. According to Par, the basis for this discovery is that it purportedly relates to Par's allegations against the validity of the patent in suit. (Request at 6-7). But Par makes no attempt to limit its requests to evidence relevant to that alleged defense, or to evidence that would be admissible at trial.

Instead, Par seeks (Request at 10) nine broad categories of documents including:

- Settlement and license agreements between Purdue and Grunenthal. The settlement agreement of the European opposition is inadmissible at trial, and Purdue has already produced the license agreement with Grunenthal relating to controlled-release tramadol;

- Grunenthal's internal memoranda relating to the opposition. The information in such memoranda is either reflected in Grunenthal's public submissions to the European Patent Office, or is privileged. In no event can Par show that internal unpublished memoranda of Grunenthal establish invalidity of the U.S. patent in suit; and

- Documents to prove the dates of first knowledge or use by Grunenthal *in Germany* of controlled release tramadol. By statute, public knowledge and use by others are prior art under 35 U.S.C § 102 only as to activities in the United States; foreign knowledge and use are not prior art. To the extent that Par seeks foreign patents and publications, which are prior art, it can do so on its own, without burdening the German Courts, Grunenthal, or Purdue.

Par points to no Grunenthal patent or publication earlier than the priority date of the '887 patent in suit to qualify as prior art under 35 U.S.C. § 102(a). Nor does Par show that Grunenthal's work in Germany was ever publicly used or sold in the Unites States to be prior art under 35 U.S.C. § 102(b).

As Par itself admits, a request for documents is generally "precluded by Germany's reservation under Article 23 of the Hague Convention." (Request at 5). In any event, the requested documents are not directed to any element of any claim or defense. Instead, as Par admits, they are sought "sole[ly] for the purpose of facilitating the examination." (*Id.*). Facilitating the examination, however, is not the test for producing documents under German law. Further, contrary to Par's contention (*Id.*), section 142 of the German Code of Civil Procedure ("ZPO") applies only to limited instances of document production by "parties," not to non-parties like Grunenthal. Even then, German law allows document submission only if the party "refers" to them in litigation (e.g., in the complaint), which is simply not the case here.

3

In addition to its improper demand for documents, Par seeks nine topics of testimony from Dr. Paques, comprising a total of 119 questions, which Par asks this Court to propound to a German Court so they can be answered by Dr. Paques. (Request at 10-19). These topics are similarly irrelevant to the issues in this action:

- Par seeks Dr. Paques' testimony about Grunenthal's work on controlled-release tramadol and on oppositions to a *Grunenthal* patent (Topic 4) -- neither of which qualifies as "prior art" to the patent in suit or relates to validity of this patent;

- Par seeks to subject Dr. Paques to exhaustive, far-reaching examination of topics that are not even limited to controlled-release tramadol formulations, let alone those claimed in the patent in suit. Par wants to question Dr. Paques about immediate-release tramadol formulations (Topic 3), Grunenthal's business relationship with the plaintiffs (Topic 8), non-tramadol products (Topic 9), and Grunenthal's opposition of foreign patents (Topics 5-7).

None of these topics bears upon validity of the patent in suit. Indeed, Par concedes that at least some are not related to any claim or defense in this case when it admits that they simply "affect the amount of weight" given to Dr. Paques' testimony. (Request at 18-19). Par's request for discovery of Grunenthal's entire work on *any* tramadol product and all of Grunenthal's *non-tramadol* business relationships with plaintiffs is plainly a fishing expedition that has no bearing on this case.

Par also asks this Court to ask the German Court to vary the standard German procedure of having any examination under letters of request conducted by a German Court, not by the parties themselves. (Request at 7). To the extent that this Court permits a request for any oral testimony, there is no reason to ask the German Court to deviate from its standard procedures. *See infra* p. 19.

It would be improper and burdensome to subject Dr. Paques, a non-party, foreign witness, to lengthy oral examination into irrelevant subject matter or to force him to collect and

produce irrelevant documents.  Purdue respectfully submits that this Court deny Par's letter of request for failure to meet the requirements of either the Hague Convention or German law.

## II.    THE PERTINENT LAW

### A.    The Hague Convention Only Allows Discovery Directly Related To The Issues In Litigation

The Hague Convention is an undertaking among sovereigns that "establish[ed] optional procedures that would facilitate the taking of evidence abroad." *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 538 (1987).  The Hague Convention, however, is not an open invitation for American litigants like Par to subject foreign, non-party witnesses to lengthy, exhaustive examinations into subject matter that is not relevant to any claim or defense at issue.  Rather, discovery pursuant to a letter of request under the Convention is limited to testimony that is expected to be used at trial and that directly relates to the issues in the litigation.  *See Philadelphia Gear Corp. v. American Pfauter Corp.*, 100 F.R.D. 58, 61 (E.D. Pa 1983); *see also* Georg A. Wittuhn et al., Civil Procedure, *in* Business Transactions in Germany § 5.03, p. 2 (Bernd Ruster ed., Matthew Bender 2007) (Ex. A); Samuel P. Baumgartner, *Is Transnational Litigation Different*, 25 U. Pa. J. Int'l Econ. L. 1297, 1324 (2004) (Ex. B).

Moreover, any letter of request issued pursuant to Fed. R. Civ. P. 28(b) must be "on terms that are just and appropriate."  Fed. R. Civ. P. 28(b)(3).  And all discovery, including discovery under the Hague Convention pursuant to Fed. R. Civ. P. 28(b), is subject to the constraints of Fed. R. Civ. P. 26(b)(2)(C), which requires that considerations of necessity and undue burden be balanced against the likely benefit of any requested discovery and protects against unreasonably cumulative discovery.  *See* Fed. R. Civ. P. 26(b).  Par's letter of request

fails to meet Rule 26(b)(2)(C)'s discovery standard, let alone the higher standard imposed by the Hague Convention.

### B.    German Law Further Requires That A Fact Sought To Be Discovered Be An Element Of A Claim Or Defense

Obtaining evidence in Germany pursuant to the Hague Convention is further subject to German law. German law prohibits probing and expansive examination of witnesses and imposes a higher standard for relevancy than in the U.S. The German relevancy standard has two requirements -- the materiality requirement and the substantiation requirement. David J. Gerber, *Extraterritorial Discovery and the Conflict of Procedural Systems: Germany and the United States*, 34 Am. J. Comp. L. 745, 762 (1986) (Ex. C).

The materiality requirement itself has two separate elements, both of which must be met for the German court to order taking of the evidence sought: (1) a precise material fact should be at issue, and (2) the evidence nominated by the party should be material to the proof of such fact. *Id.*; *see also* Business Transactions in Germany, *supra* at § 5.03, pp. 1-2. "A material fact is one which is itself *an element of a litigant's claim or defense.*" Gerber, *supra* at 762 (emphasis added). Further, evidence is material to the proof of such a fact where it "may reasonably be expected to influence the court's determination" regarding such fact. *Id.* at 762-763. Thus, German courts will not allow taking of testimony based on a mere allegation or speculation by a defendant that such testimony might lead to relevant evidence. In addition to materiality, the substantiation requirement further requires Par to describe the facts that the evidence is intended to prove. Gerber, *supra* at 763.

With respect to requests for documents, Germany made a reservation under Article 23 of the Hague Convention whereby "it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents." Thus, requests for documents are

generally precluded by the German courts. To the extent documents are ordered to be produced, however, German law imposes the same "materiality" standard as for testimony, i.e., the documents must be directed to an element of a claim or defense. Gerber, *supra* at 760-761. In addition, the document requested must either be "referenced" in the context of the litigation (e.g., in a complaint), or required to be produced pursuant to German substantive law. *Id.*; ZPO §§ 429, 422-423.

III.    **PAR'S LETTER OF REQUEST IS IMPROPER IN SCOPE**

Par's letter of request for documents and testimony in Germany should be denied for failure to meet the stringent standards of the Hague Convention and German law, as well as Fed. R. Civ. P. 26(b). There is an extensive public record about Grunenthal's opposition to the EP '366 patent that exists and has already been produced to Par. And the only issue Par contends its letter of request relates to is its defense against validity of the patent in suit. (Request at 6-7). Yet, Par fails to identify any Grunenthal controlled-release tramadol prior art that would even open the possibility of a request under the Hague Convention for evidence from this non-party, foreign entity. Indeed, Par's request is nothing more than a thinly-veiled fishing expedition into Grunenthal's work, licensing, and foreign litigation strategies, the majority of which involves formulations other than controlled-release tramadol.

A.    **Documents Related To Grunenthal Have Already Been Produced By Purdue And Are Publicly Available**

Purdue does not dispute that Grunenthal developed an immediate-release tramadol formulation in Germany prior to Purdue's work on controlled-release tramadol. Nor does Purdue dispute that Grunenthal opposed the EP '366 patent but ultimately withdrew its opposition. It is also undisputed that the EP '366 patent was ultimately revoked based on a

technicality of European law where a claim amendment impermissibly resulted in addition of subject matter to the specification; not because of any prior art.

Indeed, notwithstanding the marginal relevance, if any, of Grunenthal's foreign opposition proceedings to this litigation, Purdue has already produced thousands of pages of these documents as part of discovery in this case.

To the extent documents relating to Grunenthal's opposition proceeding are in Purdue's possession or in the possession of Purdue's outside U.S. patent counsel, and not privileged, Par has them. Purdue produced approximately 6,000 pages of documents relating to various foreign proceedings from the files of Purdue's outside U.S. patent counsel alone. The documents already produced include several of the documents requested by Par in its letter of request – license agreement between Purdue and Grunenthal relating to controlled-release tramadol (request 1); the EP '366 patent opposition papers (request 3); and publications discussing controlled-release tramadol (request 8). These documents include numerous art references, expert reports, and affidavits submitted by eleven different individuals in various foreign oppositions and litigations. Par's request for these same documents from Grunenthal is cumulative of what it already has.

Moreover, many of the requested documents, for example, Grunenthal's opposition to EP '366 patent and documents describing a Grunenthal controlled-release tramadol formulations, are also publicly available. Notably, Par already requested similar documents from Grunenthal's U.S. subsidiary, Grunenthal USA. On February 25, 2008, Par served Grunenthal USA with a subpoena seeking documents related to foreign opposition proceedings, agreements with Plaintiffs, and first disclosure of a controlled-release tramadol formulation outside Grunenthal. Grunenthal USA objected to the subpoena on March 10, 2008 on the grounds that

Par made no showing that the documents sought had any relevance to this litigation. Grunenthal USA nevertheless directed Par to four publicly available U.K. websites describing Zydol SR, a slow-release tramadol tablet. The information on these websites is dated between 1998 and 2005, which is too late to be prior art to the patent in suit. Grunenthal USA stated it had no other documents that would fall within Par's requests.

Thus, to the extent Par wishes to obtain documents in addition to what has already been produced, it can do so from the public domain. Lack of relevance aside, there is simply no justification to burden non-party, foreign witness, Dr. Paques with requests for documents that Par already has or can obtain publicly, especially when Par has made no showing that he would even have any such documents. Par's request for this discovery is prohibited by the Hague Convention and Fed. R. Civ. P. 26(b)(2)(C).

**B.    Documents Requested By Par Are Precluded Pursuant To German Law**

Notwithstanding that documents relating to Grunenthal are in the public record and have already been produced by Purdue, the documents requested by Par in its Request are improper as irrelevant and unduly broad. Par seeks agreements between Grunenthal and the Plaintiffs and their affiliates relating to tramadol (request 1), settlement agreements between Grunenthal and the Plaintiffs and their affiliates relating to controlled-release tramadol (request 2), documents submitted during various opposition proceedings (request 3), documents showing when Grunenthal first made its controlled-release tramadol formulations (requests 4-7), controlled-release tramadol publications (request 8), and agreements showing the business relationship between Grunenthal and the Plaintiffs and their affiliates (request 9).

These document requests should be denied because German courts generally do not allow document discovery pursuant to Germany's reservation under Article 23 of the Hague Convention. Indeed, Par itself recognizes that its document requests will likely be precluded and

requests the court to "nevertheless issue an order compelling" oral testimony, in lieu of document production. (Request at 5).

Nonetheless, Par makes a half-hearted attempt to justify its document requests based on ZPO § 142, asserting that the documents are needed for the "sole purpose of facilitating the examination of the witness." *Id*. Par's argument is inapposite. First, ZPO § 142 is directed to orders to a *party* to produce documents, not to non-parties such as Grunenthal. Second, the section explains that a party can be ordered to produce only those documents that it actually "made reference" to. Neither Purdue nor Par has referenced any Grunenthal documents in its pleadings.

In any event, to the extent German courts allow requests for documents, the applicable standard is not whether the document facilitates examination, as Par contends, but whether it is material, i.e., directed to an element of a claim or defense, and whether it is expected to be used at trial. The documents sought must also either be referenced in the context of litigation (e.g., in a complaint), or required to be produced by substantive law. ZPO §§ 429, 422-423. Further, the request must be highly specific to such particular documents in keeping with the prohibition against fishing expeditions. Par's document requests fail to meet any of these requirements.

None of the documents requested by Par is directed to any element of its defense against validity, or referenced in any pleadings. Par does not point to any Grunenthal patent or publication earlier than the priority date of the patent in suit to qualify as prior art. Documents sought by requests 4-7 to prove the dates of first knowledge or use by Grunenthal of controlled-release tramadol do not bear on the validity of the patent in suit. Such knowledge or use by Grunenthal in Germany is simply *not* prior art. By statute, prior art knowledge or use is limited

to activities in the United States.  35 U.S.C. § 102(a); 35 U.S.C. §102(b).  This is unlike prior

patents and publications which are prior art regardless of where in the world they occur.  Par

makes no showing that Grunenthal's work in Germany was ever publicly used or sold in the

United States.

Indeed, in response to Par's document subpoena, Grunenthal USA stated that it

has no documents in response to Par's request directed to first disclosure of controlled-release

tramadol outside Grunenthal.  The websites to which Grunenthal USA directed Par are in the

U.K., and dated between 1998 and 2005.  Thus, Grunenthal USA has no documentation of any

public disclosure of controlled-release tramadol in the U.S., let alone a disclosure that would be

early enough to qualify as prior art to the patent in suit.

Further, settlement agreements sought by request 2 are expressly not admissible

as evidence to prove or disprove any claim at trial.  Fed. R. Evid. 408.  Similarly, Grunenthal's

internal memoranda relating to the opposition proceedings sought by request 3 are protected

from discovery as privileged.  And to the extent Grunenthal's business agreements sought by

request 9 implicate business and trade secrets of either Grunenthal or Purdue, they are also

protected from discovery.  ZPO §§ 383(1)(6) and 384(3).  Requests 1-3 and 9 are, in addition,

overly broad.  Dr. Paques should not be forced to produce documents that have no bearing on

any issue in this litigation and are not discoverable under German law.

### C.    Par's Request For Deposition Testimony Should Be Denied

In addition to seeking improper documents from Dr. Paques, Par also requests

irrelevant and unduly broad oral testimony from him.  Par proposes nine examination topics

(comprising 119 questions), none of which has any relevance to this litigation.[2]

---

[2]    Topic 1 is directed to introductory questions such as Dr. Paques' deposition preparation.
Topic 2 is directed to Dr. Paques' education and employment history.  In the event this

1.    **Par Does Not Contend That Topics 3, 8, and 9 Relate To Any Claim Or Defense In This Action**

Topic 3 in the letter of request, directed to Grunenthal's work on *immediate-release* tramadol formulations, is improper in its entirety because that work has no bearing on this case. The patent and the accused product at issue in this litigation involve *controlled-release* tramadol, not any immediate release formulation. The history of Grunenthal's work on immediate-release tramadol -- when it was invented, when and where it was marketed, how it was protected etc. -- is simply inquiry into facts which are not elements of Par's defense against the validity of the patent in suit. It, thus, fails both the Hague Convention and German law standards for obtaining testimony and is not relevant to this case.

Par has failed to identify the specific information Dr. Paques has with respect to Grunenthal's immediate-release tramadol or how that information bears on the validity of patent claims directed to controlled-release tramadol. Nor has Par explained why Dr. Paques' knowledge is anything but duplicative of Grunenthal's published work on immediate-release tramadol. Indeed, by alleging that this topic "will set the foundation for why Grunenthal opposed the [EP] '366 patent," Par concedes that this topic is not actually related to any claim or defense in this case. (Request at 13).

Topic 8, directed to Grunenthal's agreements with any plaintiff or non-party Mundipharma relating to controlled-release tramadol, is also improper. Even though Par titles

---

Court allows any testimony, Purdue reserves its right to object to these questions on the basis of form and privilege as necessary.

In addition to the questions listed in Topics 1-9, Par seeks permission to ask additional questions "in response to the witness' answers relating to the subject matter." (Request at 9). Until Purdue knows what those additional questions may be, Purdue reserves its right to oppose and/or object to them.

this topic as related to controlled-release tramadol, questions 2 and 4-8 do not specify controlled-release formulations, but would encompass *any* tramadol product. As such, these questions, which would seek testimony on immediate-release tramadol formulations, are overbroad and improper because they are not relevant to the validity of the controlled-release tramadol formulations claimed in this action. (*See* discussion under Topic 3 *supra*).

Moreover, Grunenthal's business relationship with the Plaintiffs or non-party Mundipharma has no bearing on the validity of the patent in suit. Likewise, the terms of any Grunenthal agreements are not at issue in this case. To the extent Grunenthal took any license from any Plaintiff or non-party Mundipharma for controlled-release tramadol, those agreements have already been produced to Par and speak for themselves. Dr. Paques' (or anyone else's) interpretation of the terms of the agreements have no bearing on Par's invalidity defense. Par is well aware of this and attempts to mask the irrelevance of this request by alleging that this topic "may affect the amount of weight the Court will give the witness' testimony." (Request at 18). That, however, is not the test for allowing testimony under the Hague Convention in Germany.[3]

Similarly, Topic 9, directed to Grunenthal's current business relationships with the Plaintiffs for *non-tramadol* products, should be stricken in its entirety. This topic is even more overreaching than Topic 8. It is not even related to tramadol, let alone controlled-release tramadol. Grunenthal's business dealings with the Plaintiffs for products that are not at issue in this litigation have no relevance whatsoever to the validity of the controlled-release tramadol patent in suit. As with Topic 8, Par again concedes the impropriety and irrelevance of this topic by alleging that it "may affect the amount of weight the Court will give the witness' testimony."

---

[3] Moreover, to the extent these agreements implicate business and trade secrets of either Grunenthal or the Plaintiffs, that information is protected from discovery. Gerber, *supra* at 765-766; *see also* ZPO §§ 383(1)(6) and 384(3).

(Request at 19).  But once again, that is not the test for allowing testimony by the Hague Convention in Germany.

        **2.**     **Topics 5-7 Directed To Grunenthal's Opposition Should Also Be Stricken As Irrelevant To Any Claim Or Defense In This Action**

Topics 5-7 are generally directed to Grunenthal's opposition to foreign patents on controlled-release tramadol.

Topic 5 deals with Grunenthal's opposition to the EP '366 patent.  Contrary to Par's contention that this topic is "important to Par's defense of patent invalidity," it is nothing more than the classic fishing expedition that is prohibited by the German courts.  (Request at 6, 15).  As an initial matter, Grunenthal's opposition did not involve the patent in suit or any of its four foreign priority applications.  Although the EP '366 patent claims priority to the same priority applications as that of the patent in suit, it has different claims and a different specification than the patent in suit.  And although the EP '366 patent was ultimately revoked based on a technicality of European law, that revocation was not based on any prior art.  None of these facts is in dispute.

Moreover, the evidence related to the European opposition was submitted to the U.S. Patent and Trademark Office ("USPTO") during the prosecution of the patent in suit, and has already been produced to Par.  As explained above in § III.A, this production includes numerous art references, expert reports, and affidavits from various foreign oppositions and litigations.  Those documents speak for themselves.  Dr. Paques' personal opinions concerning the evidence submitted by Grunenthal (assuming he even has any such opinions) – the bases and reasons for Grunenthal's arguments to a foreign patent office or Grunenthal's current beliefs about those arguments – are simply irrelevant and privileged.

To the extent evidence submitted in Grunenthal's opposition to the EP '366 patent has any relevance to this case, it is not based on what Dr. Paques might say about that evidence today, but instead on that evidence itself or on what was communicated to the USPTO during prosecution of the patent in suit. Par has already deposed the prosecuting attorney of the patent in suit and questioned him at length about his communications with the USPTO about opposition documents.

Question 14 within Topic 5 should additionally be stricken as argumentative and misleading:

> Are you aware that Grunenthal conducted tests that reproduced Examples 2 and 3 of EP 0249347 ("the '347 patent") to show that the same dissolution results would be obtained when tramadol was used instead of dihydrocodeine?

The '347 patent is directed to controlled-release dihydrocodeine, not tramadol. Par points to no evidence that Grunenthal actually conducted any such test. This question would unfairly prejudice Purdue, because the German courts, rather than recognizing the statements as Par's argument and/or an attempt to fish for facts, may misconstrue it as this Court's conclusion of fact.

Topic 6 directed to Grunenthal's settlement of the EP '366 patent opposition is also inappropriate. First, as explained with respect to Par's document requests, settlement agreements are not admissible at trial. Second, the settlement agreement likely implicates confidential business secrets of Purdue and Grunenthal that are protected under German law. *See* ZPO §§ 383(1)(6) and 384(3). Finally, the terms of settlement involving a patent other than the patent in suit, especially a foreign patent, cannot possibly be relevant to the validity of the patent in suit. The details of the settlement are clearly not elements of Par's defense against validity in this case. To the extent Topic 6 relates to controlled-release tramadol agreements

15

between Grunenthal and the plaintiffs, or relationships between Grunenthal and the plaintiffs concerning *any* tramadol product (questions 13-16, which would encompass immediate-release formulations), they are duplicative of Topic 8 and should be stricken for the same reasons specified under Topic 8.

Topic 7 is directed to Grunenthal's oppositions to *any* controlled-release tramadol patent, owned by *anyone, anywhere* in the world. Par's justification for this overly broad inquiry into to a non-party's opposition to non-parties' patents is that it "will provide information about the state of the art at the time of the proceedings." (Request at 17). Par, however, has not even established that Grunenthal ever opposed any controlled-release patent other than the EP '366 patent. Moreover, this topic is not limited as to time and would cover proceedings that occurred even after the issue date of the patent in suit. Whether Grunenthal prepared expert reports, obtained opinions, or settled proceedings in foreign tribunals involving foreign patents that have nothing to do with the patent in suit simply have no bearing on the validity of the patent in suit here. Once again, this is exactly the kind of fishing expedition that is prohibited by the German courts: "[a] mere allegation or the speculation by a party "out of the blue" made in the hope that the taking of evidence will have some result or lead to new evidence, *will not cause* the court to order the taking of evidence." Business Transactions in Germany, *supra* at § 5.03 (emphasis added).

3.    **Topic 4 Directed To Controlled-Release Tramadol Is Impermissibly Broad**

Topic 4, directed to Grunenthal's work on controlled-release tramadol formulation, is unjustified under the Hague Convention. Par must establish that Grunenthal's work on controlled-release tramadol constitutes prior art. That Par has not done. Par has failed to point to any Grunenthal controlled-release patent or publication before the priority date of the

patent in suit.[4]  *See* 35 U.S.C. § 102(a).  Nor has Par shown that any work on controlled-release tramadol done by Grunenthal in Germany was ever publicly used or sold in the United States more than a year before the patent in suit was filed.  *See* 35 U.S.C. § 102(a).  As explained above, Grunenthal USA has already stated that it has no documents describing any public disclosure of controlled-release tramadol in the U.S., let alone a disclosure that would be early enough to qualify as prior art. *See supra* pp. 8-9.

In fact, Topic 4 is not even limited to the period before the early to mid 1990s, which is the relevant time period for validity.  For example, question 8 inquires into the various controlled-release tramadol formulations developed by Grunenthal and potentially covers any formulations developed, even in 2008.  Given Par's contention that this topic relates to the validity of the patent in suit, it must be limited to the time period leading up to the early to mid 1990s, which is when the inventions of the patent in suit were developed.

Par asserts it must be allowed to inquire into this topic "because Grunenthal would have knowledge of when controlled-release formulations of tramadol first became known to the public, which is important to" the validity of the patent in suit.  (Request at 13).  That, however, makes no sense.  Again, any prior public use or sale must be in the United States in order to qualify as prior art.  Par has not shown that Grunenthal in Germany actually has such knowledge about activities in the United States or explained why it would have such knowledge.  Par's request to probe Grunenthal based on speculation must be denied.

Moreover, as with Topic 7, questions 15 and 16 within this topic seek information about oppositions to various *Grunenthal* patents on controlled-release tramadol formulations, even though Par does not indicate, let alone establish, that any such Grunenthal patent was ever

---

[4]    The only Grunenthal patent that Par identifies, EP 642,788, is dated too late to be prior art.

opposed or how that could possibly relate to the patent in suit. Par has no basis to conduct a full-fledged inquiry into the possibility of foreign proceedings – who (if anyone) opposed non-party Grunenthal's patents, what was the result, or what were the terms of any agreements reached. Grunenthal's controlled-release tramadol patents are neither the subject of this litigation nor related to the patent in suit. And contrary to Par's desire, simply sharing the subject matter of controlled-release tramadol does not make these foreign proceedings conducted under foreign laws somehow "material" to the validity of the patent in suit. This is yet another fishing expedition and not proper examination. Questions 15 and 16 must be completely stricken.

Finally, questions 5 and 12 within this topic inappropriately inquire into the reasons Grunenthal developed controlled-release tramadol and the difficulty of that process. Once again, Grunenthal's internal decision making process and challenges that Grunenthal encountered have nothing to do with the validity of the patent in suit. And Dr. Paques' personal views on these internal Grunenthal issues are equally irrelevant.

Because Par cannot establish that Grunenthal's work on controlled-release tramadol constitutes prior art, this topic should be stricken in its entirety. In the event Par makes the requisite predicate showing of prior art, questions 5, 12, 15 and 16 in Topic 4 should nevertheless be completely stricken as unrelated to validity of the patent in suit. Any remaining questions should be limited to work done in connection with the identified prior art (i.e., it would be limited to the time period prior to the early to mid 1990s, and published or publicly used or sold in the U.S. more than a year before the patent in suit was filed).

## IV.    IF ORAL TESTIMONY IS ALLOWED, STANDARD GERMAN PROCEDURE SHOULD APPLY

Under German law, the standard practice for the examination of a witness under the Hague Convention is for a judge to pose appropriate questions to the witness.  Pursuant to Article 9 of the Hague Convention, the judicial authority executing a letter of request "shall apply its own law as to the methods and procedures to be followed."  Therefore, to the extent any part of Par's letter of request is allowed, oral testimony should be conducted according to the methods and procedures of German law.  Purdue is not aware of any reason why this standard procedure should not apply in this case.

Par asserts that this Court should request a special procedure whereby counsel for parties, rather than the judge, conducts the examination of the witness in Germany.  (Request at 7).  The only reason Par provides for deviating from the standard procedure is that its counsel is more "familiar with the documents and the issues" than the judge.  *Id.*  But that would be true in every proceeding under the Hague Convention and thus would completely undermine the existence of the provision in Article 9 allowing each executing state to apply its own procedures. That cannot be so.

Moreover, this Court is not obligated to follow Par's preference to ask the German court to deviate from its standard procedure.

To the extent this Court grants Par's request for testimony in any part and recommends that the German court follow the standard procedures, Purdue requests that it be allowed to submit any questions it may have for Dr. Paques within five days of the grant of such request.

## V.    CONCLUSION

Par's application for issuance of a letter of request, as currently presented, should be denied as a burdensome and over-reaching fishing expedition into irrelevant information that is plainly prohibited by the Hague Convention as well as under applicable German law. Par's request for documents should be rejected as not permitted by the rules and not relevant to any claim or defense in this case. Further, Par's oral testimony Topics 3 and 5-9 should be stricken in their entirety. With respect to Topic 4, at minimum, questions 5, 12, 15 and 16 should be excluded. And unless Par can establish that Grunenthal's work on controlled-release tramadol constitutes prior art, the remainder of this topic must also be stricken. Should the Court grant Par's application, Purdue requests five days from such grant to submit any questions that it may have for Dr. Paques.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com
*Attorneys for Plaintiffs*
*Purdue Pharma Products L.P.*
*and Napp Pharmaceutical Group Ltd.*

OF COUNSEL:

Robert J. Goldman
ROPES & GRAY LLP
525 University Avenue
Suite 300
Palo Alto, CA  94301
(650) 617-4000

Richard A. Inz
Sona De
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

Dated: March 17, 2008

2156730

20

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2008 I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing to:.

> Frederick L. Cottrell, III, Esquire
> Steven J. Fineman, Esquire
> RICHARDS, LAYTON & FINGER, P.A.
>
> Richard D. Kirk, Esquire
> THE BAYARD FIRM
>
> Mary W. Bourke, Esquire
> CONNOLLY BOVE LODGE & HUTZ LLP

I further certify that I caused to be served copies of the foregoing document on March 17, 2008 upon the following in the manner indicated:

Frederick L. Cottrell, III, Esquire                         *VIA ELECTRONIC MAIL*
Steven J. Fineman, Esquire                                   *and HAND DELIVERY*
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Wilmington, DE  19801

Edgar H. Haug, Esquire                                      *VIA ELECTRONIC MAIL*
Robert E. Colletti, Esquire                                  *and FIRST CLASS MAIL*
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY  10151

Richard D. Kirk, Esquire                                    *VIA ELECTRONIC MAIL*
THE BAYARD FIRM                                              *and HAND DELIVERY*
222 Delaware Avenue
Suite 900
Wilmington, DE  19801

Mary W. Bourke, Esquire                                     *VIA ELECTRONIC MAIL*
CONNOLLY BOVE LODGE & HUTZ LLP                               *and HAND DELIVERY*
The Nermours Building
1007 North Orange Street
Wilmington, DE  19801

Jack B. Blumenfeld (# 1014)

EXHIBIT A

LEXSTAT 1-5 BUSINESS TRANSACTIONS IN GERMANY § 5.03

Business Transactions in Germany

Copyright 2007, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

Part I Government and Legal System
CHAPTER 5 Civil Procedure

*1-5 Business Transactions in Germany § 5.03*

**AUTHOR:** by Dr Georg A. Wittuhn LL.M. (McGill) Dr Ralf Stucken Alexander Turowski Huth Dietrich Hahn Warburgstraße 50, 20354 Hamburg, Germany Tel.: +49 40 41525-280 Fax: +49 40 41525-111

**§ 5.03 Commencing the Action**

**[1] Complaint**

**[a] Stating the Essential Elements and the Relief Sought.** The minimum requirements for the statement of claim and the defense are laid down in Section 253(2) of the ZPO. According to this provision, the statement of claim has to include a precise motion that sets out what the party seeks. It must be clear whether the performance of a certain act, a judgment for payment of a certain sum, a declaration of a certain right or something else is sought from the court. If, for example, a plaintiff asks for delivery of a car he has to specify the make and the official registration number etc. If the plaintiff asks for payment he has to specify in principle the exact amount of money.

Neither the plaintiff nor the defendant has in theory to cite any provisions of acts or statutes or any court decisions. The old Roman principle of *iura novit curia* applies. In practice, however, the lawyers will refer to statutory provisions and cite case law favorable to their position.

If the motion is not precise enough the claim must be dismissed as inadmissible.

Furthermore, the plaintiff has to assert in detail all facts necessary to establish his case. Evidence should be offered for all questions for which a party bears the burden of proof. This does not mean that each and every piece of information available to the parties has to be written down in the statement of claim. It is possible to wait and see which allegations are in dispute and amend the pleadings accordingly. In particular, the plaintiff is not obliged to anticipate the factual allegations and legal arguments of the defendant. However, the pleadings in Germany provide much more information than in most other jurisdictions, especially the common law countries. This is necessarily so since the pleadings have to enable the parties to evaluate their situation without the possibility of a discovery procedure.n1

The plaintiff has to assert as many facts as are necessary to allow the conclusion that he has the right he claims. The keyword in this context is substantiation. Both, the statement of claim and the defense, must substantiate and identify what the case is about. This obligation may seem extremely hard to satisfy in cases where the defendant has all available information at his disposal. However, it has to be kept in mind that the jurisprudence and case law have developed duties of cooperation and changes in the onus of proof in certain situations.

The standard of relevancy and precision required for the statement of claim comes back to a basic principle of the German law of civil procedure, the prohibition of probing. This principle states that the court will only order the taking of evidence, if:

A precise material fact is at issue; and

1-5 Business Transactions in Germany § 5.03

The evidence nominated by the party is material to the proof of such fact.

A mere allegation or the speculation by a party "out of blue" made in the hope that the taking of evidence will have some result or lead to new evidence, will not cause the court to order the taking of evidence. This principle makes "fishing expeditions" virtually impossible. For example, if a party requests the court to take evidence about an alleged contract or agreement by hearing a witness, this request will be rejected for lack of precision. The party has to be able to substantiate the nominated evidence, *e.g.*, by saying that the witness is to be heard about a contract and specifying when, where and between whom the alleged contract was concluded and why he has knowledge about the material facts.

The rationale for this principle is twofold. First, it promotes efficiency by preventing the waste of judicial time and effort. Second, it protects individuals and businesses from the nuisance, costs and interference of privacy rights that follow inevitably from the taking of evidence. Evidence will not be taken if the request for it is based on mere speculation.

An example may be helpful to clarify this principle: In a case decided by the Federal Court of Justice (BGH), the plaintiff had a contractual claim to be admitted to the administration and management of a company of which he was a shareholder. The defendants - the other shareholders - alleged that the plaintiff did not have the necessary qualifications and sought to prove this with a scientific test. The BGH ruled that such a test was inadmissible as a pure fishing expedition in the absence of any other indication that the plaintiff was not fit for the job. The BGH specifically stated that the taking of evidence is not intended to provide the parties with material they do not have before and that nobody is obliged to provide his opponent with the material necessary to win at trial.

A limitation on this strict rule is to be found where the party that has the burden of proof cannot satisfy this burden whereas the other party could easily provide the information. In accordance with the general principles of the duties of the parties a vague motion for the taking of evidence is admissible. This principle governs all different kinds of evidence.

**[b] Action by Stages.** If a party is unable to specify and substantiate his claim right from the beginning, and if the opposing party is not obliged to provide this information under the principles discussed above, the only remaining possibility is to start an action by stages (*Stufenklag*) according to Section 254 of the ZPO.

If, for example, the plaintiff has a claim for information that will enable him to specify his "real" claim, the claim for information is followed in the first stage, and the real claim followed on the second stage. Such claims for information are granted by statute in most cases where the parties are involved in constant and narrow relationships.

Partners in a partnership, shareholders in a company or the spouses in divorce proceedings, for example, have far-reaching claims for information. In the absence of such a special relation the general claim for information applies, according to which anybody who has a reason to believe that someone else is in the possession of documents, which give him a case against such person may ask for the production of such document.n2 However, the documents have to be described in a very detailed way that satisfies the aforementioned principle of substantiation.

**[2] Types of Answer**

If the factual assertions are not sufficiently clear the defending party does not even have to respond to the statement of claim for the judge has a duty to dismiss the claim as inadmissible without entering into the merits of the case.

From a practical perspective, however, it is a rather dangerous game not to react when faced with a deficient statement of claim, hoping that the judge will dismiss the claim. Generally a lawyer will state in defense that the statement of claim is considered not to be in accordance with the standards of precision of the ZPO. At the same time the judge will be asked to state whether he shares this opinion. If he does not there is still an opportunity to plead to the merits.

Such extreme cases are very rare. In general the statement of defense will have to satisfy the same standards as the statement of claim. This means, in particular, that the principle of substantiation applies. It is not sufficient to simply deny the allegations of the plaintiff. The defendant has to deny every single factual assertion and give reasons for such denial. Alternatively, the defendant may deny the facts stated by the plaintiff altogether by alleging a different set of

facts. Facts, which have not been denied, are deemed to be admitted,n3 if the intention to deny such facts does not appear from the statements of the defendant in other respects.

**[3] Reply**

The plaintiff is entitled to reply to factual assertions of the defendant. The court may determine whether a first hearing precedes the reply or whether further briefs are exchanged prior to the hearing.n4

**[4] Amendments to Pleadings**

**[a] Facts.** Another factor that encourages the parties to file complete briefs right from the beginning of the proceedings is the constant threat of being precluded with factual assertions and offers of evidence. Assertions made after the specified time limit has elapsed are only admissible if they do not delay the proceedings or if the party concerned can show that he did not act negligently.n5 The decision of the court is a discretionary one. Time limits are regulated in the ZPO or may be fixed by the court.

Assertions that have not been raised in time according to the general duty of the parties to promote the development of the proceedings, are also inadmissible unless the party acted negligently or the proceedings are delayed.n6 There is considerable dispute as to the meaning of the word "delay" in Section 296 of the ZPO. According to one opinion, "delay" only requires that the proceedings take longer if the additional assertion is taken into consideration. The contrary view is that one must ask whether the proceedings would take longer than if the assertions had been raised before the time limit elapsed.

It is not necessary to enter into a discussion of these niceties of German procedural law in order to understand that Section 296 gives an extremely strong incentive to the parties to make complete and precise statements. This provision - together with possible cost sanctions - ensures that no trial by surprise occurs.

Section 530 of the ZPO contains similar provisions to ensure that new assertions are not raised in the court of second instance.

**[b] Change of Motion.** Once the statement of Claim has been served upon the defendant a change of the motion is only admissible if the defendant agrees to it or if the court considers it to be appropriate.n7

The following situations are, by operation of law, not to be considered as a change of motion and, therefore, always admissible:n8

If the legal or factual assertions of a party are amended or additional points are brought forward;

If the motion is extended or limited, i.e., cases where at the beginning of the proceedings the plaintiff asked only for a partial amount and subsequently changes to the complete amount owed to him; and

If the motion has to be changed due to a change in the underlying facts, i.e., situations where the action pursued initially the handing over of the possession of a good and such good is destroyed during the proceedings; in such a scenario the plaintiff may ask for damages without the consent of the defendant or the court considering the change of the motion to be appropriate.

The consent of the defendant to a change of the motion is deemed to be given if he argues to the merits of the new motion without stating that the change is inadmissible.n9

If Section 264 of the ZPO does not apply and the defendant refuses to give his consent the court may nevertheless deem the change of motion to be appropriate. The court has a relatively vast discretionary power in this respect. The court is likely to deem the change of motion to be appropriate if it helps to finally settle the dispute between the parties and avoids fresh proceedings.

**[5] Supplemental Pleadings**

Other claims may be introduced in the proceedingsn10 against the same defendant if the court is competent to hear these claims. In addition, the parties may at any time introduce or amend legal arguments. It is even possible for one party to adopt the legal arguments or factual assertions of the other party. If, for example, the plaintiff pursues an action based on a contract and the facts pleaded by the defendant justify a claim based on the concept of unjust enrichment the plaintiff may adopt the defendant's argument.

**[6] Joinder of Claims and Parties**

The only parties to the civil lawsuit in a legal sense are the plaintiff and the defendant. However a joinder of parties as plaintiffs (*aktive Streitgenossenschaft*) or defendants (*passive Streitgenossenschaft*) is possible (*Streitgenossenschaft* or *subjektive Klagenhaufung*).

A joinder of claims is given when the plaintiff pleads two or more claims in one action against the defendant (*objektive Klagenhaufung*).

**[a] Joinder of Parties.** A joinder of parties (as plaintiffs or defendants) is possible, when

(1) the right in dispute is owned or owed jointly by the parties, *e.g.*, joint and several debtors, co-owners or co-heirs;n11

(2) the joint parties are entitled or committed to by the same cause in law or fact, *e.g.*, joint buyers to a sales contract, injured parties of an accident;n12 or

(3) similar claims or obligations that are founded on similar causes in law or on similar facts are subject matter of the action, *e.g.*, claim of an insurance company against several policyholders for payment of the insurance premium.n13

Apart from these specific prepositions the general procedural prerequisites must be fulfilled with respect to each joinder of party, *e.g.*, the court must be locally competent for the claim against each defendant. If this is not the case, *e.g.*, the court has no jurisdiction for one of the defendants, the action is inadmissible with respect to this joinder of party.

The joinder of parties means the consolidation of several actions for one trial and hearing of evidence. Only the litigation is consolidated, the joined parties remain legally independent and one party is not influenced by the conduct of the case by the other.n14 Accordingly, the joined parties may conduct the litigation differently or even contradictive. For example, one defendant may apply for the dismissal of the claim while the other defendant acknowledges the claim. Therefore, joinder of parties does not necessarily mean a uniform decision in favor of or against the joined parties.

Special rules apply if a compulsory joinder of parties (*notwendige Streitgenossenschaft*) is given. The joinder of parties is a compulsory joinder,n15 when

(1) the right in dispute must be decided unitary for the joined parties; or

(2) the joinder of parties is a compulsory joinder by other reasons.

Therefore, compulsory joinder of parties is given when the *res judicata effect* applies to all joined parties,n16 when the decision will change a legal right or a status with effect to all joined parties (*e.g.*, action to set aside the resolution of the shareholders' meeting of a joint stock company) or when the joined parties must hold and dispose of a right jointly under substantive law (*e.g.*, heirs).

If a compulsory joinder of parties is given, the judgment must be uniform for the joined parties. To ensure a uniform judgment, contradictive acts in litigation by the joined parties are without effect, *e.g.*, if one defendant applies for the

dismissal of the claim while the other defendant has acknowledged the claim, the court is prevented from rendering a judgment on acknowledgment against the defendant who has acknowledged the claim.

**[b] Joinder of Claims.** A joinder of claims is possible, provided that the same kind of proceedings is admissible and the same court is competent to hear all pleaded claims.n17 Several claims may be independent and pleaded with equal priority or as main claim joined with an alternative claim which shall be decided only subject to the condition that the main claim is dismissed.

**[7] Counterclaims**

The counterclaim is an admissible mean of attack for the defendant provided that all general procedural prerequisite for the counterclaim are fulfilled and the court is competent to hear the counterclaim in the pending proceedings. The consistent practice of the Federal Court of Justice furthermore requires a legal connection between claim and counterclaimn18 and allows a counterclaim even against third parties if the third party consents or in view of the court it is appropriate to hear this claim in the same proceedings.n19

**[8] Cross-Claims**

In German Civil Procedure cross-claims in the meaning of a claim by one plaintiff against another plaintiff or one defendant against another defendant are not admissible.n20

**[9] Third-Party Claims**

A party (plaintiff or defendant) may bring a third party into the action by serving a third party notice - third party claim (*Streitverkundung*).n21 A party may commence third-party notice procedure if the third party would be liable to the party or might have a claim against the party in case of a detrimental judgment in the pending trial.n22

The party will request with the notice the third party to join the trial for support. If the third party does join the trial, the provisions on interventionn23 apply.n24 If the third party does not join the trial, it will be proceed without taking into account the third-party claim. Notwithstanding whether the third party has joined the trial or not, the third-party notice provokes the effect of an intervention under Section 68 of the ZPO.n25 Accordingly, in a later trial between the third party and the party who has served the third-party notice, the third party cannot argue that the judgment (by the pending trial) is not correct or that the trial was conducted insufficiently or faulty by the party.

**[10] Impleader**

A third party who is claiming a right or thing which is the subject matter of an action between the parties of a pending lawsuit, may bring an action against both parties of this pending trial (*Hauptintervention*).n26 In this (new) lawsuit both parties of the pending trial will be joined parties as defendants. On the basis of the application by a party, the court may suspend the pending trial until a final judgment in the action launched by the third party is made.

**[11] Interpleader**

A defendant sued for payment of a debt may serve a third-party notice on a person who is alleged to be entitled to the claim in dispute in the trial, if the defendant is prepared to pay the debt but uncertain about the rightful claimant. If the third party does join in the trial the defendant will resign from the lawsuit upon deposition of the amount in dispute and the proceeding will be carried on (only) between the plaintiff and the third party about their entitlement to the claim.n27

The same or similar principles apply if a defendant is sued for the possession of a thing he is holding not as a legal owner but, for example, as tenant or as depositary. The defendant may serve a third-party notice if in his opinion he must return the possession to a third party other than the plaintiff. If the third party does join the trial, the third party may take over the proceedings and continue the lawsuit about the entitlement to the possession with the plaintiff; the defendant will then resign from the lawsuit. If the third party does not join the trial, the defendant may acknowledge the claim and return the possession to the plaintiff. In this case the third party is excluded from any claim against the defendant with regard to the possession.n28

**[12] Intervention**

1-5 Business Transactions in Germany § 5.03

A third party - the intervener - may join a pending lawsuit in support of one party if the intervener has a legal interest in the success of the supported party (*Nebenintervention*).n29 The necessary legal interest is given when the decision in the pending trial would effect the legal position or status of the intervener, *e.g.*, if the decision would prejudice his legal position; if he would be subject to the *res judicata effect* of the decision; or if the supported party would have a claim against him in case of a detrimental decision.

Notwithstanding the fact that the intervener is not party to the lawsuit but only assisting to the party he supports, the intervener may plead all means of attack and defense unless they would be in contradiction to the conduct of the supported party (an exception applies in case of an intervention under Section 69 of the ZPO - *streitgenossische Nebenintervention* - where the intervener has a more independent status and may even act in contradiction to the party supported). As far as the supported party is precluded from the introduction of new facts or fresh evidence the intervener is barred to the same effect.n30

The judgment in the lawsuit will be rendered only between the plaintiff and the defendant, however will cause the specific intervention effect between the intervener and the supported party. By this intervention effect the intervener is barred in a later lawsuit against the supported party with the argument that the judgment is not correct. He is, furthermore, precluded with the assertion that the litigation was conducted faulty or insufficient by the supported party unless at the point in time of his intervention the intervener was barred to introduce new facts and fresh evidence or means of attack and defense unknown by the intervener where not pleaded by the party intentionally or gross negligently.n31

**FOOTNOTES:**

(n1)Footnote 1.  *See* the chapter "Obtaining Information Prior to Trial," *infra*.

(n2)Footnote 2.  BGB, Section 810.

(n3)Footnote 3.  ZPO, Section 138(3).

(n4)Footnote 4.  *See* Chapter on Trial, *infra*.

(n5)Footnote 5.  ZPO, Section 296(1).

(n6)Footnote 6.  ZPO, Section 296(2).

(n7)Footnote 7.  ZPO, Section 263.

(n8)Footnote 8.  ZPO, Section 264.

(n9)Footnote 9.  ZPO, Section 267.

(n10)Footnote 10.  ZPO, Section 260.

(n11)Footnote 11.  ZPO, Section 59, 1st Alternative.

(n12)Footnote 12.  ZPO, Section 59, 2nd Alternative.

(n13)Footnote 13.  ZPO, Section 60.

(n14)Footnote 14.  ZPO, Section 61.

(n15)Footnote 15.  ZPO, Section 62.

(n16)Footnote 16.  *See* Chapter on "The Conclusiveness of Judgment," *infra*.

(n17)Footnote 17.  ZPO, Section 260.

(n18)Footnote 18.  BGHZ 40, 185, 187 *et seq.*; BGH NJW 1975, 1228 *et seq.*

(n19)Footnote 19.  BGHZ 69, 37, 44 *et seq.*; BGH NJW 1975, 1228 *et seq.*

(n20)Footnote 20.  Rosen-berg, Schwab, Gottwald, *Zivilprozeβrecht*, 15th ed. (1993), Section 98, No. 4.

(n21)Footnote 21.  ZPO, Sections 72 *et seq.*

(n22)Footnote 22.  ZPO, Section 72.

(n23)Footnote 23.  ZPO, Sections 66 *et seq.*

1-5 Business Transactions in Germany § 5.03

(n24)Footnote 24.  ZPO, Section 74(1).

(n25)Footnote 25.  ZPO, Section 74(3).

(n26)Footnote 26.  ZPO, Section 64.

(n27)Footnote 27.  ZPO, Section 75.

(n28)Footnote 28.  ZPO, Section 76.

(n29)Footnote 29.  ZPO, Sections 66 *et seq.*

(n30)Footnote 30.  ZPO, Sections 67.

(n31)Footnote 31.  ZPO, Section 68.

EXHIBIT B

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 11 of 131

Westlaw.

25 U. Pa. J. Int'l Econ. L. 1297                                                    Page 1

c

University of Pennsylvania Journal of International Economic Law
Winter 2004

25th Anniversary

Articles

**\*1297 IS TRANSNATIONAL LITIGATION DIFFERENT?**

Samuel P. Baumgartner [FNa1]

Copyright (c) 2004 Trustees of the University of Pennsylvania; Samuel P. Baumgartner

Abstract

During the last fifteen years, there has been a growing interest in litigation transcending national borders. Yet, both in the United States and in Europe, where this interest is much older, a comprehensive intellectual framework to deal with this type of litigation is hard to find. In fact, courts and procedural law reformers still approach transnational cases in the same fashion as purely domestic ones, adjusting the concepts of domestic law where they believe it necessary. This has created significant problems both for litigants seeking justice in transnational cases and for lawmakers fashioning policy specifically for the transnational setting.

In light of recent developments in international trade law and in the European Union, this Article argues that, as a normative matter, we should begin to treat transnational litigation as a distinct field. It suggests that in-depth procedural comparison and international relations theory would have much to contribute to such a field. It uses a case study on judicial cooperation in Germany for litigation in the United States to demonstrate various ways in which lawmaking for transnational litigation is interconnected beyond national borders. The Article concludes that procedural law reformers who continue to disregard insights from both international politics and comparative procedure are apt to lose control over their lawmaking efforts to savvy groups, to international trade regimes such as the WTO and NAFTA, and to lawmakers abroad.

**\*1298 Overview**

| | | |
|---|---|---|
| 1. | Introduction. | 1298 |
| 2. | The Traditional Model. | 1307 |
| 3. | The Case Study: German Judicial Cooperation for Litigation in the United States. | 1312 |
| | 3.1. The German Develop- | 1314 |

25 U. Pa. J. Int'l Econ. L. 1299

Page 2

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 12 of 131

ments.

|  | 3.1.1. Initial Stages. | 1317 |
|  | 3.1.2. The "Judicial Conflict" Emerges. | 1327 |
|  | 3.1.3. The Second Stage: Recognition and Enforcement of U.S. Judgments. | 1338 |
|  | 3.2. Lessons From the German Experience. | 1344 |
| 4. | A Suggested Framework. | 1353 |
|  | 4.1. Insights From International Relations Theory. | 1353 |
|  | 4.2. Applying Liberal International Relations Theory to Transnational Litigation. | 1361 |
|  | 4.3. Refining the Suggested Framework. | 1371 |
|  | 4.4. What Makes Transnational Litigation Different?. | 1378 |
| 5. | The Basis of the Field: Comparative Procedure and International Relations Theory. | 1384 |
| 6. | Conclusion. | 1390 |

## 1. Introduction

Judicial procedure plays a powerful role in the making and application of law. Despite prominent attempts to relegate "adjective law" [FN1] to the status of a "handmaid of justice," [FN2] students of procedure have long since realized, [FN3] and empirical studies have confirmed,**1299** [FN4] that no matter what its features, procedural law affects the rights and the behavior of groups and individuals--including those involved in the administration of justice. It is therefore important that those in charge of applying and devising procedural rules continuously reflect upon the values that those rules serve or ought to serve. [FN5] Equally important, procedural

lawmakers must **\*1300** regularly assess the effectiveness of our approaches to civil litigation in furthering the chosen process values. Such an assessment is particularly urgent with regard to the quickly growing class of civil cases that transcend national borders. In this Article, I want to pursue the question whether our approaches to civil litigation are adequate to deal with this expanding class of transnational cases. Closely related, I want to know whether the presence of a transnational element, such as a foreign party or evidence located abroad, [FN6] does more than add an interesting twist to an otherwise fairly typical domestic case.

These are important queries. Both the demise of the Cold War and the revolution in communications technology have heightened our awareness of the limits of national borders and of the concomitant importance for our own law-making enterprises of social, economic, and legal developments elsewhere. This awareness has led to a sense among some that our traditional methods of dealing with litigation transcending national borders are inadequate. It is a sense that has culminated in two new projects undertaken by the American Law Institute ("ALI")--an effort to draft Transnational Rules of Civil Procedure [FN7] and a project to improve international cooperation and understanding in transnational insolvency procedures [FN8]--and in an international attempt to create a worldwide convention on jurisdiction and enforcement of foreign judgments, [FN9] **\*1301** which in turn has spawned another ALI project. [FN10] Moreover, international trade regimes, such as the World Trade Organization ("WTO") and North American Free Trade Agreement ("NAFTA"), and supranational organizations, of which the European Union ("EU") is the most prominent example, have begun significantly to affect the content of the law of transnational litigation. [FN11] Within the European Community ("EC"), this has occurred so swiftly and so frequently during the last few years that some scholars have advocated caution, flagging an urgent need for scholarship to assess the larger implications of these transnational reform efforts. [FN12]

**\*1302** Unfortunately, the foundations of this area of law have largely remained untouched by systematic scholarship. This is not for lack of scholarly attention. In fact, the distinct issues raised by transnational cases have inspired a growing number of casebooks and treatises that capably map the terrain, suggest textual analyses, and identify recurrent patterns of response. [FN13] Correspondingly, within the last decade, a new course of study named transnational (or international civil) litigation has emerged in the curriculum of U.S. law schools. [FN14] In other countries, particularly in German-speaking Europe, both the course and textbooks accompanying it have been around much longer. [FN15] However, both in the United States and **\*1303** elsewhere suggestions of a comprehensive intellectual framework that would provide definition to the cases and materials thus covered are hard to find. Equally rare are studies on any distinct factors that might affect lawmaking for transnational litigation.

Under these circumstances, one may wonder whether transnational litigation is "a distinct field." [FN16] Until relatively recently, the prevailing view seems to have been that it is not--at least not in a functional sense. [FN17] As Professor Burbank put it over a decade ago, transnational litigation should instead be understood,

> as part of a process of cross-fertilization in which (1) doctrine and techniques developed in the context of domestic cases are brought to bear on problems presented in international litigation, and (2) the increasingly international dimensions of litigation in our courts prompt changes in doctrine and techniques, which are then applied in domestic cases. [FN18] **\*1304** This analytical model nicely captures what courts and lawmakers have been doing both in the United States and in Europe. [FN19] In practice, however, this approach has created serious difficulties both for litigants seeking justice in transnational cases and for lawmakers fashioning policy for transnational procedure. [FN20] It is therefore time that we develop an analytical framework for transnational litigation that takes sufficient cognizance of the international interconnectedness of these cases, both factual and legal, and of the way this interconnectedness affects the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

process of making law for transnational proceedings. In this sense, I submit, we need to view and treat transnational litigation as a distinct field.

Fortunately, the last decade has witnessed the emergence of interdisciplinary cooperation between scholars of international law and international political scientists. [FN21] The fruits of this cooperation*1305 are highly valuable for the purpose of developing a better understanding of the factors that affect the process of making law for transnational procedure. Thus, I will use some of this recent international law and international relations scholarship to shed some light on the complex interplay among lawmaking for transnational litigation, transnational actors, and lawmaking abroad.

My central claim is this: the law applicable to transnational litigation affects the behavior of transnational actors--groups and individuals who are both subject to the laws of more than one sovereign and have access to more than one sovereign to have their interests counted. [FN22] Those actors, in turn, may affect the international as well as domestic law of transnational litigation both *1306 abroad and at home in the future. If those in charge of making and applying the law of transnational litigation want to be in control of their efforts, they need to be aware of this interplay between lawmaking and transnational actors and of how particular procedural choices may influence it in the long run. They also need to reflect on the values they want to and can usefully promote within this scheme, realizing that simply advancing their domestic procedural preferences in the short run may implicate their own values of transnational justice in the future.

Once we appreciate this need, it becomes evident that, although courts and lawmakers have occasionally considered one or the other of these factors in making their decisions on transnational litigation, they have not paid much attention to the big picture just described, largely overestimating the power of unilateral lawmaking. What is even more striking from this view is the lack of any in-depth procedural comparison guiding their work. After all, as we shall see, one of the most pervasive difficulties with understanding the forces that affect the law relating to transnational litigation lies in the complexity of procedural law and its strong control by local ideational values and the concomitant lack of information on foreign approaches to transnational cases. Thus, I contend that, together with international relations theory, comparative procedural analysis is perhaps the most important building block in the construction of a distinct field of transnational litigation.

After setting out briefly the traditional model of lawmaking for transnational litigation in Section 2 of this Article, I will proceed, in Section 3, to a case study to pinpoint important factors in making the traditional model has largely ignored. As a distinct example of what can happen if we merely approach our subject from domestic doctrines without paying systematic attention to transnational litigation as a field, I will trace the development of judicial cooperation in Germany for litigation in the United States. This German-U.S. example supplies ample material with which to examine my claim that transnational litigation in one country may affect that in another and vice versa. In Section 4, I will then suggest a larger analytical framework. The case of Germany also provides abundant evidence that decision-making based on ignorance about other procedural systems is apt to yield unpleasant surprises and that, in the long run, it may hurt rather than advance the distinct values we have chosen to pursue in transnational litigation. Thus, in Section*1307 5, I will return to comparative procedural analysis and explore its potential to serve, together with further research in international relations, as the basis of a discrete field of transnational litigation.

2. The Traditional Model

According to the traditional view, transnational litigation, as civil procedure, is primarily controlled by domestic law. At least this is what European textbooks like to point out in order to clarify for students of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"international civil procedure," as the subject is known in continental Europe, [FN23] that the "international" label does not necessarily refer to the source of the principles and rules that those students are about to explore, but to the fact that these principles and rules apply to cases with an international element--a foreign party, a foreign proceeding, or evidence located abroad. [FN24] This view serves students as a helpful rule of thumb to gain a first conceptual orientation to transnational litigation. As such it is likely to be shared in the United States, where treaties have long been neglected as a source for lawmaking in private international law [FN25] and where customary international law is not generally credited with playing much of a role in this area. [FN26]

But what exactly does it mean to say that domestic law primarily controls transnational litigation? Unfortunately, practitioners and law reformers have largely been left to their own devices in answering this question. Without profound analysis of larger issues of transnational litigation, they have mostly proceeded from the assumption that it means just what it says, namely that, absent controlling treaty provisions, "a sovereign state may fashion domestic law as it deems fit." [FN27] Seemingly straightforward, this view **1308** is often based on positivist, [FN28] and primarily in Europe, formalist [FN29] assumptions as well as by the further traditional belief that there is **1309** a clear line dividing domestic and international law. [FN30] In addition, traditional international law doctrine, with its strong state-centric outlook, has envisioned for international law a role only on the state-to-state level. [FN31]

In the United States, these assumptions have increasingly been interpreted to mean that, on the one hand, international law can have domestic effect only to the extent that it has been implemented by domestic legislation [FN32]--whereby Senate advice and consent**1310** under Article II, Section 2(2) of the U.S. Constitution may not be sufficient [FN33]--while, on the other hand, there is little in international law that prevents domestic law, including procedural law, [FN34] from being applied transnationally. [FN35] While the former view has been under attack within the area of human rights, [FN36] the latter has **1311** had considerable staying power, most recently through theories of globalization and transnationalism that in effect claim that the time for countries to invoke national sovereignty against the unilateral actions of other nations [FN37] is over. [FN38]

In the United States and elsewhere, the respective views and assumptions have operated to focus the attention of courts, commentators, and lawmakers on domestic law and policy in transnational litigation. Not surprisingly, the result has often been a distinct preference for domestic solutions, including in the interpretation and application of international law. [FN39] All of this has spawned a long list of false starts and misconceived policies. [FN40] The resulting differences among lawmakers and courts of various **1312** countries go deeper than many of them realize. Not surprisingly, the negotiations for a multilateral treaty on jurisdiction and judgments at the Hague have been stalled. [FN41] The reason for all this, as a fresh look at the subject reveals, is that the traditional view fails to capture the richness and complexity of interrelations between the international and the domestic levels of lawmaking and among groups, individuals and governments acting transnationally. As it turns out, there is a closer connection between the foreign elements that characterize a certain type of case as "transnational" [FN42] and the law applicable to it than one might at first assume.

3. The Case Study: German Judicial Cooperation For Litigation in the United States

To see why this is so, I present a case study concentrating on the ways in which the conduct of transnational litigation in one country, through various channels, affects the conduct of transnational litigation in another and vice versa. In what follows, I analyze the way in which transnational litigation in the United States affected judicial cooperation for litigation in the United States (including judgment recognition) in Germany from the 1950s to the mid-1990s. Judicial cooperation is the performance of a judicial act by one court on its territory

25 U. Pa. J. Int'l Econ. L. 1299

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 16 of 131

Page 6

upon the request and for the benefit of another. [FN43] The need for such cooperation is based on the notion that the power of national courts is limited, among other things by national sovereignty. [FN44] What makes judicial cooperation especially interesting for our purposes are the considerable disagreements between the United States and a number of civil law countries on the extent to which national sovereignty limits the power of domestic courts and on how to properly grant judicial cooperation. These **1313** disagreements are based largely on differences in domestic procedural concepts and on disparate views on how best to approach transnational cases. [FN45]

The case of Germany is particularly interesting because the relevant actors were steeped in the traditional approaches to transnational litigation sketched above. [FN46] The concentration on Germany within continental Europe is also apt because in that country, one finds a well documented record of the relevant events, influences, and legal views during what Germans have termed the Justizkonflikt (judicial conflict) [FN47] with the United States.

The analysis that follows is based on mostly published materials as well as on personal conversations with some of the individuals involved in what has become known in Germany as the "judicial conflict" with the United States. [FN48] One caveat remains, however. For various reasons, the minutes of legislative committee meetings and much of the materials of administrative decision making are either shrouded in confidentiality or have otherwise become unavailable. [FN49] It may well be that knowledge gained from **1314** such materials would change the analysis to some degree.

## 3.1. The German Developments

Disagreements about the proper method of judicial cooperation between Germany and the United States are nothing new.  There was a lengthy diplomatic exchange as early as 1874 when imperial Germany saw itself forced to defend its newly obtained sovereignty against perceived U.S. intrusions. [FN50] While post-World War II West Germany was relatively forthcoming to unilateral U.S. interests in its approach to judicial cooperation, [FN51] the country quickly reverted to its prewar position after U.S. occupation ended in 1955. [FN52] The position, similar to that of other civil law countries, [FN53] briefly stated, is: that the performance of judicial acts by foreign officials, such as the service of process and the taking of evidence, are not permitted on German territory without the previous permission of German authorities; that the proper way to obtain such judicial acts on German territory is to request a German court, through diplomatic channels, to perform them; and that, in executing such a request, usually called a letter rogatory or letter of request, [FN54] a German court will generally apply German law, including limitations on the collection of evidence that are considerably tighter than in the United States. [FN55] This position and its various ramifications had been developed through transnational cases that **1315** mostly involved other countries of the European continent, countries with which Germany shares a good deal of legal history and procedural approaches as well as traditions regarding the territorial limits of state action in private international law. [FN56] Countries, moreover, with which Germany had concluded a staggering number of treaties on judicial cooperation, [FN57] thus further harmonizing approaches. [FN58]

How this historically grown German position should be applied in detail to cases involving the United States with its entirely different litigation system and different views on judicial cooperation is a question that began to vex governmental authorities, courts, and, after a while, academics beginning in the late 1970s, when German companies, having invested heavily in the United States, increasingly became involved in U.S. litigation. [FN59] The response both under German domestic law and, since 1979, [FN60] under the Hague Service [FN61] and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hague Evidence [FN62] Conventions, has been a steady and relatively rigid application of the traditional German position, thus leading to recurrent frictions with U.S. courts and litigants searching for ways to serve process on, and receive evidence from, German nationals without having to go through the time-consuming and often unproductive letter-of-request procedure*1316 insisted on by Germany. In addition, starting in the late 1980s, German courts began to decide more or less difficult questions of recognition law against U.S. judgment creditors.

While a certain liberalization has taken place since, [FN63] these German developments are as striking for what did not happen as for what did. To this day, the regular German exposure to transnational litigation in U.S. courts has not led to an alteration of the traditional German position on judicial cooperation that would even come close, if perhaps only under certain circumstances, to providing litigants in U.S. courts with the evidence they need. It also has not led German authorities to abandon a seemingly outdated interpretation of national sovereignty regarding the service of process and the taking of evidence on and from German territory or at least to modify that interpretation so as not to require the costly, and time-consuming, letter-of-request procedure in most cases. [FN64] And finally, the exposure to U.S. litigation has not led to a recognition practice that would oppose the recognition of U.S. judgments only in the most exceptional of cases.

The reasons for these German developments are manifold, including prominently the behavior of transnational litigants and the actions of U.S. courts and governmental authorities in cases involving German nationals and their reactions to the German position just described. A closer analysis suggests that, on the most basic level, the following factors were important: (1) a sustained effort by German industry to achieve protection from mushrooming U.S. litigation that threatened to inflict costs of a magnitude these industries could hardly imagine from their experience with domestic German litigation; (2) a distinct, historically grown view of law and procedure in general and of the mandates of international law and of appropriate approaches to transnational litigation in particular; (3) a lack of understanding of the very different views and approaches in the United States on those subjects; and (4) a perceived need to protect German law and sovereignty from unwarranted intrusions by U.S. courts and litigants. As the following analysis shows, these factors interacted in specific ways to cause what is generally known in Germany as the Justizkonflikt, [FN65] suggesting a number of assumptions about the way the lawmaking process in *1317 transnational litigation works.

### 3.1.1. Initial Stages

From 1955 to 1970, judicial cooperation for litigation in the United States was not much of an issue in Germany. There were few U.S. cases that required the procurement of service or evidence on or from German territory, and in such cases as did occur, acceptable solutions were often available. Not that the German approach was satisfactory from a U.S. point of view. Far from it, not only was it usually necessary to file a letter rogatory with the appropriate German authorities, who would then apply their own law to execute the request, [FN66] but also those authorities who nevertheless refused (and still refuse in the absence of an applicable treaty [FN67] today) to apply any measures of compulsion. [FN68] On the basis of an exchange of diplomatic notes from 1955-56, never published in Germany, U.S. consular officers were allowed to question persons residing in Germany. [FN69] Although the consular officers, too, were prevented from applying any means of compulsion, [FN70] they could at least make needed evidence available in a form that could be used in U.S. court. [FN71]

Obviously, this arrangement was both fragile and complicated and therefore could not be expected to work for more frequent or *1318 larger litigation. Not surprisingly, then, even this time period did not remain without frictions. The attempt by the U.S. Justice Department ("DoJ") to break up a cartel in the international shipping

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

industry and the DoJ's concomitant order to German and other companies to produce a large number of documents in the United States, for example, elicited a sharp diplomatic protest from Germany in 1960 [FN72] and resulted in a German blocking statute applicable to high seas shipping enterprises. [FN73] However, at the time, this was considered primarily a political incident based on opposing views on economic policy rather than as an elementary issue of judicial cooperation. Thus, it did not interrupt the period in which judicial cooperation for litigation in U.S. courts was a relatively rare, calm, and low-key operation of little interest to courts, government officials, and academics.

This changed in the 1970s, when U.S. product liability, private antitrust, and securities litigation came into full swing, engulfing German, [FN74] as well as U.S. companies. [FN75] Grasping the extent of their vulnerability under U.S. procedural rules as applied to foreign defendants, German companies quickly began to ask the German governmental agencies for help while presenting the traditional German approach on judicial cooperation to U.S. courts. [FN76] Yet, their efforts, however determined, largely failed to produce the *1319 governmental support they had hoped for. While the German government did intervene diplomatically or file aide-memoires in support of German litigants in those cases in which a violation of German sovereignty, and thus of international law was clearly impending under the traditional German view. [FN77] However, it was not until the early 1980s that concern for German industry began to affect German judicial cooperation for litigation in U.S. courts in the large number of cases in which things were less clear.

Why did it take so long for those interests to make a difference? Essentially, we can identify two factors. First, there is a formalist view of the process of law-application by courts and governmental authorities. This view prevented the German government from diplomatically intervening in U.S. litigation simply to support its domestic industry without clear evidence of a violation of international law or German national sovereignty, actual or impending. Second, German authorities lacked any information on U.S. civil procedure and on U.S. approaches to transnational litigation. Initially, this led to the assumption that, however different U.S. procedure may be from its German counterpart, U.S. courts would generally recognize international law and German sovereignty as seen from the point of view of the traditional German approach. Accordingly, German authorities were willing to give the benefit of the doubt to the U.S. legal system, rather than to a German industry that had an apparent interest in protecting itself from exposure to liability litigation in the United States. [FN78] As time wore on, however,*1320 and as incidents of both U.S. court orders and individual attorney behavior in violation of the traditional German view became more frequent, this lack of information allowed German industry representatives, a number of whom had a good grasp of the relevant U.S. law, [FN79] to put their spin on how U.S. procedure was perceived in Germany.

The latter development was aided by information gained from newly published decisions and their subsequent scholarly discussion. While German activity in the early U.S. cases against German corporations, including those few that had led to diplomatic interventions, had occurred largely within the confines of the Foreign Office and the justice ministries of the individual Länder governments, [FN80] the published reports of three cases between 1978 and 1981 brought home to a larger audience of German lawyers the perceived realities of some aspects of U.S. law that in-house counsel of German companies had long lamented: large, from German standards virtually inconceivable, damage awards handed down by unpredictable juries; [FN81] expensive, [FN82] party-driven discovery with comparatively immense scope and scant protection of trade and business secrets; [FN83] and a willingness of at least some U.S. courts to *1321 enforce their procedural rules transnationally in the face of sovereignty objections by the foreign governments involved. [FN84] These aspects of U.S. litigation appeared both crude and threatening. *1322 They seemed crude from the point of view of a legal culture that has spent centuries fine-tuning the balance of interests at stake in private law and procedure through the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

promulgation of intricate rules of decision to be applied by judges well schooled in those rules. [FN85] They appeared threatening because of the apparent willingness of U.S. courts to value federal and state procedural rules above than German sovereignty concerns [FN86] in a political and economic environment in which the U.S. courts have had the upper hand and in an equity tradition that provides them with judicial powers and discretion unparalleled in Germany.

Aided by a change of the controlling law from a dusty administrative regulation [FN87] to more interesting international conventions, [FN88] these published cases elevated the arcana of judicial cooperation from the monotonous routines of governmental agencies to a topic of primary legal concern, resulting in a sudden onset of scholarly discussion. [FN89] This early academic discussion, in turn, was instrumental in setting the parameters of the debate both for a larger legal public and for future decisions by courts and governmental agencies in a culture in which the published works of scholars are more influential than in the United States. [FN90] Although primarily **1323** engaging in German-style, deductive doctrinal reasoning, these early scholarly articles betray three major concerns in dealing with judicial cooperation under the Hague Service and Evidence Conventions: (1) a felt need to protect German businesses from these disfavored U.S. practices on German territory; (2) closely related, a felt need to protect German law from imports deriving from U.S. legal culture; and (3) a felt need to protect German sovereignty from incursion by U.S. court orders.

Not surprisingly, the doctrinal conclusions of these articles, particularly those on the execution in Germany of U.S. letters of request under the Hague Evidence Convention, were less than heartening from the point of view of U.S. litigants. While generally deploring the German government's decision to enter a reservation under Article 23 of the convention, which allows a member state to declare "that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law countries," [FN91] scholars simply noted that such was now the law. [FN92] Moreover, they did not veer far from German requirements in interpreting the convention's provisions regarding the execution of requests to depose witnesses. Most importantly, they concluded that such depositions would have to be conducted by the judge, as is usual in Germany, [FN93] respect the privileges **1324** granted by the German code of civil procedure, [FN94] particularly its far-reaching protection of trade and business secrets, [FN95] and that execution could be refused when the letter of request did not specify lines of questioning sufficiently narrow or sufficiently substantiated as to clearly indicate that the proponent was not merely fishing for evidence. [FN96]

**1325** Available data indicates that the relevant German decision-makers largely shared these views. A 1985 survey conducted by Professor Koch among German Central Authorities [FN97] revealed that of the seventy-five letters of request from the United States that had been received under the Hague Evidence Convention between 1979 and 1984, the majority were considered defective under Articles 3 [FN98] or 12(b) [FN99] or inadmissible under Article 23. [FN100] Of those, twelve were refused execution while the rest were executed in a more limited fashion than requested or were executed to the extent that the witness in question participated voluntarily. [FN101] With regard to the Hague Service Convention, the survey showed that the German Central Authorities had received 1,628 requests to effect service of process, of which, about one fifth were refused execution. [FN102] Refusals occurred primarily because requests failed to provide adequate translations of the documents to be served under Article 5(2), [FN103] or because, it was argued, a U.S. attorney was not an "authority or judicial officer" for purposes of requesting service under Article 3(1) of the convention. [FN104] Some of the rejected requests**1326** involved claims by U.S. federal agencies that represented, as the German Central Authorities reasoned, administrative rather than "civil or commercial matters" within the meaning of the Hague Service Convention. [FN105] In addition, much to the displeasure of U.S. courts and litigants, some of the German Central Authorities turned out to be exceedingly formalistic in handling requests for service. [FN106] Fi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nally, at about the same time, the German government took the opportunity of a diplomatic protest against a Michigan court's order in violation of the 1955-56 exchange of diplomatic notes [FN107] in order to press hard for a discontinuation of the practice of deposing German individuals before U.S. consular officials under that exchange. [FN108] Subsequently, the U.S. State Department**1327** apparently advised its consular agents to no longer to depose German nationals. [FN109]

3.1.2. The "Judicial Conflict" Emerges

To the extent that these developments were the result of a conscious effort to limit the effects of disfavored U.S. procedure on German businesses and on German law and to preserve German sovereignty, [FN110] they turned out to be based on a deficient strategy. Again, German governmental authorities and scholars had made assumptions about U.S. practice on the basis of their own procedural and jurisprudential approaches. Although some scholars had engaged the mechanics of (federal) U.S. procedure, [FN111] their comparative enterprise was relatively limited and thus left them unaware of essential tenets of U.S. procedure as well as of the pragmatism and ingenuity with which U.S. courts and counsel approach new problems. They had also underestimated the willingness of U.S. courts unilaterally to enforce their procedural views in transnational cases, if necessary in the face of diplomatic protests and based on questionable treaty interpretations.

This lack of information was crucial for further developments. For from the U.S. perspective, the Hague Service and Hague Evidence Conventions may have brought some improvements over the previous regime governing judicial cooperation in Germany; [FN112] yet, the described German developments imposed severe limitations on the usefulness of the letter-of-request procedure. This was particularly problematic because, following its traditional position,**1328** [FN113] Germany had objected to virtually all forms of serving process and taking evidence in its territory other than by letter of request under the two conventions. [FN114] The effect was most pronounced in the evidence area, where documents would, thus, largely be undiscoverable and both the access to, and the scope of, witness testimony would remain severely restricted. Together with exasperation over the perceived formalism of German Central Authorities [FN115] and with impatience over the expense and delay imposed by the letter-of-request procedure, these German limitations--and related limitations imposed by other civil law countries--led U.S. courts to endorse new interpretations of the two conventions. [FN116] Most importantly, U.S. courts gradually changed from requiring, as a matter of comity, that first resort be the procedures of the Hague Evidence Convention, [FN117] to routinely ordering **1329** foreign individuals under the court's jurisdiction to produce evidence located abroad for inspection in the United States without considering the Convention as helpful or even necessary. [FN118] Some courts concluded that the Convention did not even apply "to the production of evidence in this country by a party subject to the jurisdiction of a district court." [FN119] Similarly, attempts by U.S. plaintiffs to avoid serving foreign defendants abroad by serving their domestic subsidiary as their involuntary agent, although unsuccessful throughout the 1970s and early 1980s, [FN120] were soon held to be acceptable under the Hague Service Convention. [FN121]

The Germans reacted with considerable despair. It seemed as if U.S. courts were on a collision course, doing whatever it took to avoid limitations set by international treaty obligations and German sovereignty. To some degree, this was indeed true. In interpreting the Hague Conventions, U.S. courts, particularly federal courts, did not see why an international treaty, without specifically stating so, should limit their jurisdiction and thus their powers under**1330** the Federal Rules (or even state rules) of Civil Procedure ("Federal Rules"), thus providing foreign litigants with significant advantages over domestic litigants. [FN122] This attitude, as Professor Burbank's historical analysis shows, was the result both of decades of neglecting foreign concerns in the federal rulemaking process, [FN123] and of U.S. negotiators at the Hague, who, in their effort to secure the advice

and consent of the Senate, represented to the American public that the two conventions "ma[d]e no changes in U.S. procedure necessary and require[d] no major changes of U.S. legislation or rules," [FN124] while other countries would have to change their ways significantly. [FN125] Nonetheless, this concern with preserving domestic jurisdiction and power under the Federal Rules did not become outcome-determinative until cases from Germany and other civil law countries had revealed how fickle the convention procedures were and, particularly, how seriously limited the access to evidence was under the Hague Evidence Convention's letter-of-request procedure. [FN126]

    Lacking the necessary information on U.S. law to foresee these developments, German observers were taken by surprise and concluded*1331 that Germany was now locked in a judicial conflict with the United States. A conflict that also seemed to involve other European countries as evidenced by such high-profile cases as the Laker [FN127] saga and the Uranium Antitrust Litigation. [FN128] Understanding that the new U.S. interpretations seriously jeopardized their efforts to protect German law, sovereignty, and businesses from U.S. procedure, these individuals quickly realized that the German approach needed to be modified. Invited by the Fifth Circuit Court of Appeals to express its positions on the Hague Evidence Convention in In re Anschuetz, [FN129] the German government was the first to react. In its amicus brief, it stated, as it would again two years later in Société Nationale Industrielle Aérospatiale v. U.S. District Court [FN130] ("Aerospatiale"), any order directing a party or non-party to produce evidence located in Germany for inspection in the United States without using the Convention's procedures violated both German sovereignty and the Hague Evidence Convention. [FN131] German scholars, on the other hand, thought that this statement went too far insofar as parties were concerned. They pointed out that German courts, also, occasionally order foreign parties to send specific documents to Germany for inspection or entered injunctions ordering defendants to perform certain acts abroad. [FN132] Some of those scholars had thus previously indicated that similar orders by U.S. courts, if directed at German parties, [FN133] neither implicated the text and purpose of the Hague Evidence Convention nor violated*1332 German sovereignty. [FN134] Now, however, these academics concluded that U.S. discovery orders directed at German parties properly before them could nevertheless violate German sovereignty by their sheer intensity; it would thus trigger the country's sovereign right to protect its citizens from unreasonable demands by foreign states. [FN135] When that intensity would be attained was (and still is) a matter of some controversy. Essentially, the required intensity would arise from the scope of the discovery order [FN136] or from its impending enforcement through (from a German view) draconian contempt sanctions, [FN137] thus triggering German sovereignty concerns whenever an order veers too far from German standards. [FN138]

    In short, both government and scholars adapted their positions to the new U.S. challenge, yet the scholars' position was more tempered. Indeed, some academics unsuccessfully urged the government to adopt their more moderate and thus more credible stance in representations to the U.S. Supreme Court in Aérospatiale. [FN139] The German government not only stood by its strict stance in its amicus brief in Aérospatiale, [FN140] it went on to suggest to the Supreme Court *1333 in Volkswagen AG v. Schlunk [FN141] a year later that allowing service on a foreign corporation by serving its wholly owned domestic subsidiary under state law violated the letter and spirit of the Hague Service Convention. [FN142] This interpretation of the Hague Service Convention was as unpersuasive, [FN143] if perhaps not as unacceptable from a U.S. point of view, [FN144] as the German position in Aérospatiale. After all, the same German government had represented to its own legislature ten years earlier that the negotiators at the Hague had left the question whether, in fact, there was "occasion to transmit a judicial or extrajudicial document for service abroad" [FN145] for the domestic law of the requesting state to determine. [FN146]

    *1334 Why, then, did the German government continue to present its more aggressive position regarding the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hague Evidence Convention to the U.S. Supreme Court in the face of warnings by academics that this could prove counterproductive, and why did it follow up with an equally aggressive position regarding the Hague Service Convention? To some extent, this was a matter of power. While law professors were interested in suggesting a workable line of argument, the German government saw its sovereign power to control the taking of evidence from German territory and the serving of process on German domiciliaries (through the Länder governments) threatened with the new interpretations given the Hague Conventions by lower U.S. courts. More importantly, there was a well-meaning attempt to maximize the by now well-known interests of the German industry. However, by the mid-1980s, scholars had enough comparative knowledge of U.S. procedure and of U.S. approaches to transnational cases to realize that "the chances that the Supreme Court will . . . [adopt the German government's position] are equal to zero." [FN147] The government, however, lacked some of that knowledge and chose to ignore the advice. In addition, in the case of the Hague Service Convention, little had been written in Germany on the new U.S. interpretation. This left the German government without a full appreciation of how little sense its position made from a U.S. point of view given the treaty's history and language as the German government had itself represented it to its own Parliament. [FN148] The fact that other civil law governments presented similar positions to the U.S. Supreme Court in Aérospatiale [FN149] may have created a false sense of security, thus preventing these governments from adopting a better-informed stance.

*1335 Given this lack of information, the U.S. Supreme Court's decisions in Aérospatiale and Schlunk created another round of consternation. [FN150] Even those German academics who had earlier cautioned their government to moderate its stance were surprised at the extent of the U.S. Supreme Court's adulation of the Federal Rules within the framework of an international treaty in Aérospatiale and at the majority's unwillingness in that case to articulate principles setting the outer limits on unilateral U.S. discovery in light of both foreign sovereignty concerns and the purpose of the treaty enterprise. [FN151] In regard to Schlunk, reactions were more mixed. Those knowledgeable about the Service Convention's negotiating history and the German government's earlier statements were more sympathetic to the majority's holding in Schlunk [FN152] than were others. [FN153] Yet, here too, there was concern about an interpretation of the Service Convention that would allow a member state to bypass Convention procedures in most cases by allowing for all sorts of domestic service on foreigners. [FN154]

In short, it seemed that the judicial conflict was alive and well, and there was need for a renewed adaptation of the German approach to protect German law, sovereignty, and businesses. In the area of service, several German Central Authorities reacted by refusing to execute requests for serving punitive-damage claims under the Hague Service Convention, arguing that such claims were not "civil and commercial matters." [FN155] The courts to which these decisions were appealed, however, including ultimately the German*1336 Constitutional Court, [FN156] all reversed. [FN157] Whatever their legal reasoning, the German judges by now knew enough about U.S. procedure to assume that this approach would merely lead U.S. courts to accelerate their use of all kinds of Pennoyer-era statutes to allow service on foreign defendants by serving a domestic agent, thus further undermining both the Convention's usefulness and German control over service on its domiciliaries. [FN158] The refusal of these German courts to set up a new hurdle to service in Germany under the Hague Service Convention has given U.S. courts less reason to support means of avoiding the Convention; the refusal is thus likely to have been at least partly responsible for the recent cases in which U.S. courts have held, contrary to earlier post-Schlunk decisions, [FN159] that where state law requires that summons and complaint be transmitted to the defendant's foreign domicile for service on a domestic agent to be complete, the Convention's procedures must be used. [FN160]

*1337 In regard to the Hague Evidence Convention, efforts to bring U.S. courts to re-adopt a rule of first re-

sort to the Convention along the lines of Justice Blackmun's concurrence and dissent in Aérospatiale centered on partly lifting Germany's Article 23 objection to the discovery of documents. [FN161] This was to be accomplished by promulgating a regulation under Section 14(2) of the German Act implementing the Hague Evidence Convention, in which the German legislature delegated to the executive the power to "define the circumstances under which, having due regard to essential principles of German procedure and to the interests of those affected, letters of request for the purpose of discovering documents could nonetheless be executed." [FN162] However, the adoption of such a regulation, which the German government had already promised to the U.S. Supreme Court in its amicus brief in Aérospatiale, [FN163] proved impossible, however. The most powerful industrial association resisted any regulation that would allow the discovery of documents from German territory under rules plainly more liberal than those of the German Code of Civil Procedure. [FN164] Moreover, several important industry representatives as well as various scholars did not think that Germany should unilaterally make concessions to the United States in the area of judicial cooperation at this time. As a result, the regulation was never adopted.

In any case, the suggested liberalization of the Article 23 declaration would have been too little, too late. Most post-Aérospatiale *1338 decisions of lower U.S. courts [FN165] had put the burden on the party opposing unilateral U.S. discovery to show that proceeding under the Hague Evidence Convention would produce the evidence as effectively as under the Federal Rules or state rules of procedure. [FN166] The German government's draft of the regulation with its limitations and escape clauses, although a bit more liberal than German procedure, [FN167] presumably would not have sufficed to meet that burden.

3.1.3. The Second Stage: Recognition and Enforcement of U.S. Judgments

By the time the liberalization of the Article 23 declaration was discussed, the focus had already turned to an area where the United States would not usually have the upper hand--the recognition and enforcement of U.S. judgments. Again, industry representatives and their lawyers had much earlier attempted to convince the legal public that there were various reasons why U.S. *1339 judgments, particularly those in the product liability area, should face difficulties when enforcement is attempted in Germany. [FN168] This time, their suggestions contravened a published opinion by the Max Planck Institute on Private International Law that had failed to find any reason why U.S. product liability judgments should be refused enforcement, [FN169] a view that was later reiterated in the Institute's standard volume on judgments recognition. [FN170] Under these circumstances, the industry's suggestions were of questionable persuasiveness in future recognition disputes before German courts. German defendants in U.S. litigation thus preferred to settle rather than to risk a default judgment that might be enforced against them in Germany.

This situation changed, however, as a number of academics began to revisit the issue in the late 1980s, thus reframing the debate for the 1990s. Departing from the earlier liberal academic stance, these scholars, in careful analysis, suggested various reasons for refusing to enforce U.S. judgments on public policy grounds, including: discovery in violation of German sovereignty, imposition of seemingly absolute liability in product liability cases, low threshold levels for a finding of causation, "disproportionately high" damages for pain and suffering, and punitive damages (except to the extent that they compensated for damages not already included in the compensatory portion of the award). [FN171] In 1992, the *1340 country's highest civil court, the Bundesgerichtshof, adopted the majority of these limitations on the enforcement of U.S. judgments in some form or another in its landmark decision on the recognition of U.S. judgments. [FN172]

How did this change come about? There were essentially two factors at play-- business interests and inform-

ation. First, as exposure of German companies to U.S. liability litigation increased, and as it became clear that efforts to protect German businesses from U.S. litigation within the process of judicial cooperation would lead nowhere, the industry's suggestions for protection in the recognition area began to carry more weight. Second, the available **1341** information on U.S. law changed over time and was significantly influenced by industry representatives. As long as the policies underlying U.S. product liability law were studied for purposes of potential emulation, these policies were largely portrayed in a neutral light and judgments based on them could hardly be argued to violate a German public policy that was slowly moving in the direction of U.S. law. [FN173] With increased exposure of German companies to U.S. litigation, however, the scholarly articles of industry representatives and their lawyers began to control the debate. Their accounts bristled with cases exemplifying the uncontrolled imposition of liability by runaway juries and with references to numerous tort-reform efforts in the United States. [FN174] This created the impression of a litigation system largely uncontrolled by the rule of law--a system that was apparently in such disarray that even its own most influential lawyers, including former Chief Justice Burger, [FN175] had stepped up to criticize it. [FN176] This impression was further corroborated by the academics' earlier experience, during the "judicial conflict," with U.S. courts unwilling to subject their procedure to limitations arising from foreign sovereignty concerns and international law. If, therefore, German businesses, German law, and German sovereignty needed to be protected from the importation of such untenable practices, the recognition and enforcement**1342** of U.S. judgments was the place to exercise some leverage.

This view, by now widely shared by judges and scholars, also had more subtle effects on the interpretation of recognition requirements other than the public policy test, particularly on the requirement that the rendering U.S. court have had jurisdiction. [FN177] In a 1988 case, the judgment creditor, with the help of an academic expert, [FN178] succeeded in persuading the district court of Munich to hold that, with regard to judgments from nations having a federal form of government, the personal jurisdiction of the courts of the individual state in question rather than the jurisdiction of the courts of the entire nation must be established for the judgment to be recognized in Germany. [FN179] Thus, the court refused to enforce the judgment of an Arizona state court for lack of jurisdiction, although the courts of California and, arguably, those of Virginia would have had personal jurisdiction over the defendant under German law. [FN180] This interpretation, new at the time, [FN181] developed a **1343** considerable following among academics, [FN182] although the Bundesgerichtshof recently refused to follow it with regard to judgments emanating from U.S. federal courts. [FN183]

Moreover, a 1993 case involving the judgment of a Washington state court in a dispute over an exclusive-distribution contract, the Bundesgerichtshof decided that if the only conceivable jurisdictional basis for a foreign default judgment under German law is the place where the alleged tort had been committed, [FN184] then the question whether the tort had in fact been committed in the rendering state was a question that could be fully litigated before the German recognition court, in application of the regular standard of proof, [FN185] thus allowing a partial re-opening of the foreign proceedings. [FN186] In support of its holding, the Bundesgerichtshof argued that the only alternative would be to forgo any examination of the rendering court's jurisdiction in default judgments based on an alleged tort-- an option that would deny German defendants the right to refuse to appear before a foreign court whose assertion of jurisdiction they consider exorbitant and subsequently to test the propriety of that assertion by collaterally attacking the resulting judgment at home. [FN187] Without this right to default, the court further reasoned, German law would support plaintiffs who sue German defendants in favorable fora on trumped-up charges in the hope the defendant would be unable to mount an effective defense. [FN188] Combined with the court's further indication that its holding allowed the defendant**1344** in the present case to avoid the high costs of defending a lawsuit in the United States, [FN189] its reasoning reflects a thinly veiled reference to prevalent views in Germany of a U.S. litigation system in which strike suits are rampant and

in which defending such suits is an unreasonably expensive proposition. [FN190] As a result, German defendants with few or no assets in the United States can effectively force U.S. tort claimants to litigate in Germany the issue of whether, in fact, a tort had been committed.

## 3.2. Lessons From the German Experience

These German developments demonstrate the extent to which the law of transnational litigation in one country is interconnected, via the behavior of groups and individuals, to the approaches to transnational cases in other nations and vice versa. In the German case, these interconnections have had serious and unexpected consequences. On the one hand, the German government and, to a lesser extent, German scholars, in their attempt to protect domestic business firms along with German law and German sovereignty from what they viewed as undue U.S. intrusions, helped set in motion legal developments in the United States that have frustrated those intentions to an extent that, I suspect, many Germans have not fully grasped to this day. [FN191] While German recognition law now allows German nationals with no or few assets in the United States to force U.S. tort plaintiffs to pursue at least part of their claim in Germany, [FN192] the majority of large and medium-sized German business enterprises cannot afford to take that risk. In fact, if **1345** such enterprises do become involved in U.S. litigation, discovery of evidence in their control in German territory is now usually governed entirely by U.S. procedural law whether the case involves a relatively straightforward contract dispute, [FN193] a large antitrust suit, [FN194] or a complex human rights class action to recover for slave labor performed under the Nazi regime. [FN195] This is because, since Aérospatiale, U.S. courts have effectively relegated the use of the procedures of the Hague Evidence Convention and thus any control of German law over the taking of evidence from German territory to cases in which discovery is sought from German non-parties. [FN196] Even the latter category has shrunk to the extent that U.S. courts have assumed that parties have control over evidence that under German law traditionally would have been assumed to be in control of a non-party. [FN197] To this extent--and this is a large extent--German law has become irrelevant and the German government has entirely lost its sovereign control over U.S. orders to provide evidence from German territory, one of the main concerns of both the German government and German scholars. [FN198]

The fact that German law and sovereignty have not become similarly irrelevant in the area of U.S. service on German defendants is largely due to a better understanding of the interconnections of transnational litigation law by German courts. Had they **1346** not stopped German Central Authorities from refusing to serve U.S. punitive damage claims under the Hague Service Convention, post-Schlunk decisions in the United States would have likely become more aggressive in allowing U.S. plaintiffs to avoid the procedures of the Hague Service Convention by serving defendants from Germany and other member states of the Convention within the United States. [FN199]

On the other side of the Atlantic Ocean, those who set out to amend the woefully inadequate [FN200] provisions on serving process and on taking evidence abroad in the Federal Rules in the early 1960s were primarily concerned with providing practitioners with the choices necessary to obtain the best available judicial cooperation from any foreign jurisdiction. [FN201] In their eagerness to avoid limiting those choices and in their concomitant disdain for what they viewed as outdated concepts of judicial sovereignty, [FN202] the rulemakers took an approach that promoted attitudes toward foreign sovereignty concerns that ultimately helped evoke legal developments in Germany and elsewhere that have made it difficult for some U.S. litigants to receive access to needed evidence or to enforcement proceedings abroad in some cases. By,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*1347** (1) permitting service (and, one may add, discovery abroad) in violation of foreign law (and, in the view of some countries of international law), (2) failing adequately to assist lawyers in making an informed choice among alternatives, and (3) neglecting to empower the courts to require resort to another alternative when that would benefit international relations, [FN203] the 1963 amendments to the Federal Rules (and by implication their state counterparts) fulfilled the drafters' additional wish to keep U.S. courts out of difficult issues of foreign law. [FN204] But they also fostered a continuing lacking awareness of, and nonchalance about, foreign sovereignty concerns and possible international obligations of the United States among U.S. courts and litigants. Representations made by the U.S. negotiators of the Hague Service and Hague Evidence Conventions to the U.S. Senate for purposes of advice and consent failed to change this attitude with regard to these conventions. [FN205] The resulting disregard for German concerns of sovereignty and proper treaty interpretation was an important factor in creating the German reactions during the "judicial conflict." [FN206] Thus, a policy of refusing to "clog lawsuits with threshold questions about the foreign law that might prove extremely hard to decide," [FN207] the politics of advice and consent, and, ultimately, the federal courts' concern with preserving their power under the Federal Rules and the power of state courts to determine the adequacy of service under domestic law, [FN208] have contributed to the emergence of attitudes and, German rules that severely disadvantage not only those U.S. litigants who seek to obtain evidence located in Germany if that evidence cannot be obtained through direct U.S. **\*1348** discovery, but also those who seek to enforce U.S. judgments in Germany. Thus, to the extent that the U.S. negotiators at the Hague now attempt to improve the lot of U.S. judgment creditors abroad, [FN209] they are working on removing obstacles partly initiated or reinforced by the policies of those who made law for transnational litigation law in the United States in the 1960s.

More importantly, rather than generating the large-scale emulation of the liberal attitudes toward judicial cooperation that the drafters of both the 1963 amendments to the Federal Rules and the 1964 amendments to the Judicial Code [FN210] had envisioned, [FN211] their work product ultimately helped produce the "judicial conflict" with Germany and similar protective reactions in other civil law countries. [FN212] Preoccupation with such protective action has prevented those nations from sincerely reconsidering their approach to notions of state sovereignty in regard to judicial cooperation in the face of today's interconnected world. This has left us with rigid approaches to judicial cooperation in a great number of countries--approaches that are clearly inadequate in a world in which it is technically feasible, through the internet, closed-circuit television, and similar means, to serve process and take evidence abroad instantly. [FN213] It has also prevented any meaningful discussion of much-needed nontraditional forms of judicial cooperation, most importantly direct judicial interaction across borders. [FN214]

**\*1349** What went wrong? Both the Germans and the Americans set transnational litigation policies without (sufficient) awareness of the forces affecting those policies down the line. They acted as if they could control the law of transnational litigation unilaterally. However, the events that transpired demonstrate that such is not the case. They exemplify some of the pathways through which an array of public and private actors--domestic, foreign, and international--may affect the making and application of transnational litigation law in a particular country. First, there is the importance of groups and individuals as consequential actors in transnational lawmaking. The interest of German business firms in limiting their exposure to U.S. litigation from their transnational endeavors played an important role in adapting the traditional German approach to judicial cooperation to the perceived new threats arising from U.S. litigation. German industry representatives were influential in seeking protection from U.S. litigation, [FN215] and in resisting a unilateral German liberalization of judicial cooperation for document discovery. [FN216] With their superior knowledge of U.S. law, they were also able to influence emerging German perceptions of the U.S. litigation process and of U.S. tort law. [FN217] Similarly, it was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the ingenuity of U.S. attorneys that ultimately led U.S. courts to permit the use of methods of service and dis-covery that would avoid triggering the procedures of the Hague Service and Hague Evidence Conventions. [FN218]

But the case of Germany also demonstrates that the role of groups and individuals in transnational lawmak-ing is not limited *1350 to interest-group pressures for the purposes of advancing a particular self-interest as public-choice theory would have it. [FN219] Industrial pressure did not really become influential in German ap-proaches to judicial cooperation for litigation in the United States until individuals in the German government and in academia responsible for fashioning those approaches perceived a need to protect German law, sover-eignty, and industry from U.S. decisions that threatened to undermine legitimate German control under tradition-al German views about transnational litigation, state sovereignty, and international law. [FN220] Thus, policy changes may also result from perceived threats to important ideational values shared by the individuals in charge of fashioning transnational-litigation law in a particular country.

On one hand, these ideational values may derive from the values underlying domestic procedure. Thus, one of the major concerns of German academics and government officials with U.S. discovery orders regarding evid-ence located in Germany was the potential of those orders to debase traditional, constitutionally safeguarded German values of privacy protection in civil litigation. [FN221] Conversely, U.S. courts quickly perceived the procedures of the Hague Evidence Convention, as interpreted by Germany, as a severe threat to the policy of open and equal access to evidence under the Federal Rules and similar state approaches. [FN222]

On the other hand, the ideational values that the local legal community prefers to protect may arise out of notions of national sovereignty and proper approaches to transnational litigation as protected by international law. These latter values, in turn, tend to be strongly influenced by the procedural approaches and jurisprudential values prevailing in the country in question. In Germany, *1351 where service and the taking of evidence are controlled by the court, [FN223] those activities have been considered sovereign acts that foreign judicial of-ficers or their surrogates may not perform on German territory without violating international law at least since the advent of European nationalism in the late eighteenth century. [FN224] Thus, U.S. attorneys who attempted to serve process on German domiciliaries through direct mail [FN225] or to depose German witnesses on Ger-man territory with the blessing of U.S. procedural law [FN226] and, more importantly, U.S. courts that ordered discovery to take place on German territory quickly created the perception of a need to react among German academics and government officials. [FN227]

The preferences relevant to lawmaking for transnational litigation are thus significantly shaped by the ideational values of the local legal establishment. Hence, the effectiveness of group and individual action in in-fluencing lawmaking for transnational litigation may be determined to some degree by local jurisprudential views and shared norms of discourse. The interest of German business in achieving protection from increasing liability exposure in the United States was at first largely unsuccessful. Not only because the legal establish-ment did not yet perceive a threat to its preferred values, [FN228] but also because the industry's interest was not strong enough to influence the extent of judicial cooperation in a country with a formalist legal tradition, un-der which courts and administrative agencies are supposed to interpret and apply statutes according to preor-dained rules, while the consideration of the interests of groups and individuals is deemed to be relegated to the *1352 legislative process. [FN229] This did not, however, prevent policymakers from adjusting accepted inter-pretations of statutes (including international conventions) where additional pressing interests so demanded. Yet even then did German scholars stick to traditional deductive-doctrinal reasoning, [FN230] as they quickly de-nounced new positions of the German government before U.S. courts that appeared not only overly aggressive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 1259    Page 18

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 28 of 131

politically but were also untenable under German views of proper interpretive power. [FN231]

However, as the case of Germany also shows, finding out about the relevant ideational values as well as about the mechanics of procedural law, the preferred approaches to transnational litigation and international law that those values have produced in a particular country is a difficult task not usually undertaken by procedural law reformers fashioning law for transnational litigation. A significant lack of information about the views and approaches to civil procedure and to transnational litigation in the United States led German academics, German Central Authorities, and courts to seriously uninformed decisions. [FN232] The same fate visited law reformers and courts in the United States with regard to the procedural law of Germany and other civil law countries. [FN233]

Finally, there is evidence of power politics playing a role. The ease with which some U.S. courts dismissed continental European sovereignty concerns in the service and evidence areas was generally seen in Germany as a result of U.S. economic and political power. [FN234] Because of that power and the concomitant German sense of powerlessness, the preference for protecting German procedural**1353** values and German sovereignty in interpreting the new Hague Evidence Convention was particularly strong. [FN235] In addition, when it became clear that German attempts to protect German litigants from having to produce evidence located in Germany under U.S. procedural rules had largely failed because most of those litigants had sufficient assets in the United States to be unable to resist U.S. judicial power, efforts to protect domestic firms shifted to areas in which the United States did not have the upper hand. [FN236] Thus, both the strength of state preferences and the resulting strategic policy choices that shape the law of transnational litigation in a particular country may be affected by perceptions of relative state power.

### 4. A Suggested Framework

#### 4.1. Insights From International Relations Theory

Having identified some of the factors affecting lawmaking for transnational litigation in the German case, I now wish to develop a larger framework for understanding the complex set of actors and behavior relevant to such lawmaking today. For this purpose, an international relations perspective promises to be especially profitable. International relations scholars have considerable expertise in explaining state behavior and in identifying the factors relevant to state action by way of empirically tested causal hypotheses. [FN237] Moreover, their parsimonious core statements of theory operate on a level of abstraction that is particularly conducive to rethinking traditional starting points in the law applicable to transnational cases, both domestic and international.

*1354* Scholars of international relations base their causal theories on larger theoretical approaches, or schools of thought, that each rest on their own characteristic set of principal assumptions about state behavior. [FN238] There are essentially four such schools today: realism, institutionalism, liberalism, and constructivism. [FN239] At the risk of serious oversimplification, their basic assumptions are as follows. Realism, articulated as a scientific theory in the late 1930s and 1940s, [FN240] assumes that nation states are the primary actors in international politics, and that the basic organizing principle is anarchy--an unhappy term denoting that there is no higher political authority--and thus that state action is a function of power, with the central preference of states to maximize their respective power. [FN241] Institutionalism, developed in the 1980s, starts from these realist premises, [FN242] but is more optimistic about international cooperation. Modeling international relations as a multilateral prisoner's dilemma or coordination problem, institutionalists assume that institutions, that is, "established rules, norms, and conventions," [FN243] can mitigate the effects of anarchy by reducing transaction

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

costs, promoting iteration, providing information, *1355 monitoring, issue-linkage, and reputational benefits and thus promote cooperation. [FN244] Liberalism, restated as a paradigm in the 1990s, [FN245] abandons the view that states are unitary actors and that they are the only consequential actors. Liberalism instead assumes that the interests of individuals and groups are analytically prior to state politics. [FN246] Thus, while states remain important actors, their preferences are determined by the interests and the behavior of groups and individuals acting in domestic and transnational society. [FN247] It is the state preferences thus resulting that determine outcomes in international relations, although, importantly, within the constraints imposed by the relative preferences of other states. [FN248] Liberalism thus acknowledges the importance of subnational and transnational actors in international relations. Constructivist approaches, finally, oppose the rationalist assumptions more or less underlying the previous three paradigms and argue that both social reality and knowledge of it are socially constructed. [FN249] Thus, they concentrate on ideas, norms, beliefs, and identities as consequential factors in international relations. [FN250]

*1356 The case of Germany in the previous Section supports at least some of the tenets of each of the four schools of thought in international relations. The presence of power as a factor influencing state behavior, both in the United States and in Germany, supports the realist assumption that relative state power determines outcomes. The role of groups and individuals in influencing governmental and court action supports the liberal assumption that groups and individuals are consequential actors in international relations. The importance of local ideational values and shared norms of discourse is in line with constructivist theory and its emphasis on the power of ideas. Finally, information deficits are among the major problems in international politics that institutionalists argue can be overcome with international institutions. [FN251]

However, some of these theoretical insights fit the German case better than others. There are two primary reasons for this. First, realism and institutionalism are committed to an instrumentalist optic, [FN252] a "logic of consequences" over a "logic of appropriateness." [FN253] This facilitates the building [FN254] and empirical testing [FN255] of rigorous causal theories. Yet the instrumentalist optic makes it difficult for those theories to account for the effect of the ideational values and shared norms of discourse in evidence in the German case. [FN256] Liberalism, although based on instrumentalism as well, at *1357 least allows for ideas, norms, and identities to play a role in determining the relevant interests that states may represent. [FN257]

Second, during much of its history, international relations theory has been no less state-centric in outlook than classical international law. [FN258] This is particularly true of realism. [FN259] But institutionalists, too, largely start from realist premises [FN260] and thus are unable to account fully for transnational individual-individual and individual-state relations. [FN261] Thus, these theories have difficulty explaining the role of groups and individuals in affecting lawmaking for transnational litigation at home and abroad as evidenced in the case of Germany. [FN262] As in international law, [FN263] however, this state-centric view of the international system has intermittently been *1358 called into question by international relations scholars. [FN264] Some constructivists [FN265] have made particular headway in explaining the relevance of transnational actors, such as transnational advocacy networks [FN266] and knowledge-based communities, [FN267] who attempt to change what they consider inadequate practices of states and international organizations. Moreover, with their interest in law and argument, [FN268] constructivists have a close affinity to the belief systems of lawyers [FN269] and are thus predisposed to research the role of law in transnational relations. However, its eccleclticism and lack of a coherent theory [FN270] make constructivism difficult to use as an analytical first cut of a coherent and rigorous theoretical framework with which to gain fresh insights into the process of lawmaking for transnational litigation. [FN271]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*1359** Liberal international relations theory meets this need best. While normative liberal international relations theories have been around at least since Immanuel Kant published his philosophical sketch toward achieving eternal peace, [FN272] this particular kind of liberalism seeks to state a theory of how states do behave, rather than how they should behave. [FN273] As indicated above, it assumes that the interests of individuals and groups are analytically prior to state politics. [FN274] Thus, states always represent, and respond to, some subset of society, depending on "the underlying identities, interests, and power of individuals and groups (inside and outside the state apparatus)." [FN275] Liberals assume that the resulting state preferences can vary widely, depending on domestic constitutional structure, interests represented, and transnational context. [FN276] Moreover, in focusing on individual and group interests, some liberal theorists posit that the state is increasingly disaggregated into its component parts, each representing its own set of interests on **\*1360** the international plane. [FN277] All this allows liberal international relations theory to take full account of the influence of groups and individuals on state action both at home and abroad, and of the interdependence created by transnational trade and investment patterns, population flows, and social communication.

Liberal theory is thus invaluable in focusing our attention on the important role that transnational groups and individuals play in the development of domestic as well as international law and policy. Once we recognize the significance of this role, [FN278] the need for a more systematic analysis of the interrelation between transnational actors and the law applicable to them--transnational law--becomes apparent. As Dean Slaughter has pointed out, liberal international relations theory provides a powerful theoretical framework for this purpose. [FN279] She suggests that "[f]rom a Liberal standpoint, transnational law helps structure patterns of individual and group interaction in transnational society, patterns that in turn generate interests that shape and constrain state action." [FN280] This analytical framework engages all those parts of domestic and international law "that directly regulate transnational activity between individuals and between individuals and state governments." [FN281] It thus covers not only private and parts of public international law, but also sizable portions of domestic law, some of which may have originally been promulgated solely with domestic purposes in mind, but parts of which have become relevant to transnational actors over time.

**\*1361** Thus, transnational lawmaking may (but need not originally) represent an attempt to regulate the private endeavors of transnational actors. At the same time, transnational law is itself the result of individual and group preferences--within and outside of government--exerted either directly through participation in the legislative, administrative, and litigation processes, or indirectly by engaging in transactional or litigation strategies designed to take advantage of, or frustrate, substantive or procedural policy. This process runs several ways. Frequently, more than one country attempts to regulate particular patterns of behavior with the result that state action needs to account for the preferences of other governments in the international system. Moreover, affected transnational actors have more than one government to address their grievances. Thus, the policy decisions of one state may result in responsive governmental action both at home and abroad.

## 4.2. Applying Liberal International Relations Theory to Transnational Litigation

It is within this analytical framework that transnational litigation operates, covering that part of transnational law which deals with the litigation of disputes among transnational actors. At its core, to be sure, litigation procedure involving transnational aspects remains domestic procedure, administered by domestic courts. [FN282] Yet, the presence of transnational actors triggers the suggested complex inter-relationship among that procedure, transnational groups and individuals, and state action abroad. Moreover, supranational tribunals have begun to assume part of the role traditionally played by national courts in the administration of transnational litigation be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause private groups and individuals have increasingly been granted an active role in litigation before tribunals, such as the European Court of Justice ("ECJ") [FN283] and the NAFTA dispute resolution panels. [FN284] This development is likely to accelerate**1362** as the negotiators of international treaty regimes, armed with the insights of research in the liberal international vein, [FN285] increasingly**1363** provide for the direct involvement of private groups and individuals before international tribunals to help enforce their regimes. [FN286] Those in charge of promulgating and applying the procedural law applicable to transnational cases thus need to assess the rules and principles of domestic procedure and the values underlying them within the suggested analytical framework so as to properly account for the transnational environment within which those rules and principles operate. This requires both reflection on the sort of procedural justice that can and should usefully be promoted within this transnational environment and an assessment of existing procedural rules within the policy objectives to be developed for transnational law as a whole.

Consider the growing interest in the interrelationship between litigation procedure and patterns of international trade. The Europeans in particular have been concerned with the adverse effects that some approaches to transnational litigation may have on the right to the free movement of goods, persons, services and capital under the EC Treaty. [FN287] In the early 1990s, scholars eloquently argued that the four freedoms guaranteed by the EC Treaty [FN288] directly mandate the abolition of procedural rules that in effect operate**1364** as barriers to inter-EC trade and, hence, that they require a much broader approximation of transnational litigation practice in the various EU member states than previously envisioned. [FN289] This goal is now explicitly supported by Article 65(c) of the EC Treaty. [FN290] On its basis, a number of directives on issues ranging from the protection of consumer interests to combating late payments in commercial transactions include procedural minimum standards regarding aspects such as access to justice, costs of proceedings, effective enforcement of judgments, and group litigation. [FN291] Moreover, the ECJ hesitantly adopted the argument in a number of cases reaching from Hubbard v. Hamburger [FN292] to Hayes v. Kronenberger. [FN293] In most of these cases, the court struck down national**1365** rules requiring foreign plaintiffs to post a bond as a precondition to hearing their claims, holding that such rules discriminated against nationals of other member states and thus violated Article 6 of the EC Treaty. [FN294] In Mund & Fester v. Hatrex International Transport, [FN295] the Court struck down as covertly discriminatory even a provision of the German Code of Civil Procedure, allowing a defendant's judgment proof status in Germany as grounds for granting a pre-judgment attachment.

The concern with facilitating international trade in fashioning rules for transnational litigation is not, however, exclusively a European phenomenon. [FN296] The U.S. Supreme Court, for example, has decided a line of cases on the assumption that closed-minded approaches to forum selection and arbitration clauses could hamper the interests of U.S. businesses abroad. [FN297] While the sincerity of the Supreme Court's international-commerce rhetoric in these cases may be questioned, [FN298] the same is not true of a number of recent international trade agreements, most notably the Trade-Related Aspects of Intellectual Property Agreement ("TRIPS"), the WTO sub-agreement on matters of intellectual property, [FN299] that contain a significant number of procedural minimum standards on issues ranging from evidence gathering to available remedies. [FN300] **1366** As supranational tribunals become more confident in enforcing these trade regimes, they may well take a closer look at the procedural rules in the various member countries, measuring transnational litigation rules on the policy of free trade. This is well demonstrated by two recent cases in which NAFTA arbitration panels were asked to consider the compatibility of an award of punitive damages--against a Canadian company by a Mississippi court [FN301] and the dismissal, by a Massachusetts court, of a suit by a Canadian corporation against the City of Boston for reasons of sovereign immunity, [FN302] respectively, with NAFTA's investment provisions. NAFTA's Chapter 11, under which these cases were heard, may be in a "legitimacy crisis" [FN303] that is partly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

due to its setup as a private ad-hoc arbitration without public accountability of the arbitrators and a lack of public access to the proceedings. [FN304] But the *1367 point should be clear.

A liberal perspective aids significantly in understanding the forces that lead to this pressure on domestic procedure by international trade agreements. As the European experience suggests, the scrutiny of domestic procedure by international trade tribunals is particularly likely where individuals and groups have themselves the opportunity to bring cases before such a tribunal. [FN305] Moreover, future trade talks may yield more specific procedural rules as transnational groups press proposals for procedural reform that they have been unable to obtain on a domestic level.

Consider Professor Benvenisti's analysis of collective-action failures in the transnational system. [FN306] Using public choice theory, he shows that relatively small but transnationally savvy groups such as producers, employers, and service providers have effectively utilized the international arena to exploit less organized groups at home by shifting their activities to different countries or by cooperating with similarly situated foreign groups to persuade their home governments to create international treaties or international organizations in order to avoid undesirable regulatory regimes at home. [FN307] He also notes that both international law and domestic constitutional norms premised upon the traditional state-centric view of the international system perpetuate this scheme, leading to a laissez-faire approach that effectively undermines domestic achievements of the welfare state and of standards of environmental and consumer protection. [FN308]

Procedural law reformers, both domestic and international, would do well to consider these developments carefully in devising rules applicable to transnational cases. Process values derived from policies of free trade, such as attempts to reduce expense and delay, [FN309] may conflict with domestic process values at every turn. [FN310] *1368 Even the ECJ has realized that facilitating international trade cannot be the only value, nor even the most important one, served by transnational procedure. Only two years after Hayes, in E.D. Srl. v. Fenocchio, [FN311] the court upheld the limitation under Italian law of the Italian order-of-payment procedure [FN312] to defendants who can be served with process on Italian territory against a challenge by an Italian creditor who demanded to use the mechanism against his recalcitrant Italian debtor who, at the time, resided in Germany. In the court's view, "the possibility that nationals would therefore hesitate to sell goods to purchasers established in other Member states is too uncertain and indirect for that national provision to be regarded as liable to hinder trade between Member States." [FN313]

Moreover, those involved in the making of transnational law and policy need to contemplate whether they intend to perpetuate, modify, or reverse the developments observed by Professor Benvenisti and to design strategies to implement their choice. [FN314] Whether these strategies are devised for transnational law as a whole or for specific issue areas within it, they are necessarily interrelated with aspects of procedure. In Dow Chemical Company v. *1369 Castro Alfaro, [FN315] for example, Justice Dogget, in a concurrence, engaged some of his colleagues on the Texas Supreme Court in an interesting debate on the issue of whether the doctrine of forum non conveniens should be abolished so that U.S. corporations that take advantage of substandard worker and consumer protection arrangements abroad by shifting some of their activities there can be held accountable in Texas courts. [FN316] Of course, there are other important policies to be considered when deciding whether to grant a motion to dismiss for forum non conveniens or whether the doctrine serves any useful purpose at all, [FN317] but the point should be clear.

In short, procedural law reformers need to act in awareness of the complex interdependence between transnational actors and the law applicable to them. Otherwise their work product risks unintentionally support-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing patterns of individual and group behavior they may not wish to condone, such as those observed by Professor Benvenisti, and unnecessarily hampering others, such as international trade. This, in turn, may lead to individual and group initiatives whose effect is to subject transnational procedure to particular substantive interests, most importantly, the promotion of free **\*1370** trade. On the other hand, transnational actors may simply choose to circumvent disfavored substantive and procedural law by structuring their behavior so as to avoid its application. Arbitration and forum selection clauses, for example, are frequently used by international business firms to stay out of countries with what is considered business-unfriendly litigation procedure and to avoid the application of domestic law deemed to be insufficiently sensitive to the needs of international trade. [FN318] This, in turn, may create pressure either to change the disfavored laws for the benefit of those transnational actors or, [FN319] conversely, to limit their exit options in favor of those incurring the negative externalities flowing from them. [FN320] In considering the alternatives for transnational litigation **\*1371** law, in particular whether and to what extent facilitating international trade should be its goal, domestic proceduralists may also wish to consider participating both in fashioning those international free-trade regimes that increasingly promise to control transnational litigation practice, and in debating their proper interpretation in the relevant transnational tribunals.

## 4.3. Refining the Suggested Framework

If this were all, one would be hard pressed to contest that the analysis suggested above is neither particularly novel nor fully compelling in arguing that there is more that separates transnational litigation from domestic interstate procedure than an opportunity for cross-fertilization. [FN321] At least in the United States, scholars have "long been alert to the observation that public life consists of 'competition among pressure groups for political influence'" [FN322] as well as to the incentive effects of rules. [FN323] If so, however, these insights have had surprisingly little effect on lawmaking for transnational litigation. The view that "a sovereign state may fashion domestic law as it deems fit," [FN324] particularly prevalent among federal judges and federal rulemakers in the United States, [FN325] has led to approaches that largely proceed as if transnational litigants had no transnational exit options at their disposal, no foreign or international tribunals, legislatures, or administrative agencies to address their grievances; and no opportunity to engage in transactional or litigation strategies abroad designed to take advantage of, or frustrate, domestic substantive or procedural policy. To be sure, the various interest-balancing tests that have been introduced to tackle issues as varied as the reach of domestic legislative jurisdiction,**\*1372** [FN326] transnational discovery, [FN327] or dismissals on forum non conveniens grounds [FN328] would provide opportunities to take these aspects of transnational interconnectedness into account, at least on the level of judicial lawmaking. [FN329] Yet, courts as well as commentators have done so only on occasion and without developing a systematic approach. [FN330]

But there is more. While similarities do exist between the interstate and the transnational levels in the ways groups and individuals and the interests of foreign states affect the law-making process, [FN331] there are also significant differences. The first difference from the domestic interstate situation is that some of the major players are not the same. As Professor Benvenisti demonstrates, transnationally savvy groups are more likely to influence policy than other actors, often outsmarting domestic lawmakers along the way. [FN332] This is not only true with regard to the making of international law, where well organized transnational groups can influence state preferences twice: at the negotiation stage and at the ratification**\*1373** or implementation stage, both times with significant advantages of information and access to both domestic and foreign governments. [FN333] As the case study above suggests, transnational actors also have an impact at the domestic levels of lawmaking. [FN334] For instance, there is a growing transnational bar that is well informed about the procedural traits of various countries and about their primary exit option--international commercial arbitration. This segment of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bar has become proficient in playing those procedural traits and in influencing local law reform in search of the best option for their clients. [FN335] A variety of procedural issues, from approaches to personal jurisdiction and parallel proceedings, to the availability of discovery and contingency fee agreements, to the circumstances under which arbitration is available, have played a role in this scenario. [FN336] This is not to say that transnational lawyers are engaging in reprehensible behavior. On the contrary, they are doing their job. [FN337] Rather, the point is that, unlike on the interstate level, they possess knowledge and access that other groups and individuals, including those involved in the making of procedural law, often do not have, and thus are able to influence the process of fashioning approaches to transnational litigation to a much greater extent than at the purely domestic level.

The second difference, closely related and nicely supported by the German case above, is that information about the policies and approaches of other countries to transnational cases remains a scarce commodity. [FN338] This type of information is crucial, for, without**1374** it, we cannot assess the real and potential effectiveness of our chosen procedural approaches. [FN339] While this kind of knowledge about other states' legal systems is quite easy to obtain within a federal system, the same is not true on the transnational level. The problem may be logistical. [FN340] Mostly, however, it is due to differences in legal history, culture, economy, and procedural philosophy, which severely impede the endeavor of someone trained in the legal system of one country to locate the rules and principles in point in another, let alone to gain a proper understanding of their relevance. Even where the language of a foreign country is the same, these differences of legal background may easily lead to misunderstandings. [FN341] Under these circumstances, it is much easier for those with a particular agenda to control the information fed to courts and procedural law reformers.

With that, we have identified the third difference. In domestic interstate relations, factors such as national identity, national economy, constitutional architecture, a federal or central government, legal education and practical training, and a discrete legal culture with its own history and philosophy tend to impose a distinct **1375** value system. True, there is often vigorous disagreement among the legal elite on jurisprudential as well as on policy issues. [FN342] But the way lawyers think, the way they draft their laws and legal opinions, what they consider convincing arguments, and who they consider important legal actors, as well as a great number of detailed assumptions about the best way to conduct a civil proceeding with and without foreign parties tend to be heavily ingrained. The same is not true on the transnational level, where there tend to be significant differences from country to country in the way lawyers think, in what they expect from particular legal institutions, and in those institutions themselves. [FN343]

The fourth and final difference transnational litigation involves is the jurisdictions of sovereign nations. Unlike states in a federal system, these nations are neither subject to a unifying constitutional structure nor to a federal or central government. The precise content of their sovereignty has, however, become the subject of a spirited debate. Despite conflicting empirical claims regarding the status of actual state autonomy, [FN344] the problem arises from a normative**1376** concept of sovereignty that no longer seems practicable in a world in which domestic lawmaking is increasingly constrained by international regimes, such as the WTO, NAFTA, and various human rights treaties, some of which may be considered to have constitution-like effects. [FN345] One may see in these developments a loss of the protection of national sovereignty [FN346] under international law, or a change of its content. [FN347] However, to the extent that reconceptualizations of the norm of sovereignty goes beyond that achieved by the ratification of treaties that limit actual state autonomy and is instead sought unilaterally, it tends to be resisted by nations--especially smaller ones--that continue to value their autonomy in making law for transnational litigation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Consider U.S. courts and federal rulemakers, who have long been impatient with what they consider to be impractical insistence on formalities. [FN348] Dean Slaughter's empirical research on the use of the act of state doctrine puts an interesting spin on this observation, finding that U.S. courts tend to be less reluctant to sit in judgment on the acts of a foreign sovereign if that sovereign is another liberal democratic state. [FN349] This confirms her theory that liberal **1377** states have been able to shift a significant portion of their transnational relations with one another from a political level to one controlled by law. [FN350] Thus, she concludes, "in court, pleas of the prerogatives of sovereignty are more likely to be honored with respect to nonliberal states than with respect to liberal states." [FN351] There is, however, a danger in turning these empirical findings on the behavior of U.S. federal courts into normative choices for international law binding on the entire world. [FN352] Groups and individuals in countries less powerful than the United States may view such undertakings from a more realist perspective. [FN353] To them, U.S. courts and lawmakers may simply be calculating when it is in the best interest of their country to defer to a political solution. [FN354] From this perspective, a "shared approach" that suggests substituting mutual interest balancing for the recognition of "abstract 'sovereign interests'" [FN355] is apt to increase the view that the power of mighty states determines the values governing transnational law and litigation at the expense of smaller nations. [FN356]

Thus, fresh concepts of national sovereignty, whether or not they distinguish between liberal and nonliberal states, will have to allow for some measure of self-determination by less powerful **1378** states. [FN357] Otherwise, negative reactions by groups and individuals in those smaller states are to be expected. [FN358] Such reactions do not need to culminate in responsive legislative and executive action, such as diplomatic protests [FN359] and blocking statutes. [FN360] As the German case demonstrates, they can affect foreign state action in much subtler ways that are nonetheless capable of adversely affecting the procedural values chosen for transnational cases elsewhere. [FN361]

## 4.4. What Makes Transnational Litigation Different?

Returning, thus, to the question of the law controlling transnational cases, it becomes clear that, from a strictly positivist point of view, [FN362] the law applicable to transnational litigation is indeed **1379** primarily domestic in nature. From this point of view, nation states may truly fashion the law of transnational litigation as they deem fit, [FN363] although their efforts are superseded by a growing patchwork of rules and standards of international law [FN364] and are increasingly controlled by the jurisprudence of supranational tribunals. [FN365] As a matter of policy, however, once attention is focused away from state-centric modes of analysis, we detect a strong interrelation between transnational-litigation law and patterns of behavior of transnational actors. This interrelation is complex, running up and down from national governmental entities, to groups and individuals, to governmental entities both at home and abroad as well as back and forth among governmental entities of different nations as they attempt to fashion their substantive and procedural policies in relation to the perceived preferences of other states. Through these various channels, one country's approaches to transnational litigation are likely to affect and constrain that country's own policies and law-making efforts as well as those of other countries in the future.

Such constraints may be legal as well as factual. To the extent that this interaction between transnational actors and transnational litigation law partakes of a larger "transnational legal process," [FN366] it has normative force. [FN367] Thus, a particular approach to a problem of transnational litigation may not only inhibit or facilitate, as the case may be, group and individual behavior that adversely affects the substantive or procedural policies in the country in question, it may also result in the formation of a new norm of transnational litigation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

This new norm may be the result of group and individual pressure on the same governmental body that promulgated the initial rule, such as when the U.S. courts partly retracted from overly aggressive assertions of legislative jurisdiction in the antitrust area in response to vigorous criticism at home and abroad. [FN368] *1380 More often, however, the new norm emanates from lawmaking in international or foreign fora, over which the original lawmaker has no direct control, but which nonetheless constrains that lawmaker's future endeavors. [FN369]

If, therefore, those in charge of lawmaking for transnational litigation--be they legislators, judges, or court rulemakers--want to be in control of their efforts, they need to act in awareness of the possible ways in which their decisions may affect their own policy choices through this web of transnational interdependence. They must carefully consider the values that they can and want to usefully pursue for transnational litigation. In doing so, they need to be mindful of the special circumstances that particularly set procedural lawmaking for transnational cases apart from its sister enterprise in domestic interstate litigation, including: the presence of different actors, both private individuals [FN370] and sovereign foreign governments; [FN371] differences in legal history, culture, and procedural philosophy; [FN372] and the scarcity of adequate information about policies and norms on transnational litigation in other countries. [FN373] Effective lawmaking for transnational litigation therefore requires a strategy to deal with these particular circumstances.

Before turning to my suggested approach to deal with these issues*1381 in Section 5, however, let me briefly clarify a couple of points. First, notice that I do not claim that taking transnational litigation seriously as a field means adopting a code of civil procedure specifically for transnational cases, a code that would contain distinct norms for everything from the filing of the complaint to the enforcement of a judgment. Nor do I mean to suggest that we should discard the values underlying domestic procedure in dealing with transnational cases. This would be neither wise nor feasible. As pointed out above, [FN374] the mechanics of civil procedure and the values underlying them tend to be deeply ingrained in the minds of the local bench and bar. Thus, to the extent that suggestions to change those norms for transnational cases cannot be supported by convincing arguments, such as their necessity to regulate transnational society in the desired fashion, they are likely to be strongly resisted. This is particularly true in the United States, where the ideal of transsubstantive rules has held sway in federal procedure, whether in the promulgation of the Federal Rules or in case law, since 1938. [FN375] Strong resistance against what are perceived to be unnecessary changes was also in plain view in a survey that Professor Walter and I conducted among lawyers in Germany and Switzerland on the feasibility of adopting, in those two countries, the Transnational Rules of Civil Procedure, originally drafted by Professors Hazard and Taruffo and now a project of both the American Law Institute and UNIDROIT. [FN376] If adopted, the rules would entirely replace, in transnational cases, the current "judge-centered procedure" [FN377] in Germany, Switzerland, and other civil law countries with an adversarial model, albeit one that forgoes many of the characteristic elements of U.S. civil procedure, [FN378] a prospect few of our respondents considered worth contemplating at this time. [FN379]

*1382 What we need to do, however, is carefully reflect on the values we can and should promote for transnational law in general, and trans-border litigation in particular, and to contemplate which of those domestic procedural norms need adapting or supplementing for most effective implementation of those values within the operational constraints imposed by transnational society. This may increasingly lead to the adaptation of procedural norms that casebooks and treatises on transnational litigation do not usually deal with, thus providing more reason and opportunity for transnational groups to cause transnational-litigation lawmakers to act. If the European experience regarding payment orders is any indication, [FN380] there may increasingly be pressure on domestic law reformers to provide simplified and inexpensive mechanisms for the enforcement of transnational debts. [FN381] Similarly, issues that have received lackluster treatment in courses on transnational litigation,

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 37 of 131

such as judicial cooperation to secure preliminary relief [FN382] or preliminary relief in transnational litigation in general, [FN383] may rise to *1383 prominence as the analysis of law reformers reveals the enormous importance of these issues in ordering transnational society. [FN384]

Second, if in a given jurisdiction procedural law reformers decide to promote their chosen values for transnational litigation by "adjusting the rules of the game for a larger playing field rather than playing by different rules," [FN385] this is a workable alternative as long as the net is cast wide enough to allow for the profound policy-cum-comparative analysis I suggest is necessary to successfully anticipate the effects of a particular approach on the behavior of transnational actors. However, it is an alternative that showcases the importance of the question of who, inside a nation state, should have the power to make the rules on transnational litigation. Casting the net wide enough to maintain the same norms for transnational as for domestic litigation in effect requires delegating the power of making the relevant policy choices to the trial court. [FN386] Whether this type of ad-hoc decision-making is desirable or even *1384 acceptable under a particular country's constitutional architecture of separation of powers is a legitimate question. It is a question that in transnational cases is complicated by the further inquiry into the proper role of courts in the interpretation and application of international law. [FN387]

5. The Basis of the Field: Comparative Procedure and International Relations Theory

As we have seen, the law of transnational litigation in one country can affect the behavior of groups and individuals in transnational society, and, through them, substantive and procedural law abroad and at home. We have also seen that this reality requires lawmakers to be aware of those interconnections and to act accordingly if they want to remain in control of their efforts. [FN388] The next question, then, is how transnational litigation as a field can help us better understand this process of transnational interaction and to predict outcomes.

The discussion thus far has demonstrated that international relations scholarship, both theoretical and empirical, has much to contribute to such a field. Liberal international relations theory with its emphasis on the behavior of groups and individuals and its de-emphasis of the nation state as the primary actor in international relations has particular potential to aid in a better understanding of the functioning of lawmaking for transnational society. [FN389] Yet, as the case of Germany in Section 3 has shown, other international relations theories also have important insights to contribute. [FN390]

Interdisciplinary cooperation between international relations scholars and lawyers specializing in litigation procedure and international law is therefore likely to prove most fruitful in assisting those who make and apply the law of transnational litigation in predicting whether their proposals are likely to work the way they are intended to work. [FN391] Because international relations scholars *1385 have paid relatively little attention to litigation procedure, the precise pathways through which such procedure may affect the behavior of groups and individuals as well as that of states--particularly procedural law's correlation with transnational economic interaction--are still relatively poorly understood and thus would offer interesting avenues of research for international relations scholars interested in the transnational-litigation setting.

Lawyers, on the other hand, can make the most valuable contribution to the field by helping to reduce the gaping informational deficits regarding foreign legal systems that pervade lawmaking for transnational litigation today. They can do so by bringing to bear their relative advantage in understanding both jurisprudential starting points and the intricacies of procedural approaches. [FN392] For if, as we have seen, [FN393] local ideational values and shared terms of discourse both affect the impact of group interests on transnational-litigation law-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

making and determine the strength and content of the preferences of procedural law reformers, getting to under-stand those values is crucial for the development of our field. Only with such an understanding will lawmakers fully be able to anticipate the ways in which their suggested norms may affect transnational actors in conjunction with the norms of other nations; [FN394] to communicate effectively, both directly and indirectly, with for-eign lawmakers; and to anticipate the reaction of other countries to contemplated approaches to transnational cases. Indeed, the case of Germany explored in Section 3 suggests that lack of knowledge about foreign proced-ural systems may be the single most pervasive barrier to making informed choices in transnational *1386 litiga-tion.

What is sorely needed, therefore, is in-depth comparative analysis to overcome this persistent information deficit. Unfortunately, there has been very little comparative analysis that fits this need. Indeed, there has been very little procedural comparison, period. [FN395] This may partly be the result of a general "malaise" affecting comparative law [FN396] and a concomitant lack of interest in the "comparative method," as it is also known, [FN397] among students, scholars, and the legal profession. [FN398] Partly, it may be due to the traditional view that procedure, whether domestic or transnational, is generally controlled by domestic law, [FN399] a view that does not envision a particular need for procedural comparison. If so, the discussion so far should have ex-posed the latter assumption as at least shortsighted, [FN400] and the identified need for comparative procedural analysis may light the way out of the "malaise." The comparative enterprise necessary for our purposes would entail a *1387 clearly stated objective (to provide knowledge about foreign ideational values underlying proced-ural approaches) and a defined topic (the views relevant to transnational litigation), and would clearly limit the available methodologies, thus avoiding some of the chief obstacles facing traditional comparative legal scholar-ship and teaching. [FN401]

There is, however, one problem usually associated with comparative law that the analysis needed for our field cannot easily avoid. It is reflected in the frequent objection that research into the legal approaches of for-eign countries is unduly demanding and prone to error. [FN402] To some degree, this problem is defused by having a clear purpose, defined topic, and limited choice of methods,*1388 [FN403] thus allowing for more fo-cused research. Yet, even with these restrictions in place, it cannot be denied that gaining and imparting know-ledge about the ideational values underlying the approaches to procedure and transnational litigation in various foreign countries is an arduous and time-consuming task full of dangers of reverting to assumptions and simpli-fications. However, rather than an argument against conducting comparative procedural analysis, this should be a bugle call to action on developing the methods and training needed to avoid some of the pitfalls of procedural comparison. As with empirical research to determine the efficacy of domestic procedural rules, to argue that it is too demanding is an odd objection against engaging in the only type of research capable of producing the know-ledge necessary for law reformers to make informed decisions. [FN404] Moreover, once a respectable body of comparative procedural analysis has been accumulated and once research methodologies have been refined and a certain stock of comparative knowledge has become second nature for specialists of transnational litigation, fur-ther and deeper analysis will be much easier to conduct. [FN405]

Finally, unilateral comparative analysis by academics and individual law reformers is not the only path lead-ing to much-needed knowledge about foreign litigation systems. As institutionalist international relations schol-ars have shown, a powerful means to overcome information deficits and the uncertainty attending them in the in-ternational realm is to increase the quantity and quality of communication. [FN406] Perhaps the most effective path toward this goal on the state-to-state level consists of entering into treaties. Treaties provide a forum for communication and information exchange not only at the negotiation stage, but also by setting up *1389 more or less sophisticated mechanisms for generating and disseminating information and for monitoring state behavior.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 1359                                                                          Page 29

Case 1:07-cv-00255-JJF          Document 60-2          Filed 03/17/2008          Page 39 of 131

[FN407]

There are also many other ways to promote information exchange specifically for purposes of transnational-litigation lawmaking that are less formalized than treaties, from academic conferences [FN408] to more institutionalized processes of public and private organizations; from domestic organizations, such as the ALI, to international ones, such as UNIDROIT and UNCITRAL. For example, as mentioned above, the ALI has undertaken the task of drafting Transnational Rules of Civil Procedure to be applied in all transnational cases in domestic courts. [FN409] Although those rules, as currently drafted, focus too strongly on harmonizing the phases of a lawsuit rather than on more pressing issues of transnational litigation, [FN410] their further discussion on several levels, including in cooperation with UNIDROIT, [FN411] has the potential of allowing for a sophisticated information exchange on domestic approaches to procedure, transnational litigation, and (as far as relevant) international law and the ideational values underlying them among the impressive array of leading practitioners and scholars involved in the enterprise. [FN412]

Whether this type of comparative education is gained by way of transnational communication, comparative scholarship, or both, its results are likely to benefit transnational-litigation lawmakers **1390** not only directly--by providing information helpful to pinpoint possible problems with intended policy choices--but also indirectly--by providing scholars of international relations with the factual material with which to develop and test new and more intricate theories about the effects of lawmaking in transnational society in general and in the transnational-litigation setting in particular. If such international-relations scholarship is to further assist law reformers in predicting the likely effects of their contemplated actions, it needs to overcome the tendency of rationalist international relations scholars, as of U.S. economists, [FN413] to base their work on assumptions and empirical data taken mostly from the U.S. experience. [FN414] Some international relations scholars have recently noticed the importance of incorporating comparative insights. [FN415] Hence, recognizing the importance of comparative knowledge about the ideational values underlying foreign litigation systems should no longer require a leap of faith. Doing so will allow international relations theory optimally to contribute to the further development of transnational litigation as a field.

6. Conclusion

For far too long, judges and procedural law reformers have approached transnational litigation exclusively from the precepts of domestic procedure, failing to engage the larger implications of lawmaking in a transnational setting. This has produced suboptimal lawmaking, at times severely so. It has led to unnecessary international tensions, [FN416] the perpetuation of approaches and concepts that are not in line with some of the declared values that lawmakers want to pursue in transnational litigation, [FN417] to the stalling**1391** of important treaty negotiations, [FN418] and, most often, to unintended consequences, large and small. [FN419]

Depending on one's jurisprudential vantage point, there is nothing wrong with the view that the law of transnational litigation is controlled primarily by domestic law. However, together with state-centric assumptions about lawmaking and with the traditional belief that there is a clear line separating domestic and international law, [FN420] this view tends to mask the transnational interconnectedness of lawmaking for transnational litigation. [FN421] For, as a matter of fact, lawmaking in one country, through the behavior of transnational actors, may affect lawmaking in another as well as on the international stage, where more and more treaties and conventions on substantive issues of transnational law, particularly on trade law, contain provisions affecting domestic procedure and allow transnational groups to help enforce those provisions by filing suit in both domestic and international tribunals. Thus, in effect, the process of lawmaking for transnational litigation involves

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

groups and individuals at home and abroad, whether private or in government service, as well as state power. It is different from the purely domestic lawmaking process in that it involves different actors and nation states with their own lawmaking power and in that it requires overcoming severe information deficits about foreign litigation systems and the jurisprudential views underlying them. [FN422] Approaching transnational litigation in one country in disregard of these interconnections may result in reactions abroad that can hamper future transnational policies in the originating country for quite some time.

Therefore, it is time that we take transnational litigation seriously on its own. This requires that we attempt to better understand the causal pathways through which lawmaking for transnational cases in one country is interconnected with that in others and with transnational lawmaking as a whole. [FN423] This task is complicated**1392** by the reality, neglected by rationalist international relations theory and underestimated by much of the traditional international-law scholarship, that law is socially constructed by the legal elite in a particular country. Thus, the views on what are proper approaches to problems of transnational litigation under international as well as under domestic law depend heavily on local jurisprudential values and traditions, particularly on those underlying domestic procedure. Thus, we need to inform ourselves and then teach our students--the next generation of law reformers [FN424]--more extensively about foreign procedural systems and their underlying values. [FN425] On the basis of such newly gained knowledge, we can then make informed choices on the values that we want transnational litigation to serve.

This is not to suggest that courts and lawmakers must choose a multilateral approach to making law for, or interpreting treaties relevant to, transnational litigation. [FN426] That is, they may not necessarily be "willing to apply the laws of [other nations] under specified conditions" so as to "balance the advantages accruing to individual citizens operating transnationally with a minimum assurance that the policies embedded within their own laws will be effectuated by other states." [FN427] Separation of powers concerns, constraints arising from federalism, or simply their good judgment may prevent judges in particular from engaging in what might be perceived as a giveaway. [FN428] My suggestion is simply that we gain the necessary knowledge to allow judges and procedural law reformers to make informed decisions. If the process of gaining that knowledge results in a loss of overly self-regarding attitudes about one's own approaches to procedure and thus to an increased use of multilateral approaches, to treaty negotiations, and, ultimately, to **1393** increased procedural harmonization, all the better.

Moreover, taking transnational litigation seriously as a field will require proceduralists to engage in policy discussions far beyond those they have traditionally contemplated. Most importantly, proceduralists will need to take an active role in discussing the relationship between domestic approaches to transnational litigation and supranational and international trade organizations. It will no longer suffice simply to observe supranational courts, such as the ECJ, and international trade organizations, such as the WTO and NAFTA, as they regulate one aspect of procedure after another, often from narrow vantage points. Otherwise we run the risk of yielding control over transnational procedure to those few groups and individuals in transnational society that do have access to the type of information domestic lawmakers have not cared about and thus are learning quickly to play the policy-making game, as occurred in early international law. [FN429]

[FNa1]. Associate Professor, University of Akron School of Law. LL.B. 1990, University of Bern, Switzerland; M.L.I. 1993, LL.M. 1995, University of Wisconsin, Madison; J.S.D. 2002, University of Bern, Switzerland. I am indebted to Ron Brand, Steve Burbank, Kevin Clermont, Annelise Riles, Tom Rowe, Gerhard Walter, and to the

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 41 of 131

participants of a faculty workshop at Cornell Law School for valuable comments on earlier drafts of this Article and to Louise Teitz and Fridolin Walther for insightful discussions. Unless otherwise indicated, translations are mine.

[FN1]. Roscoe Pound, The Etiquette of Justice, 3 Proc. Neb. St. B.A. 231 passim (1908) (referring to procedural law as "adjective law").

[FN2]. Charles Clark, The Handmaid of Justice, 23 Wash. U. L.Q. 297 (1938); see also Edson R. Sunderland, An Inquiry Concerning the Functions of Procedure in Legal Education, 21 Mich. L. Rev. 372, 381-82 (1922) (describing procedure as "secondary and derivative" and as merely serving to make substantive law operative). On the sentiment of Pound, Clark, and others involved in the movement for uniform federal rules of civil procedure and earlier reform movements that what was needed were simplified rules of procedure that would be subservient to the just application of substantive law, see Stephen N. Subrin, How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective, 135 U. Pa. L. Rev. 909, 945-46, 952-56, 962-63 (1987).

[FN3]. See, e.g., Phyllis Tropper Baumann et al., Substance in the Shadow of Procedure: The Integration of Substantive and Procedural Law in Title VII Cases, 33 B.C. L. Rev. 211 (1992) (exploring interrelation between substance and procedure in Title VII cases); Robert G. Bone, Statistical Adjudication: Rights, Justice, and Utility in a World of Process Scarcity, 46 Vand. L. Rev. 561 (1993) (analyzing the effect of statistical sampling on case outcomes); Stephen B. Burbank, The Costs of Complexity, 85 Mich. L. Rev. 1463, 1471-76 (1987) [hereinafter Burbank, Costs of Complexity] (discussing the effect of procedural rules on substantive law). For a treasure trove (although partially dated) of comparative and interdisciplinary research, see also Access to Justice, vols. I-IV (Mauro Cappelletti gen. ed., 1978-79) and Access to Justice and the Welfare State (Mauro Cappelletti ed., 1981). In fact, Charles Clark himself actively pursued the idea of procedure as an instrument of social control, see Subrin, supra note 2, at 966-68, while William Howard Taft and other conservatives participated in, indeed spearheaded, the work to create simplified procedural rules to advance their own political goals, see id. at 955-56.

[FN4]. See, e.g., Stephen B. Burbank, Rule 11 in Transition: The Report of the Third Circuit Task Force on Federal Rule of Civil Procedure 11 (1989) (presenting empirical findings, conclusions, and recommendations with regard to the use of Rule 11 in the Third Circuit); Deborah R. Hensler et al., Class Action Dilemmas, Pursuing Public Goals for Private Gain (2000) (analyzing a large number of damage class actions and presenting ten case studies); E. Allen Lind & Tom R. Tyler, The Social Psychology of Procedural Justice (1988) (reviewing current theory and empirical research on procedural justice and exploring its implications for legal, political, interpersonal, and work-related settings); James S. Kakalik et al., Inst. for Civil Justice, Discovery management: Further Analysis of the Civil Justice Reform Act Evaluation Data (1998) (examining civil discovery abuse and providing policy recommendations); Thomas E. Willging et al., Discovery and Disclosure Practice, Problems and Proposals For Change (1997) (researching the use of discovery and discovery-related problems and evaluating the need for rule changes); Kevin M. Clermont & Theodore Eisenberg, Litigation Realities, 88 Cornell L. Rev. 119 (2002) (summarizing existing, and presenting new, empirical data on six phases of a civil suit); Michael Selmi, The Price of Discrimination: The Nature of Class Action Employment Discrimination Litigation and Its Effects, 81 Tex. L. Rev. 1249 (2003) (examining the effect of complex employment discrimination cases on corporate behavior and plaintiff benefits); Thomas E. Willging et al., An Empirical Study of Discovery and Disclosure Practice Under the 1993 Federal Rule Amendments, 39 B.C. L. Rev. 425 (1998) (surveying discovery and disclosure practice, its costs, benefits, and problems).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN5]. See, e.g., Burbank, Costs of Complexity, supra note 3, at 1466. For a valuable collection of articles to stimulate reflection on process values, see Robert Cover & Owen Fiss, The Structure of Procecure (1979). See also Robert G. Bone, Agreeing to Fair Process: The Problem With Contractarian Theories of Procedural Fairness, 83 B.U. L. Rev. 485 (2003) (positing a theory of procedural fairness); Jonathan T. Molot, An Old Judicial Role for a New Litigation Era, 113 Yale L.J. 27 (2003) (positing a traditional model of adjudication).

[FN6]. See infra note 24 and accompanying text.

[FN7]. Principles and Rules of Transnational Civil Procedure (Proposed Final Draft 2004) [hereinafter 2004 Draft]; Principles and Rules of Transnational Civil Procedure (Preliminary Draft No. 2, 2000); Principles and Rules of Transnational Civil Procedure (Preliminary Draft No. 1, 1998) [hereinafter 1998 Draft].

[FN8]. American Law Institute ("ALI"), Transnational Insolvency Project: Principles of Cooperation in Transnational Insolvency Cases Among the Members of the North American Free Trade Agreement (Tentative Draft 2000); American Law Institute, Transnational Insolvency Project: Interim Report (1999); American Law Institute, Transnational Insolvency Project, International Statement of Mexican Bankruptcy Law (Tentative Draft 1998); American Law Institute, Transnational Insolvency Project, International Statement of U.S. Bankruptcy Law (Tentative Draft 1997) [hereinafter U.S. Statement]; American Law Institute, Transnational Insolvency Project, International Statement Canadian Bankruptcy Law (Tentative Draft 1997).

[FN9]. Hague Conference on Private International Law, Summary of the Outcome of the Discussion in Commission II of the First Part of the Diplomatic Conference 6-20 June 2001, Interim Text, available at http://hcch.e-vision.nl/upload/wop/jdgm_pd15e.pdf (last visited Nov. 5, 2004). For scholarship on the proposed Hague Convention, see A Global Law of Jurisdiction and Judgments: Lessons from the Hague (John J. Barceló III et al. eds., 2002); Samuel P. Baumgartner, The Proposed Hague Convention on Jurisdiction and Foreign Judgments, Trans-Atlantic Lawmaking for Transnational Litigation (2003) [hereinafter Baumgartner, Hague Convention]; Samuel P. Baumgartner, The Proposed Hague Convention on Jurisdiction and Foreign Judgments: Where We Are and the Road Ahead, 4 Eur. J.L. Ref. 219 (2002); Andreas F. Lowenfeld, Thoughts About a Multinational Judgments Convention: A Reaction to the von Mehren Report, 57 Law & Contemp. Probs. 289 (1994); Arthur T. von Mehren, Drafting a Convention on International Jurisdiction and the Effects of Foreign Judgments Acceptable World-wide: Can the Hague Conference Project Succeed?, 49 Am. J. Comp. L. 191 (2001) [hereinafter von Mehren, Drafting]; Arthur T. von Mehren, Recognition and Enforcement of Foreign Judgments: A New Approach for the Hague Conference?, 57 Law & Contemp. Probs. 271 (1994); Linda J. Silberman, Comparative Jurisdiction in the International Context: Will the Proposed Hague Judgments Convention Be Stalled?, 52 DePaul L. Rev. 319 (2002); Russel J. Weintraub, How Substantial is Our Need for a Judgments-Recognition Convention and What Should We Bargain Away to Get It?, 24 Brook. J. Int'l L. 167 (1998).

[FN10]. ALI, International Jurisdiction and Judgments Project (Discussion Draft 2002) [hereinafter ALI Draft]; ALI, International Jurisdiction and Judgments Project (Report 2000); see also Linda J. Silberman & Andreas Lowenfeld, A Different Challenge for the ALI: Herein of Foreign Country Judgments, an International Treaty, and an American Statute, 75 Ind. L.J. 635 (2000) (proposing and describing the development of a draft statute and commentary concerning recognition of foreign country judgments).

[FN11]. See infra text accompanying notes 283-308.

[FN12]. See, e.g., Burkhard He<<beta>>, Der Verordnungsvorschlag der französischen Ratspräsidentschaft vom 26. 6. 2000 über einen "Europäischen Besuchstitel," 20 Praxis des Internationalen Privat- und Verfahrensrechts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00255-JJF          Document 60-2          Filed 03/17/2008          Page 43 of 131

[IPRax] 361, 363 (2000) (lamenting lack of scholarship); Haimo Schack, The New International Procedure in Matrimonial Matters in Europe, 4 Eur. J.L. Ref. 37, 55-56 (2002); Astrid Stadler, Das Europäische Zivilprozess-recht - Wie viel Beschleunigung verträgt Europa?, 24 IPRax 2 (2004) (criticizing the speed and lack of research with which procedural law reform proceeds within the European Community ("EC")). The EC has adopted an ambitious agenda regarding projects dealing with, or at least affecting, transnational procedure. Aside from a large number of decisions of the European Court of Justice ("ECJ") interpreting the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, Sept. 27, 1968, 1972 O.J. (L 299) 32 [hereinafter Brussels Convention], things really took off with the introduction of the competence of the EC to create secondary Community law regarding inter-community procedure in 1999. See infra note 290 and accompanying text. Since then, the EC Council, upon suggestion by the Commission, has passed a considerable number of regulations in this area. See, e.g., Parliamentand Council Regulation 805/2004, 2004 O.J. (L 143) 15 ("European Enforcement Order for Uncontested Claims"); Council Directive 2002/8/EC, 2003 O.J. (L 26) 41 ("Improvement of Access to Justice in Cross-border Disputes by Establishing Minimum Common Rules Relating to Legal Aid for Such Disputes"); Council Regulation 1206/2001, 2001 O.J. (L 174) 1 ("Cooperation between the Courts of the Member States in the Taking of Evidence in Civil or Commercial matters"); Council Regulation 44/2001, 2001 O.J. (L 12) 1 ("Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters") [hereinafter Brussels Regulation] (replacing the Brussels Convention); Council Regulation 1346/2000, 2000 O.J. (L 160) 1 (concerning insolvency proceedings); Council Regulation 1348/2000, 2000 O.J. (L 160) 37 (relating to the service in the Member States of the of judicial and extrajudicial documents in civil or commercial matters); Council Regulation 1347/2000, 2000 O.J. (L 160) 19 (regarding jurisdiction and the recognition and enforcement of judgments in matrimonial matters and in matters of parental responsibility for children of both spouses). Aside from these traditional matters of international procedure, both the ECJ and the Commission have increasingly utilized substantive trade rules and decidedly non-procedural provisions of the EU Treaty to circumscribe the duties of the Member States in matters relating to transnational cases. See infra text accompanying notes 290-295.

[FN13]. See Gary B. Born, International Civil Litigation in United States Courts (3d ed. 1996); Andreas F. Lowenfeld, International Litigation and Arbitration (2d ed. 2002) [hereinafter Lowenfeld, International Litigation]; Ralph G. Steinhardt, International Civil Litigation (2002); Louise Ellen Teitz, Transnational Litigation (1996); Russel J. Weintraub, International Litigation and Arbitration: Practice and Planning (3d ed. 2003).

[FN14]. In a review of the on-line course schedules for the top 30 U.S. law schools as identified by the latest U.S. News & World Report ranking (for lack of a better method to circumscribe my research), I was able to locate a specific course on transnational or international civil litigation at fifteen schools. Eight out of those fifteen are among the top ten schools (last visited Nov. 5, 2004).

[FN15]. See, e.g., F. Meili, Das internationale Civilprozessrecht (1906) (Switzerland) (treatise of international civil procedure); Erwin Riezler, Internationales Zivilprozessrecht (1949) (Germany) (providing German materials for the study of international civil procedure); Gustav Walker, Streitfragen aus dem internationalen Civilprozessrechte (1897) (Austria) (discussing issues of international civil procedure). In France and other Romanic countries, some aspects of transnational litigation have usually been treated as an add-on to the general course on private international law. See, e.g., Henri Battifol & Pierre Lagarde, II Droit International Privé P&psign 667-753. (8th ed. 1993) (France) (standard treatise on private international law). But see Prospero Fedozzi, Diritto processuale civile internazionale (1905) (Italy).

[FN16]. Stephen B. Burbank, The World in Our Courts, 89 Mich. L. Rev. 1456, 1458 (1991) [hereinafter Burb-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ank, World] (reviewing Gary B. Born & David Westin, International Civil Litigation in United States Courts (1989)).

[FN17]. While Professor Burbank was persuaded that transnational litigation is a nominal field, one that "'can... be justified by the heuristic needs of the profession,'" Burbank, World, supra note 16, at 1457-58 (citing to Michael S. Moore, A Theory of Criminal Law Theories, in 10 Tel Aviv Stud. in Law 115, 131 (Daniel Friedmann ed., 1991)), he did not consider it a field of a functional kind, one that tries "'to realize some underlying kind of justice.'" Id. at 1459; see also Heinrich Nagel & Peter Gottwald, Internationales Zivilprozessrecht 2 (5th ed. 2002) (suggesting that the term "international civil procedure" does not identify a cohesive body of rules, but rather refers to a host of different issues that may arise in litigation that for one reason or another transcends national borders).

[FN18]. Burbank, World, supra note 16, at 1458. Professor Burbank there responded to a claim by the authors of the first casebook/treatise on the market in the United States that what they called "international civil litigation" was about to be a distinct field of law. See Born & Westin, supra note 16, at 3. In making that claim, Mr. Born and Mr. Westin suggested their own framework for analysis by identifying five themes that recur in international civil litigation: balance of interest, foreign relations, federalism, public international law, and comity. Id. at 3-18. Rather than adapting this scheme in later editions so as to meet Professor Burbank's powerful argument, they apparently chose to yield to it by omitting this opening chapter altogether. See Gary B. Born & David Westin, International Civil Litigation in United States Courts (2d ed. 1992); Born, supra note 13.

[FN19]. With respect to the United States, Professor Burbank has elsewhere explained this phenomenon as a motive or psychological "disposition to assimilate international to domestic interjurisdictional cases," which derives from "a complex of structural, historical, and cultural factors," one of which consists of "a history of accommodating the perceived needs of [state] sovereignty under constitutional language long on aspiration but short on details," and which is "reinforced by the very powerful impulse of modern American procedural law, including for these purposes choice of law, to apply the same rules to all cases." Stephen B. Burbank, Jurisdictional Equilibration, the Proposed Hague Convention and Progress in National Law, 49 Am. J. Comp. L. 203, 208-09 (2001) [hereinafter Burbank, Equilibration]. Notice, however, that as a matter of fact, transnational cases may be treated differently from domestic cases to some extent. See, e.g., Kevin M. Clermont & Theodore Eisenberg, Xenophelia in American Courts, 109 Harv. L. Rev. 1120 (1996) (finding that foreigners, both as plaintiffs and as defendants, fare significantly better than Americans in U.S. federal courts); Kimberly A. Moore, Xenophobia in American Courts, 97 Nw. U. L. Rev. 1497 (2003) (finding anti-foreigner bias in U.S. patent litigation).

[FN20]. See, e.g., infraSection 3.

[FN21]. For an illuminating categorization of this scholarship and for suggestions of new directions for joint research, see Anne-Marie Slaughter et al., International Law and International Relations Theory: A New Generation of Interdisciplinary Scholarship, 92 Am. J. Int'l L. 367 (1998). See also The Role of Law in International Politics (Michael Byers ed., 2000); Tom Ginsburg & Richard H. McAdams, Adjudicating in Anarchy: An Expressive Theory of International Dispute Resolution, 45 Wm. & Mary L. Rev. 1229 (2004) (positing expressive theory of international dispute resolution); Jack L. Goldsmith & Eric A. Posner, A Theory of Customary International Law, 66 U. Chi. L. Rev. 1113 (1999) (using international relations theory and case study to craft a theory of customary international law); Jonathan D. Greenberg, Does Power Trump Law?, 55 Stan. L. Rev. 1789 (2003) (discussing relationship between state power and international law); Andrew T. Guzman, A Compliance-Based Theory of International Law, 90 Cal. L. Rev. 1825 (2002) (positing a theory of compliance with interna-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tional law); Oona A. Hathaway, Do Human Rights Treaties Make a Difference?, 111 Yale L.J. 1935 (2002) (exploring the impact of human rights treaties on state behavior); Laurence R. Helfer, Overlegalizing Human Rights: International Relations Theory and the Commonwealth Caribbean Backlash Against Human Rights Regimes, 102 Colum. L. Rev. 1832 (2002) (providing Caribbean case study of overlegalization); Kal Raustiala & Anne-Marie Slaughter, International Law, International Relations and Compliance, in Handbook of International Relations 538 (Walter Carlsnaes et al. eds., 2002) (exploring state compliance with international law); John K. Setear, Responses to Breach of a Treaty and Rationalist International Relations Theory: The Rules of Release and Remediation in the Law of Treaties and the Law of State Responsibility, 83 Va. L. Rev. 1 (1997) (analyzing functionality of rules of release and remediation); Harold Hongju Koh, Why Do Nations Obey International Law?, 106 Yale L.J. 2599 (1997) [hereinafter Koh, Why Obey?] (reviewing Abram Chayes & Antonia Handler Chayes, The New Sovereignty: Compliance with International Regulatory Agreements (1995) and Thomas M. Franck, Fairness in International Law and Institutions (1995)); Judith Goldstein et al., Introduction: Legalization and World Politics, 54 Int'l Org. 385 (2000) (introducing special issue on legalization and world politics).

[FN22]. For many of us, this is increasingly true to some extent some of the time. My concept of transnational actors is thus a fluid one. It may be most interesting to study those transnational actors with a particular transnational purpose, such as multinational organizations, certain non-governmental organizations, advocacy networks, and epistemic communities (networks of experts and scientists pursuing policy goals based on profound knowledge in a particular issue or area), because they are the ones with the most measurable impact. See, e.g., Thomas Risse, Transnational Actors and World Politics, in Handbook of International Relations, supra note 21, at 255, 255-56 [hereinafter Risse, Transnational Actors]. As the case study in Section 3 of this Article demonstrates, however, it would be a mistake to exclude from the analysis transnational actors that do not self-consciously pursue a transnational purpose.

[FN23]. See authorities cited supra note 15.

[FN24]. See, e.g., Andreas Bucher, I/1 Droit International Privé Suisse 17 (1998); Giuseppe Campeis & Arrigo De Pauli, Il Processo Civile Italiano e lo Straniero 1 (1996); Reinhold Geimer, Internationales Zivilprozessrecht 4-5 (4th ed. 2001); Haimo Schack, Internationales Zivilverfahrensrecht 1 (3d ed. 2002); Gerhard Walter, Internationales Zivilprozessrecht der Schweiz 47 (3d ed. 2002).

[FN25]. See, e.g., Baumgartner, Hague Convention, supra note 9, at 16-46; Stephen B. Burbank, The Reluctant Partner: Making Procedural Law For International Civil Litigation, 57 Law & Contemp. Probs. 103, 127-39 (1994) [hereinafter Burbank, Reluctant Partner].

[FN26]. See, e.g., Burbank, World, supra note 16, at 1464-65, 1496-97 (doubting whether customary international law ever played a role or even should play a role in U.S. courts).

[FN27]. Max Guldener, Das Internationale und Interkantonale Zivilprozessrecht der Schweiz 1 (1951).

[FN28]. Positivism emerged in response to the natural law theories that for centuries had assumed that law is shaped and determined by metaphysical powers such as deity or human reason. In much-cited passages, John Austin (1790-1859) described the basic tenets of positivism thus:

    Every positive law (or every law simply and strictly so called) is set, directly or circuitously, by a sovereign individual or body, to a member or members of the independent political society wherein its author is supreme.  In other words, it is set, directly or circuitously, by a monarch or sovereign number, to a person or persons in a state of subjection to its author.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 46 of 131

John Austin, The Province of Jurisprudence Determined 29 (Wilfrid E. Rumble ed., Cambridge University Press 1995) (1832). And:

> The existence of law is one thing; its merit or demerit is another. Whether it be or be not is one enquiry; whether it be or be not conformable to an assumed standard, is a different enquiry. A law, which actually exists, is a law, though we happen to dislike it, or though it vary from the text, by which we regulate our approbation and disapprobation.

Id. at 157. In modern positivist theory, these two theses live on as the "social thesis" and the "separability thesis." The latter intends to distinguish legal rules from other norms (such as moral or religious standards) in society. The former seeks to explain the normativity of law. See, e.g., Brian Leiter, Positivism, Formalism, Realism, 99 Colum. L. Rev. 1138, 1141-42 (1999) (reviewing Anthony Sebok, Legal Positivism in American Jurisprudence (1998)). Of course, Austin further concluded that international law does not constitute law because it is not enforced by sovereign coercion. Later positivist international lawyers disagreed and concluded instead that norms of international law must be deduced from the collective state will. See, e.g., Benedict Kingsbury, Legal Positivism as Normative Politics: International Society, Balance of Power and Lassa Oppenheim's Positive International Law, 13 Eur. J. Int'l L. 401, 423-26 (2002); Bruno Simma & Andreas L. Paulus, The Responsibility of Individuals for Human Rights Abuses in Internal Conflicts: A Positivist View, 93 Am. J. Int'l L. 302, 303-04 (1999). But see H.L.A. Hart, The Concept of Law 209 (1961) (arguing that "[t]he question 'Is international law really law' can hardly be put aside").

[FN29]. See, e.g., infra notes 78, 85, 229 and accompanying text for examples of formalism in German jurisprudence. Formalist theories are theories about adjudication, that is, theories about how law is and how it should be applied to decide cases. They hold that law is reasonably determinate, so that a court or other agency applying the law to a particular case can engage in a relatively mechanical syllogistic exercise guided by the logic of legal rules. Thus, the law applier has little, if any discretion, and may not have recourse to reasoning extant to law. See, e.g., Leiter, supra note 28, at 1144-46. In the United States, formalism was utterly discredited by the anti-formalists and legal realists in the early part of the last century and has never fully recovered. See, e.g., Neil Duxbury, Patterns of American Jurisprudence 32-299 (1995).

[FN30]. See, e.g., I/1 Georg Dahm et al., Völkerrecht 102-03 (1989) (suggesting that, today, not even the monists generally claim that international law renders inapplicable, inconsistent domestic law within the domestic legal sphere); Harold G. Maier, The Authoritative Sources of Customary International Law in the United States, 10 Mich. J. Int'l L. 450 (1989). At least for non-Americans, Professor Maier's piece, id., is particularly interesting because it mixes a strongly antiformalist, partly antipositivist, McDougal-inspired process view of international law with a strict positivist-based distinction between lawmaking authority for domestic and international law.

[FN31]. See, e.g., S.S. "Lotus" (Fr. v. Turk.), 1927 P.C.I.J. (ser. A) No. 10, at 18 ("International law governs relations between independent States."); Vienna Convention on the Law of Treaties, May 23, 1969, art. 1, 1155 U.N.T.S. 331 (mentioning only nation states as legal subjects capable of entering into international treaties); 1 L. Oppenheim, International Law: A Treatise 21-22 (2d ed. 1912) ("[T]he Law of Nations is based on the common consent of individual States, and not of individual human beings. States solely and exclusively are the subjects of international law."); Dahm et al., supra note 30, at 23, 102-03 (noting that states are the subjects of international law).

[FN32]. Contrary to traditional view (see, e.g., Restatement (third) of the Foreign Relations Law of the United States §§ 111 cmt. d, 115 cmt. e (1987) [hereinafter Restatement (Third)] (stating that customary international

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

law is federal law); Louis Henkin, Foreign Affairs and the United States Constitution 238-39 (2d ed. 1996) (claiming that customary international law is federal common law)), a number of scholars have recently argued that customary international law is not automatically the law of the United States. The arguments differ. Professor Maier, for example, has suggested that even where a U.S. court "applies" customary law, the source of authority is its decision and thus U.S. law rather than international law because its decision to interpret the international law rule in a particular fashion represents the "will of the United States body politic." Maier, supra note 30, at 455. Others have argued that customary international law cannot be federal common law and thus cannot be applied by U.S. courts unless authorized to do so by the federal political branches. See, e.g., Curtis A. Bradley & Jack L. Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, 110 Harv. L. Rev. 816 (1997); Curtis A. Bradley & Jack L. Goldsmith, Federal Courts and the Incorporation of International Law, 111 Harv. L. Rev. 2260 (1998) (responding to critiques of their work). But see Harold Hongju Koh, Is International Law Really State Law?, 111 Harv. L. Rev. 1824 (1998) (critiquing Bradley & Goldsmith, Customary International Law as Federal Common Law: A Critique of the Modern Position, supra); Gerald L. Neuman, Sense and Nonsense About Customary International Law: A Response to Professors Bradley and Goldsmith, 66 Fordham L. Rev. 371 (1997); Beth Stephens, The Law of Our Land: Customary International Law as Federal Law After Erie, 66 Fordham L. Rev. 393 (1997) (offering historical support for the traditional position).

[FN33]. This is due to the concept of the "non-self-executing" treaty--that is, the treaty provisions which cannot be invoked by individuals before U.S. courts because either the treaty itself or the circumstances surrounding U.S. ratification indicate that the Executive or Congress considered prior implementing legislation necessary. See, e.g., Restatement (third), supra note 32, § 111(4). Indeed, some have recently suggested that, as originally understood, the Constitution of the United States requires all treaties to be implemented by Congress before they can regulate the conduct of private parties. See John C. Yoo, Globalism and the Constitution: Treaties, Non-Self-Execution, and the Original Understanding, 99 Colum. L. Rev. 1955 (1999). But see Martin S. Flaherty, History Right?: Historical Scholarship, Original Understanding, and Treaties as "Supreme Law of the Land," 99 Colum. L. Rev. 2095 (1999) (responding to Yoo, Globalism and the Constitution, supra); Carlos Manuel Vazquez, Laughing at Treaties, 99 Colum. L. Rev. 2154 (1999) (refuting claims in Yoo, supra).

[FN34]. See, e.g., infra Section 3.2 and text accompanying notes 200-209.

[FN35]. See, e.g., Burbank, World, supra note 16, at 1459-66; Maier, supra note 30, at 465-68. The contrary aspiration of the Restatement's drafters, see Restatement (third), supra note 32, § 403 cmt. a (claiming that the Restatement's mandate of a reasonableness inquiry "has emerged as a principle of international law"), was dealt a severe blow by the U.S. Supreme Court in Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993).

[FN36]. See, e.g., Doe v. Unocal Corp., 2002 WL 31063976, at *11 (9th Cir. 2002) (applying "international law as developed in the decisions of international criminal tribunals"), reh'g en banc granted and vacated Doe v. Unocal Corp., 2003 WL 359787 (9th Cir. 2003); Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995) (relying on the settled proposition that federal common law incorporates customary international law); Filartiga v. Pena Irala, 630 F.2d 876, 886 (2d Cir. 1980) (applying customary international law); Ryan Goodman & Derek P. Jinks, Filartiga's Firm Footing: International Human Rights and Federal Common Law, 66 Fordham L. Rev. 463 (1997); Kathleen Kedian, Customary International Law and Human Rights Litigation in United States Courts: Revitalizing the Legacy of The Paquete Habana, 40 Wm. & Mary L. Rev. 1395 (1999); Harold Hongju Koh, Transnational Public Law Litigation, 100 Yale L.J. 2347 (1991); David Sloss, Non-Self-Executing Treaties: Exposing a Constitutional Fallacy, 36 U.C. Davis L. Rev. 1 (2002) (opposing the modern doctrine of non-self-executing

Case 1:07-cv-00255-JJF          Document 60-2          Filed 03/17/2008          Page 48 of 131

treaties). But see Curtis A. Bradley & Jack L. Goldsmith, Treaties, Human Rights, and Conditional Consent, 149 U. Pa. L. Rev. 399, 439-67 (2000) (arguing that declarations of non-self execution by the political branches are valid under the U.S. Constitution); Curtis A. Bradley & Jack L. Goldsmith, The Current Illegitimacy of International Human Rights Litigation, 66 Fordham L. Rev. 319 (1997) (arguing that international human rights law cannot be treated as federal law without authorization by the political branches). In interpreting the subject-matter jurisdiction of federal courts under Section 1350 of the U.S. Code, Title 28, in Sosa v. Alvarez-Machain, 124 S. Ct. 2739 (2004), the Supreme Court now charts a middle ground, holding that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the 18th-century paradigms familiar when § 1350 was enacted." Id. at 2765.

[FN37]. Traditionally, liberals in the United States have been concerned primarily about what they consider to be unwarranted claims of national sovereignty against the ability of U.S. courts to do justice, whereas conservatives have primarily fought suggestions that the President and Congress should be so limited in the exercise of their constitutional powers. Cf. Paul B. Stephan, A Becoming Modesty - U.S. Litigation in the Mirror of International Law, 52 DePaul L. Rev. 627, 628 (2002) ("Commentators who wish U.S. judges to take on a broader role in addressing international injustice often deplore U.S. unilateralism by the Executive or Congress. The reverse is also true: skeptics of collective security, typically jealous of national sovereignty, express alarm at bold judicial action affecting foreign affairs.").

[FN38]. See, e.g., infra notes 349-355; cf. In Re Automotive Refinishing Paint Antitrust Litigation, 358 F.3d 288, 304 (3d Cir. 2004) (alleging that "there is no reason to assume that discovery under the Federal Rules would inevitably offend Germany's sovereign interest because presumably Germany, like the United States, would prohibit the alleged price-fixing conspiracy and would welcome investigation of such antitrust violation to the fullest extent"); Ugo Mattei, American Law ina time of Global Interdependence: U.S. National Reports to the XVIth International COngress of Comparative Law, 50 Am. J. Comp. L. 87, 96 (Supp. 2002) (noting that American "legal parochialism... can easily be explained within the Globalization = Americanization equation").

[FN39]. See, e.g., Burbank, Reluctant Partner, supra note 25, at 123 (citing the concern of some members of the Advisory Committee on Civil Rules regarding a proposed amendment to Fed. R. Civ. P. 26 in 1990 that deference be expressed in the rule to "diplomatic efforts that are undertaken and accomplished by other branches of government," and "[a]fter expressing that deference--I don't mean as a complete ritual, but after expressing that deference, then proceed with what we need to do to do justice"); see also Patrick M. McFadden, Provincialism in United States Courts, 81 Cornell L. Rev. 4 (1995) (exploring the reasons for the marginal role played by international law in U.S. courts).

[FN40]. See, e.g., infra Section 3.

[FN41]. For the reasons of the difficulties, see generally Baumgartner, Hague Convention, supra note 9. The project currently proceeds on a much narrower basis as a treaty on jurisdiction and judgments recognition where there is a forum selection clause. See Hague Conference on Private International Law, Draft on Exclusive Choice Court Agreements, Working Document 110 E (May 2004), available at http://www.hcch.net/doc/jdgm_wd110_e.pdf (last visited Nov. 13, 2004).

[FN42]. See supra text accompanying note 24.

[FN43]. See, e.g., Bruno A. Ristau, 1 International Judicial Assistance § 1 (1984); Harry Leroy Jones, Interna-

tional Judicial Assistance: Chaos and a Program for Reform, 62 Yale L.J. 515, 515 (1953).

[FN44]. On the historical origins of this notion, see Baumgartner, Hague Convention, supra note 9, at 48-53.

[FN45]. See, e.g., id. §§ 2-3.

[FN46]. See supra Section 2.

[FN47]. See, e.g., Der Justizkonflikt mit den Vereinigten Staaten von Amerika (Walther J. Habscheid ed., 1986) [hereinafter Justizkonflikt] (containing essays on the judicial conflict between the United States and Europe); Peter Schlosser, Der Justizkonflikt zwischen den USA und Europa (Walter de Gruyter ed., 1985) [hereinafter Schlosser, Justizkonflikt]; see also Peter Gottwald, Grenzen zivilgerichtlicher Massnahmen mit Auslandswirkung, in Festschrift für Walther J. Habscheid 119 (1989) (speaking of Justizkrieg [judicial war]). Although the rhetoric of Justizkonflikt has since subsided somewhat, many of the underlying problems have not. See, e.g., Herausforderungen des Internationalen Zivilverfahrensrechts (Andreas Heldrich & Toshiyuki Kono eds., 1994) (containing contributions to a Japanese-German-Swiss symposium considering problems in transnational cases involving the United States). European complaints about American procedural imperialism have flourished anew in the wake of the Cold War's demise and of U.S. litigation against continental European firms regarding their roles in the Nazi Holocaust. See, e.g., Burkhard He<<beta>>, Entschädigung für NS-Zwangsarbeit vor US-amerikanischen und deutschen Zivilgerichten, 44 Aktiengesellschaft 145, 145-46 (1999) (discussing issues of Holocaust-related ligitation). For a concise review of that litigation by one of the plaintiff's chief protagonists, see Burt Neuborne, Preliminary Reflections on Aspects of Holocaust-Era Litigation in American Courts, 80 Wash. U. L.Q. 795 (2002).

[FN48]. See supra note 47 and accompanying text.

[FN49]. For example, the central authorities in Germany do not keep any copies of materials supporting requests for judicial cooperation. Thus, finding out what happened in a particular case is all but impossible to discover after the fact. See, e.g., Harald Koch, Zur Praxis der Rechtshilfe im amerikanisch-deutschen Proze<<beta>>recht - Ergebnisse einer Umfrage zu den Haager Zustellungs - und Beweisübereinkommen, 5 IPRax 245, 245 (1985).

[FN50]. See Born, supra note 13, at 849 (describing German diplomatic protests against attempts of a U.S. Vice-Consul and an Assistant U.S. Attorney to take sworn testimony on German territory).

[FN51]. In judging how voluntarily Germany really cooperated with U.S. authorities, one needs to be aware not only of the function of the United States as an occupying force but also of the fact that several of the cases at issue concerned German suits to reclaim property from the U.S. Alien Property Custodian under the Trading with the Enemy Act. For an example of such a case, see Jones, supra note 43, at 532.

[FN52]. See Abbo Junker, Discovery im Deutsch-Amerikanischen Rechtsverkehr 221 (1987). See generally Bundesministerium der Justiz, Rechtshilfeordnung für Zivilsachen, Oct. 19, 1956 [hereinafter ZRHO]; Hans Arnold, Monatsschrift für Deutsches Recht 385 (1957) (describing the German position).

[FN53]. See, e.g., Born, supra note 13, at 774-77, 847-49 (discussing civil law views).

[FN54]. See, e.g., 28 U.S.C. § 1781 (2002).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN55]. See, e.g., Born, supra note 13, at 774-77, 847-49; Junker, supra note 52, at 218-22 (discussing the German approach).

[FN56]. See, e.g., Baumgartner, Hague Convention, supra note 9, at 47-67.

[FN57]. See, e.g., Nagel & Gottwald, supra note 17, at 7-8 (listing sixteen treaties). See also Jones, supra note 43, at 516 (noting that civil law countries "have covered the globe with a network of treaties to assure judicial assistance" among them).

[FN58]. On the harmonizing effect of bilateral recognition compacts between continental European states, see Gerhard Walter & Samuel P. Baumgartner, General Report: The Recognition and Enforcement of Foreign Judgments Outside the Scope of the Brussels and Lugano Conventions, in 3 Civil Procedure in Europe: The Recognition and Enforcement of Foreign Judgments Outside the Scope of the Brussels and Lugano Conventions 1, 6-8 (Gerhard Walter et al. eds., 2000) [hereinafter Walter & Baumgartner, Recognition].

[FN59]. See infra Section 3.1.1.

[FN60]. Between Germany and the United States, the two conventions entered into force on June 26, 1979, with their ratification by Germany. See Convention on the Service Abroad of Judicial and Extrajudicial Documents, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 [hereinafter Hague Service Convention]; Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231 [hereinafter Hague Evidence Convention]. The United States had ratified the Hague Service Convention in 1967 (with effect in 1969) and the Evidence Convention in 1972.

[FN61]. Hague Service Convention, supra note 60.

[FN62]. Hague Evidence Convention, supra note 60.

[FN63]. See infra text accompanying notes 156-167.

[FN64]. See infra Section 3.1.2.

[FN65]. See supra note 47 and accompanying text.

[FN66]. See supra note 55 and accompanying text.

[FN67]. The two most important treaties containing an obligation of the requested state to apply compulsion, where necessary, to serve process or to take evidence are the Hague Service and Evidence Conventions. See infra note 112 (discussing improvements brought about by the Conventions).

[FN68]. ZRHO, supra note 52, §§ 70(2), 83(1). This is based on the theory that any application of compulsion by the state requires a basis in parliamentary legislation. The ZRHO, which regulates judicial assistance, is, however, merely a regulation issued by the executives of the federal and state governments. See, e.g., Rolf Stürner, Die Gerichte und Behörden der U.S.A. und die Beweisaufnahme in Deutschland, 81 Zeitschrift für Vergleichende Rechtswissenschaft 159, 202 (1982) [hereinafter Stürner, Beweisaufnahme].

[FN69]. Agreement Relating to the Taking of Evidence, Feb. 11, 1955-Oct. 8, 1956, U.S.-F.R.G., 32 U.S.T. 4181.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN70]. The Notes provided that U.S. consular officers could question West German and other non-U.S. nationals, without compulsion of any kind, with an opportunity for the person questioned to be accompanied by counsel, at the consular premises or (upon the express request or express consent of the person to be questioned) at the home or place of business of the person to be questioned. Id.

[FN71]. See, e.g., Ulrich Drobnig, American-German Private International Law 340 (2d ed. 1972).

[FN72]. In re Grand Jury Investigation of the Shipping Indus., 186 F. Supp. 298, 318 (D.D.C. 1960) (discussing the objections of several nations, including Germany, regarding the production of documents).

[FN73]. Gesetz über die Aufgaben des Bundes auf dem Gebiet der Seeschiffahrt, v. 24.5.1965 (BGBl. II S.835-36) [Law on the Tasks of the Federal Government in the Area of High-Seas Shipping].

[FN74]. Apparently, an extraordinarily favorable currency-exchange rate had unleashed a wave of German investment in the United States in the early 1970s, thus further increasing German exposure to U.S. litigation. See Abbo Junker, Der lange Arm amerikanischer Gerichte: Gerichtsgewalt, Zustellung und Jurisdictional Discovery, 6 IPRax 197, 198 (1986).

[FN75]. U.S. companies also perceived (or at least found it convenient to assert) that the new onslaught of litigation had taken on crisis proportions and thus began to push strongly for tort and procedure reform, initiating the first tort reform movement that was carried by prominent judges, justices, and practicing attorneys as well as by corporations themselves. See, e.g., Marc Galanter, Reading the Landscape of Disputes: What We Know and Don't Know (and Think We Know) About Our Allegedly Contentious and Litigious Society, 31 UCLA L. Rev. 4, 6-11 (1983) (exploring perceptions that the United States was overly litigious in the 1970s and 1980s).

[FN76]. See, e.g., Hermann H. Hollmann, Diskussion, in Justizkonflikt, supra note 47, at 138, 140.

[FN77]. See, e.g., Volkswagenwerk AG v. Superior Court, 33 Cal. App. 3d, 503 (1973). In this case, the Superior Court for the County of Sacramento had ordered the deposition of various Volkswagen employees and ordered Volkswagen to permit inspection of its plant in Wolfsburg, Germany, on consecutive working days, both clear violations of the traditional rule that any taking of evidence on German territory without prior assent of the German government violates German judicial sovereignty. See supra text accompanying notes 53-55; see also Ernst C. Stiefel, "Discovery": Probleme und Erfahrungen im Deutsch-Amerikanischen Rechtshilfeverkehr, 25 Recht der Internationalen Wirtschaft [RIW] 509, 515 (1979) (citing two unpublished cases in which similar orders of federal courts to permit discovery on German territory led to diplomatic interventions by the German government); Diplomatic Note Dated September 27, 1979, from the Embassy of the Federal Republic of Germany to the U.S. Department of State, reprinted in Born, supra note 13, at 777 (protesting the use of direct mail to serve process on German defendants).

[FN78]. See, e.g., Hollmann, supra note 76, at 139 (complaining that the industry's requests for help and information on how to proceed in U.S. litigation was often met with "lack of knowledge, lack of interest, or even a playing down of the problems").

[FN79]. Some had acquired LL.M. degrees from U.S. law schools.

[FN80]. See, e.g., Peter Schlosser, Internationale Rechtshilfe und Rechtsstaatlicher Schutz von Beweispersonen, 94 Zeitschrift für Zivilprozess [ZZP] 369, 370 (1981) [hereinafter Schlosser, Rechtshilfe] (noting that before the

entry into force of the Hague Service and Evidence Conventions, judicial assistance had been conducted exclusively by the justice ministries of the Länder under § 9 ZRHO, supra note 52, thus failing to create published opinions). But see Hans-Viggo von Hülsen, Vorlage von Dokumenten und Zeugenvernehmungen für US-Zivilprozesse [Pre Trial Discovery], 20 Aussenwirtschaftsdienst des Betriebs-Beraters [AWD] 315 (1974) (reporting on Volkswagenwerk, supra note 77).

[FN81]. This aspect was brought home by a brief student note, based on an article in the Wall Street Journal, reporting on a domestic U.S. case in which a California jury had handed down a $128.5 million verdict against Ford Motor Co., including, at $125 million, one of the largest punitive awards in a product liability case at the time. See Peter C. Heesch, Amerikanisches Gericht verhängt 125 Mio. $ Strafschadenersatz, 33 Juristenzeitung [JZ] 247 (1978). On remittitur, the trial judge reduced the award to $3.5 million, and this was upheld by the Court of Appeals (both of which remained unreported in Germany). See Grimshaw v. Ford Motor Co., 119 Cal. App. 3d 757 (Ct. App. 1981).

[FN82]. Germany follows the loser-pays rule for apportioning attorneys' fees. § 91(1) (ZPO) provides in pertinent part, "The losing party has to bear the costs of the litigation, including indemnifying the opponent for his costs, as far as they were necessary for the effective prosecution or defense of the claim."

[FN83]. The first published case exemplifying these aspects of U.S. discovery to the German legal community involved an antitrust counterclaim, in support of which the claimant sought to discover numerous documents from two alleged German co-conspirators as well as the deposition of some of the latters' current and former executives. The District Court for the Western District of Virginia ordered that the discovery proceed through the letter-of-request procedure of the Hague Evidence Convention, then newly ratified by Germany. It thus generated the first (and so far last) published German decisions on whether, and to what extent, a U.S. letter of request should be executed under that Convention in Germany. Corning Glass Works v. Int'l Telephone & Telegraph Corp., OLG München, 36 JZ 540 (1981), reprinted in 20 I.L.M. 1025, 1025 (1981); Int'l Telephone & Telegraph Corp. v. Bavarian Ministry of Justice, OLG München, 36 JZ 538 (1981), reprinted in 20 I.L.M. 1025, 1049 (1981). While the U.S. court in that case appears to have made every effort to narrow the discovery order so as to meet a high standard of materiality, including a narrowing of the lines of questioning upon informal request by the Munich district court, see Schlosser, Rechtshilfe, supra note 80, at 373-74 (reproducing the narrowed request in English), the request still went far beyond what is permissible under German law. Id. at 383. In the Bavarian Ministry of Justice decision, supra, the Munich court refused to order the production of various documents from German territory under Article 23 of the Convention without deciding whether and to what extent the document request would otherwise violate German law. 20 I.L.M. at 1055. In the Corning Glass Works decision, it let the depositions of the witnesses proceed under questioning of a German judge and in application of most of the limitations that the German Code of Civil Procedure sets for the scope of discovery-- including a limitation on the questioning to the subject matter contained in the requested documents--but in the presence of a U.S. magistrate judge and in accordance with the U.S. court's request to administer oaths and to produce a verbatim transcript. 20 I.L.M. at 1032-39. In a sequel to the second decision, the Munich courts later decided that the witnesses to be heard in executing the letter of request were prevented by German procedural law from divulging any trade or business secrets. AG München, 27 RIW 850 (1981); LG München, 27 RIW 851 (1981). In a more disturbing case, from a German point of view and also published in Germany, see Stürner, Beweisaufnahme, supra note 68, at 161-64. A California court had ordered Volkswagen to permit "claimant's representatives to have access to the VWAG facilities at Wolfsburg... on five consecutive days to inspect and photograph the premises" and to inspect and copy any writings "which plaintiffs shall designate as bearing upon [their claims]." Volkswagenwerk AG v. Superior Court, 123 Cal. App. 3d 840, 847 (Ct. App. 1981). The California Court of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Appeal later granted a petition for mandamus and reversed and ordered the discovery order to proceed under the Hague Evidence Convention. Id. at 848.

[FN84]. In Volkswagenwerk, the trial court had not thought it necessary to proceed under the Hague Evidence Convention, although VWAG had produced an aide memoire issued by the German government describing the traditional German position on sovereignty (although admittedly under the legal regime controlling before entry into force of the Hague Evidence Convention) to a California court in an earlier case in which a similar discovery order had been at stake. See Volkswagenwerk AG, 123 Cal. App. 3d at 855.

[FN85]. See, e.g., Joachim Zekoll, Kant and Comparative Law - Some Reflections on a Reform Effort, 70 Tul. L. Rev. 2719, 2743-45 (1996) (describing the German process of law application in private-law matters).

[FN86]. See, e.g., supra text accompanying note 77 (discussing the Volkswagenwerk case).

[FN87]. See supra note 52.

[FN88]. See Hague Service Convention, supra note 60; Hague Evidence Convention, supra note 60.

[FN89]. See, e.g., F.A. Mann, Anmerkung, 36 JZ 840 (1981) (commenting on Volkswagenwerk); Rolf Stürner, Rechtshilfe nach dem Haager Beweisübereinkommen für Common Law-Länder, 36 JZ 521 (1981) [hereinafter Stürner, Rechtshilfe]; Schlosser, Rechtshilfe, supra note 80; Stürner, Beweisaufnahme, supra note 68. In-house counsel of, and attorneys representing German firms also participated in the scholarly debate. See Hermann H. Hollmann, Auslandszustellungen in US-amerikanischen Zivil-und Verwaltungssachen, 28 RIW 784 (1982); Hans-Viggo von Hülsen, Gebrauch und Missbrauch US-amerikanischer "pre-trial discovery" und die internationale Rechtshilfe, 28 RIW 225 (1982); Hans-Viggo von Hülsen, Kanadische und Europäische Reaktionen auf die US "pre-trial discovery," 28 RIW 537 (1982); Dirk-Reiner Martens, Erfahrungen mit Rechtshilfeersuchen aus den USA nach dem Haager Beweisaufnahme-Übereinkommen, 27 RIW 725 (1981).

[FN90]. See, e.g., Rudolf B. Schlesinger et al., Comparative law 715 (6th ed. 1998) (noting that "courts in civil-law countries show more respect for the scholar's view than is customary in the common-law world" and that "[w]hen a lawyer in a 'civil law' country has a legal problem which is not definitely settled by statute he may be satisfied to solve it without reference to decisions, but never without the literature" (quoting Fritz Moses, International Legal Practice, 4 Fordham L. Rev. 244, 266 (1935)).

[FN91]. The German legislation implementing the Hague Evidence Convention provides that the executive may pass a regulation allowing for the execution of letters requesting the discovery of documents under circumstances to be specified by that regulation. Ausführungsgesetz zum Haager Beweisaufnahmeübereinkommen § 14, v. 1980 (BGBl. II S.1297). Until now, no such regulation has been enacted. See infra text accompanying note 164.

[FN92]. See, e.g., Schlosser, Rechtshilfe, supra note 80, at 394-95; Stürner, Rechtshilfe, supra note 89, at 522.

[FN93]. While some scholars concluded that a request for a U.S.-style examination of the witnesses by the parties' attorneys could be granted under Article 9(2) of the Convention, as long as the examination was conducted in German, under the supervision of a German judge, and with the further limitations noted in the text, see Schlosser, Rechtshilfe, supra note 80, at 386-90, others thought that such a request could arguably be refused as "impossible... by reason of practical difficulties" under Article 9(2). See, e.g., Stürner, Rechtshilfe, supra note

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 54 of 131

89, at 524. On the primary role of the judge in taking evidence, including questioning witnesses in Germany, see, for example, David J. Gerber, Extraterritorial Discovery and the Conflict of Procedural Systems: Germany and the United States, 34 Am. J. Comp. L. 745, 753-55 (1986); John H. Langbein, The German Advantage in Civil Procedure, 52 U. Chi. L. Rev. 823, 826-30 (1985) [hereinafter Langbein, German Advantage]. While the availability of U.S.-style depositions was thus controversial, however, those commentators had no objection to German courts administering oaths and creating verbatim transcripts when requested by the U.S. court under Article 9(2) of the Convention. See, e.g., Schlosser, Rechtshilfe, supra note 80, at 394-95.

[FN94]. Article 11 of the Convention provides: "In the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege to give evidence--(a) under the law of the State of execution." Hague Evidence Convention, supra note 60, at 243; see, e.g., Stürner, Rechtshilfe, supra note 89, at 524.

[FN95]. See, e.g., Schlosser, Rechtshilfe, supra note 80, at 402-05; Stürner, Rechtshilfe, supra note 89, at 523-24. This view is based on Article 9(1) of the Convention, which provides that "[t]he judicial authority which executes a Letter of Request shall apply its own law as to the methods and procedures to be followed." Hague Evidence Convention, supra note 60, at 243. On the scope of the protection of trade and business secrets in German procedure, see Gerber, supra note 93, at 764-67.

[FN96]. See, e.g., Mann, supra note 89, at 840; Schlosser, Rechtshilfe, supra note 80, at 384-90; Stürner, Rechtshilfe, supra note 89, at 521-22. This conclusion is based on Article 3 of the Convention, the German translation of which is clearly more amenable to such an interpretation than its English original. While Article 3(c) requires that a Letter of Request specify "the nature of the proceedings for which the evidence is required, giving all necessary information in regard thereto," Hague Evidence Convention, supra note 62, at 2558, the German equivalent says "die Art und den Gegenstand der Rechtssache sowie eine gedrängte Darstellung des Sachverhalts" ["the nature and the subject matter of the dispute and a brief exposition of the facts" ] (emphasis added). And while Article 3 further requires that "where appropriate, the Letter shall specify... (f) the questions to be put to the persons to be examined or a statement of the subject-matter about which they are about to be examined," id., the German translation states "[d]as Rechtshilfeersuchen enthält ausserdem, je nach Sachlage:... (f) die Fragen, welche an die einzuvernehmende Personen gerichtet werden sollen, oder die Tatsachen, über die sie einvernommen werden sollen" ["the letter of request shall further contain, depending on the specific situation... the questions to be directed at the persons examined or the facts about which they are to be interrogated" ] (emphasis added). The reason for these differences is largely attributable to sloppy drafting at The Hague. Although the German text is not an authentic text, the French version of the Convention is, and the German represents a fairly good translation. In any case, some commentators even suggested that substantial attempts at fishing might violate German public policy under Article 12(b) of the Convention--see, for example, Schlosser, Rechtshilfe, supra note 80, at 380-84--and most of them chided the Munich court, supra text accompanying note 83, for executing a letter of request that, in their view, clearly represented a violation of Article 3 of the Convention. (Remember that from an American point of view, the requests before the Munich court were considerably narrower than what is usual in an antitrust case. Supra note 83.) For more on the German rule against "fishing," in its attempting to weed out unjustified intrusions into privacy by requiring the court to be satisfied, either from evidence already available or from a sufficiently specific allegation by the proponent that a particular line of questioning is likely to produce relevant evidence, see Gerber, supra note 93, at 762-63, explaining the German standard of relevancy, and see generally, Rolf Stürner, Die Aufklärungspflicht der Parteien des Zivilprozesses (1976).

[FN97]. Koch, supra note 49.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN98]. See supra note 96 and accompanying text.

[FN99]. See id.

[FN100]. Koch, supra note 49, at 247-48. One Central Authority responded that 90% of requests would have been refused execution under Article 12 had the witnesses in question not participated voluntarily. Id. at 248.

[FN101]. Id. at 247-48.

[FN102]. Id. at 245-46.

[FN103]. The German Declaration to the Hague Service Convention requires such a translation. See Declaration of the Federal Republic of Germany to the Convention on the Service of Process in Civil and Commercial Matters, Oct. 3, 1990 [hereinafter German Declaration on Service Convention] ("Formal service... shall be permissible only if the document ... is written in, or translated into, the German language.").

[FN104]. This ground for refusing service is puzzling since discussions among the member states of the Convention in 1977 had acknowledged the fact that, in the United States, service is often initiated by attorneys and thus had agreed that U.S. counsel were permitted to complete letters of request under Article 3 of the Convention. See Report of the United States Delegation, 17 I.L.M. 316 (1978) (reporting that "attorneys are proper 'Applicants' under the Convention, and should be so regarded by foreign Central Authorities").

[FN105]. Koch, supra note 49, at 246. A number of requests were further rejected because they attempted to have the Central Authority serve interrogatories or other discovery requests, and thus, in the view of the German Authorities, represented an attempt to circumvent the more exacting requirements of the Hague Evidence Convention. Id.

[FN106]. See, e.g., Rivers v. Stihl, Inc., 434 So. 2d 766, 769 (Ala. 1983) (expressing exasperation with the Justice Ministry of Baden-Württemberg, which had refused service twice within one-and-one-half years; the first time because the plaintiff's attorney had failed both to use the official form referred to in Article 3(1) of the Convention and to provide the German translation on separate sheets of paper and the second time because the attorney failed to send the documents to be served in duplicate as Article 3(2) of the Convention requires).

[FN107]. See supra text accompanying notes 69-71. The Michigan court had violated the terms of the agreement because it had ordered depositions before a U.S. consular official in Germany on pain of sanctions. See Brief of the United States as Amicus Curiae at 8, Volkswagenwerk AG v. Falzon, 461 U.S. 1303 (1983) (No. 82-1888), reprinted in 23 I.L.M. 412, 416-17 (1984).

[FN108]. See id. at 417 n.5 (documenting the exchange of notes). The basic argument of the German government was that the legislation implementing the Hague Evidence Convention, in its refusal to accept any taking of evidence by diplomatic and consular personnel against German nationals under Articles 15 and 16 of that Convention, superseded any prior or subsequent declaration to the contrary by the Foreign Office, or any other arm of the executive. See id. at 420, 421 (reproducing the German Note Verbale of April 28, 1983 to the American Embassy, Bonn). While legally correct, see Junker, supra note 52, at 349-50, this argument came as somewhat of a surprise after the Foreign Office had specifically declared to the U.S. government in 1979 that the understanding from the 1955-56 exchange of notes was still considered valid after the entry into force of the Hague Evidence Convention between the United States and Germany. See Judicial Assistance, Taking of Evidence,

Agreements effected by exchange of notes (Oct. 17, 1979) T.I.A.S. 9938 (documenting the understanding).

[FN109]. See Junker, supra note 52, at 349.

[FN110]. See supra text accompanying note 90.

[FN111]. See Schlosser, Rechtshilfe, supra note 80; Stürner, Rechtshilfe, supra note 89; Stürner, Beweisaufnahme, supra note 68.

[FN112]. The most important improvements were the introduction of the central-authority mechanism, thus shortening the lengthy diplomatic channels through which letters rogatory need to travel, see, for example, Born, supra note 13, at 798-99, 897-98 (giving an overview of the Central-Authority mechanism under the Hague Service and Evidence Conventions); increasing the availability of formal service, compare supra note 68 and accompanying text with Hague Service Convention, supra note 61, arts. 5 & 13; and improving the availability of compelled testimony under oath, compare supra note 70 with Hague Evidence Convention, art. 10. Note, however, that German law does not allow for the compulsion of testimony from parties, thus limiting the usefulness of Article 10 for American litigants. See, e.g., Schlosser, Rechtshilfe, supra note 80, at 380.

[FN113]. See supra text accompanying notes 53-55.

[FN114]. In its declaration to the Hague Service Convention, Germany has objected to the use of the alternative methods of service in Articles 8 (service through diplomatic or consular agents) and 10 (service by mail and direct service through judicial officers, officials or other competent persons in the state of destination) of that Convention. German Declaration on Service Convention, supra note 103. In its Declaration to the Hague Evidence Convention, Germany has allowed the taking of evidence on its territory by commissioners and consular officers under Articles 15-17 of the Convention only upon prior permission and possibly with restrictions, unless the person from whom evidence is to be taken is a national of the requesting state. Declaration of the Federal Republic of Germany to the Convention on Taking Evidence Abroad in Civil and Commercial Matters, Mar. 18, 1970 [hereinafter German Declaration on Evidence Convention]. Note also, that even in the latter case, the Convention does not permit the use of any measures of compulsion. In any case, in implementing the Hague Evidence Convention, the German legislature, upon suggestion by the German government, further mandated that "[t]he taking of evidence by diplomatic or consular representatives is impermissible if it concerns German nationals." Gesetz zur Ausführung des Haager Übereinkommens (Ausfuhrungsgesetz), v. 22.12.1977 (BGBl. I. S.3105, 3106).

[FN115]. See, e.g., supra note 106 and accompanying text (noting German refusal of service on technical grounds).

[FN116]. As one federal district court remarked, for example: "[T]he [procedure under the Hague Evidence Convention] does not appear to be trouble free. Perhaps its most glaring fault... is that Germany has exercised its right not to execute letters of request 'issued for the purpose of obtaining pre-trial discovery of documents as known in Common law countries.'" Murphy v. Reifenhauser KG Maschinenfabrik, 101 F.R.D. 360, 361 (D. Vt. 1984).

[FN117]. For examples of cases where the court resorted to the Hague Evidence Convention, see Phila. Gear Corp. v. Am. Pfauter Corp., 100 F.R.D. 58, 60 (E.D. Pa. 1983); Schroeder v. Lufthansa German Airlines, 39 Fed. R. Serv. 2d. 211 (N.D. Ill. 1983); Pierburg GmbH & Co. Kg. v. Superior Court, 137 Cal. App. 3d 238 (Ct.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

App. 1982); Th. Goldschmidt AG v. Smith, 676 S.W.2d 443 (Tex. Ct. App. 1984); Gebr. Eickhoff Maschinen-fabrik v. Starcher, 328 S.E.2d 492 (W. Va. 1985).

[FN118]. See, e.g., In re Anschuetz & Co., GmbH, 754 F.2d 602 (5th Cir. 1985); In re Messerschmitt Böelkow Blohm GmbH, 757 F.2d 729 (5th Cir. 1985); Lowrance v. Michael Weinig GmbH & Co., 107 F.R.D. 386 (W.D. Tenn. 1985); Slauenwhite v. Bekum Maschinenfabriken GmbH, 104 F.R.D. 616 (D. Mass. 1985); Laker Air-ways, Ltd. v. Pan Am. World Airways, 103 F.R.D. 42, 48-51 (D.D.C. 1984); Graco, Inc. v. Kremlin, Inc., 101 F.R.D. 503, 517-24 (N.D. Ill. 1984); Murphy v. Reifenhauser KG Maschinenfabrik, 101 F.R.D. 360 (D. Vt. 1984); Wilson v. Lufthansa German Airlines, 489 N.Y.S.2d 575 (N.Y. App. Div. 1985). However, where the taking of evidence was to take place in Germany or another Convention state that objects to the taking of evid-ence outside the Convention's procedures, courts generally concluded that the Convention's procedures must be used. See, e.g., Graco, Inc., 101 F.R.D. at 524 ("The court emphasizes that it is not ordering that any proceeding be conducted within France.")

[FN119]. In re Anschuetz, 745 F.2d at 615, vacated by 483 U.S. 1002 (1987).

[FN120]. See, e.g., Richardson v. Volkswagenwerk AG, 552 F. Supp. 73, 78-79 (W.D. Mo. 1982); Jones v. Volkswagen of Am., Inc., 82 F.R.D. 334, 335 (E.D. Tenn. 1978); Dr. Ing. H.C. F. Porsche AG v. Superior Court, 123 Cal. App. 3d 755, 760-62 (Ct. App. 1981). But see Bollard v. Volkswagenwerke AG, 313 F. Supp. 126 (W.D. Mo. 1970) (holding that common law tort actions may be served on the agent designated for service of process pursuant to the National Traffic and Motor Vehicle Safety Act).

[FN121]. See, e.g., Zisman v. Sieger, 106 F.R.D. 194 (N.D. Ill. 1985); Lamb v. Volkswagon of Am., Inc., 104 F.R.D. 95 (S.D. Fla. 1985); Ex parte Volkswagenwerk AG, 443 So. 2d 880 (Ala. 1983). On the surface, to be sure, the change was not primarily one of interpreting the Service Convention. Rather, plaintiffs mysteriously overcame difficulties in proving that the U.S. subsidiaries of certain German corporations were in fact alter egos of their parents.

[FN122]. See, e.g., In re Anschuetz, 754 F.2d at 606, 611; Laker Airways, Ltd., 103 F.R.D. at 48; Graco, 101 F.R.D. at 519, 522. Interestingly, one of the legal arguments suggested by German scholars in favor of limiting available discovery on German territory through the Hague Evidence Convention's letter-of-request procedure to German standards was just the converse: parties involved in litigation abroad who seek to obtain evidence in Germany must not be given an advantage over parties who seek to obtain the same evidence when litigating in German courts. See Stürner, Rechtshilfe, supra note 89, at 525.

[FN123]. Burbank, Reluctant Partner, supra note 25, at 111-24.

[FN124]. Philip Amram, The Proposed Convention on the Taking of Evidence Abroad, 55 A.B.A.J. 651, 655 (1969).

[FN125]. Burbank, Reluctant Partner, supra note 25, at 129-33. Note, however, that while this ratification his-tory in the United States may explain the argument that the Hague Evidence Convention did not mean to limit the operation of the Federal Rules or any other U.S. laws, it does not help in countering the German argument that the taking of evidence on or from German territory violates German sovereignty as protected by customary international law antedating the Hague Conventions. See infra text accompanying notes 223-227.

[FN126]. See supra text accompanying notes 91-109 (illustrating problems with the Hague Evidence Conven-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion's letter-of-request procedure from American perspective). In earlier cases involving the Hague Evidence Convention, U.S. courts had already expressed doubt as to whether that Convention could ever preempt the Federal Rules or state rules of procedure. But they mandated that, as a matter of comity, a first use of the Convention procedures be attempted to obtain the requested evidence. See supra note 117 (requiring first attempts to be made through Convention procedures).

[FN127]. See, e.g., Dieter G. Lange, Der Justizkonflikt zwischen den USA und Europa dargestellt am Beispiel des Falles "Laker," in Justizkonflikt, supra note 47, at 65; Schlosser, Rechtshilfe, supra note 80, at 370-72. For a concise presentation of the various cases and the back-and-forth between U.K. and U.S. courts in the Laker litigation, see Lowenfeld, International Litigation, supra note 13, at 118-34, 144-46.

[FN128]. For background information and excerpts of the relevant parts of the decisions involved in the Uranium litigation, see Lowenfeld, International Litigation, supra note 13, at 780.

[FN129]. In re Anschuetz, 754 F.2d at 602, 605.

[FN130]. Société Nationale Industrielle Aérospatiale v. United States Dist. Court, 482 U.S. 522 (1987); see infra note 140 and accompanying text.

[FN131]. Brief for the Federal Republic of Germany as Amicus Curiae, In re Anschuetz, 754 F.2d 602.

[FN132]. See, e.g., Schlosser, Justizkonflikt, supra note 47, at 17-22; Rolf Stürner, Der Justizkonflikt zwischen U.S.A. und Europa, in Justizkonflikt, supra note 47, at 3, 25-26 [hereinafter Stürner, Justizkonflikt].

[FN133]. But see Stürner, Rechtshilfe, supra note 89, at 524 (arguing that even orders directed at non-party witnesses do not violate German sovereignty).

[FN134]. Schlosser, Rechtshilfe, supra note 80, at 394; Stürner, Rechtshilfe, supra note 89, at 523.

[FN135]. Schlosser, Justizkonflikt, supra note 47, at 25; Stürner, Justizkonflikt, supra note 132, at 26.

[FN136]. Stürner, Justizkonflikt, supra note 132, at 26.

[FN137]. Schlosser, Justizkonflikt, supra note 47, at 25; Stürner, Justizkonflikt, supra note 132, at 49. Professor Leipold would later argue that the impending imposition of criminal sanctions, including criminal contempt, was the only relevant factor distinguishing permissible from impermissible extraterritorial discovery requests against parties under international law. See Dieter Leipold, Lex Fori, Souveränität, Discovery: Grundfragen des Internationalen Zivilprozessrechts 64-66 (1989).

[FN138]. Schlosser, Justizkonflikt, supra note 47, at 25; Stürner, Justizkonflikt, supra note 132, at 49.

[FN139]. See, e.g., Stürner, Justizkonflikt, supra note 132, at 49-50. Academics particularly urged that the notion that the Hague Evidence Convention itself (rather than German sovereignty) prevented courts of member states from ordering the taking of evidence from (rather than on) foreign territory was untenable given both the language and the history of the treaty. See, e.g., Ulrich Drobnig, Diskussion, in Justizkonflikt, supra note 47, at 114; Peter Schlosser, Diskussion, in Justizkonflikt, supra note 47, at 111-12.

[FN140]. Brief for the Federal Republic of Germany as Amicus Curiae at 2-3, 13-14, Société Nationale Industri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

elle Aérospatiale v. United States Dist. Court, 482 U.S. 522 (1987) (No. 85-1695), reprinted in 25 I.L.M. 1540 (1986) [hereinafter Brief for Germany].

[FN141]. Volkswagenwerk AG v. Schlunk, 486 U.S. 694 (1988).

[FN142]. Brief for the Federal Republic of Germany as Amicus Curiae at 2, id. (No. 86-1052).

[FN143]. The lack of persuasiveness of the German government's stance opened the door for the argument that assertions of judicial sovereignty "often have an abstract quality and [that they] do little, in and of themselves, to elucidate the substantive foreign interests at stake" and thus that "assertions of 'judicial sovereignty' may simply illustrate a foreign nation's desire to protect its nationals from liability, or reflect a preference for its own mode of dispute resolution instead of ours." Brief for the United States and the Securities and Exchange Commission as Amici Curiae, at 22, 23, Société Nationale Industrielle Aérospatiale, 482 U.S. 522 (No. 85-1695). This pushed into the background the legitimate concern that "assertions of 'judicial sovereignty' may reflect an understandable reluctance to forfeit the moderating effects of judicial supervision and to expose one's citizens to unpredictable and potentially abusive evidentiary demands." Id.

[FN144]. Unlike the German position in Aérospatiale regarding the taking of evidence located on German territory, this posture did not imply that service on the U.S. subsidiaries of German corporations was impossible, but merely that it had to proceed through the channels identified by the Hague Service Convention and as circumscribed by the German Declaration to that Convention.

[FN145]. Hague Service Convention, supra note 60, art. 1.

[FN146]. Denkschrift der Bundesrepublik Deutschland zum Haager Zustellungs-und Beweisaufnahmeübereinkommen, Bundestagsdrucksache 7/4892 (1977) reprinted in Rolf A. Schütze, Internationales Zivilprozessrecht 697, 703 (1980) [hereinafter Denkschrift]. In fact, as the government explained in its report, the German delegation at The Hague had tried since 1905 to preempt "notification au parquet" as practiced by France and other countries influenced by its law by requiring, as a matter of treaty law, that defendants located abroad be served there, but that these attempts had been strongly resisted by the states practicing "notification au parquet," for they believed--and this is interesting for our purposes--that although their system may unduly favor the plaintiff, the German suggestion unduly favored the defendant, imposing a lengthy waiting period until it was proven that process had been served through treaty channels. Id. at 700. As the German government's report continues, these two views were resolved by a compromise in the Hague Service Convention, under which France and other countries could continue to use "remise au parquet," but with the limitations imposed by Articles 15 and 16 of the Convention. Id. at 700-01; see also Hans Arnold, Die Ergebnisse der Zehnten Tagung der Haager Konferenz für internationales Privatrecht auf dem Gebiete des internationalen Zivilproze<<beta>>rechts, 11 Aussenwirtschaftsdienst des Betriebs-beraters 205, 205-06 (1965) (reporting by the German delegate to the Hague Conference recounting same).

[FN147]. Stürner, Justizkonflikt, supra note 132, at 49.

[FN148]. See supra note 146 and accompanying text.

[FN149]. See e.g., Brief for Germany, supra note 140; Brief of the Republic of France, as Amicus Curiae in Support of Petitioners at 4-17, Société Nationale Industrielle Aérospatiale v. United States Dist. Court, 482 U.S. 522 (1987) (No. 85-1695), reprinted in 25 I.L.M. 1540 (1986); Brief of the Government of Switzerland at 8-10,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Société Nationale Industrielle Aérospatiale, 482 U.S. 522 (No. 85-1695), reprinted in 25 I.L.M. 1549 (1986) .

[FN150]. See, e.g., Abbo Junker, Der Justizkonflikt mit den USA, 42 Betriebs-berater 1752 (1987) (analyzing Aerospatiale); Harald Koch, US-Supreme Court hält Haager Beweisübereinkommen für fakultativ, 7 IPRax 328 (1987) (reporting that U.S. Supreme Court holds Hague Evidence Convention procedures to be voluntary); Har-ald Koch, Haager Zustellungsübereinkommen oder "Zustellungsdurchgriff" auf Muttergesellschaften?, 9 IPRax 313 (1989) (reporting on Schlunk) [hereinafter Koch, Zustellungsdurchgriff]; Rolf Stürner, Anmerkung, 42 JZ 988 (1987) (analyzing Aerospatiale).

[FN151]. See, e.g., Junker, supra note 150, at 1752-53; Stürner, supra note 150, at 988-89.

[FN152]. See, e.g., Abbo Junker, Der deutsch-amerikanische Rechtsverkehr in Zivilsachen - Zustellungen und Beweisaufnahmen, 44 JZ 121, 122-23 (1989).

[FN153]. See, e.g., Koch, Zustellungsdurchgriff, supra note 150.

[FN154]. Peter Schlosser, Legislatio in fraudem legis internationalis, in Festschrift für Ernst C. Stiefel zum 80. Geburtstag at 683, 687 (Marcus Lutter et al. ed., 1987).

[FN155]. The scope of application of the Convention is limited to "civil and commercial matters." See Hague Service Convention, supra note 145, art. 1(1).

[FN156]. BVerfGE 91, 335 (F.R.G.), reprinted in 48 Neue Juristische Wochenschrift [NJW] 649 (1995), trans-lated in 34 I.L.M. 580 (1995) [hereinafter Constitutional Court]. But see In re Bertelsmann AG, BVerfGE 108, 238 (F.R.G.) (staying decision of the Oberlandesgericht Düsseldorf not to refuse serving a claim for $17 billion in a proceeding pending in federal court in New York because the claim might violate German public policy and thus Article 13 of the Service Convention).

[FN157]. See, e.g., OLG München, 39 RIW 70 (1993) (holding that the service of a claim for punitive damages relates to a "civil or commercial matter" under the Convention); OLG Düsseldorf, 38 RIW 846 (1992) (same); OLG Frankfurt, 37 RIW 417 (1991) (same); OLG München, 42 RIW 3102 (1989), translated in 29 I.L.M. 1571 (same).

[FN158]. Pennoyer v. Neff, 95 U.S. 714 (1878); see, e.g., Constitutional Court, supra note 156, at 651. There are also more direct ways in which U.S. courts have frustrated the attempts of German Central Authorities to avoid service of punitive damage claims on their nationals. See, e.g., Marschhauser v. Travelers Indem. Co., 145 F.R.D. 605 (S.D. Fla. 1992) (holding that Article 15 of the Service Convention allowed a U.S. court to enter a default judgment after the German Central Authority had refused to execute the plaintiff's letter of request on a basis that, in the court's view, was ill-founded under the Convention's language).

[FN159]. See, e.g., Melia v. Les Grands Chais de France, 135 F.R.D. 28 (D.R.I. 1991) (holding that service of process was effective where made on Secretary of State); see also Pittsburgh Nat'l Bank v. Kassir, 153 F.R.D. 580 (W.D. Pa. 1994) (upholding service on German corporation via contractually appointed local agent under Pennsylvania law).

[FN160]. See, e.g., Darden v. Daimler Chrysler N. Am. Holding Corp., 191 F. Supp. 2d 382, 387-88 (S.D.N.Y. 2002) (service on domestic subsidiary insufficient to serve process on German parent); Davies v. Jobs & Ad-verts Online, Gmbh, 94 F. Supp. 2d 719 (E.D. Va. 2000) (holding that substituted service on state corporation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 1357

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 61 of 131    Page 51

commission insufficient under Hague Convention); Kim v. Frank Mohn A/S, 909 F. Supp. 2d 474 (S.D. Tex. 1995) (voiding service where documents not mailed to foreign country's central authority as required by the Hague Service Convention); Quinn v. Kleinicke, 700 A.2d 147 (Del. Super. Ct. 1996) (where service on secretary of state is only complete under state law, if secretary of state then sends notice to the defendant in Germany, Hague Service Convention must be used). Where, however, state law allows for the involuntary service on a local subsidiary of the foreign defendant, Schlunk of course remains good law. Volkswagen AG v. Schlunk, 486 U.S. 694 (1988); see, e.g., Hickory Travel Sys., Inc. v. TUI AG, 213 F.R.D. 547 (N.D. Cal. 2003) (denying validity of service on a corporate parent as service on its subsidiary and on one joint venture partner by service on the other).

[FN161]. See, e.g., Harald Koch & Christian Kirchner, Probleme einer Urkundenvorlage-Verordnung nach dem Ausführungsgesetz zum Haager Beweisübereinkommen, 33 Aktiengesellschaft 127 (1988) (discussing possible regulation under Section 14(2)).

[FN162]. Gesetz zur Ausführung der Haager Übereinkommens (Ausführunggesetz), v. 22.12.1977 (BGBl. I. S. 3105)

[FN163]. Brief for Germany, supra note 140, at 9-10.

[FN164]. See Christoph Böhmer, Spannungen im deutsch-amerikanischen Rechtsverkehr in Zivilsachen, 43 NJW 3049, 3053 (1990) (reporting on resistance by industry).

[FN165]. But see Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33 (N.D.N.Y. 1987) (finding Justice Blackmun's concurring and dissenting opinion more persuasive, and thus putting the burden on the proponent to show why Convention procedures should not be used); Knight v. Ford Motor Co., 615 A.2d 297, 299-302 (N.J. Super. Ct. Law Div. 1992) (holding that courts must first use Hague Evidence Convention procedures before resorting to New Jersey discovery rules in discovery requests from a German corporation).

[FN166]. See, e.g., Doster v. Schenk AG, 141 F.R.D. 50 (M.D.N.C. 1991); Haynes v. Kleinwefers, 119 F.R.D. 335 (E.D.N.Y. 1988); Benton Graphics v. Uddeholm Corp., 118 F.R.D. 386 (D.N.J. 1987); Moake v. Source Int'l Corp., 623 A.2d 263 (N.J. Super. Ct. App. Div. 1993). Some of these courts have, however, limited discovery requests so as to render them less intrusive upon claimed foreign sovereign interests. See, e.g., Benton Graphics v. Uddeholm Corp., 118 F.R.D. 386, 390 (requiring further streamlining of discovery requests abroad); Rich v. KIS Cal., Inc., 121 F.R.D. 254, 257-58 (M.D.N.C. 1988) (noting that one factor in deciding whether to use Hague Evidence Convention procedures is how intrusive the discovery is and holding that the pared down interrogatories in the case at hand are not intrusive and thus do not require use of Convention mechanisms). More recent decisions demonstrate that approach noted in the text remains good law. See, e.g., In re Vitamins Antitrust Litigation, 120 F. Supp. 2d 45 (D.D.C. 2000) (holding, after comity analysis, that plaintiff is not required to have first resort to Hague Evidence Convention procedures); Fishel v. BASF Group, 175 F.R.D. 525 (S.D. Iowa 1997) (allowing jurisdictional discovery to proceed under the Federal Rules rather than under the Hague Evidence Convention while disallowing one strand of discovery as overbroad).

[FN167]. See Referentenentwurf des Justizministeriums zu einer Urkundenvorlageverordnung, reprinted in Vorschläge zum Erlass einer Urkundenvorlage-Verordnung nach dem HBewÜbk (Claus-Dieter Brandt ed., 1987).

[FN168]. See, e.g., Hans-Viggo von Hülsen, Produktehaftpflicht USA 1981, 28 RIW 1, 9 (1982); Rolf A.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Schütze, 1979 Wertpapiermitteilungen 1167 (1979); Friedrich Graf von Westphalen, "Punitive Damages" in US-amerikanischen Produkthaftungsklagen und der Vorbehalt des Art. 12 EGBGB, 27 RIW 141 (1981).

[FN169]. Eike von Hippel, Schadenersatzklagen gegen deutsche Produzenten in den Vereinigten Staaten, 17 AWD 61, 64-65 (1971).

[FN170]. Dieter Martiny, Handbuch des Internationalen Zivilverfahrensrechts, Band III/1, at 471 (1984). In this book, Professor Martiny did, however, tentatively express his view that, depending on the circumstances, punitive damages might be considered criminal rather than civil in character and thus be unenforceable. Yet, he also noted that product safety was a legitimate goal to pursue in civil litigation, implying that the use of punitive damages for that purpose should not automatically lead to nonrecognition. Id. at 236.

[FN171]. See, e.g., Ernst C. Stiefel & Rolf Stürner, Die Vollstreckbarkeit US-amerikanischer Schadensersatzurteile exzessiver Höhe, 38 Versicherungsrecht 829 (1987) (An English version of this Article appears in shortened, updated, and considerably muted form as Ernst C. Stiefel et al., The Enforceability of Excessive U.S. Punitive Damage Judgments in Germany, 39 Am. J. Comp. L. 779 (1991)); see also Joachim Zekoll, US-Amerikanisches Produkthaftpflichtrecht vor Deutschen Gerichten (1987) (exploring in detail the recognizability of U.S. products liability judgments in Germany). These suggestions of limiting the enforcement of U.S. judgments appeared outright moderate when compared to some of the propositions that had been made earlier. See, e.g., Schütze, supra note 168, at 1175-76 (suggesting that the mere use of discovery and of contingent fees renders a U.S. judgment unenforceable in Germany).

[FN172]. BGHZ 118, 312 (F.R.G.). For a comment on that case in English, see Peter Hay, The Recognition and Enforcement of American Money-Judgments in Germany - The 1992 Decision of the German Supreme Court, 40 Am. J. Comp. L. 729 (1992). At least the Bundesgerichtshof rendered the opinion as one would a landmark decision, carefully weighing all aspects of possible public policy violations by a U.S. tort judgment. However, the U.S. judgment to be recognized in the case was hardly typical of U.S. tort judgments against German nationals. It involved a $750,260 award for battery against a U.S.-German dual citizen who had lived most of his life in California, where he had sexually abused a 14-year-old boy in California, then fled to Germany after being convicted for the crime in California, but before the civil case based on the same facts had been adjudicated. Thus, the case not only lacked many of the characteristics that industry representatives and scholars had criticized about U.S. tort law and procedure but was also devoid of a strong connection to Germany, leading the Court to recognize both the compensatory portion of the award, even though not necessarily justified in its full amount from the point of view of German law, and the $200,000 portion for pain and suffering. The court made it clear, however, that similarly lenient standards were unlikely to prevail in a case involving a U.S. product liability award against a German producer. BGHZ 118, 312 (349) (F.R.G.). Moreover, there had been no discovery in violation of German sovereignty because the evidence in the case had been taken from the criminal case, discovery for which had taken place while the defendant lived in California. The Court nonetheless pointed out that discovery in violation of German sovereignty, perhaps even discovery involving extensive fishing, would violate German public policy. BGHZ 118, 312 (323-24) (F.R.G.). Even in this extraordinary case, however, the Court did refuse to recognize the $400,000 punitive award. In comparison, the district court of Berlin had refused, in an earlier case, to execute a $275,000 product liability award against a German manufacturer imposed by a Massachusetts state court in its entirety, finding that, since there was no written opinion that indicated whether the U.S. court had imposed absolute liability (the judgment was based on a jury verdict), the lack of clarity in this regard had to be charged against the judgment creditor. LG Berlin, RIW 38 (1989), 988 (F.R.G.), translated in Lowenfeld, International Litigation, supra note 13, at 440.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN173]. See, e.g., von Hippel, supra note 169, at 64-65 (finding that U.S. products liability judgments would not ordinarily violate German public policy).

[FN174]. See, e.g., Heinz J. Dielmann, Produzentenhaftung für Lebensmittelprodukte in den USA, 32 RIW 949, 949 (1986) (speaking of "drastic increase of product liability cases ... exorbitant awards, and the extremely high costs for legal defense," all of which have led to a "crisis in the insurance and reinsurance business"); Hans-Viggo von Hülsen & Töns Grüning-Brinkman, Produkthaftung USA 1983/84, 31 RIW 187 (1985) (reporting on various seemingly outrageous multimillion dollar awards); Michael Magotsch, Exzessive Entwicklung der Produkthaftung in den USA, 32 RIW 413, 414 (1986) (reporting on numerous efforts by members of Congress to introduce product liability reform legislation).

[FN175]. Chief Justice Burger's efforts to bring about tort reform were frequently cited in German publications. See, e.g., Peter Heidenberger, Der amerikanische Juryprozess in Produkthaftungsfällen, 28 RIW 872, 873 (1982).

[FN176]. See, e.g., Stiefel & Stürner, supra note 171, at 835-36 (referring to several federal reform proposals, listing a considerable number of seemingly inconceivable multimillion-dollar awards, and referring to "the collapse of the U.S. liability and insurance system"). On the problems with such global characterizations, atrocity stories cited out of context, and assertions about aggregate patterns unsupported by empirical evidence within the United States, see, for example, Marc Galanter, An Oilstrike in Hell: Contemporary Legends About the Civil Justice System, 40 Ariz. L. Rev. 717 (1998).

[FN177]. On the requirement that there be no public policy violation and on the review of personal jurisdiction in European recognition practice respectively, see Walter & Baumgartner, Recognition, supra note 58, at 22-24, 28-31.

[FN178]. The expert, as all experts in German procedure, had been appointed by the court and was ultimately paid for by the losing party. He thus had no immediate interest in supporting one litigant over the other. On the way experts are used in German procedure, see, for example, Langbein, German Advantage, supra note 93, at 836-40. This does not mean, however, that the expert may not have had a certain sympathy for the plight of the judgment debtor, a large local investment bank, as well as an interest in protecting the integrity of German law. After all, the case appeared to be a prime example of American unreasonableness, in which a simple contract dispute over an investment loan had been turned into a major RICO case.

[FN179]. RIW, 34 (1988), 738 (F.R.G.).

[FN180]. Id.

[FN181]. The reason for the reference to jurisdiction of "the courts of the rendering state" or "the rendering nation" rather than to jurisdiction of the rendering court derives from a distinction in the civil law between international jurisdiction, the jurisdiction of the courts of a particular country, and territorial jurisdiction, the personal jurisdiction of a court within a particular country. Only the former can be re-examined at the recognition stage to ensure fairness to the defendant, while territorial jurisdiction remains an issue of the internal organization of the rendering country and is thus beyond the purview of the recognition tribunal. See, e.g., Geimer, supra note 24, at 871. From this perspective, the Munich court's holding is difficult to fathom given that "[f]or local interests, the several States of the Union exist, but for national purposes, embracing our relations with foreign nations, we are but one people, one nation, one power." Chinese Exclusion Case, 130 U.S. 581, 606 (1889).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 299

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 64 of 131

Page 54

[FN182]. See, e.g., Schack, supra note 24, at 389; Oliver Sieg, Internationale Anerkennungszuständigkeit bei US-amerikanischen Urteilen, 16 IPRax 77 (1996); Rolf Stürner & Jens Bormann, Internationale Anerkennungszuständigkeit US-amerikanischer Bundesgerichte und Zustellungsfragen im deutsch-amerikanischen Verhältnis, 55 JZ 81, 81-85 (2000). But see Bernd von Hoffman & Wolfgang Hau, Zur interna-tionalen Anerkennungszuständigkeit US-amerikanischer Zivilgerichte, 44 RIW 344 (1988) (arguing that German courts should look to the United States as a whole rather than to individuals states within it when deciding on personal jurisdiction for recognition purposes).

[FN183]. BGHZ 141, 286 (F.R.G.), reprinted in 52 NJW 3198, 3199-200 (1999).

[FN184]. On the locus delicti commissi, the place of the commission of the tort as a proper basis for jurisdiction under the law of Germany and other civil law countries, see Schlesinger et al., supra note 90, at 390-92.

[FN185]. On the usually higher civil standard of proof in civil law countries compared to that in the United States, see, for example, Kevin M. Clermont & Emily Sherwin, A Comparative View of Standards of Proof, 50 Am. J. Comp. L. 243 (2002).

[FN186]. BGHZ 124, 237 (F.R.G.).

[FN187]. Id. at 242-43.

[FN188]. Id. at 244.

[FN189]. Id. at 246.

[FN190]. See also Harald Koch, Anmerkung, 108 ZZP 367, 372 (1995) (criticizing the Court for going beyond the requirement of the German recognition statute). The concern with strike suits reappears in a recent decision of the Bundesgerichtshof that is otherwise much more lenient in questions relating to the enforcement of U.S. judgments. See BGHZ 141, 286 (F.R.G.). In that decision, the Court sent the case back to the lower courts to de-termine, among other things, whether the defendant had committed fraud in his jurisdictional claims before the District Court for the Eastern District of Wisconsin. Id., reprinted in 52 NJW 3198, 3202-03 (1999).

[FN191]. See, e.g., Martin J. Reufels, Pre-trial discovery-Ma<<beta>>nahmen in Deutschland: Neuauflage des deutsch-amerikanischen Justizkonflikts?, 45 RIW 667, 667-68 (1999) (expressing surprise at the brevity and clarity with which the court in Fishel v. BASF Group, 175 F.R.D. 525 (S.D. Iowa 1997) held that discovery against the German defendants could proceed outside of the Hague Evidence Convention procedures).

[FN192]. See supra Section 3.1.3.

[FN193]. See, e.g., Benton Graphics v. Uddeholm Corp., 118 F.R.D. 386 (D.N.J. 1987) (addressing alleged fraud and breach of contract in steel sales).

[FN194]. See, e.g., Automotive Refinishing Paint Antitrust Litigation,358 F.3d 288 (3d Cir. 2004) (concerning jurisdictional discovery).

[FN195]. See, e.g., Fishel v. BASF Group, 175 F.R.D. 525 (S.D. Iowa 1997) (involving Holocaust survivors' claims against successors of companies alleged to have benefited from slave labor).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN196]. Most U.S. courts may have accepted the proposition by Germany and other civil law nations that, if discovery is to physically take place on the territory of a member state of the Convention, the Convention procedures must be used. See, e.g., McLaughlin v. Fellows Gear Shaper Co., 102 F.R.D. 956 (E.D. Pa. 1984); Graco, Inc., v. Kremlin, Inc., 101 F.R.D. 503, 524 (N.D. Ill. 1984). But few U.S. litigants will seek to take depositions in Germany if unilateral U.S. discovery, unencumbered by the procedures of the Hague Evidence Convention and thus with limitations set by German law, is so easily available. See supra notes 165-166 and accompanying text.

[FN197]. See, e.g., Addamax Corp. v. Open Software Found., Inc., 148 F.R.D. 462 (D. Mass. 1993) (holding that a non-party witness subsidiary had control over documents in possession of a German parent company and thus that the U.S. subsidiary could be compelled to produce such documents).

[FN198]. See supra note 135 and accompanying text.

[FN199]. See supra text accompanying notes 158-160.

[FN200]. See, e.g., Burbank, Reluctant Partner, supra note 25, at 112 ("Those concerned about the inadequacy of our mechanisms for seeking and providing assistance in aid of international civil litigation recognized that some provisions in the Federal Rules on such matters as service were an invitation to disaster for litigants using them abroad ....").

[FN201]. See, e.g., Benjamin Kaplan, Amendments to the Federal Rules of Civil Procedure, 1961-63 (I), 77 Harv. L. Rev. 601, 635-36 (1964) [hereinafter Kaplan, 1961-63 (I)]; Benjamin Kaplan, Amendments to the Federal Rules of Civil Procedure, 1961-63 (II), 77 Harv. L. Rev. 801, 812-13 (1964) [hereinafter Kaplan, 1961-63 (II)].

[FN202]. See, e.g., Kaplan, 1961-63 (I), supra note 201, at 637 (accusing those who objected "that there ought to be a statement invalidating any manner of service allowed by the rule but forbidden by the law of the country in which the service was attempted" of "[t]enderness to the sensibilities of foreign countries," and musing that "[i]t is not clear that any substantial number of countries are really concerned to outlaw service within their boundaries to effectuate litigation being conducted elsewhere..."); Hans Smit, International Litigation under the United States Code, 65 Colum. L. Rev. 1015, 1017-18 (1965) (opining that the attitude of some foreign nations that oppose the performance of procedural acts on their territory by foreigners "has been influenced by undue stress on abstract notions of sovereignty, by misconception of the nature of foreign procedural acts, and by lack of concern for the interests of litigants who wish to perform procedural acts in the most effective and efficient manner" and further suggesting that "nations that do raise objections have on the whole failed to advance satisfactory reasons for their positions.").

[FN203]. Burbank, Reluctant Partner, supra note 25, at 113.

[FN204]. See Kaplan, 1961-63 (I), supra note 201 at 637; Kaplan, 1961-63 (II), supra note 201, at 813.

[FN205]. See Burbank, Reluctant Partner, supra note 25, at 129-33 (discussing statements made by U.S. negotiators during ratification of the two Conventions in the Senate).

[FN206]. See Volkswagenwerk AG v. Superior Court, 123 Cal. App. 3d 840 (1981) (describing the willingness of some U.S. courts to enforce procedural rules in the face of sovereignty objections by foreign governments);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

supra text accompanying notes 122-154 (depicting the German response to U.S. unilateralism).

[FN207]. Kaplan, 1961-63 (I), supra note 201 at 637.

[FN208]. See, e.g., supra text accompanying notes 122-126.

[FN209]. See, e.g., von Mehren, Drafting, supra note 9, at 194-95 (discussing "a fundamental discordance" between the United States and the Europeans on the role of litigation, adjudicatory jurisdiction, and recognition of foreign judgments at the Hague).

[FN210]. Pub. L. No. 88-619, 78 Stat. 995 (1964) (codified as amended at 28 U.S.C. §§ 1696, 1781-1784 (2002)).

[FN211]. See, e.g. Philip Amram, Public Law No. 88-619 of October 3, 1964-New Developments in International Judicial Assistance in the United States of America, 32 J. Bar Ass'n D.C. 24, 28, 33 (1965); Smit, supra note 202, at 1019 (stating that "the reforms are premised on the hope that principle of liberality in rendering aid to foreign courts and litigants will find widespread acceptance abroad").

[FN212]. See supra Section 3.1.2. Cf., e.g., Born, supra note 13, at 850-52 (noting foreign nondisclosure statutes passed in reaction to U.S. discovery).

[FN213]. Cf., e.g., Rio Properties, Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1017 (9th Cir. 2002) (upholding service by email upon foreign corporation as acceptable mode of alternate service under the Federal Rules of Civil Procedure ["Federal Rules" ]).

[FN214]. Cf., e.g., Anne-Marie Slaughter, A Global Community of Courts, 44 Harv. Int'l L.J. 191, 213-15 (2003) [hereinafter Slaughter, Community of Courts] (noting direct judicial communications in global bankruptcies, at least among common law courts); Jay L. Westbrook, International Judicial Negotiation, 38 Tex. Int'l L.J. 567, 571-73 (2003) (same). But see, e.g., Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children, art. 8 (1996), reprinted in Jeremy Rosenblatt, International Conventions Affecting Children 15 (2000) (providing for direct communication between the courts and other authorities of two member states to determine whether "the authority of another Contracting State would be better placed in the particular case to assess the best interests of the child"); Committee on International Civil and Commercial Litigation, Third Interim Report: Declining & Referring Jurisdiction in International Litigation in International Law Association, Report of the Sixty-ninth Conference, London 33, Principle 5.2 (2000) (suggesting same for determination of appropriate court in determining whether to refer claim to another court).

[FN215]. See supra Section 3.1.2.

[FN216]. See supra text accompanying notes 161-164.

[FN217]. See supra Section 3.1.3.

[FN218]. See supra notes 115-121 and accompanying text.

[FN219]. See, e.g., Gary S. Becker, A Theory of Competition Among Pressure Groups for Political Influence, 98 Q.J. Econ. 371 (1983).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN220]. See supra Section 3.1.1. The two were of course intertwined as are all the factors noted here. Thus, the perception of a threat from U.S. law was significantly influenced by industry representations. See supra text accompanying note 79. On the other hand, industry representatives, mostly lawyers in a legal environment in which attorneys primarily see themselves as professionals rather than as hired guns, acted not only in the self-interest of the industry they represented, but also expressed genuine concern about the protection of German law and sovereignty by participating in the scholarly debate.

[FN221]. See supra text accompanying notes 93-96.

[FN222]. See, e.g., supra text accompanying note 122.

[FN223]. See supra note 93 and accompanying text.

[FN224]. See supra notes 53-55 and accompanying text (describing traditional German position on judicial co-operation); Baumgartner, Hague Convention, supra note 9, at 48-53; Junker, supra note 52, at 368-70; Schack, supra note 24, at 310; Stürner, Justizkonflikt, supra note 132, at 22.

[FN225]. See, e.g., Diplomatic Note from the Embassy of the Federal Republic of Germany to the U.S. Department of State (Sept. 27, 1979), reprinted in Born, supra note 13 at 777 (protesting U.S. service on German addressees by direct mail as a violation of German sovereignty).

[FN226]. See, e.g., Böhmer, supra note 164, at 3054 (referring to a 1989 press report on U.S. attorney Lee Kreindler, who, without permission of the German authorities, flew to Frankfurt to depose a number of German witnesses at an airport hotel).

[FN227]. See supra text accompanying notes 84-86.

[FN228]. See, e.g., supra notes 219-220 and accompanying text.

[FN229]. See supra text accompanying note 78 (noting that German authorities gave the U.S. legal system the benefit of the doubt). Because the legislative process is deemed open to pressure-group politics, it is not surprising that open industry pressure to create a blocking statute in the shipping area (see supra note 73 and accompanying text) and to oppose regulations to unilaterally limit application of Article 23 of the Hague Evidence Convention (see supra note 164 and accompanying text) was not considered problematic.

[FN230]. See supra note 90 and accompanying text.

[FN231]. See supra note 139 and accompanying text (noting that scholars unsuccessfully urged the German government to take a more moderate view).

[FN232]. See supra notes 63-65, 74-78, 147-160, 173-176 and text accompanying.

[FN233]. See supra notes 200-209 and accompanying text (discussing efforts in the United States during the 1960s to amend the Federal Rules).

[FN234]. See, e.g., Stürner, Justizkonflikt, supra note 132, at 35-43 (attributing U.S. procedural approaches to U.S. hegemony and exploring the reasons for that hegemony).

[FN235]. See, e.g., id. at 43 (stressing need to counter American hegemony in procedure).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 68 of 131     Page 58

[FN236]. See supra Section 3.1.3 (discussing the effects in the area of recognition and enforcement of U.S. judgments). In return, the United States may (re)introduce a general reciprocity requirement in proposed federal recognition legislation to punish countries with restrictive recognition practices. See ALI Draft, supra note 10, § 5(c) (offering two different reciprocity requirement proposals currently being considered).

[FN237]. See, e.g., Kenneth W. Abbott, International Relations Theory, International Law, and the Regime Governing Atrocities in Internal Conflicts, 93 Am. J. Int'l L. 361, 362-63 (1999) (For a discussion of the operation of theories on state action in international relations, see Kenneth N. Waltz, Theory of International Politics 1-13 (1979)).

[FN238]. For a historical account of the development of the major schools in international politics in relation to international law scholarship see Anne-Marie Slaughter Burley, International Law and International Relations Theory: A Dual Agenda, 87 Am. J. Int'l L. 205, 206-22, 226-28 (1993) [hereinafter Slaughter Burley, Dual Agenda].

[FN239]. See, e.g., Abbott, supra note 237, at 364-68.

[FN240]. See, e.g., E.H. Carr, The Twenty Year's Crisis 1919-39 (1939); Hans J. Morgenthau, Politics Among Nations (1948). Realism has dominated international relations theory for decades. See, e.g., Slaughter Burley, Dual Agenda, supra note 238, at 214-17; Robert O. Keohane, International Institutions and State Power 36 (1989) [hereinafter Keohane, International Institutions] ("Realism constitutes the central tradition in the study of world politics.").

[FN241]. See, e.g., John A. Vasquez, The Power of Power Politics: A Critique 18 (1983); Waltz, supra note 237, at 88-93, 102-28; Greenberg, supra note 21, at 1793-96.

[FN242]. See, e.g., Anne-Marie Slaughter, Interdisciplinary Approaches to International Economic Law: Liberal International Relations Theory and International Economic Law, Am. U. J. Int'l L. & Pol'y 717, 726 (1995) [hereinafter Slaughter, Economic Law].

[FN243]. Keohane, International Institutions, supra note 240, at 1; see also Stephen D. Krasner, Structural Causes and Regime Consequences: Regimes as Intervening Variables, 36 Int'l Org. 185, 186 (1982) ("Regimes can be defined as sets of implicit or explicit principles, norms, rules, and decision-making procedures."). For a discussion on the long debate over the proper definition of institutions, see Beth A. Simmons & Lisa L. Martin, International Organizations and Institutions, in Handbook of International Relations, supra note 21, at 192, 193.

[FN244]. See Cooperation under Anarchy (Kenneth A. Oye ed., 1986); Robert O. Keohane, After Hegemony: Cooperation and Discord in the World Political Economy 244-46 (1984) [hereinafter Keohane, After Hegemony]. As Dean Slaughter has pointed out, the insight that international institutions can thus promote cooperation was relatively "new only to political scientists," for McDougal-Lasswell jurisprudes and international legal process scholars "had spent the previous three decades defining international law as something other than an Austinian constraint system." Slaughter Burley, Dual Agenda, supra note 238, at 219. For an approach that combines institutionalist and constructivist theory with international legal process, see Abram Chayes & Antonia Handler Chayes, The New Sovereignty: Compliance with International Regulatory Agreements (1995).

[FN245]. See Andrew Moravcsik, Taking Preferences Seriously: A Liberal Theory of International Politics, 51 Int'l Org. 513, 514-15 (1997) (offering a restatement of liberal theory).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 459

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 69 of 131

Page 59

[FN246]. Id. at 516-17.

[FN247]. Id. at 518-20; Slaughter Burley, Dual Agenda, supra note 238, at 227-28.

[FN248]. Moravcsik, supra note 245, at 520-22.

[FN249]. Emanuel Adler, Constructivism in International Relations, in Handbook of International Relations, supra note 21, at 95. A closer view reveals, however, that choosing between rational choice and constructivism is not exclusively an either/or proposition once one moves beyond the metaphysical debate. See James Fearon & Alexander Wendt, Rationalism v. Constructivism: A Skeptical View, in Handbook of International Relations, supra note 21, at 52.

[FN250]. See, e.g., Alexander Wendt, Social Theory of International Politics (1999); John Gerard Ruggie, What Makes the World Hang Together? Neo-utilitarianism and the Social Constructivist Challenge, 52 Int'l Org. 855 (1998).

[FN251]. See, e.g., Kenneth W. Abbott, "Trust But Verify": The Production of Information in Arms Control Treaties and Other International Agreements, 26 Cornell Int'l L.J. 1 (1993).

[FN252]. See, e.g., Jack Goldsmith, Sovereignty, International Relations Theory, and International Law, 52 Stan. L. Rev. 959, 962-65 (2000) (book review); Robert O. Keohane, International Relations and International Law: Two Optics, 38 Harv. Int'l L.J. 487, 489-91 (1997).

[FN253]. James G. March & Johan P. Olsen, The Institutional Dynamics of International Political Orders, 52 Int'l Org. 943, 949-52 (1998).

[FN254]. Cf. Waltz, supra note 237, at 6-7 (defining theory); Goldsmith, supra note 252, at 983-85 (arguing for the use of rational choice techniques to achieve methodological sophistication in international law scholarship).

[FN255]. Constructivist theories may be difficult to prove with quantitative methods--a notion, however, that has become the subject of controversy. See, e.g., Thomas Risse, Constructivism and International Institutions: Toward Conversations Across Paradigms, in Political Science: The State of the Discipline 597, 598 (Ira Katznelson & Helen V. Milner eds., 2002). Indeed, some constructivists have argued that causal explanations are inappropriate in social inquiry. See, e.g., Fearon & Wendt, supra note 249, at 57.

[FN256]. See supra notes 219-231 and accompanying text (discussing ideational values displayed in the "judicial conflict"); see also Fearon & Wendt, supra note 249, at 60 (arguing that it is a bad idea to view actions in world politics as based on either a logic of consequences or a logic of appropriateness, for, depending on the circumstances and the issue area, it may now be one and then the other, and often a combination of both); Thomas Risse-Kappen, Structures of Governance and Transnational Relations: What Have We Learned?, in Bringing Transnational Relations Back In 280, 281 (Thomas Risse-Kappen ed., 1995) ("In particular the empirical findings [in the studies of that volume] point to the significance of culture and norms"). Note that in law and economics, too, there are a number of influential scholars who have begun to argue that rational choice theory has significant shortcomings in explaining human behavior and thus needs to be amended with insights from other fields, such as cognitive psychology and sociocultural studies, to provide better predictions about the incentive effects of legal rules. See, e.g., Christine Jolls et al., A Behavioral Approach to Law and Economics, 50 Stan. L. Rev. 1471 (1998); Russel B. Korobkin & Thomas S. Ulen, Law and Behavioral Science: Removing the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rationality Assumption from Law and Economics, 88 Cal. L. Rev. 1051 (2000); Cass R. Sunstein, Behavioral Analysis of Law, 64 U. Chi. L. Rev. 1175 (1997).

[FN257]. See, e.g., Moravcsik, supra note 245, at 513, 523, 525.

[FN258]. See supra notes 28-31 and accompanying text (describing traditional views on international law).

[FN259]. See supra note 241 and accompanying text.

[FN260]. See supra note 242 and accompanying text.

[FN261]. See Slaughter Burley, Dual Agenda, supra note 238, at 225. The reason, as Professors Simmons and Martin explain, is that "American institutionalists have largely allowed their research agenda to be defined by responding to the neorealist challenge to show that 'institutions matter.'" Simmons & Martin, supra note 243, at 202.

[FN262]. Cf. supra notes 215-218 and accompanying text (noting role of groups and individuals in making and applying law of transnational litigation).

[FN263]. See, e.g., Reparation for Injuries Suffered in the Service of the United Nations, 1949 I.C.J. 174, 178-79 (Apr. 11) (holding that the United Nations, a non-state actor, has capacity to sue in the ICJ); Philip C. Jessup, Transnational Law (1956) (reevaluating the role of non-state-actors in international lawmaking); Koh, Why Obey?, supra note 21, at 2656-57 (positing a theory of transnational legal process involving interaction, interpretation, and internalization by domestic and transnational actors).

[FN264]. For a concise intellectual history of the role of transnational actors in international politics, see Risse, Transnational Actors, supra note 22, at 256-59.

[FN265]. Cf., e.g., Fearon & Wendt, supra note 249, at 56 (pointing out that there are state-centric as well as non-state centric theories within constructivism).

[FN266]. See, e.g., Margaret E. Keck & Kathryn Sikkink, Activists Beyond Borders: Advocacy Networks in International Politics 6-7 (1998) (defining transnational advocacy networks); Audie Klotz, Norms in International Relations: The Struggle Against Apartheid 6 (1995) (same).

[FN267]. See, e.g., Peter M. Haas, Introduction: Epistemic Communities and International Policy Coordination, 46 Int'l Org. 1 (1992) (examining the roles that networks of knowledge-based communities play in developing and directing state policy).

[FN268]. See, e.g., Martha Finnemore, Are Legal Norms Distinctive?, 32 N.Y.U. J. Int'l L. Pol. 699, 699 (2000); see also Friedrich V. Kratochwil, Rules, Norms, and Decisions (1989) (relating norms to law, international relations and political science); Nicholas G. Onuf, World of Our Making: Rules and Rule in Social Theory and International Relations (1989); Thomas Risse, "Let's Argue!": Communicative Action in World Politics, 54 Int'l Org. 1 (2000).

[FN269]. Cf. supra notes 219-227 and accompanying text (describing ideational values in the German case); infra notes 342-343 and accompanying text (pointing out different ideational values of lawyers across borders).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN270]. See, e.g., Ruggie, supra note 250, at 856 (noting that "constructivists have not as yet managed to formulate a fully fledged theory of their own" and thus that "constructivism remains more of a philosophically and theoretically informed perspective on and approach to the empirical study of international relations").

[FN271]. See, e.g., id. at 883 (acknowledging that, while constructivism may help provide "a richer understanding of some phenomena ... it lacks rigor and specification"); cf. Moravcsik, supra note 245, at 539-40 (claiming that the assumptions of liberal international relations theory are analytically prior to variables deduced from constructivist theory). Note also that constructivists have as yet spent little time researching the influence of domestic ideas, norms, and modes of discourse on the preference formation of transnational actors that are in evidence in the German case above. See, e.g., Adler, supra note 249, at 109-10.

[FN272]. Immanuel Kant, Zum ewigen Frieden: ein philosophischer Entwurf 1795 (Rudolf Malter ed. 1995). For an attempt to revive Kant's arguments, see, for example, Bruce Russet & John R. Oneal, Triangulating Peace: Democracy, Interdependence, and International Organization (2001); Michael W. Doyle, Kant, Liberal Legacies, and Foreign Affairs, 12 Phil. & Pub. Aff. 205 (1983). The best-known example of a normative liberal international theory is probably Wilsonian liberal internationalism, whose "legal moralist" approach has been derided by the realists in reaction to the experiences surrounding World War II. See, e.g., Slaughter Burley, Dual Agenda, supra note 238, at 207-08 (giving a historical account of this criticism). As recent historical international relations scholarship has pointed out, however, few if any scholars ever held such utopian views. See, e.g., Andreas Osiander, Rereading Early Twentieth-Century IR Theory: Idealism Revisited, 42 Int'l Stud. Q. 343 (1998).

[FN273]. See Moravcsik, supra note 245, at 515. But see Richard A. Matthew & Mark W. Zacher, Liberal International Relations Theory: Common Threads, Divergent Strands, in Controversies in International Relations Theory, 107, 107-11 (Charles W. Kegley, Jr. ed., 1995) (arguing that liberalism's propositions cannot be simply deduced from its assumptions).

[FN274]. See supra note 246 and accompanying text.

[FN275]. Moravcsik, supra note 245, at 518. This does not mean that liberal international relations theory only applies to democratic states. In fact, "every government represents some individuals and groups more fully than others. In an extreme hypothetical case, representations might empower a narrow bureaucratic class or even a single tyrannical individual ...." Id. However, some liberals have concluded that the quality of the relationship among liberal states is different from that among non-liberal states and among liberal and non-liberal states. See infra notes 349-351 and accompanying text.

[FN276]. See, e.g., Abbott, supra note 237, at 366; Moravcsik, supra note 245, at 522-23; Slaughter Burley, Dual Agenda, supra note 238, at 228-29.

[FN277]. See, e.g., Kal Raustiala, The Architecture of International Cooperation: Transgovernmental Networks and the Future of International Law, 43 Va. J. Int'l L. 1 (2003) (examining international cooperation through transnational networks of governmental agencies); Anne-Marie Slaughter, Global Government Networks, Global Information Agencies, and Disaggregated Democracy, 24 Mich. J. Int'l L. 1041 (2003) (same); Anne-Marie Slaughter, International Law in a World of Liberal States, 6 Eur. J. Int'l L. 503, 524-28 (1995) [hereinafter Slaughter, International Law] (same).

[FN278]. See, e.g., Thomas Risse-Kappen, Bringing Transnational Relations Back In: Introduction, in Bringing

Transnational Relations Back In, supra note 256, at 3 [hereinafter Risse-Kappen, Transnational Relations] ("Transnational relations, i.e., regular interactions across national boundaries when at least one actor is a non-state agent or does not operate on behalf of a national government or an intergovernmental organization, permeate world politics in almost every issue area." (footnote omitted)).

[FN279]. Slaughter Burley, Dual Agenda, supra note 238, at 230.

[FN280]. Id.

[FN281]. Id.

[FN282]. See supra notes 23-39 and accompanying text.

[FN283]. See, e.g., Joseph H.H. Weiler, The Transformation of Europe, 100 Yale L.J. 2403, 2420-22 (1991) (discussing the role of private parties in helping enforce Community law through the Article 177 procedure).

[FN284]. North American Free Trade Agreement, Dec. 17, 1992, Can.-Mex.-U.S., chs. 11 & 19, 19 U.S.C. § 3301, 32 I.L.M. 605, 639-49, 682-93 [hereinafter NAFTA]; North American Agreement on Environmental Co-operation, Sept. 14, 1993, Can.-Mex.-U.S., arts. 14-15, 19 U.S.C. §3472, 32 I.L.M. 1480; see, e.g., Barton Legum, The Innovation of Investor-State Arbitration Under NAFTA, 43 Harv. Int'l L.J. 531 (2002) (discussing the investor-state arbitration under NAFTA); Chris Tollefson, Games Without Frontiers: Investor Claims and Citizen Submissions Under the NAFTA Regime, 27 Yale J. Int'l L. 141 (2002) (analyzing the role of individuals and groups in the new NAFTA regime). Dean Slaughter dramatically speaks of a "deep conceptual shift," due to which international tribunals are no longer viewed exclusively as venues where disputes between nations are resolved, while transnational litigation is limited to litigation before domestic courts, but rather of a new concept of transnational litigation that involves both domestic and international tribunals. Slaughter, Community of Courts, supra note 214, at 191-92. Others have raised delegation concerns. See, e.g., Curtis A. Bradley, International Delegations, the Structural Constitution, and Non-Self Execution, 55 Stan. L. Rev. 1557 (2003) (discussing constitutional implications of U.S. delegation of authority to international institutions).

[FN285]. For instance, research in this vein has demonstrated that efforts to engage private groups and individuals more directly in the implementation of international law in both supranational and domestic litigation have been more successful in bringing about compliance with international law, at least among liberal democratic states, than traditional avenues of enforcement, such as state responsibility, countermeasures, and state-to-state litigation before an international tribunal. See, e.g., William J. Aceves, Liberalism and International Legal Scholarship: The Pinochet Case and the Move Toward a Universal System of Transnational Law Litigation, 41 Harv. Int'l L.J. 129, 160-71 (2000) (using the Pinochet litigation in Spanish and English courts as a case study to show the effectiveness of litigation initiated by private groups in domestic courts to enforce international human rights law); Anne-Marie Burley & Walter Mattli, Europe Before the Court: A Political Theory of Legal Integration, 47 Int'l Org. 41 (1993) (identifying the ways in which the ECJ created opportunities for pro-EC subnational actors and national courts and thus provided them with a stake in the promotion of EC law, thus leading to faster and deeper integration than most member states would have liked); Carol Harlow, Toward a Theory of Access for the European Court of Justice, 12 Y.B. Eur. L. 213 (1992) (describing the way pressure groups have used Article 177 referrals to the ECJ to further their interests); Laurence R. Helfer & Anne-Marie Slaughter, Toward a Theory of Effective Supranational Adjudication, 107 Yale L.J. 273, 282-337 (1997) (tracing the success of the ECJ and the European Court of Human Rights ("ECHR") in terms of compliance with their judgments in cases involving private parties versus their compliance record and that of other international tribunals in traditional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 1 297

Page 63

state-to-state litigation and isolating the factors contributing to such effective supranational adjudication); Wal-
ter Mattli & Anne-Marie Slaughter, Revisiting the European Court of Justice, 52 Int'l Org. 177 (1998)
(canvassing the literature on the role of the ECJ in European integration to paint a richer picture of the prefer-
ences and constraints of groups, individuals, and supranational entities that have played a role in the process of
integration); Alec Stone Sweet & James A. Caporaso, From Free Trade to Supranational Polity: The European
Court and Integration, Ctr. for German and European Studies, Working Paper No. 2.45, 1996) (using statistical
analyses and case studies to show the close relationship between the behavior of transnational actors and
European integration through the jurisprudence of the ECJ, a jurisprudence mostly at odds with the interests of
the most powerful member states), available at http://www.ciaonet.org/frame/wpsfrm (last visited Nov. 14,
2004).

[FN286]. For a liberalist-inspired argument in favor of granting individuals and groups standing before the WTO
dispute resolution panels, see G. Richard Shell, Trade Legalism and International Relations Theory: An Analysis
of the World Trade Organization, 44 Duke L.J. 829, 911-22 (1995). For further arguments in favor of increased
participation of private groups and individuals before the WTO, both in the "legislative" and in the dispute res-
olution process, see Steve Charnovitz, Participation of Nongovernmental Organizations in the World Trade Or-
ganization, 17 U. Pa. J. Int'l Econ. L. 331 (1996); Daniel D. Esty, Nongovernmental Organizations at the World
Trade Organization: Cooperation, Competition or Exclusion, 1 J. Int'l Econ. L. 123 (1998). But see Jeffrey L.
Dunoff, The Misguided Debate over NGO Participation at the WTO, 1 J. Int'l Econ. L. 433 (1998) (using a de-
tailed description of the Kodak v. Fuji dispute and other cases before the WTO dispute settlement panel to show
that, behind the scenes and more or less overtly, some private groups and individuals already do participate in
the processes before that body); Joel P. Trachtman & Philip M. Moremen, Costs and Benefits of Private Parti-
cipation in WTO Dispute Settlement: Whose Right Is It Anyway?, 44 Harv. Int'l L.J. 221 (2003).

[FN287]. Treaty Establishing the European Community, Nov. 10, 1997, O.J. (C 340) 33 (1997) [hereinafter EC
Treaty]. See, e.g., Commission communication to the Council and the European Parliament 'towards greater ef-
ficiency in obtaining and enforcing judgments in the European Union,' 1998 O.J. (C 33) 3 passim (suggesting
that current obstacles to judgments recognition impedes inter-EC trade).

[FN288]. The four freedoms are the free movement of goods, EC Treaty, supra note 287, arts. 9-37; free move-
ment of persons, id. arts. 48-58; free movement of services, id. arts. 59-66; and free movement of capital, id.
arts. 67-73h.

[FN289]. The groundbreaking article is Manfred Wolf, Abbau prozessualer Schranken im europäischen Binnen-
markt, in Wege zu einem Europäischen Zivilprozessrecht 35 (Wolfgang Grunsky et al. eds., 1992).

[FN290]. Article 65, in force since January 1, 1999, provides in pertinent part:

Measures in the field of judicial cooperation in civil matters having cross-border implications... shall
include:

... (c) eliminating obstacles to the good functioning of civil proceedings, if necessary by promoting the com-
patibility of the rules on civil procedure applicable in the Member States.

EC Treaty, supra note 287. On the difficulties in implementing Article 65 arising from the reservations de-
clared by the United Kingdom, Ireland, and Denmark to the Treaty of Amsterdam, Treaty of Amsterdam amend-
ing the Treaty on European Union, the Treaties establishing the European Communities and certain related acts,
Oct. 2, 1997, O.J. (340) 1 (1997) [hereinafter Treaty of Amsterdam], see, for example, Burkhard He<<beta>>,
Die "Europäisierung" des internationalen Zivilprozessrechts durch den Amsterdamer Vertrag - Chancen und Ge-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fahren, 53 Neue Juristische Wochenschrift 23, 28 (2000). In Article III-170, the proposed European Constitution adopts the content of Article 65 of the EC Treaty. See Draft Treaty Establishing a Constitution for Europe of July 18, 2003, available at http://european-convention.eu.int/docs/Treaty/cv00850.en03.pdf (last visited Oct. 14, 2004).

[FN291]. See, e.g., Council Directive 2000/35/ art. 5, 2000 O.J. (L 200) 35 (requiring member states to "ensure that an enforceable title can be obtained, irrespective of the amount of debt, normally within 90 calendar days of the lodging of the creditor's action" if "the debt or aspects of the procedure are not disputed"); Council Directive 98/27, 1998 O.J. (L 166) 51 (mandating that consumer groups organized under the laws of one member state be given standing to sue in another member state); Council Directive 97/5, art. 10, 1997 O.J. (L 43) 25 (requiring member states to "ensure that there are adequate and effective procedures for the settlement of disputes" in cross-border credit transfers). For further recent European legislation regarding trans-border procedure, see also supra text accompanying note 12 .

[FN292]. Case C-20/92, 1993 E.C.R. I-3790.

[FN293]. Case C-323/95, 1997 E.C.R. I-1718.

[FN294]. See, e.g., Data Delecta Aktiebolag v. MSL Dynamics Ltd., Case C-43/95, 1996 E.C.R. I-4661, paras. 16-22; 1997 E.C.R. I-1718, supra note 293, paras. 15-25.

[FN295]. Case C-398/92, 1994 E.C.R. I-467.

[FN296]. See, e.g., Ronald A. Brand, Recognition of Foreign Judgments as a Trade Law Issue: The Economics of Private International Law, in The Economic Analysis of International Law 592 (Jagdeep Bhandari et al. eds., 1998) (discussing the recognition and enforcement of foreign judgments from the perspective of international trade).

[FN297]. Vymar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528 (1995); Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614 (1985); Scherk v. Alberto Culver Co., 417 U.S. 506 (1974); Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).

[FN298]. See, e.g., Burbank, World, supra note 16, at 1497 (suggesting that the Court's rhetoric in these cases may "simply [be] a function of calculations about when it is in the judiciary's interest to share power"). But see, e.g., IDS Life Ins. Co. v. SunAmerica, Inc., 103 F.3d 524, 528 (7th Cir. 1996) (noting "Congress's emphatically expressed support for facilitating arbitration" not only to "lighten the caseload of the federal courts" but also to "effectuate private ordering").

[FN299]. Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, Legal Instruments - Results of the Uruguay Round; arts. 41-50, vol. 31, 33 I.L.M. 81 (1994), arts. 41-50.

[FN300]. See also NAFTA, supra note 284, art. 2022 (exhorting member states "to the maximum extent possible [to] encourage and facilitate the use of arbitration and other means of alternative dispute resolution for the settlement of international commercial disputes between private parties in the free trade area" and to create an Advisory Committee on Private Commercial Disputes to study and report on the availability and effectiveness of arbitration and other ADR methods to resolve such disputes).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN301]. See Decision on Hearing of Respondent's Objection to Competence and Jurisdiction, Loewen Group, Inc. v. United States, sec. 137 (ICSID Case No. ARB(AF)/98/3), available at http:// www.state.gov/documents/organization/3921.pdf (last visited Nov. 14, 2004) (holding that the decision by the Mississippi court could itself constitute an expropriation and thus was subject to arbitral review under Chapter 11 of NAFTA). Ultimately, the NAFTA panel dismissed the case for lack of diversity of nationality and for a failure to exhaust local remedies. The panel did, however, register its view that the Mississippi trial and its verdict were "clearly improper and discreditable and cannot be squared with minimum standards of international law and fair and equitable treatment." Loewen Group, Inc. v. United States, (ICSIP Case No. ARB(AF)/98/3), available at http:// www.state.gov/documents/organization/22094.pdf (last visited Nov. 14, 2004).

[FN302]. See Award, Mondev Int'l Ltd. v. United States, pp 129-140 (ICSID Case No. ARB(AF)/99/2), available at http:// www.state.gov/documents/organization/14442.pdf (last visited Nov. 14, 2004) (holding, after close scrutiny of reasoning of a Massachusetts court, that application of the principle of sovereign immunity did not violate NAFTA's investment provisions in the case at hand).

[FN303]. Charles H. Brower, II, Structure, Legitimacy, and NAFTA's Investment Chapter, 36 Vand. J. Transnat'l L. 37, 93 (2003).

[FN304]. See, e.g., id. at 68-72. The "legitimacy crisis" of NAFTA's Chapter 11 in the United States is also due to the fact that the "international standards" of expropriation and "fair and equitable treatment," long imposed on less-developed countries through bilateral investment treaties, are now for the first time being applied to regulatory and procedural laws and to decisions of courts and authorities in the United States. See, e.g., Guillermo Aguilar Alvarez & William W. Park, The New Face of Investment Arbitration: NAFTA Chapter 11, 28 Yale J. Int'l L. 365 (2003).

[FN305]. See supra note 285.

[FN306]. Eyal Benvenisti, Exit and Voice in the Age of Globalization, 98 Mich. L. Rev. 167, 169 (1999).

[FN307]. Id. at 171-84.

[FN308]. Id. at 184-96.

[FN309]. See, e.g., Wolf, supra note 289, at 35.

[FN310]. See, e.g., Gerhard Walter & Samuel P. Baumgartner, Improving the Prospects of the Transnational Rules of Civil Procedure Project: Some Thoughts on Purpose and Means of Implementation, in 18 Ritsumeikan L. Rev. 169 (2001) [hereinafter Walter & Baumgartner, Prospects]; see also Brand, supra note 296, at 627 (suggesting that "fundamental jurisprudential disagreements" may justify non-recognition of a foreign judgment in spite of a preference for the free movement of judgments from a free-trade perspective).

[FN311]. Case C-412/97, 1999 E.C.R. I-3845.

[FN312]. The procedure, called decreto ingiuntivo, allows a creditor who believes to have an uncontested claim for the payment of a sum of money to obtain an enforceable judgment within 60 days at minimal cost by simply filling out a form identifying the debtor, sum of money owed, and a brief description of the cause of action, thus obviating the need for filing a full complaint. The court then orders the defendant to either pay the sum of money or to object to its order. In the latter case, the plaintiff can overcome the objection only by initiating an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 1337

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 76 of 131

Page 66

ordinary civil proceeding. However, if the defendant neither pays nor objects within the time identified, the court declares the order an enforceable judgment in the amount claimed. See Codice di Procedura Civile [CPC], art. 633 et seq. (Italy). Together with a similar procedure available in Germany and France, it served as the basis for the recent European Late-Payment Directive, supra note 291.

[FN313]. 1999 E.C.R. I-3845 at no. 11 (citation omitted).

[FN314]. Professor Benvenisti, for one, envisions the creation of transnational institutions to coordinate policies. See supra note 306, at 202-211. Professor Trimble, on the other hand, suggests to tackle "laissez-faire globalism" by moving from a preoccupation with state authority to a concern with substantive justice by strengthening and democratizing international institutions. See Phillip R. Trimble, Globalization, International Institutions, and the Erosion of National Sovereignty and Democracy, 95 Mich. L. Rev. 1944, 1969 (1997) (book review).

[FN315]. 786 S.W.2d 674 (Tex. 1990).

[FN316]. Dow Chemical Co., 786 S.W.2d at 688-89 (Dogget, J., concurring). But see Dow Chemical Co., 786 S.W.2d at 697 (Gonzalez, J., dissenting) (suggesting that the court lacks the power to make this policy decision). The Texas legislature subsequently reenacted the doctrine of forum non conveniens in personal injury actions. See Tex. Civ. Prac. & Rem. Code § 71.051 (1997). So far, the argument has not had much success in blocking the application of the doctrine of forum non conveniens in the United States. See, e.g., Aguinda v. Texaco, Inc., 303 F.3d 470 (2d Cir. 2002) (affirming dismissal for forum non conveniens); In re Union Carbide Corp. Gas Plant Disaster, 89 F.2d 195 (2d Cir. 1987) (affirming dismissal for forum non conveniens); Sequihua v. Texaco, Inc., 847 F. Supp. 61 (S.D.Tex. 1994) (dismissing complaint on grounds of forum non conveniens). In the English case of Lubbe v. Cape Plc., 1 W.L.R. 1545 (2000), however, the House of Lords was apparently swayed by the argument and denied a dismissal on forum non conveniens grounds in favor of a class of South African plaintiffs who had filed suit at the defendant's place of incorporation in England for claims arising out of the defendant's operation of asbestos-mining operations in South Africa although all the relevant factors seemed to point clearly toward South Africa as the more convenient forum.

[FN317]. See, e.g., Samuel P. Baumgartner, Related Actions, in 3 Zeitschrift Für Zivilprozess International 203, 216-23 (1998) (discussing policy considerations underlying the doctrine of forum non conveniens); Stephen B. Burbank, Jurisdictional Conflict and Jurisdictional Equilibration: Paths to a Via Media?, 26 Hous. J. Int'l L. 385 (2004) (assessing the roles of forum non conveniens and lis pendens in resolving jurisdictional conflicts).

[FN318]. See, e.g., Ives Dezaley & Briant G. Garth, Dealing in Virtue: International Commercial Arbitration and the Construction of a Transnational Legal Order (1996) [hereinafter Dezelay & Garth] (recounting how international commercial arbitration, depending on the country in question, has become more or less of a privatized venue to adjudicate international business disputes away from the public courts to the extent that those courts are viewed as unfriendly to particular business interests); Thomas E. Carbonneau, National Law and the Judicialization of Arbitration: Manifest Destiny, Manifest Disregard, or Manifest Error, in International Arbitration in the 21st Century: Towards "Judicialization" and Uniformity 115, 116-17 (Richard B. Lillich & Charles N. Brower eds., 1993) (suggesting that if domestic "legal processes are too rigid to adapt and to undergo reform," they fuel a demand for international commercial arbitration). This development is further strengthened by the attempts of a number of countries to attract international commercial arbitration and the business it produces for the local bar and infrastructure services by drafting international arbitration laws that provide for a minimum of judicial interference in the arbitral process. See, e.g., Dezaley & Garth, supra, at 129-81 (discussing how Brit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 199                                                  Page 67

Case 1:07-cv-00255-JJF     Document 60-2     Filed 03/17/2008     Page 77 of 131

ish and U.S. lawyers have used and developed international arbitration to their business advantage); Gary B. Born, International Commercial Arbitration in the United States 30-34 (2d ed. 2001) (describing the Federal Arbitration Act and how Congress sought to facilitate development of a stable system of international commercial dispute-resolution favoring business interests).

[FN319]. See, e.g., Moravcsik, supra note 245, at 518 (noting that "cost-effective exit options, such as emigration, noncompliance, or the transfer of assets to new jurisdictions or uses, insofar as they constrain governments, may be thought of as substitutes for formal representation," by which the preferences of those groups are translated into state policy).

[FN320]. See, e.g., Thomas E. Carbonneau, The Exuberant Pathway to Quixotic Internationalism: Assessing the Folly of Mitsubishi, 19 Vand. J. Transnat'l L. 263 (1986) (suggesting that there ought to be genuine limits to the enforcement of arbitration clauses where the public policy of the forum is concerned); Amr A. Shalakany, Arbitration and the Third World: A Plea for Reassessing Bias Under the Specter of Neoliberalism, 41 Harv. Int'l L.J. 419 (2000) (critiquing the effect of international commercial arbitration to resolve trade and investment disputes in favor of the North).

[FN321]. See supra text accompanying notes 16-18.

[FN322]. Benvenisti, supra note 306, at 169 (citation omitted).

[FN323]. See, e.g., Richard Posner, Economic Analysis of Law (6th ed. 2002). This does not mean, however, that there is agreement on how to analyze and predict those incentive effects. See supra note 256.

[FN324]. Supra text accompanying note 27.

[FN325]. See supra note 39; In re Anschuetz & Co., GmbH, 754 F.2d 602, 608-09 (5th Cir. 1985) ("We have a party, we have jurisdiction, and under Rule 34 that party is required to produce documents which are in its possession, custody or control.... The fact that the documents are in West Germany is, to this court, immaterial." (quoting the district court)); Baumgartner, supra note 9, at 30-45 (tracing U.S. history of unilateral approaches to transnational litigation).

[FN326]. See, e.g., Timberlane v. Bank of America, 549 F.2d 597 (9th Cir. 1976) (adopting a balancing test to determine whether extraterritorial jurisdiction should be exercised); Mannington Mills v. Congoleum Corp., 595 F.2d 1287 (3d Cir. 1979) (agreeing substantially with the Ninth Circuit's test and describing the factors to consider); Restatement (third), supra note 32, § 403 (discussing the limits on domestic jurisdiction).

[FN327]. See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa, 482 U.S. 522 (1987) (using an interest-balancing test to determine whether to require first resort to the Hague Evidence Convention).

[FN328]. See, e.g., Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) (balancing private and public interests factors for a determination of whether or not to grant a dismissal on grounds of forum non conveniens).

[FN329]. See, e.g., Slaughter, Economic Law, supra note 242, at 735 (observing that the development of the law controlling the reach of U.S. legislative jurisdiction from territoriality to the "rule of reason," which requires the balancing of the relevant interests, is in line with liberal international relations theory "precisely because it suggests a shift from a focus on power to a focus on interests"). Whether it is appropriate for a court to engage in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the type of policy analysis suggested above is a different question. See infra text accompanying notes 385-387.

[FN330]. Cf., e.g., Slaughter, Economic Law, supra note 242, at 736 (critiquing that the "rule of reason" remains too closely tied to notions of physical power rather than truly determining the extent to which the underlying interests of groups and individuals can be harmonized).

[FN331]. See supra text accompanying notes 322-323; Burbank, World, supra note 16 passim (analyzing a number of examples of such similarities).

[FN332]. Benvenisti, supra note 306, at 184-89; see also Risse-Kappen, Transnational Relations, supra note 278, at 26 (arguing that "'[c]lever' transnational actors adapt to the domestic structure to achieve their goals").

[FN333]. Benvenisti, supra note 306, at 184-89; Helen V. Milner, Interests, Institutions, and Information 14-17, 20-23, 67-98 (1997); see also Keck & Sikkink, supra note 266 (exploring the role of NGOs in collecting information and in pressuring governments at home and abroad to adopt particular policies).

[FN334]. See supra notes 215-218 and accompanying text .

[FN335]. As far as arbitration is concerned, see Dezaley & Garth, supra note 318 (discussing the role of specialized lawyers in the development of international commercial arbitration).

[FN336]. See, e.g., Friedrich K. Juenger, Forum Shopping, Domestic and International, 63 Tul. L. Rev. 553, 560-74 (1988) (discussing the role of forum shopping in shaping international commercial arbitration).

[FN337]. See, e.g., id. at 571-72 (noting that effective representation of clients is a lawyer's duty).

[FN338]. See supra notes 232-233 and accompanying text (describing lack of knowledge as to U.S. litigation approaches). On the many undesirable effects of actors' inadequate information in international politics, see George Downs & David Rocke, Optimal Imperfection: Domestic Uncertainty and Institutions in International Relations (1995); Robert Jervis, Perception and Misperception in International Politics (1976); and Keohane, After Hegemony, supra note 244, at 244-47.

[FN339]. For example, the prerequisites for provisional relief differ so widely from country to country that there may be "a black hole in which a defendant can escape out of sight and become unreachable." Mercedes Benz AG v. Leiduck, [1996] 1 A.C. 284, 305 (P.C. 1995) (appeal taken from Hong Kong) (Lord Nicholls dissenting). In that case, Mercedes Benz was unable to secure an attachment of the defendant's Hong Kong property before the courts of Monaco, the defendant's domicile, because Monaco law does not allow the attachment of property located abroad. Subsequently, the Privy Council equally upheld the reversal of the decision of a Hong Kong trial court to grant such an attachment by the Hong Kong courts of appeal because of a lack of personal jurisdiction over the defendant. On the difficulties with the various national laws in regard to preliminary relief, see, for example, The International Law Association, Report of the Sixty-Seventh Conference Held at Helsinki, Finland 185 (James Crawford & Michael Byers eds., 1996) [hereinafter ILA Report].

[FN340]. See, e.g., Walter & Baumgartner, Recognition, supra note 58, at 4-5 (noting difficulties in locating legal materials in some Eastern European countries).

[FN341]. See, e.g., Geoffrey C. Hazard, Jr., Foreword to U.S. Statement, supra note 8, at xiii, xiv (reporting that, "although the United States and Canada share a common language and common source in English law, in this

project we discovered the truth that literal equivalencies sometimes can mask important substantive differences"); Lawrence Collins, The Hague Evidence Convention and Discovery: A Serious Misunderstanding?, 35 Int'l & Comp. L.Q. 765 (1986) (suggesting that U.S. courts misconceived the Hague Convention as being designed to further the process of discovery).

[FN342]. See, e.g., Duxbury, supra note 29 (analyzing the historical development of various strands of American jurisprudential thought); Gerald B. Wetlaufer, Systems of Belief in Modern American Law: A View From Century's End, 49 Am. U. L. Rev. 1 (1999).

[FN343]. William Ewald, Comparative Jurisprudence (I): What Was it Like to Try a Rat?, 143 U. Pa. L. Rev. 1889 (1995) [hereinafter Ewald, Comparative Jurisprudence); see also George P. Fletcher, The Right and the Reasonable, 98 Harv. L. Rev. 949 (1985) (distinguishing flat and structured legal reasoning); William B. Ewald, What's So Special About American Law?, 26 Okla. City U. L. Rev. 1083, 1095-96 (2001) (noting that among the things that puzzle his foreign students about American law are the civil jury and the resulting complexities of the law of evidence, pretrial discovery, contingent fees, the death penalty, "intellectual movements such as law and economics or critical race theory," the "practice of electing judges and prosecutors, and of allowing them to run what is in effect a political campaign, complete with campaign contributions and the support of a political party"); Linda S. Mullenix, Lessons From Abroad: Complexity and Convergence, 46 Vill. L. Rev. 1, 11 (2001) (suggesting that "American students and the American practicing bar typically recoil from [the] civil law jurisprudence" that does not provide for things such as trial by jury, full-fledged discovery, the American rule of costs, entrepreneurial lawyers, punitive damages, class actions, and American-style adversary litigation).

[FN344]. Among international law scholars, it has become an article of faith that state sovereignty has waned significantly within the last fifty years. See, e.g., Goldsmith, supra note 252, at 979; see also Richard W. Mansbach et al., The Web of World Politics, Non-State Actors in the Global System (1976) (making claims as to the demise of state sovereignty); James N. Rosenau, The Study of Global Interdependence, Essays on the Transnationalization of World Affairs (1980) (making similar claims). As Professor Krasner has demonstrated in a careful empirical study, however, states have for centuries encroached upon the sovereignty of others by imposing constitutions, rules on the treatment of a state's own citizens (particularly minorities), and dictates on economic regulation in connection with the granting of sovereign loans. Stephen B. Krasner, Sovereignty 73-219 (1999).

[FN345]. See, e.g., Richard Falk, Human Rights and State Sovereignty (1981); Peter M. Gerhart, The Two Constitutional Visions of the World Trade Organization, 24 U. Pa. J. Int'l Econ. L. 1 (2003); Benedict Kingsbury, The Tuna-Dolphin Controversy, the World Trade Organization, and the Liberal Project to Reconceptualize International Law, 5 Y.B. Int'l Envtl. L. 1 (1994).

[FN346]. See, e.g., Sol Picciotto, Networks in International Economic Integration: Fragmented States and The Dilemmas of Neo-Liberalism, 17 Nw. J. Int'l L. & Bus. 1014 (1996-97).

[FN347]. See, e.g., Chayes & Chayes, supra note 244, at 27 (suggesting that sovereignty now exists "in membership in reasonably good standing in the regimes that make up the substance of international life," while "[i]solation from the pervasive and rich international context means that the state's potential for economic growth and political influence will not be realized").

[FN348]. See, e.g., United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945) (holding that the reach of the Sherman Act is not limited by territorial boundaries); In re Anschuetz & Co., GmbH, 754 F.2d 602, 606 (5th Cir. 1985) (dismissing German sovereignty concerns that would result in limiting the effectiveness of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 U. Pa. J. Int'l Econ. L. 499    Page 70

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 80 of 131

Federal Rules); supra notes 200-207 and accompanying text.

[FN349]. Anne-Marie Burley, Law Among Liberal States: Liberal Internationalism and the Act of State Doctrine, 92 Colum. L. Rev. 1907, 1961-65, 1975-86 (1992) [hereinafter Burley, Liberal Internationalism]. I add the qualifier "U.S." (courts) here because her data are culled exclusively from the opinions of U.S. tribunals.

[FN350]. Id. at 1909-10.

[FN351]. Slaughter Burley, Dual Agenda, supra note 238, at 230 (emphasis in original).

[FN352]. But see id. at 229-30.

[FN353]. As Professor Jackson points out, Westphalian sovereignty has always served to protect weaker from more powerful nations. Robert H. Jackson, Quasi-States: Sovereignty, International Relations and the Third World 6 (1990).

[FN354]. See supra notes 234-235 and accompanying text. Dean Slaughter acknowledges this view. See Burley, Liberal Internationalism, supra note 349, at 1963 (noting that "judges respond not to a subconscious identification of a particular state as 'liberal' or 'nonliberal,' but rather to individualized assessments of the particular economic and political interests at stake on the facts of a given case").

[FN355]. Andreas F. Lowenfeld, International Litigation and the Quest for Reasonableness 230 (1996) [hereinafter Lowenfeld, Quest]; see also Burley, Liberal Internationalism, supra note 349, at 1980-86 (suggesting that the courts of liberal states deal with contentious regulatory disagreements between governments by balancing the interests involved rather than deferring to a political solution).

[FN356]. Cf., e.g., Samuel P. Baumgartner, Human Rights and Civil Litigation in United States Courts: The Holocaust Era Cases, 80 Wash. U. L.Q. 835, 846-49 (2002) (noting instances when transnational public law litigation in U.S. courts has come across to influential groups and individuals abroad as simply another arrow in the quiver of a powerful country that attempts to impose its own political preferences upon others).

[FN357]. Cf. Benedict Kingsbury, Sovereignty and Inequality, 9 Eur. J. Int'l L. 599 (1998) (arguing that a radical change in the traditional concept of sovereignty will be hazardous to both international law and international society if not accompanied by the development of an alternative concept that is capable of serving that concept's function of equalizing inequality among nation states).

[FN358]. Cf., e.g., Greenberg, supra note 21, at 1818 (pointing to the realist insight that "a great nation that in its actions inspires resentment among friendly and neutral states, generates hatred and humiliation among those who perceive themselves to be subjected to its power and ... will inspire alliances against it--alliances that threaten to undermine that nation's prosperity and security").

[FN359]. See, e.g., Ernest L. Kerley, Contemporary Practice of the United States Relating to International Law, 56 Am. J. Int'l L. 794 (1962) (reporting a Swiss diplomatic protest to the United States when a U.S. agency served a Swiss corporation with documents by mail, an act that infringed on Switzerland's sovereign power). For some more obscure sources of such protests, see Born, supra note 13, at 849-50.

[FN360]. See, e.g., Born, supra note 13, at 850-52 (describing different categories of foreign blocking statutes).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN361]. See supra notes 234-236 and accompanying text. As indicated above, the views on what is considered protected by national sovereignty are to some degree connected to prevailing jurisprudential views and procedural particularities. See supra text accompanying notes 44-45. This increases the difficulty of those trained in one legal system to understand the views on sovereignty in another. See, e.g., Lowenfeld, Quest, supra note 355, at 229 ("I have long wondered how the concept of sovereignty crept into the subjects here discussed .... Is it really pertinent to the limits of the effects doctrine, or to procurement of evidence for purposes of discovery or trial?"). As a leading international law scholar well versed in foreign approaches, of course, Professor Lowenfeld is expressing more than the view of an American lawyer by querying whether the civil law insistence on sovereignty in these matters still makes sense in today's world of transnational interdependence. See id. at 2. This question is perfectly legitimate, but as I have just noted in the text, it is not the only relevant question. See supra notes 210-214 and accompanying text.

[FN362]. See supra note 28 and accompanying text.

[FN363]. See supra note 27 and accompanying text.

[FN364]. See supra notes 287-304 and accompanying text.

[FN365]. See supra notes 285-286 and accompanying text.

[FN366]. Harold Hongju Koh, Transnational Legal Process, 75 Neb. L. Rev. 181 (1996) [hereinafter Koh, Transnational Legal Process].

[FN367]. Id. at 184 (suggesting the normative quality of transnational legal process); Koh, Why Obey?, supra note 21, at 2626-27, 2646 (suggesting that transnational legal process is normative, constitutive, and dynamic).

[FN368]. Compare United States v. Aluminum Co. of Am., 148 F.2d 416 (2d Cir. 1945), with Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287 (3d Cir. 1979), and Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597 (9th Cir. 1976). But see Hartford Fire Insurance Co. v. California, 509 U.S. 764, 798 (1993) (holding that "even assuming that in a proper case, a court may decline to exercise Sherman Act jurisdiction over foreign conduct (or, as Justice S[calia] would put it, may conclude by the employment of comity analysis in the first instance that there is no jurisdiction), international comity would not counsel against exercising jurisdiction in the circumstances alleged here"). In F. Hoffman-LaRoche Ldt. v. Empagran S.A., 124 S. Ct. 2359 (2004), the Supreme Court, possibly in part reacting to a considerable number of amicus briefs by foreign governments, retreated to a cautious approach to applying the Sherman Act extraterritorially where the antitrust claim is based entirely on harm suffered abroad. The Court thus sided with caution regarding foreign sovereignty concerns in a recent circuit split over the meaning of sections 6a(1) and 6a(2) of the Federal Trade Antitrust Improvements Act (FTAIA). Compare Empagran S.A. v. F. Hoffman-LaRoche, Ltd., 315 F.3d 338 (D.C. Cir. 2003); and Kruman v. Christie's Int'l PLC, 284 F.3d 384 (2d Cir. 2002), with Den Norske Stats Oljeselskap As v. Heeremac Vof, 241 F.3d 420 (5th Cir. 2001).

[FN369]. See, e.g., supra Section 3; notes 287-304 and accompanying text.

[FN370]. See, e.g., supra notes 331-337 and accompanying text.

[FN371]. See, e.g., supra notes 344-361 and accompanying text.

[FN372]. See, e.g., supra text accompanying notes 342-343.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN373]. See, e.g., supra text accompanying notes 338-341.

[FN374]. See supra text accompanying notes 340-343.

[FN375]. See, e.g., Burbank, Reluctant Partner, supra note 25, at 111-12; Robert M. Cover, For James Wm. Moore: Some Reflections on a Reading of the Rules, 84 Yale L.J. 718, 722 (1975); Subrin, supra note 2, at 977; see also supra note 19 (noting further reasons for the resistance to treat transnational cases differently than domestic ones in the United States).

[FN376]. See supra note 7 and accompanying text.

[FN377]. 1998 Draft, supra note 7, § 0.3 cmt.

[FN378]. 2004 Draft, supra note 7, at 7-8.

[FN379]. Gerhard Walter & Samuel P. Baumgartner, Utility and Feasibility of Transnational Rules of Civil Procedure: Some German and Swiss Reactions to the Hazard-Taruffo Project, 33 Tex. Int'l L.J. 463, 466-75 (1998) [hereinafter Walter & Baumgartner, Utility].

[FN380]. See supra notes 291, 312 and accompanying text (noting Italian, German and French procedural amendments that served as the basis for the European Late Payment Directive and the underlying attempt to speed up transnational debt collection within the EC).

[FN381]. Summary judgment, initially introduced into common law procedure as a means to help creditors enforce uncontested debts (see, for example, Jeffrey W. Stempel, A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict, and the Adjudication Process, 49 Ohio St. L.J. 95, 136 (1988)), is unlikely to meet this demand fully.

[FN382]. In the United States, courts have been unable to agree on whether or not to provide such cooperation. Compare, e.g., Pilkington Bros. v. AFG Indus. Inc., 581 F. Supp. 1039, 1047 (D. Del. 1984) (refusing to issue an injunction duplicative of an interim injunction issued by an English court against a Delaware corporation), with Cardenas v. Solis, 570 So. 2d 996, 1000 (Fla. Dist. Ct. App. 1991) (affirming injunction freezing husband's Florida bank accounts on request of Guatemalan court). See also David Westin & Peter Chrociel, Interim Relief Awarded by U.S. and German Courts in Support of Foreign Proceedings, 28 Colum. J. Trans. L. 723 (1990).

[FN383]. See, e.g., Groupo Mexicano de Desarollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308 (1999) (holding that the trial court lacked jurisdiction to grant a preliminary injunction); ILA Report, supra note 339 (exposing gaps in laws that frustrate plaintiffs' civil recovery and proposing a new legal framework); George A. Bermann, Provisional Relief in Transnational Litigation, 35 Colum. J. Transnat'l L. 553 (1997) (providing comparative analysis of provisional relief in transnational litigation); Stephen B. Burbank, The Bitter With the Sweet: Tradition, History and Limitations on Federal Judicial Power - A Case Study, 75 Notre Dame L. Rev. 1291, 1334-45 (2000) [hereinafter Burbank, The Bitter With the Sweet] (critiquing Groupo Mexicano, supra, from the perspective of transnational litigation). In continental Europe, the issue of preliminary relief in transnational cases has been somewhat more prominently on the minds of specialists of "international civil procedure" than in the United States. See, e.g., Bucher, supra note 24, at 118-32; Campeis & De Pauli, supra note 24, at 260-64; Schack, supra note 24, at 183-92; Walter, supra note 24, at 140-41, 405-06. This may have to do with a strict territorialist approach to transnational litigation there, see, for example, Walter & Baumgartner, Recogni-

tion, supra note 58, at 5. In addition, with Articles 24 and 26 of the Brussels and Lugano Conventions (and now Articles 31 and 33 of the Brussels Regulation), as interpreted by the ECJ in Case 125/79, Denilauer v. Couchet Fieres, 1980 E.C.R. 1553 (1980), they have had provisions regulating the most basic aspects of transnational preliminary relief. But Article 24 of the Brussels Convention, too, has recently given rise to more difficult transnational issues before the ECJ. See, e.g., Case C-99/96, Mietz v. Intership Yachting Sneek, 1999 E.C.R. I-2277 (1999) (setting limits to jurisdiction based on Article 24 so as to disallow its use to circumvent the jurisdictional requirements of Articles 2-18); Case C-53/96, Hermès Int'l v. FHT Mktg. Choice BV, 1998 E.C.R. I-3637 (1998) (delineating jurisdiction under Article 24 from jurisdiction to enter preliminary relief under Article 50 of TRIPS); Case C-391/95, Van Uden Mar. BV v. Deco-Line, 1998 E.C.R. I-7122 (1998) (allowing a national court to issue preliminary relief in a case governed by an arbitration clause under certain circumstances).

[FN384]. See also supra note 339 (highlighting the difficulties with "various national laws in regard to preliminary relief").

[FN385]. Burbank, World, supra note 16, at 1467; see also Lowenfeld, Quest, supra note 355 passim (suggesting that transnational litigation be controlled by the principle of reasonableness).

[FN386]. Cf. Burbank, Costs of Complexity, supra note 3, at 1473-74 ("Many of the Federal Rules authorize essentially ad hoc decisions and therefore are transsubstantive in only the most trivial sense").

[FN387]. See supra notes 36-37 and accompanying text; infra note 428 and accompanying text.

[FN388]. See supra text accompanying notes 370-372.

[FN389]. See supra Sections 1 and 2.

[FN390]. See supra Section 4.3; supra notes 251-271 and accompanying text.

[FN391]. Cf. Anne-Marie Slaughter & Steven R. Ratner, The Method Is the Message, 93 Am. J. Int'l L. 410, 417 (1999) (suggesting that International Law/International Relations scholars, among others, "ask whether the law as formulated will have an actual impact on the behavior of state or individual actors, and if so, whether it will be the intended or anticipated impact").

[FN392]. See, e.g., Koh, Transnational Legal Process, supra note 366, at 206 (suggesting comparative advantage of lawyers vis-à-vis political scientists in so far as lawyers "specialize in the close reading of texts, examining the social impact of procedural rules, understanding the power of norms in civil society, and designing public policy against a backdrop of law"); Friedrich Kratochwil, Constructivism as an Approach to Interdisciplinary Study, in Constructing International Relations: The Next Generation 13 (Karin M. Fierke & Knud Erik Joergensen eds., 2001) ("Since lawyers have been arguing with rules all their lives, their 'style' of argument as well as their methodologies deserve far greater attention than they have received from social scientists.")

[FN393]. See supra text accompanying notes 219-231, 342-343.

[FN394]. See supra notes 370-373 and accompanying text.

[FN395]. See, e.g., Peter Gilles, Prozessrechtsvergleichung [Comparative Procedural Law], in 3 Trans-national Aspects of Procedural Law 969, 987-94 (1998).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN396]. See Ewald, Comparative Jurisprudence, supra note 343, at 1961-90; Mathias Reimann, The Progress and Failure of Comparative Law in the Second Half of the Twentieth Century, 50 Am. J. Comp. L. 671, 685-90 (2002).

[FN397]. See Schlesinger, supra note 90, at 1 (arguing that the term "comparative method" is preferable to "comparative law"). As a number of comparatists have recognized, however, the term "comparative method" is as much a misnomer as the term "comparative law," for there is no one single method, nor even a number of clearly identified methods or methodologies that practitioners of comparative law would agree upon as accepted approaches to their field. See, e.g., Hiram Chodosh, Comparing Comparisons: In Search of a Methodology, 84 Iowa L. Rev. 1025 (1999).

[FN398]. See, e.g., John H. Langbein, The Influence of Comparative Procedure in the United States, 43 Am. J. Comp. L. 545, 545 (1995) (reporting that "[t]he study of comparative procedure in the United States has little following in academia, and virtually no audience in the courts or in legal policy circles"); Mathias Reimann, The End of Comparative Law as an Autonomous Subject, 11 Tul. Eur. & Civ. L.F. 49, 52 (1996) ("There are but very few full-time teachers in the field even at the top law schools. Students mostly ignore the subject ... This situation is so familiar to comparatists as well as nonspecialists that I need not describe it at any greater length.")

[FN399]. See supra notes 23-39 and accompanying text. Similarly, the lex fori principle, the choice-of-law principle according to which the court always applies the law of the forum in matters of procedure, has in part been developed precisely for the purpose of keeping domestic courts out of the business of inquiring into foreign procedural law and thus is also partly responsible for the lack of in-depth procedural analysis today. See, e.g., Schack, supra note 24, at 16-18.

[FN400]. See supra notes 363-373 and accompanying text.

[FN401]. As Professor von Mehren has observed,

   Most subject matters in our curriculum, given focus by the needs of the practicing profession, experience no difficulty in establishing a core of information and theory that is carried forward, developed, and refined by succeeding generations of scholars. Work in comparative law, on the other hand, tends to be scattered and diffuse as to topic, legal system, and purpose. Although much excellent scholarship has been achieved, no shared body of information and theory, no scholarly tradition susceptible of transmission to succeeding generations has emerged. One has the uneasy feeling that comparative-law scholarship is always beginning over again, that comparatists lack a shared foundation on which each can build.

   Arthur T. von Mehren, An Academic Tradition for Comparative Law?, 19 Am. J. Comp. L. 624, 624 (1971) (emphasis added).  On the issue of methodology, see supra note 397.  See also Jennifer Widner, Comparative Politics and Comparative Law, 46 Am. J. Comp. L. 739, 748 (1998) (suggesting that comparative law, as comparative politics, may gain an edge in the market for relevancy if its practitioners will be able to offer decision makers "observations that clarify thinking or show the likely empirical results of selecting one course of action over another").

[FN402]. Professor Ewald's description of often-heard objections against the teaching of comparative law equally applies to comparative scholarship:

   Comparative law is said to be:

   (a) Superficial, because not even the teacher, let alone the students, can master all of the intricacies of two distinct legal systems; ...

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(d) Futile, because the students will never achieve the proficiency of a continental lawyer, or even learn to do research in foreign legal materials; and finally

(e) Misleading, because, for all the preceding reasons, both students and teachers will be tempted by their ignorance to draw false analogies between legal systems, thus undermining the value of the "fresh perspectives" on domestic law.

Ewald, Comparative Jurisprudence, supra note 343, at 1968 (emphasis in original).

[FN403]. See supra text accompanying notes 400-401.

[FN404]. Responding to a similar practical objection against research into domestic preferences in international relations, Professor Moravcsik points out that "[n]o respectable philosophy of science recognizes the difficulty of performing relevant empirical research with current techniques as a legitimate reason to abandon a promising scientific paradigm. Instead, scientific technique and training should adjust--an argument for thorough training in languages and primary-source analysis." Moravcsik, supra note 245, at 544.

[FN405]. Cf. Widner, supra note 401, at 746 (relating that in comparative politics as in comparative law "[t]he greater the extent of prior research on which the investigator may rely, the better a project will perform with regard to quality criteria").

[FN406]. See, e.g., Keohane, International Institutions, supra note 240, at 117, 120.

[FN407]. See, e.g., Chayes & Chayes, supra note 244, at 154-96; Abbott, supra note 251, at 36-46; see also Burbank, World, supra note 16, at 1477 (suggesting that the "framework for dialogue that an international convention establishes" may be "its most enduring contribution").

[FN408]. See, e.g., Burbank, Equilibration, supra note 19, at 204 ("Symposia like [this one] provide opportunities for scholars from countries with different traditions to educate each other and, through their writing, domestic and foreign audiences, including courts, about those approaches and needs.").

[FN409]. See supra text accompanying notes 376-379.

[FN410]. See Walter & Baumgartner, Utility, supra note 379, at 466-75.

[FN411]. See 2004 Draft, supra note 7, at 4-5 (noting partnership with UNIDROIT).

[FN412]. From this perspective, the current practice of the ALI to organize meetings exclusively for the American, European, and Asian advisers, respectively, while understandable from a logistical point of view, is less than ideal for the success of the enterprise. It does not allow for direct discussions among the three groups; indeed it does not allow for much information exchange among those groups at all, for the contribution of one group largely remains unknown to the others. For further suggestions to supply the in-depth comparative analysis necessary for a successful completion of the project, see Walter & Baumgartner, Utility, supra note 379, at 475-76.

[FN413]. See Ronald Dore, Goodwill and the Spirit of Market Capitalism, 34 Brit. J. Soc. 459, 469 (1983) (quipping that American economists "write as if the world were America").

[FN414]. See, e.g., supra text accompanying notes 352-361.

[FN415]. See, e.g., Helen V. Milner, Rationalizing Politics: The Emerging Synthesis of International, American,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Comparative Politics, 52 Int'l Org. 759 (1998); Moravcsik, supra note 245, at 543-44 (noting the necessity of research into domestic preference formation).

[FN416]. See supra Section 3 (tracing judicial conflict).

[FN417]. See, e.g., supra text accompanying notes 210-214 (discussing major unintended effects in the long run of the 1963 amendments to the Federal Rules and 1964 amendments to the Judicial Code).

[FN418]. See, e.g., supra text accompanying note 41 (noting difficulties with the Hague Jurisdiction and Judgments Project).

[FN419]. See, e.g., supra Section 3 for many examples.

[FN420]. See supra text accompanying notes 27-42 (outlining notions underlying the traditional approaches to the subject).

[FN421]. See supra Section 4.

[FN422]. See supra Section 4.3.

[FN423]. See supra text accompanying note 391.

[FN424]. See, e.g., Burbank, Costs of Complexity, supra note 3, at 1471.

[FN425]. See supra text accompanying notes 392-415.

[FN426]. On multilateral and unilateral approaches in private international law, see, for example, Lea Brilmayer, Conflict of Laws 17-19 (2d ed. 1995); Albert A. Ehrenzweig, A Treatise on the Conflict of Laws 312-13 (1962) (distinguishing "unilateral" and "universal" approaches); Friedrich K. Juenger, Choice of Law and Multistate Justice 6-46 (1993); and William S. Dodge, Extraterritoriality and Conflict-of-Laws Theory: An Argument for Judicial Unilateralism, 39 Harv. Int'l L.J. 101, 106-21 (1998).

[FN427]. Burley, Liberal Internationalism, supra note 349, at 1949.

[FN428]. See, e.g., Burbank, The Bitter With the Sweet, supra note 383, at 1339; Burbank, World, supra note 16, at 1465-66, 1480.

[FN429]. See, e.g., Benvenisti, supra note 306, at 175-77 (describing how seventeenth century international merchants engaged the services of the great international lawyers of the time to help fashion international law in their favor and thus to cause the externalization of their costs upon domestic society).

25 U. Pa. J. Int'l Econ. L. 1297

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

DAVID J. GERBER

# Extraterritorial Discovery and the Conflict of Procedural Systems:  Germany and the United States

When the explosion of an automobile in Kansas causes serious injury and there is a possibility that it was caused by a defective part made outside the United States, limitations on the plaintiff's discovery rights due to the foreign location of witnesses or documents are likely to be seen in the United States as violations of basic concepts of procedural justice.  Conversely, to the foreign manufacturer defendant, being coerced to submit to unlimited American discovery procedures because one of the parts manufactured by him might have been defective may also violate basic concepts of procedural justice.  In such cases, therefore, the application of United States discovery rules to evidence located outside the United States often involves fundamental differences in legal process and a clash between concepts of procedural justice.  The result is an intense and escalating international controversy.[1]

Operating on the basis of domestic concepts of justice, American courts consider themselves justified in applying American discovery rules extraterritorially (i.e., to require conduct outside the United States).[2]  In response, foreign governments seek to protect their own interests and concepts of justice by attempting to prevent or limit such applications.  The measures taken have included diplomatic pressure on the United States government,[3] participation in U.S. liti-

---

DAVID J. GERBER is Associate Professor of Law, IIT/Chicago-Kent College of Law.

1. Various aspects of the controversy are treated in Symposium, "Compelling Discovery in Transnational Litigation," 16 *N.Y.U. J. Int'l L. & Pol.* 957-1167 (1984). See also, e.g., Shemanski, "Obtaining Evidence in the Federal Republic of Germany: The Impact of American Judicial Cooperation," 17 *Int'l Lawyer* 465, 466 (1983); Note, "The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters:  The Exclusive and Mandatory Procedures for Discovery Abroad," 132 *U. Pa. L. Rev.* 1461, 1464 (1984); von Huelsen, "Gebrauch und Missbrauch US-amerikanischer 'pre-trial discovery' and die internationale Rechtshilfe," 28 *Recht der Internationalen Wirtschaft* 225 (1982); and Focsaneau, "L'Instruction Extraterritoriale des Litiges Economique et la Defense de la Souveranete des Etats," 1981 *Annuaire Français de Droit International* 628.

2. See, e.g., In re Anschuetz & Co., 754 F.2d 602 (5th Cir. 1985).

3. See, e.g., Note, Embassy of Fed. Rep. of Germany to U.S. Dept. of State (20 Aug. 1982), printed in Brief for the U.S. as Amicus Curiae, at Appendix, Volkswagenwerk A.G. v. Falzon et al., 461 U.S. 1303 (1983).

HeinOnline -- 34 Am. J. Comp. L. 745 1986

gation,[4] and, in some cases, the passage of so-called "blocking legislation" designed to impede American discovery efforts.[5]

This conflict has led to substantial confusion on the part of lawyers, litigants and judges, and this uncertainty substantially increases the costs and risks of transnational litigation. These increased costs of doing business in the United States tend to lead, in turn, to higher costs to American consumers and a reduced flow of certain goods to the United States. In addition, the conflict creates significant costs for the U.S. government as well as for foreign governments, and it has a negative impact on the foreign relations of the United States.

The conflict over extraterritorial discovery results from differences between the U.S. procedural system and the procedural systems of the other countries involved in the controversy. Such differences provide the main reasons why foreign countries resist U.S. discovery, and they also provide the conceptual framework within which disputes concerning extraterritorial discovery are approached. Yet the role of these systemic differences seems to be little understood, particularly in the United States. American lawyers and judges are generally unaware of the differences between procedural systems which lead foreign governments to resist the application of American discovery rules to conduct within their territories, and foreign lawyers and judges often fail to understand American discovery procedures and the functions they perform within the American procedural system.

The controversy over extraterritorial discovery is not entirely new,[6] but its importance and severity have dramatically increased in recent years. A variety of factors have led to this development. First, U.S. discovery rules have been expanded to permit more extensive pre-trial discovery outside the U.S.[7] Second, until 1983, the availability of discovery under U.S. law had been generally increas-

---

4. See, e.g., Graco Inc. v. Kremlin, Inc., 101 F.R.D. 503 (N.D. Ill. 1984).

5. For general discussions of blocking legislation, see Cira, "The Challenge of Foreign Laws to Block American Antitrust Actions," 18 *Stan. J. Int'l L.* 247 (1982) and Gerber, "Beyond Balancing: International Law Restraints on the Reach of National Laws," 10 *Yale J. Int'l L.* 185, 219-220 (1985).

6. See generally, e.g., Jones, "International Judicial Assistance: Procedural Chaos and a Program for Reform," 62 *Yale L.J.* 515 (1953); Volkommer, "Disharmonien und Spannungen im internationalen Rechtshilfeverkehr zwischen den U.S.A. und Deutschland," 80 *Zeitschrift für Zivilprozess* 248 (1967); and Onkelinx, "Conflict of International Jurisdiction: Ordering the Production of Documents in Violation of the Law of the Situs," 64 *Nw. U.L. Rev.* 487 (1969).

7. The most important change occurred in 1963, when Rule 28(b)(1) of the Federal Rules of Civil Procedure (hereinafter "Fed. R. Civ. P." or "the Federal Rules") was amended "to facilitate depositions in foreign countries by enlarging the class of persons before whom the depositions may be taken on notice." Fed. R. Civ. P. 28(b) 1963 advisory committee note. For a discussion of these developments, see 4 *Moore's Federal Practice* §§ 28.01 and 28.03-28.08.

ing for several decades.[8]  Third, concepts of personal jurisdiction have been significantly expanded during recent decades, making it easier for U.S. courts to acquire jurisdiction over foreign defendants.[9]  Fourth, the substantive law of products liability has been broadened, with a resulting increase in both the likelihood and the size of damage awards for defective products.[10]  Fifth, and paradoxically, the preparation and operation of an international treaty on evidence-taking, the Hague Evidence Convention,[11] has led to misunderstandings and unfulfilled expectations on both sides.[12] And, finally, changes in trade and investment patterns have increased the probability of U.S. product liability suits against foreign manufacturers by making it increasingly likely that consumer durable items sold in the U.S. will have components manufactured abroad.[13]

This article, therefore, analyzes the differences between legal systems that play a significant role in the controversy and then analyzes the controversy itself in light of these systemic differences. The objectives are, first, to identify and explain the systemic differences which lead to resistance to the use of U.S. discovery methods and impede development of an effective legal framework for transnational evidence-taking and, second, to identify potential avenues for improving the current situation.

A central fact about the controversy over extraterritorial discov-

---

8. The relevancy requirement was eviscerated by the Supreme Court in 1948 in Hickman v. Taylor, 329 U.S. 495 (1947), where "fishing expeditions" were specifically approved. Another key development was the 1970 change in the Federal Rules which deleted the requirement of a showing of "good cause" to enforce the production of documents.

9. See, e.g., Lilly, "Jurisdiction over Domestic and Alien Defendants," 69 *Va. L. Rev.* 85 (1983). See also Juenger, "Judicial Jurisdiction in the United States and in the European Economic Communities: A Comparison," 82 *Mich. L. Rev.* 1195 (1984) for a comparison which suggests that the area of personal jurisdiction is contracting in some areas while expanding in cases involving products liability claims.

10. See, e.g., Wheeler, "A Brief History of the Development of Modern Products Liability Law," in *Product Design Liability* 13 (Wheeler ed. 1981). See also Gilmore, "Products Liability: A Commentary," 38 *U. Chi. L. Rev.* 103 (1970), and Posner, "Strict Liability: A Comment," 2 *J. Leg. Stud.* 205 (1973).

11. Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature 18 March 1970, 23 U.S.T. 2555, T.I.A.S. 7444, 847 U.N.T.S. 231.

12. See infra, pt. III. Attention was focused on problems in this area by the very well-publicized "Westinghouse Uranium Litigation." See In re Westinghouse Elec. Corp. Uranium Contracts Litigation, 563 F.2d 992 (10th Cir. 1977) and In re Uranium Antitrust Litigation, 480 F. Supp. 1138 (N.D. Ill. 1979). For discussion, see Augustine, "Obtaining International Judicial Assistance Under the Federal Rules and the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters: An Exposition of the Procedures and a Practical Example: *In re Westinghouse Uranium Contracts Litigation,*" 10 *Ga. J. Int'l & Comp. L.* 101 (1980).

13. See, e.g., "The Latest Foreign Beachhead," *Forbes*, 13 Oct. 1980, at 42, reporting that 10% to 15% of all car parts in domestic cars are from foreign manufacturers.

ery is that it finds the United States in conflict with "the rest of the world". Nevertheless, in order to keep the analysis here within manageable bounds, this article will focus on the extraterritorial discovery controversy in the context of legal relations between the United States and the Federal Republic of Germany. Germany is a civil law country, and, therefore, elements of the German legal system relating to this controversy are generally similar to those of other countries of the civil law tradition.[14] Moreover, German firms and the German government have been frequently and intensely involved in the controversy, and, as a result, there is a substantial amount of legal material on that conflict.

This article will deal only with the application of U.S. discovery rules in the context of civil litigation. The problems that arise when government agencies seek extraterritorial discovery—e.g., in criminal or administrative proceedings—involve a series of distinct issues which will not be analyzed here.[15]

## II. Differences in Procedural Systems

The controversy over extraterritorial discovery is rooted in differences between the respective procedural systems of Germany and the United States. The differences in civil litigation which are particularly relevant to the controversy over extraterritorial discovery can be grouped into four categories: (1) the structure of the litigation process itself; (2) the respective roles assigned to the participants in that process; (3) the treatment of information within the process; and (4) the scope of evidentiary obligations.[16]

### A. *The Structure of the Litigation Process*

In two areas, in particular, differences between the American and German litigation processes have contributed to the controversy over extraterritorial discovery.[17] The first relates to whether the lit-

---

14. See generally *International Cooperation in Litigation: Europe* (Smit ed. 1965); Nagel, *Die Grundzüege des Beweisrechts im europäischen Zivilprozess* (1967); Schlosser, *Der Justizkonflikt zwischen den USA und Europa* 17-22 (1985); and Millar, "The Mechanism of Fact-Discovery: A Study in Comparative Civil Procedure IV," 32 *Ill. L. Rev.* 424 (1937). For discussion of modern trends in this area, see Capelletti, "Social and Political Aspects of Civil Procedure," 69 *Mich. L. Rev.* 847 (1971).

15. See, e.g., U.S. v. Bank of Nova Scotia, 740 F.2d 817 (11th Cir. 1982), cert. denied, 105 S. Ct. 778 (1985).

16. For discussion of the problem of comparing the German and American systems, see Kaplan, "Civil Procedure: Reflections on the Comparison of Systems," 9 *Buffalo L. Rev.* 409 (1960) and Grossfeld, "Probleme der Rechtsvergleichung im Verhaeltnis Vereingte Staaten von Amerika-Deutschland," 39 *RabelsZ.* 5 (1975).

17. The term "litigation process" is here used to denote the state-regulated process whereby a private conflict is presented to, and resolved by, a court of law; it does not include actions which are not regulated by the state — e.g., private investi-

igation process at first instance is unified or divided into a trial and
pre-trial phase, and the second involves the relationship between the
treatment of facts and the treatment of legal issues in the two
systems.

The litigation process in the United States consists of two sepa-
rate but interdependent components—the pre-trial stage and the
trial itself. This division of the litigation process is often misunder-
stood outside the United States, and an important element of the
controversy over international discovery relates to the issue of
whether U.S. pre-trial discovery is part of the litigation process for
purposes of international judicial cooperation.[18]

In the Common Law tradition the central component of the liti-
gation process is the trial. Because of the presence of a lay jury
within the system, the trial is necessarily continuous, which means
that there is usually little opportunity to discover new facts during
the course of the procedure itself. Consequently, each party must
prepare his case before the trial.[19] As unlimited access to facts be-
came increasingly valued in the American legal system,[20] and as evi-
dence, especially documentary evidence, became increasingly
available, the litigation process was expanded to include the search
for information to be used at the trial, and state power is now avail-
able to enforce compliance with the attorneys' requests for
information.[21]

The creation of a pre-trial procedure was intended, among other
things, to reduce the length of trials and increase their effectiveness
by requiring fact issues to be clarified prior to the proceeding it-

---

gation of the facts of a controversy. This point must be emphasized, because there is
a tendency in the United States to view discovery as "private" activity, even though
it is authorized and regulated by the states.

18. See infra, text accompanying n. 180-186.

19. In the civil procedure of the United Kingdom, preparation of the case must
also occur before trial, but discovery is allowed only where the party seeking discov-
ery specifies the material to be examined and demonstrates its relevance. Thus the
U.K. position on this point is essentially similar to that of the civil law countries, and
the U.K. has actively sided with the civil law countries in the extraterritorial discov-
ery controversy. For a discussion of discovery in England and a comparison of the
U.S. and British discovery systems, see Levine, *Discovery: A Comparison Between
English and American Civil Discovery Law* (1982). See also Cappelletti & Garth, "A
Comparative Conclusion," in *Civil Procedure*, XVI *Int'l Encyc. Comp. L.* 249, 252-53,
and Myrick & Love, "Obtaining Evidence Abroad in United States Litigation," 35
*Sw. L.J.* 858, 597-609 (1981).

20. For a discussion of this development, see Purcell, *The Crisis of Democratic
Theory* 74-94, 159-179 (1973).

21. The major change occurred in 1938, when discovery in its modern form was
introduced into the Federal Rules. For accounts of the changes, see, e.g., Holtzhoff,
"Instruments of Discovery under Federal Rules of Civil Procedure," 41 *Mich. L. Rev.*
105 (1942) and Pike & Willis, "The New Federal Deposition-Discovery Procedure
(pts. 1 & 2)," 38 *Colum. L. Rev.* 1179, 1436 (1936). See also Glaser, *Pre-trial Discov-
ery and the Adversary System* 18-37 (1968).

self.[22] It was a direct response to the constraints imposed by a jury-oriented trial procedure. From the perspective of U.S. law, therefore, pretrial discovery is an integral and necessary part of the litigation process.

In Germany, in contrast, there is no "trial" in the American sense of the term.[23] Hence there is no need for a "pre-trial" phase of litigation. Because there is no jury, the litigation process can develop in relatively informal stages. The process may consist of several "hearings", and evidence may be received on more than one occasion.[24] At each stage of the proceeding, the judge is present and "in control", and only those procedures in which the judge participates are part of the litigation process. Thus, the litigation process is effectively coterminous with the judicial process.

From the perspective of German law, therefore, U.S. pre-trial discovery is often misunderstood to represent preparation for the litigation process and therefore not actually to be part of that process. This misapprehension is strengthened by the fact that discovery procedures are labelled "pre-trial," which is often understood to mean "pre-litigation process".[25]

Where discovery procedures are considered to be merely preparatory for the litigation process, they are presumed not to be entitled to be treated as part of that process in the international context.[26] Therefore, it is argued, foreign governments may not be expected to cooperate with the U.S. by providing international judicial assistance in relation to pre-trial procedures, for such assistance is intended to relate only to the litigation process itself.

A second structural factor related to the extraterritorial discovery controversy concerns the manner in which "law" is procedurally

---

22. The stated purposes of the new procedures are discussed in Brazil, "The Adversary Character of Civil Discovery: A Critique and Proposals for Change," 31 *Vand. L. Rev.* 1295, 1298-1303 (1978).

23. Recent reforms in German civil procedure have, however, attempted to "focus" court proceedings and reduce the number of separate litigation episodes. For a discussion of these changes, see Fisch, "Recent Developments in West German Civil Procedure," 6 *Hastings Int'l and Comp. L. Rev.* 221, 226 (1983) and Gottwald, "Simplified Civil Procedure in West Germany," 31 *Am. J. Comp. L.* 687 (1983).

24. For a description of this process, see Kaplan, von Mehren & Schaefer, "Phases of German Civil Procedure I," 71 *Harv. L. Rev.* 1193, 1211 (1958). This article remains the most complete and authoritative description of German civil procedure in English. A major part of the article was updated as of 1977 in von Mehren & Gordley, *The Civil Law System* 151 (2d ed. 1977).

25. See generally "Report of the Work of the Special Commission on the Operation of the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters," 17 *Int'l Leg. Mat.* 1425 (1978) [hereinafter cited as "1978 Commission Report"]. For further discussion, see Oxman, "The Choice Between Direct Discovery and Other Means of Obtaining Evidence Abroad: The Impact of the Hague Evidence Convention," 37 *U. Miami L. Rev.* 733, 772 n. 110 (1983).

26. See infra, text accompanying n. 180-86.

related to "facts". In the American litigation process, the process of establishing facts is distinct from the process of determining and applying law. The former includes both pre-trial discovery and the trial itself. It is highly regulated and highly visible, and it often involves the expenditure of extensive resources by parties, witnesses and even by the state itself. It is clearly the central part of the litigation process.

In contrast, the process of determining law plays a more peripheral role, being subject to minimal procedural requirements and generally not highly visible.[27] The judge is solely responsible for determining the applicable law and generally has great discretion with regard to the procedure for performing that function. Legal issues may be presented by the attorneys orally or in writing, with few limits on the judge's discretion as to the form in which such arguments are to be presented and the extent to which they will be considered.

This procedural separation of the law-determination and fact-determination functions has resulted from the presence of the jury.[28] Since a lay jury is responsible for determining issues of fact, and since it has been thought that its members could only be confused and misled by discussion of legal issues,[29] legal issues are not presented to the jury and are relegated to a separate procedure.

In Germany, legal and factual issues are presented and evaluated as part of the same process. From the inception of the litigation process to its termination, issues of fact and issues of law are continually and necessarily intertwined, and the unity of the litigation process derives from the fact that the judge is responsible for the determination of both facts and law as well as for the application of law to facts.[30]

From the German perspective, the fact-determination procedure cannot be divorced from the law determination and application procedures without changing the nature of the litigation process. In particular, where fact-determination is an essentially separate procedure, there is no means of supervising the gathering of facts and assuring that only those facts are gathered which are directly relevant to the case. As a result, the American system of fact-determination appears alien—and potentially offensive—to German principles of procedure.

---

27. The law-determination process is obviously not peripheral in the sense of being unimportant or even less important than the fact-determination process. It is peripheral only in the sense of not being the central focus of the litigation process.

28. See generally James & Hazard, *Civil Procedure* 302-313 (3rd ed. 1985).

29. See generally Friedenthal, Kane & Miller, *Civil Procedure* 470-74 (1985).

30. See Kaplan, von Mehren & Schaefer, supra n. 24 at 1225-1228.

*B. Role Assignments: Who Does What?*

Related to these differences in the structure of the respective litigation processes are differences relating to the respective roles of the participants in the litigation process—the issue of who does what. The two procedural models define the roles of judge and attorney in the litigation process very differently, and a key participant in the American process—the jury—is not even present in the German litigation process.

In order to compare the German and U.S. processes more effectively, one can analyze the litigation process into several distinct components: fact investigation, fact presentation, fact determination and law presentation, law determination, and law application.

In the U.S., attorneys have virtually sole responsibility for fact investigation and fact presentation, and thus their roles dominate both the pre-trial and trial proceedings. They are authorized to depose witnesses, examine documents and demand answers to written interrogatories, and the state enforces compliance with their demands for information. Thus the state clothes attorneys with extensive authority to coerce private conduct merely because they represent parties in pending litigation. Such fact investigation authority granted to attorneys in the U.S. appears to exceed that granted by any other state.

Moreover, the state only minimally supervises the exercise of this authority, even though such proceedings often involve extensive financial and other burdens as well as interference with personal freedom. The judge is not present during discovery proceedings. He may issue protective orders restricting discovery, but the grounds for issuing such orders are limited and poorly defined, and the party seeking such a protective order bears the burden of persuading the judge that it should be issued.[31] Consequently, the attorneys have extensive authority to determine who must submit what to discovery procedures as well as substantial discretion with respect to the conduct of the proceedings.

Attorneys generally have similarly broad control of the fact-presentation process.[32] Each attorney actually presents his client's factual case; he has what may be called "configurative authority" with respect to the presentation of information to the trier of fact. This means that he generally determines the order in which his wit-

---

31. See generally, U.S. v Int'l Business Machines, 81 F.R.D. 628 (D.C.N.Y. 1979), which suggests that the very heavy burden of proof on the proponent is the reason why protective orders are issued so infrequently. For commercial information the burden is especially heavy. See, e.g., Citicorp. v. Interbank Card Assn., 478 F. Supp. 756 (D.C.N.Y. 1979).

32. For a general description of this aspect of the trial process, see Friedenthal, Kane & Miller, supra n. 29 at 453-458 (1985).

nesses will be called and the timing and circumstances for the presentation of his documentary evidence.[33] Moreover, the attorneys generally control the form of testimony, because witnesses may only present information in response to specific questions of the attorneys.

The American judge's role during the trial is primarily that of a referee between opposing attorneys.[34] Only rarely does he question witnesses or otherwise participate in the fact presentation process. The judge has virtually unlimited control over the law-determination procedure, but since the law-determination procedure is separated from the fact-determination procedure, the judge's central role in the former does not affect his limited role in the latter.

In the American system there is a third participant in the litigation process—the jury,[35] whose role it is to decide issues of fact and apply the law to the facts in accordance with the judge's instructions. A trial may take place without a jury, but trial procedure is based on the assumption that there may be a jury,[36] and the presence of the jury in the system thus significantly influences the characteristics of the system.

In sharp contrast, the German procedural system is dominated by the judge, who is solely responsible for performing the fact-determination, law-determination and law-application functions.[37] Thus there is no procedural separation of these functions, as there is in the U.S. They are treated as essentially indivisible.

The fact that these functions are combined allows the judge to control all aspects of the litigation process.[38] He calls witnesses when and as he sees fit and thus determines the context and order of presentation of evidence. Moreover, it is primarily the judge who

---

33. In the federal courts the freedom of attorneys to control these matters has been limited in some cases by 1983 amendments to Fed. R. Civ. P. 16, which allow the judge, in consultation with the attorneys, to fashion a final pre-trial order establishing, *inter alia*, the order of presentation of evidence.

34. See generally, Fuller, "The Forms and Limits of Adjudication," 92 *Harv. L. Rev.* 353, 381-393 (1978). See also Friedenthal, Kane & Miller, supra n. 29 at 457.

35. See generally Kalven & Zeisel, *The American Jury* (1966).

36. There is an ongoing debate concerning the issue of whether the rules of evidence should be used by judges in bench trials. See generally, *McCormick on Evidence* 153-54 (3rd ed. 1984).

37. Although reference here is to the role of *the* judge, judging is often done in panels of three or more judges. See Fisch, supra n. 23 at 227-236.

38. During this century, judicial control over litigation proceedings has been seen as an antidote to procedural delay, and such control has been gradually increased in order to combat delay. The first major step in this direction was the reform of 1927. For details, see Engelmann, *A History of Continental Civil Procedure* 616-620 (Millar ed. 1927). For more recent steps, see Fisch, supra n. 23 at 225 and 254-260. According to Fisch, "Major reforms were adopted in 1909 and 1924, and lesser ones in 1933 and 1943, all designed principally to tighten judicial control over the course of the lawsuit and promote efficiency." Id. at 225.

questions witnesses.[39] Thus, the judge rather than the attorneys has configurative authority with respect to the presentation of evidence. The judge's power in this regard is augmented by the fact that he records testimony in summary narrative form, and in this form becomes part of the case file. There is generally no verbatim transcript of testimony.[40]

One of the judge's principal functions is to limit the scope of the proceedings. From the inception of the procedure the judge explores potential lines of argument in discussions with the attorneys and attempts to narrow the issues to those which are likely to be dispositive of the case. The result is that evidence-taking can be focused on those specific issues which have been identified as potentially dispositive.[41]

In most types of civil litigation, however, the judge's role is limited by a procedural principle known as the party-presentation principle (*Verhandlungsmaxime*).[42] According to this principle, "the Court may take into consideration only those facts and assertions which the parties have presented to him. The judge may not on his own seek out new evidentiary material."[43]

The judge also has an important "guidance" or "party-assistance" function.[44] According to section 139 of the Code of Civil Pro-

---

39. According to ZPO section 397:
I.  The parties are entitled to request that questions be posed to the witness which they consider useful in clarifying the factual situation or the circumstances (*Verhaeltnisse*) of the witness.
II.  The presiding judge may allow parties and must, on request, allow their attorneys to pose questions directly to witnesses.
For a discussion of this section, see Baumbach & Lauterbach, *Zivilprozessordnung* 1035 (43rd ed. 1985).

40. For a discussion of the procedures, see Rosenberg & Schwab, *Zivilprozessrecht* 724-25 (13th ed. 1981). See also Baumbach & Lauterbach, id. at 464-467.

41. See generally Bruns, *Zivilprozessrecht* 1040-50 (2d ed. 1979) and Langbein, "The German Advantage in Civil Procedure," 52 *U. Chi. L. Rev.* 823, 830-32 (1985). In Langbein's view, this "focusing" capacity of German civil procedure provides one of that system's main advantages over U.S. procedure.

42. The party-presentation principle is often contrasted with the so-called investigatory principle (*Untersuchungsmaxime*), according to which the judge is charged with actively investigating the facts of a case and is not limited to the material nominated by the parties.
Each principle is considered to have its own sphere of operation, and there is a sharp distinction between the two spheres. Thus the investigatory principle operates in certain kinds of litigation —e.g., much family law litigation, and where it operates the party-presentation principle, is *a fortiori*, no longer operative. For discussion of the investigatory principle and its relation to the party-presentation principle, see Engelmann, supra n. 38 at 11-18.

43. Nagel, supra n. 14 at 28. See also Engelmann, id. at 11.

44. For futher discussion, see Rosenberg & Schwab, supra n. 40 at 437-443 and Arens, *Zivilprozessrecht* 13-16 (3d ed. 1984). See also Kaplan, von Mehren & Schaefer, supra n. 24 at 1224-1230; Fisch, supra n. 23 at 255-257; and Bernhardt, "Die Aufklaerung des Sachverhalts in Zivilprozess," in *Festgabe für Leo Rosenberg - Beiträge zum Zivilprozessrecht* 10 (1949).

cedure (*Zivilprozessordnung* — hereinafter "ZPO"):

> The presiding judge shall see to it that the parties make full explanations concerning all material facts and make the appropriate demands for relief, in particular that they supplement inadequate statements of asserted facts and designate sources of proof. For this purpose he shall, to the extent necessary, discuss the factual and legal aspects of the dispute with the parties and put questions.

This so-called "duty of clarification" (*Aufklärungspflicht*) requires the judge to assist the parties "in order to clarify the content of the parties' claims and their objectives in the litigation, to cause the parties to supplement their assertions and thus contribute to a proper disposition of the litigation."[45]

The role of the attorney in the German litigation process is much more limited than that of his American counterpart. He is not clothed with authority to demand information, and, consequently, he cannot perform a significant investigative function.[46] He has access only to those facts that are presented to him or that he can ascertain on his own. Moreover, the fee system discourages fact investigation by generally not providing conpensation for it.[47]

The German attorney also has virtually no role in fact presentation. He makes available to the court information which is available to him and nominates sources of information which he believes will prove his client's factual claims, but he has little to do with the presentation of factual information. He may suggest questions for the judge to put to the witnesses and may even pose questions himself, but the extent of such questioning is quite limited, and it clearly plays a subsidiary role.[48]

German procedure is thus centered on the judge. Control of proceedings by the judge in the interests of parties and witnesses is critical to the entire conception of the legal process. Therefore, allowing attorneys to utilize state power to search for information with virtually no supervision by the court conflicts with fundamental principles of the German procedural system. Consequently, a major source of resistance to the extraterritorial application of U.S. discovery methods is the authority such methods give to private attorneys and the lack of judicial supervision of the fact-gathering process.

---

45. Rosenberg & Schwab, supra n. 44 at 437. For a discussion, see Baumbach & Lauterbach, supra n. 39 at 430-35. See also Stuerner, *Die Richterliche Aufklärung im Zivilprozess* (1982).

46. See generally Kaplan, von Mehren & Schaefer, supra n. 24 at 1199-1202.

47. See id. at 1200.

48. Id. at 1235.

## C. Treatment of Information

The German and American procedural systems also treat information differently. In the United States, evidence is "gathered", "presented", and evaluated. The attorneys perform the first c two functions; the jury performs the third. In the German procedural system, evidence is "suggested" or "nominated" by the attorneys and "received" and evaluated by the court.

In the United States, the fact-gathering process is prior to, and separate from, the law-determination process. The result is that the system encourages attorneys to amass facts which tend to support any legal theories which may turn out to be relevant to the issues that eventually are identified as dispositive of the litigation. Moreover, decisions concerning discovery are placed in the hands of private attorneys whose incentives are to acquire as much information as possible.

Once evidence has been gathered, its presentation to the court is subject to extensive control by the attorneys. For example, the attorneys present the evidence themselves, and generally determine when and how "their" information is presented to the court. In addition, there is extensive attorney control over the form and manner of presentation of evidence, particularly with regard to the testimony of witnesses, because the attorney generally "prepares" the witness by questioning and discussions prior to his testimony and because testimony generally may be presented only in response to questions posed by the attorneys. Thus the presentation of information is continually subject to detailed control by the attorneys.

In Germany, in comparison, a court generally may compel the production of evidence only where one of the parties requests that particular evidence be compelled and can establish the likely relevance of such evidence to the litigation.[49] The procedure for taking evidence is known as "evidence reception" (*Beweisaufnahme*),[50] and,

---

49. There is a widespread impression in the United States that the German system is "inquisitorial" because the judge is primarily responsible for taking evidence. Recently, for example, one American expert stated that "In civil law countries, like Germany or France, an 'inquisitorial' not an 'adversarial' system of justice exists. Judges, not the parties or lawyers, do the questioning and taking of other evidence . . . ." Seidel, "Introduction and Overview," in *Extraterritorial Discovery in International Litigation* (Seidel ed. 1984). This fails to recognize the degree to which the judge is bound by the party-presentation principle.

An inquisitorial system was tried in Prussia from 1781 through 1833, but it was rejected in subsequent German legislation. See, e.g., Caenegem, "History of European Civil Procedure," in *Civil Procedure*, Vol XVI *Int'l Encyc. Comp. L.* 92-93.

50. The German *"Beweisaufnahme"* is generally translated as "evidence-taking", but this article generally avoids the term "taking of evidence" in reference to German civil procedure, because that term may suggest that the court's role is more assertive than it generally is.

as the term suggests, it represents an essentially passive concept of the treatment of evidence.

The essentially passive posture of the German litigation process is also evident in the manner in which evidence—in particular, testimony—is received by the court. Very little control may be exercised over the form of testimony either by the court or by the attorneys; evidence is thus presented basically in "raw form". A witness is typically requested by the court to relate his knowledge of particular events or circumstances in a continuous narrative,[51] and there is little interference with a witness' testimony. In general, questions are posed only at the conclusion of the narrative and only by the judge. An attorney may suggest or pose questions designed to reflect weaknesses in testimony,[52] but the extent of such questioning is limited by the fact that it is the responsibility of the judge to probe for such weaknesses, and questioning by an attorney may tend to suggest that the judge is not meeting that responsibility.[53]

Thus, the American and German litigation processes treat information quite differently. In the U.S. the basic notion is that the litigation process—through private attorneys—is justified in compelling the production of extensive amounts of unspecified and detailed information and then manipulating such information for presentation to a trier of fact. In Germany, the basic notion is that information is to be compelled only where specified and demonstrated to be reasonably necessary for purposes of the litigation. Moreover, such information is to be presented in unmanipulated form to a professional judge. These differences reflect, therefore, a sharp conflict over the proper use of state power in relation to information.

## D. The Scope of Evidentiary Obligations

Related to these differences in the treatment of evidence are differences in the scope of information subject to the litigation process. The differences here relate to the structure of obligations to provide information as well as to relevancy and confidentiality limits on the scope of such obligations.

### 1. The Obligation to Provide Information: Basic Concepts

The first issue is who may be compelled to provide what types

---

51. ZPO § 396. See also Kaplan, von Mehren & Schaefer, supra n. 24 at 1235.

52. The permissible scope of an attorney's questions is limited. According to one commentator, the questions of an attorney "may . . . cover only the subject matter of the examination as stated in the evidence order. . . . Judges rarely allow witnesses, in answer to questions by the attorneys, to cover ground already covered in answering the court's questions. Martens, "German Civil Procedure and the Implementation of the Hague Evidence Convention," 1 *Int'l Litig. Q.* 115, 120 (1985).

53. Kaplan, von Mehren & Schaefer, supra n. 24 at 1235.

of information, and the key distinctions are those between non-parties and parties and between testimony and document production.

In the U.S. the obligation of a party to provide information pursuant to the discovery process is extremely broad.[54] A party may be deposed, and he may also be compelled to answer interrogatories and to produce documents. Thus, his obligation to provide information is subject only to the application of concepts of relevancy and confidentiality.[55]

The obligations of a non-party to provide information pursuant to discovery procedures are only somewhat more limited. In general, assuming that the court has jurisdiction over him, a non-party may be deposed, but he may not be compelled to answer interrogatories, nor is he subject to the essentially boundless obligation to produce documents which is applicable to parties.[56] At the request of a party, a court may, however, issue a subpoena ordering a non-party to produce documents in conjunction with his deposition.[57] Often, therefore, the scope of a non-party's obligation to produce documents is nearly as broad as that of a party.

At the trial, parties and subpoenaed non-parties are equally subject to a general duty to testify and to produce requested documents. This duty is subject only to rules of evidence which, in general, apply equally to parties and nonparties.[58]

In Germany, the structure of obligations to produce information for the litigation process is significantly different. Central to this structure is the fact that the rules applicable to parties are kept separate and distinct from those applicable to witnesses, and a party cannot be a witness (*Zeuge*).[59]

An initial set of evidentiary obligations relates to the party's presentation of his case.[60] In presenting his claim for relief or his defense to the court, a party must provide assertions of fact to support his position on those issues as to which he bears the burden of proof. In addition, he must nominate evidence (*Beweismittel*) to

---

54. For a general description of the discovery process, see James & Hazard supra, n. 28 at 223-270, and Haydock & Herr, *Discovery: Theory, Practice and Problems* (1983).

55. See infra, text accompanying n. 84-89 and 93-96.

56. See generally, Friedenthal, Kane & Miller, supra n. 29 at 407-08.

57. Fed R. Civ. P. 45. For discussion, see Welling, "Discovery of Nonparties: Tangible Things Under the Federal Rules of Civil Procedure," 59 *Notre Dame L. Rev.* 110 (1983).

58. For a general discussion of party and non-party assertion of privileges, see *McCormick on Evidence*, supra n. 36 at 153-54, and Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551 (2d Cir. 1967).

59. For the development of the treatment of non-party witnesses in European law, see Nagel, supra n. 14 at 237-403.

60. For discussion, see Rosenberg & Schwab, supra n. 40 at 439-40.

support his assertions of fact.[61]  This generally requires stating the name of the witness or describing the material to be examined by the court.[62]  If no evidence is nominated to support the assertion, it cannot be considered to have been proven.

In conjunction with this obligation to nominate evidence, the party also has a statutory "duty of truth" (*Wahrheitspflicht*) which includes a "duty of completeness".[63]  Accordingly, a party must recount all information relevant to his case accurately and completely, even where revelation of particular facts may be against his interest. Violation of this duty of completeness may result in criminal sanctions, and it may also constitute the basis for a damage claim against the violating party by his opponent.[64]

Some courts and commentators recently have extended the duty of completeness to apply in some situations to the party who does not bear the burden of proof.[65]  This allows a court to compel information from such a party concerning a particular assertion of fact, provided that the party bearing the burden of proof has demonstrated a reasonable likelihood that the asserted fact is true.

With regard to the taking of evidence by the court, the obligations of parties and non-parties are significantly different.  A court may order a non-party to testify, in which case the witness must appear and testify accurately and completely in response to the questions of the court, and these duties may be enforced by fines and even jail sentences.[66]

A party may not, however, be compelled to testify.[67]  Until recently[68] parties were not even allowed to testify, the theory being that a party's testimony would be inherently biased and therefore

---

61. The term "nominate" translates the German "*Beweisantreten*", which literally means "entering of evidence". See Langbein, supra n. 41, at 834.

62. This is often done in what are sometimes called "pleadings", but it may also be done subsequently. For a description, see Martens, supra n. 52 at 118. Examples of pleadings and other court documents may be found in Cohn, *Manual of German Law* 191-96 (2nd ed. 1971).

63. The duty of truth is contained in ZPO § 138 I, which provides that "The Parties shall make their declarations concerning factual circumstances complete and truthful." This critically important duty was based on a similar concept in the Austrian Code of Civil Procedure. See Bruns, *Zivilprozessrecht* 101 (2nd ed. 1979).

64. See Rosenberg & Schwab, supra n. 60 at 378.

65. The key work in this development is Stuerner, *Die Aufklärungspflicht der Parteien des Zivilprozesses* (1976).

66. See Bruns, supra n. 63 at 282.

67. Party testimony is provided for in ZPO §§ 445-455. For discussion, see Arens, *Zivilprozessrecht* 213-14 (3rd ed. 1984) and Baumbach & Lauterbach, supra n. 39 at 1081-89.

68. Parties were first permitted to testify under a revision of the ZPO enacted in 1933. Law of 27 Oct. 1933 [1933] IRGBL 780.

Party testimony replaced the use of the decisory oath and was based on the Austrian code. Rosenberg & Schwab, supra n. 40 at 736. For a discussion of the Austrian background, see Engelmann, supra n. 38 at 632-640.

never useful to a court.[69] The court may request that a party testify, but the court may make such a request only where no other evidence is available which can be used to evaluate an assertion of fact.[70] Although a party is under no obligation to comply with such a request, the judge may draw inferences from a refusal to testify either in general or with respect to specific questions.[71]

The obligation to produce documents is considered separate and distinct from the obligation to testify, and it is subject to a separate set of rules.[72] Here there are several important exceptions to the principle of party presentation.[73] The court may, for example, of its own accord demand from any party the production of certain specified documents—e.g., commercial books of account—as well as any document to which such party may have made reference.[74] In addition, the duty of completeness applicable to a party's presentation does not extend to the production of documents,[75] and a party need not, therefore, submit documents in his possession which might tend to disprove his assertions of fact.

With regard to documents requested by a party, it is necessary to distinguish between two separate sources of documents. If a party seeks documents which are in the possession of his opponent, the opponent has an obligation to provide them to the court only if the materiality requirements for receiving evidence are met (discussed below)[76] and if one of two additional conditions is fulfilled. First, if the opponent has referred to the existence of such a document in the context of the litigation (e.g., in the complaint), he must produce it.[77] Second, an opponent must produce a requested document wherever he is obligated to do so under provisions of substantive law.[78] There are several important provisions of the civil and commercial law which create a right of information in the context of specific legal (generally, contractual) relationships.[79] Consequently, a party may be entitled to request that documents be produced by his opponent, if, for example, such documents refer to a contractual relation-

---

69. For further discussion of the development and status of party testimony in Germany, see id. at 302-07.

70. ZPO § 451.

71. Any such inferences are, however, entirely at the judge's discretion. ZPO § 446.

72. ZPO §§ 418-431. See generally, Nagel, supra n. 14 at 323-330.

73. See generally, Rosenberg & Schwab, supra n. 40 at 713. The court may itself also demand documents from government sources. See, e.g., ZPO § 415.

74. Some courts and commentators would extend this duty by implication to virtually any materials possessed by a party. See, e.g., Nagel, supra n. 14 at 343.

75. Baumbach & Lauterbach, supra n. 39 at 428. Cf. Gottwald, Zur Wahrung von Geschäftsgeheimnissen im Zivilprozess, 35/36 *Betriebsberater*, 1780, 3 (1979).

76. See infra, text accompanying n. 90-91.

77. ZPO § 423.

78. ZPO § 422.

79. These provisions are summarized in Rosenberg & Schwab, supra n. 40 at 713.

ship or negotiation between the two parties.[80] If an opponent declines to produce a document which the judge believes to be in his possession, the judge may accept as proven the proponent's statements as to the content of such document.[81] This substantive legal right to compel the production of documents has no close analogue in the United States system, and, therefore, its potential role in securing information generally goes unnoticed in the American literature.

If a document requested is in the possession of a nonparty, such person has an obligation to produce the document only under the circumstances discussed above concerning the opponent's obligation to produce documents.[82] The only means of enforcing this obligation is, however, for the requesting party to file a suit against such person.[83]

In sum, the basic obligations to provide information for use in litigation are significantly more limited in Germany than they are in the United States, especially in regard to non-parties.

## 2. Relevancy Limits

Not only are the basic obligations to produce information more limited in Germany than in the United States, but the standard of relevancy is significantly higher in Germany. Because the relevancy issue has been particularly important in the controversy over extraterritoriality and because it has been the source of much confusion, it is necessary to be particularly careful in using the term. "Relevancy" will be used here to refer to limitations on the scope of evidentiary obligations which relate to the probability that particular information will contribute to accuracy in determing facts.

Under American procedure there are two standards of rele-

---

80. During recent years the courts have broadly interpreted the provisions of civil law which provide such an obligation. This has been particularly true with regard to section 810 of the BGB (*Bürgerliches Gesetzbuch*) which contains a general obligation relating to contractual negotiations. According to § 810:

> Whoever has a legal interest in inspecting a document which is in the possession of another person, may demand from the possessor permission to inspect the document, provided that the document was made for his benefit or a legal relationship is documented between himself and another or the document describes negotiations relating to a transaction between him and another or between either of them and someone who is negotiating between them.

This provision has been held to create a substantive legal obligation to produce, for example, letters, receipts, and insurance policies. See Baumbach & Lauterbach, supra n. 39 at 1065-66.

81. ZPO § 427(2).

82. ZPO § 429.

83. ZPO §§ 429-431. See Baumbach & Lauterbach, supra n. 39 at 1069-1071. The court does not, however, possess any means of coercing the party to produce the documents.

vancy, one for the discovery process and another for the trial.[84] For purposes of this article, the discovery standard is the primary concern.[85] According to Rule 26(b)(1) of the Federal Rules of Civil Procedure, discovery may be had whenever the "information sought appears reasonably calculated to lead to the discovery of admissible evidence."[86] The courts have interpreted this provision expansively. Only where the judge believes that the material sought bears no conceivable relationship to the subject matter of the litigation does the concept of relevancy limit the scope of the discovery process.[87]

Procedurally, the issue of relevancy comes before the court only where a party asks for a protective order limiting discovery,[88] and the burden of persuasion is on the party opposing discovery.[89] Consequently, attorneys routinely ask for all information which may bear on the subject matter of a litigation, and there is often little judicial scrutiny of the relevancy of discovery.[90]

The standard of relevancy in the German system is substantially higher than it is in the U.S. and significantly more complex. If a party nominates evidence to support an assertion of fact, the court must generally "receive" the evidence by ordering the designated person to testify or to produce the designated documents for inspection. This is subject, however, to two relevancy limitations—a standard of materiality[91] and a procedural prerequisite of substantiation.

The materiality standard requires (1) that a material fact be at issue and (2) that the nominated evidence be material to the proof of such fact. A material fact is one which is itself an element of a litigant's claim or defense, and evidence may only be received with respect to the proof of such facts.[92] Evidence is material to the proof

---

84. For a discussion of relevancy standards at trial, see 22 Wright & Graham, *Federal Practice and Procedure*, §§ 5165, 6 (1978).

85. The stricter standard of relevancy applicable at trial need not be treated in this context, because the concern here is the scope of information which is subject to the litigation process.

86. Fed. R. Civ. P. 26(b)(1) reads, in relevant part, as follows:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. . . . It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

87. See 4 *Moore's Federal Practice* ¶ 26.56[1] for examples.

88. This is done under Fed. R. Civ. P. 26(c).

89. Wright & Graham, supra n. 84 at 264-65.

90. See, e.g., Byrnes, "Discovery: Its Uses and Abuses," 44 *Antitrust L.J.* 14, 25 (1975).

91. A material fact need not be proved, where, for example, it is a matter of common knowledge or it is included in a confession.

92. " 'Material' includes anything which may influence the decision of the judge, that is, the consideration of which would lead to a determination which is different than the one which would have been reached without such consideration." Rosenberg & Schwab, supra n. 40 at 570.

of such a fact where it may reasonably be expected to influence the court's determination regarding such fact. A court will not receive evidence merely because it might lead in the direction of relevant information, as is the case in the U.S. Such evidence may only be received in order to affect the determination of whether an asserted fact is true.[93]

The requirement of substantiation provides a second relevancy limitation: a court may order testimony only where a party can generally describe the facts that the evidence is intended to prove.[94] Where, for example, a plaintiff nominates evidence to prove that a conversation took place between A and B, he must be in a position generally to describe where and when such conversation is likely to have taken place. Thus only where the party has a modicum of knowledge about the evidence to be taken as well as about the facts to be proven will a court order a witness to testify. The requirement of substantiation is designed to assure that evidence is taken only where the party nominating the evidence can show that taking such evidence is likely to yield information useful to the court.[95]

The German system thus places a substantial burden on any party seeking to utilize the state's power of coercion to secure information. One reason for this is to prevent waste of judicial time and effort and thus protect the efficiency and integrity of the system.[96]

Secondly, however, the relevancy requirements reflect a perceived need to protect individuals and businesses from excessive coercion by the state and from the concomitant compliance costs and interference with privacy rights that such coercion entails.[97] Individual freedom is not to be interfered with and compliance costs are not to be imposed unless such actions can reasonably be justified as necessary to obtain justice.[98] Mere speculation of a party that a witness may say something relevant to the litigation process is not enough to trigger the use of state power.

---

93. In the extraterritorial discovery controversy the concept of materiality has often been misunderstood to be the only relevancy standard, in part, at least, because the German term for this standard (*Erheblichkeit*) is often translated as "relevancy" and American lawyers, unaccustomed in their own system to other types of relevancy limits, merely assume that this is the only relevancy standard.

94. See generally, Peters, *Ausforschungsbeweis im Zivilprozess* 12-16 (1966).

95. Relevancy limits are usually viewed as protection against "*Ausforschung*", which may be roughly translated as "probing". The main notion here is that the litigation system may not be used to "probe" for evidence. If a party does not have sufficient knowledge on which to base his claim, he has no right to use the litigation process to help him look for it. See Stuerner, supra n. 65 at 106-112.

96. See Peters, supra n. 94 at 63-65.

97. See Stuerner, supra n. 65 at 114-16.

98. For discussion of this point in the context of the controversy over extraterritorial discovery, see infra, text accompanying n. 188.

### 3. Confidentiality Limits

Confidentiality restrictions on the scope of information which can be subjected to the litigation process establish spheres of protected privacy for persons, organizations and relationships.[99] Where a sphere of protection is created by state A, and a foreign legal system encroaches on that protected area, there is likely to be resistance to such encroachment. Since, therefore, Germany generally provides greater confidentiality protections than does the U.S., confidentiality issues have become a significant part of the controversy.

In Germany there are two basic sets of privileges (*Zeugnisverweigerungsrechte*) on the basis of which such a witness may withhold testimony. The first set includes privileges based on the nature of the relationship between the witness and the facts sought—e.g., family relationships or confidential professional relationships such as doctor-patient and attorney-client.[100] These are similar to privileges in the U.S. The second set includes, however, the protection of many types of personal information—e.g., nonpublic business or artistic information and information which might bring dishonor or direct economic loss to the witness.[101] The latter set of privileges often extends beyond protections available in the U.S. and thus leads to conflict.

The conflict has centered on one main area of difference between the German and American systems—the protection of business information.[102] In the U.S. the protection of business or trade secrets in litigation is often quite limited.[103] According to Rule 26(c)

99. The German system of privileges tends to focus on the recognition of personal or organizational "privacy spheres", whereas in the United States, confidentiality protections relate primarily to relationships—such as, for example, doctor-patient or attorney-client. For a discussion of common law concepts of privilege, see *McCormack on Evidence*, supra n. 36 at 170-187.

100. ZPO §§ 383, 384. See also Rosenberg & Schwab, supra n. 40 at 718-19, and Kaplan, von Mehren & Schaefer, supra n. 24 at 1237-39.

101. ZPO §§ 384, 5.

102. See, e.g., Schlosser, Internationale Rechtshilfe und Rechtsstaatlicher Schutz von Beweispersonen, 94 *Zeitschrift für Zivilprozess* 369 (1981).

103. The term "trade secret" in U.S. law is generally used as a term of art relating to specific types of (usually) technological information. According to one leading definition:

> The term 'trade secret' as it is usually understood means a secret formula or process, not patented, known only to certain individuals who use it in compounding or manufacturing some article of trade having a commercial value. It is rarely, if ever, used to denote the mere privacy with which an ordinary commercial business is carried on.

In re Bolster, 59 Wash. 655, 110 P. 547, 548 (1910). There are significant variations in the definition of trade secrets. For a discussion, see Milgrim, *Trade Secrets* § 2.01 (Vol. 12, *Business Organizations* 1985).

In Germany, the notion of "business secret" (*Geschäftsgeheimnis*) is much broader and relates to any type of business information. See infra, text accompanying n. 111-13.

of the Federal Rules of Civil Procedure, a party or witness may apply to the court for a protective order directing "that a trade secret or other confidential information not be disclosed or be disclosed only in a designated way."[104] This provision permits a witness or party to seek to limit the use of discovery procedures to gain access to its business secrets. If the judge considers the request justified, he may allow the person requesting protection to decline to provide such information or order that he provide it in a way which limits access to it.[105]

The judge is given virtually unlimited discretion to determine when protection should be provided. Moreover, a protective order often has only a temporary effect, because even information protected during discovery frequently must be revealed at trial.[106]

In Germany the protection of business information is much broader in scope, and such information is protected during the entire proceeding rather than only temporarily.[107] Access to business information in litigation depends on who has the information sought and who is sought to be excluded from access to such information.[108] The judge may exclude the public from proceedings relating to certain information, including business secrets, "whose public discussion would violate predominant interests deserving protection."[109] Thus, exclusion is likely wherever the presence of the public might harm a significant business interest.[110]

More difficult is the issue of whether the information must be disclosed in the court proceedings. Here the distinction between parties and witnesses becomes particularly important. According to Section 384(3) of the ZPO, a witness has a right to refuse to answer questions "that the witness would not be able to answer without revealing a . . . business secret." A "business secret" for these purposes may be any information which is not public and which an

---

104. "To resist discovery, the party must establish that the information is a trade secret within the definition of Rule 26(c)(7)(2), and that its release might be harmful," 4 *Moore's Federal Practice* ¶ 26.60[4].

Protection may also be available under state law, but the degree of protection varies significantly. See generally, *Protecting Trade Secrets 1985* (Pretty ed. 1985).

105. For a discussion of such protective procedures, see Milgrim, *Trade Secrets,* ¶ 7.06[1][c]-[e] (Vol. 12A, *Business Organizations* 1985) and 4 *Moore's Federal Practice,* ¶ 26.67.

106. See Milgrim, supra n. 105 at § 7.06[2]-[3]. See also, e.g., Kleinerman v. U.S. Postal Service 100 F.R.D. 66 (D. Mass. 1983).

107. Under German law, confidentiality provisions protect against incursion by the litigation process into defined spheres of privacy and thus do not vary according to the stage of the proceeding.

108. See Gottwald, "Zur Wahrung von Geschäftsgeheimnissen im Zivilprozess," 35/36 *BetriebsBerater,* 1780, 3 (1979).

109. § 172, Statute on the Organization of Courts (*Gerichtsverfassungsgesetz*). For discussion, see Baumbach & Lauterbach, supra n. 39 at 2164-65.

110. Gottwald, supra n. 108 at 1781.

enterprise has a legitimate interest in protecting.[111] This may include product information as well as information on marketing and enterprise strategy.[112] There is no doubt that this covers the witness' own business secrets,[113] although there is conflict concerning its application to the business secrets of others.[114]

Another provision of the ZPO normally justifies a witness in refusing to disclose information with regard to the business secrets of others. According to Section 383, I(6), persons "who by virtue of their . . . business have information confided to them whose secrecy is required by its nature or by statute. . . ." may decline to disclose information. Thus, where a witness learns of information by virtue of a confidential relationship, such as employer-employee or distributor-manufacturer, he is justified in not testifying with regard to such information.[115] The combined effect of these two sections is that witnesses are generally justified in refusing to provide nonpublic business information.

There is also little opportunity for a party to compel his opponent to divulge business secrets, because the opponent generally has no obligation either to testify or to produce documents. Those courts which have extended the parties' duty of completeness to parties who do not have the burden of proof have, however, required some business secrets to be revealed under a balancing test,[116] according to which the court must weigh the defendant's need for secrecy against the plaintiff's need for information.[117]

In general, therefore, business information is given substantially more protection in Germany than in the U.S., and this protection is justified, in large part, by the perceived need to prevent firms from utilizing the litigation process to gain access to business secrets. In the context of extraterritorial discovery the need for such protection takes on an added dimension because the relatively weak protection of business secrets in the U.S. may permit American (or other) busi-

---

111. According to one commentator, " 'Trade secret' (*Gewerbegeheimnis*) can . . . be anything which by its nature may be in the interest of a business to keep secret." Schlosser, supra n. 102 at 402.

112. See Gottwald, supra n. 108 at 1781.

113. See, e.g., Bruns, supra n. 41 at 288.

114. See Gottwald, supra n. 108 at 1781.

115. See Baumbach & Lauterbach, supra n. 39 at 1019-23.

116. This is part of the controversy over whether, and when, parties without the burden of proof have an obligation to provide information. See supra, text accompanying n. 65.

117. The basic principle appears to be that the secrecy interest must be subjugated to the information interest only to the extent necessary for the court to evaluate an assertion of fact which the plaintiff has been able to demonstrate is reasonably likely to be true. See generally, Gottwald, supra n. 108 at 1782-83, and cases cited therein. Some commentators would also require documents to be produced under such circumstances, but this remains a minority position.

nesses to employ the litigation process to coerce foreign business information.[118]

## E.  Concepts of Procedural Justice

Underlying each procedural system is a structure of concepts of procedural justice whose interrelationships are determined by the relative value attached to each by the society in which the system operates. The differences between the U.S. and the German procedural systems reflect differences both in concepts of procedural justice and in the values attached to such concepts.

Two interrelated concepts of procedural justice are central to the American system. The first is that competition between attorneys tends to produce fairness and justice—the so-called adversarial principle.[119] According to one commentator:

> ". . .the experienced judge or arbitrator desires and actively seeks to obtain an adversary presentation of the issues. Only when he has had the benefit of intelligent and rigorous advocacy on both sides can he feel fully confident of his decision.
>
> Viewed in this light, the role of a lawyer as a partisan advocate appears not as a regrettable necessity, but as an indispensible part of a larger ordering of affairs. The institution of advocacy is not a concession to the frailties of human nature, but an expression of human insight in the design of a social framework within which man's capacity for impartial judgment can attain its fullest realization.[120]

In this view it is the nature of the adversarial process itself which leads to justice.

In the U.S. the adversarial principle is intertwined with a second key notion—namely, that maximum access to facts is necessary for the provision of justice. The common law tradition,[121] fortified by ideas of "legal realism" and of process theory,[122] has engendered a strong belief in the necessity of maximum access to facts. As stated by the U.S. Supreme Court in *Hickman v. Taylor*, "mutual

---

118. See generally, von Huelsen, supra n. 1.

119. For recent discussions of the adversarial principle in the context of the American system, see, e.g., Landsman, *The Adversary System* (1984) and Miller, "The Adversarial System: Dinosaur or Phoenix?," 69 *Minn. L. Rev.* 1 (1984). For discussion of the relationship between discovery and the adversary system, see Glaser, supra n. 21 at 34-37.

120. Gray, *The Nature and Sources of Law* 115 (2d ed. 1921), cited in Fuller, supra n. 34 at 384.

121. See generally, Landsman, supra n. 119 at 8-26.

122. See generally, Purcell, supra n. 20 at 74-94, 159-79, and White, "From Sociological Jurisprudence to Realism: Jurisprudence and Social Change in Early Twentieth-Century America," 58 *Vir. L. Rev.* 999 (1972).

knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession."[123] It is this concept which justifies the use of state power to coerce the production of information for use in the litigation process. The combined influence of these justice concepts has impelled the system toward a highly activist view of the litigation process and a dominant role for attorneys in that process. Moreover, during the last half century this configuration of justice concepts has dominated legal thinking to the exclusion of other concepts of justice. Until very recently, values which would limit the scope of the litigation process have seldom had significant influence.

The German system is also based on the adversarial principle,[124] but it is not accompanied by the maximum fact access principle which has been so dominant in the United States. There is no assumption that justice is likely to be directly proportional to the access of the parties to facts. Indeed, it is the ability of the system to focus on determining those facts which are relevant to the legal issues that is considered critically important.

In addition, however, there are two concepts of procedural justice that tend to limit the influence of the adversarial principle. The first may be called the concept of judicial professionalism.[125] According to Professor Karl Larenz:

> The judge, who in modern procedural law must "freely" assess the elements of proof, must conscientiously convince himself concerning the facts, while eliminating all sources of error which are known to him. It is not possible here to dispense with human personality and a method of evaluation which is carefully formed by the judicial ethos.[126]

The central notion is that procedural justice is primarily secured by the informed professionalism of the judiciary. It is the judge's skill and experience in evaluating evidentiary material which is considered likely to lead to the "truth", not the gathering of immense quantities of factual information by attorneys who are then free to

---

123. Hickman v. Taylor, 329 U.S. 495, 507 (1947).

124. This is certainly true if one functionally defines the adversarial principle so as to refer to the basic allocation of incentives and responsibilities in the system. In this view a system based on the adversarial principle is one in which the parties are primarily responsible for presenting the elements of a civil conflict to the court and in which competition between parties or their representatives is the basic mechanism for achieving effectiveness in the resolution of the conflict.

125. See generally, Shapiro, *Courts: A Comparative and Political Analysis* 150-53 (1981) and Meador, "German Appellate Judges: Career Patterns and American-English Comparisons," 67 *Judicature* 16 (1983).

126. Larenz, *Methodenlehre der Rechtswissenschaft* 293 (5th ed. 1983).

present or not to present such information and to manipulate its presentation to serve their own ends.

Moreover, it is the close interrelationship of the fact-determination process with the law-determination and law-application functions which allows the judge effectively and efficiently to reach a just result. The keystone of the legal process is the proper application by a professional judge of a body of concepts to a given fact pattern. The judge's ability to apply such principles correctly is the central value in the process.

The German legal system is built around this notion. Unlike American judges, German judges are career civil servants who are trained as judges immediately after finishing their legal training and remain judges throughout their lives. The judicial profession is the only profession with which most will be associated, and the system contains important incentives for the maintenance of professional quality and of high standards conduct. It is the professionalism engendered by this incentive-based collegial structure which is expected to assure impartiality as well as thoroughness.

A second central concept of procedural justice may be called the "classical liberal" theory of the litigation process. The idea is that the litigation process is intended to be a means of resolving disputes in society with the maximum dispatch, a minimum of interference with private rights and a minimum cost to society. Accordingly, the state is not to be allowed to interfere with privacy rights or impose burdens on private citizens for the sake of the resolution of a private conflict unless there is a reasonable basis for believing that the result of such use of state power will be significant.

Thus, the differences between the litigation process in the U.S. and Germany reflect differing concepts of procedural justice and differing configurations of values attached to such concepts. Consequently, procedures that are fundamental to fairness in one system may, if imposed on the other system, violate fundamental notions of justice and fairness. Where American discovery rules are applied to conduct in Germany, there is a direct confrontation between the values embodied in the two systems.

### III. THE CONTROVERSY OVER EXTRATERRITORIAL DISCOVERY

#### A. Approaches to Extraterritorial Evidence

There are significant differences between the United States and Germany regarding both the legal mechanism for dealing with extraterritorial evidence and the approach to the issue itself. These differences constitute the immediate context of the controversy over extraterritorial discovery.

In the U.S., discovery rules are often assumed to be applicable

in the same manner to foreign evidence as to domestic evidence, provided that discovery does not exceed any limits that might be imposed by domestic or international law. As a result, the concept of international judicial assistance, whereby a domestic court requests that evidence outside the country be "taken" by a foreign court and transmitted for use to the domestic court, generally receives little attention in the U.S.[127] Moreover, such procedures tend to be mistrusted by American attorneys, for they appear to violate basic American concepts of procedural justice by interfering with free access to evidence and by requiring a different evidentiary procedure than is applicable to domestic evidence.[128]

In Germany, the structure of the system and the values embodied in it impel a different legal framework for extraterritorial evidence. Where evidence is located outside of the country, German law automatically turns to the procedures of international judicial assistance to seek to acquire such evidence.[129] Since it is the judge who "receives" evidence in domestic procedure, it is natural for a civil law system to look to a cooperative arrangement between judges to secure evidence outside the country.

International judicial assistance is, therefore, the automatic and necessary frame of reference for extraterritorial evidence-taking. Moreover, there is an established body of law which deals with the procedures relating to international judicial assistance and with the rights and obligations applicable to that process.

Thus, the two systems approach the issue of extraterritorial discovery from differing starting points. The German literature on the controversy tends to focus on issues relating to international judicial assistance,[130] and especially the role of the Hague Evidence Convention, whereas the American discussion of the subject tends to focus

---

127. A personal survey of textbooks and casebooks currently in use in United States law schools reveals that the concept of international judicial assistance is virtually never mentioned.

128. One of the main problems here is the fact that U.S. rules concerning the admissibility of evidence at trial often make the use of evidence obtained abroad under foreign procedures difficult, marginally effective or even impossible. For discussion, see Seidel, "United States Trial Considerations When Obtaining Evidence Abroad," in Seidel (ed.), *Extraterritorial Discovery in International Litigation* 429 (1984).

129. International Procedural Law (*Internationales Prozessrecht*) is a well-defined area of law, a major part of which deals with international judicial assistance. Leading treatises include Nagel, *Internationales Prozessrecht* (1980) and Schuetze, *Internationales Prozessrecht* (1980).

130. See, e.g., Mentz, "Das Pre-Trial Discovery Verfahren," 27 *Recht der Internationalen Wirtschaft* 73 (1981); von Huelsen, "Vorlage von Dokumenten and Zeugen Vernehmungen fuer US-Zivilprozesse (PreTrial Discovery)," *Recht der Internationalen Wirtschaft* 315 (1974); Schlosser, supra n. 102; and Stuerner, "Die Gerichte and Behörden der USA and die Beweisaufnahme in Deutschland," 81 *Zeitschrift für Vergleichende Rechtswissenschaft* 159-214 (1982).

on the application of American legal rules to foreign evidence.[131]

## B.  Extraterritorial Discovery Under Domestic Law

The domestic laws of each country relating to extraterritorial evidence play an important role in the controversy by providing the conceptual framework through which each side views the conflict and by establishing the parameters of response by each side to actions of the other.

American courts have generally taken the position that discovery procedures applicable to domestic discovery are also applicable where foreign evidence is concerned, except where prohibited by international law or restricted by domestic concepts reflecting international concerns.[132] This framework of analysis is based on the interplay of three sets of legal concepts.

The discovery rules themselves provide the first component of the argument. U.S. discovery rules generally do not specify the geographical scope of their application, and, with limited exceptions, they do not specifically refer to international evidence issues.[133] As a result, litigants and courts often assume that since the statutory language does not limit the geographical scope of the discovery provisions, they are applicable on a worldwide basis.[134]

Secondly, the concept of personal jurisdiction is viewed as conferring power on the court.[135] Consequently, if a court has jurisdiction over parties or witnesses, the assumption is that it is authorized to make whatever orders it thinks proper with respect to such persons, provided that it does not thereby violate constitutional or other

---

131. See, e.g., Acomb, "Foreign Depositions: The Problems, Pitfalls and Procedures," 14 *Forum* 440-458 (1979); Light, "Discovery Abroad and the Consequences When Recovery is Not Possible," 50 *Antitrust L.J.* 577-98 (1982); Carter, "Obtaining Foreign Discovery and Evidence for Use in Litigation in the U.S.: Existing Rules and Procedures," 13 *Int'l Lawyer* 5-18 (1979), Platto, "Taking Evidence Abroad for Use in Civil Cases in the United States—A Practical Guide," 16 *Int'l Lawyer* 575-585 (1982). For a useful bibliography, see McKay, "Compelling Discovery and Disclosure in Transnational Litigation: A Selected Bibliography," 16 *N.Y.U.J. Int'l L. & Pol.* 1217 (1984).

132. See infra, text accompanying n. 139-47 and 158-72.

133. The following provisions of the Federal Rules relate specifically to foreign discovery: 28(b), 32(b), 44(c)(2) and 45(e)(2).

134. In other areas, however, the U.S. Supreme Court in recent years has specifically rejected this assumption. The Court has emphasized that international situations may require that U.S. laws be applied in a manner which differs from their application in purely domestic cases. See, e.g., Bremen v. Zapata Offshore Corp., 407 U.S. 1 (1972) and Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc., 87 L.Ed. 244 (1985).

135. According to Kaplan, von Mehren & Schaefer: "We venture the observation that the German system for allocating business among the courts is best learned when one first forgets American conceptions of 'jurisdiction over the person' and of 'territorial limits of effective service.'" Supra n. 24 at 1205.

norms.[136] In the context of extraterritorial discovery, therefore, the power concept of jurisdiction creates a presumption of authorization.[137]

The third concept supporting this jurisdictional assertion is one of parallelism. Since a foreign litigant in an American court has the right to utilize American discovery methods to investigate the facts of the case, it would be unfair to his domestic opponent not to permit equivalent discovery opportunities with regard to him, regardless of the location of the information.[138]

These factors tend to impel United States courts to apply discovery rules extraterritorially. Consequently, on the basis of one or more of these concepts, U.S. courts have generally found that they were authorized to apply U.S. discovery rules to foreign evidence, except where prohibited by certain domestic or international legal principles.

Two related domestic legal concepts are used to limit extraterritorial discovery. The first such source of limits is the doctrine of foreign government compulsion.[139] An American court generally will not compel the violation of a duty which is statutorily imposed by a foreign government relating to action within the territory of such state, at least where such violation would lead to criminal liability.[140] Thus where a state imposes criminal liability for providing domestic documents for use in foreign investigations or foreign litigation, American courts have held that this statutory provision must generally be given force and that a party or witness failing to produce evidence because of it may not be penalized in American litigation.[141]

Recent American cases have, however, attached a substantial limitation to this defense, holding that it is only applicable where the party claiming its benefit has made a good faith effort to secure

136. See generally, In re Anschuetz & Co., 754 F.2d 602, 614 (5th Cir. 1985).

137. Critical here is the framing of the issue. Where the issue is viewed as one of judicial power, the judge is likely to be compelled by notions of fairness to the domestic litigant to exercise that power, unless there is a legal principle limiting the court's power.

138. See In re Anschuetz & Co., 754 F.2d 602, 606 (5th Cir. 1985).

139. The foreign government compulsion concept is generally not viewed as deriving from public international law. It is, rather, a doctrine of United States law based on notions of procedural fairness to litigants as well as notions of international comity.

140. For general treatments of the doctrine, see Meal, "Government Compulsion as a Defense Under United States and European Economic Community Antitrust Law," 20 *Colum. J. Transnat'l L.* 51 (1981) and Note, "Development of the Defense of Sovereign Compulsion," 69 *Mich. L.Rev.* 888 (1971).

141. The existence of such a statutory provision does not constitute a defense unless there is a high probability that the provision will be enforced. See, e.g., Compagnie Française D'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co., 105 F.R.D. 16 (S.D.N.Y. 1984).

exemption from the provisions of the statute.[142]  Thus in *Graco Inc. v. Kremlin, Inc.*,[143] a U.S. district court ordered a French defendant to comply with discovery requests which appeared to violate a French blocking statute that imposed penalties for providing documents for use in foreign litigation.  In assessing the sanctions it would apply in the event of a failure to comply with its discovery order, the court said it would

> . . . inquire whether SKM is relying on the Blocking Statute in good faith, or whether it has not made a genuine effort to determine whether it might comply with the court's order despite the Blocking Statute.  Such a genuine effort might include exploration of several possibilities, such as:  securing an exemption from France; complying with as much of the court's order as possible outside the territorial reach of the Blocking Statute; effecting as much compliance as possible under the procedures of the Hague Convention; and providing the court with a firm basis for understanding the manner in which France enforces its Blocking Statute.[144]

As limited by this good faith requirement, the foreign government compulsion defense may have little impact on the scope of extraterritorial discovery.

The second domestic limitation on the reach of extraterritorial discovery is the concept of comity.[145]  According to this principle, American courts must take into account foreign interests when deciding whether to apply or enforce provisions of American law.  In the context of extraterritorial discovery, some courts have used the concept in determining whether to order extraterritorial discovery and whether sanctions should be applied in the event of failure to obey such orders.[146]  Moreover, several courts have used the principle of comity to require that the procedures of the Hague Evidence Convention be followed before a court may order the use of American discovery procedures.[147]

Under German law the issue of extraterritorial discovery is analyzed quite differently.  The American notion that personal jurisdiction subjects parties and witnesses to the *power* of the court and thus implicitly creates a presumption of authority over them is un-

---

142.  See generally, Meal, supra n. 140 at 67-82.
143.  101 F.R.D. 503 (N.D. Ill. 1984).
144.  Graco Inc. v. Kremlin, Inc., 101 F.R.D. 503, 526 (N.D. Ill. 1984).
145.  See generally, Yntema, "The Comity Doctrine," 65 *Mich. L. Rev.* 9 (1966) and Maier, "Extraterritorial Jurisdiction at a Crossroads:  An Intersection Between Public and Private International Law," 76 *Am. J. Int'l L.* 280 (1982).
146.  See, e.g., Ings v. Ferguson, 282 F.2d 149 (2d Cir. 1960).
147.  See, e.g., Laker Airways, Ltd. v. Sabena, Belgian World Airlines, 731 F.2d 909 (D.C. Cir. 1984) and Schroeder v. Lufthansa German Airlines, 18 Av. Cas. (CCH) ¶ 17,222 (N.D. Ill. 1983).

known in German law. The term "personal jurisdiction" is not even easily translated into German, because there is no nearly analogous concept.[148] In Germany, particular courts are "competent" (*zuständig*) to resolve certain kinds of disputes.[149] When a suit is filed before a competent court, that court may make certain well-defined and statutorily-authorized orders with respect to parties and witnesses, and failure to comply with its orders may entail sanctions. There is, however, no notion that particular contacts of parties or witnesses with the forum give that court broad and undifferentiated power with respect to such persons.

The limiting concepts of foreign government compulsion and comity are also without direct analogue in German law. Instead, domestic law restraints are derived from the principles of private international law which determine whether a foreign law may be applied by a German court and whether a foreign judgment may be recognized by a German court.[150]

Thus, the two systems differently conceive the legal issue presented by extraterritorial discovery. In the U.S. the issue is one of judicial power—whether a U.S. court has the power to require certain actions. In Germany, the issue is generally considered to be the validity of applying legal norms—here, American discovery rules—within German territory.

The principle of private international law that is most significant in the context of international discovery is that of "*ordre public*".[151] A court may decline to apply a particular foreign law or to recognize a foreign judgment if such action would violate "fundamental principles of the legal order".[152]

The concept of *ordre public* is relevant to the extraterritorial discovery conflict in two ways. First, it serves as the basic conceptual reference-point for assessing the validity of U.S. discovery orders relating to conduct in Germany. Accordingly, if an American discovery order violates fundamental principles of the German legal order, it cannot validly be applied to conduct within Germany.

Since, however, an American court applying American discov-

---

148. See generally, Gerber, "The Extraterritorial Application of the German Antitrust Laws," 77 *Am. J. Int'l L.*756, 760 (1983).

149. See generally, Cohn, supra n. 62 at 170-73.

150. See, e.g., Dolle, *Internationales Privatrecht* (2d ed. 1972).

151. "*Ordre public*" is often translated as "public policy" in English-language literature. For discussions, see Kahn-Freund, *General Problems of Private International Law* 282-85 (1980); Paulsen & Sovern, "Public Policy in the Conflict of Laws," 56 *Col. L. Rev.* 969 (1956); and Forde, "Ordre Public," 29 *Int'l & Comp. L.Q.* 259 (1980).

152. The basic concept is contained in Art. 30, *Einführungsgesetz zum Bürgerlichen Gesetzbuch* (EGBGB), according to which "a foreign law will not be applied if this would violate *bonos mores* or the purpose of a German statute." For discussion, see Cohn, supra n. 62 at 103-07.

Case 1:07-cv-00255-JJF    Document 60-2    Filed 03/17/2008    Page 118 of 131

ery rules is not asking a German court to apply foreign law within its borders, the only context in which this "violation" of Germany's *ordre public* can be attacked under German law is in relation to the recognition of an American judgment based on such "invalid" discovery.

According to Section 328(4) of the ZPO, a German court may refuse to enforce a foreign judgment if recognition of the judgment would violate *ordre public* principles.[153] Thus, if a United States court orders discovery that is considered to violate German *ordre public* principles, any U.S. judgment based on, or related to, such a discovery order may thereby be rendered unenforceable under German law.[154] The fact that these differences between U.S. and German procedural principles might lead to failure by German courts to recognize U.S. judgments does not yet appear to have played a role in American discussions of extraterritorial discovery.

There do not as yet appear to be any reported cases dealing specifically with the application of *ordre public* principles to U.S. discovery orders.[155] Scholarly opinion, as well as government statements, however, view U.S. discovery orders relating to conduct on German soil as violations of German *ordre public* principles, at least under certain circumstances.[156] According to one commentator:

> The sometimes crass value differences in substantive law [between the United States and Germany] are so significantly exacerbated by the peculiarities of American procedural law, with its private investigatory rights and decision by the jury, that aid in applying American law must in many cases be classified as a violation of *ordre public* principles.[157]

## C.  *Relevance of Customary International Law*

The potential role of customary international law in the extra-

---

153. See generally, Rosenberg & Schwab, supra n. 40 at 952-63.

154. Such a judgment may, of course, be enforceable against the defendant's assets located in the U.S.

155. There is one reported German appeals court decision in which a German court applied German *ordre public* principles to a request by a U.S. court for judicial assistance under the Hague Evidence Convention. The court indicated that such requests might violate German *ordre public* principles under some circumstances, but it did not find such a violation where the requested examination of witnesses would be conducted by a German judge and the procedural protections of the German system were available. Judgment of 27 Nov. 1980, Oberlandesgericht, Munich, 1981, 27 *Recht der Internationalen Wirtschaft* 554 (1981).

156. See, e.g., Stiefel, " 'Discovery'-Probleme und Erfahrungen im Deutsch-Amerikanischen Rechtshilfeverkehr," 25 *Recht der Internationalen Wirtschaft* 509, 514-520 (1979).

157. Von Huelsen, supra n. 1 at 550.

territorial discovery context has not been thoroughly analyzed either in the U.S. or in Germany. In both countries, arguments based on customary international law have been based largely on assumptions about the content of general principles, in particular, the concept of territorial sovereignty.[158] Each country recognizes that the concept of sovereignty provides certain limits on the scope and enforcement of U.S. discovery orders, but there are significant differences between the two countries concerning the content of such limits.[159]

American decisions have generally recognized that the concept of sovereignty prohibits the U.S. from ordering discovery within foreign territory—whether implemented by government officials or by attorneys acting under the authority of discovery rules.[160] It has been held, for example, that an American court may not order a foreign national on foreign territory to allow inspection of documents or to submit to depositions, at least where the foreign state objects to such practices.[161]

American courts have generally held, however, that the principle of sovereignty does not prevent a U.S. court from ordering a foreign party or witness located in Germany to present himself and/or documents located in Germany for discovery in the U.S. and imposing sanctions against such party or witness for failure to comply with such order.[162] The courts thus distinguish between ordering acts on foreign soil which are part of the U.S. litigation process—e.g., depositions—and ordering acts in foreign territory which are merely in preparation for the litigation process—e.g., boarding a plane for the United States.

Because the scope of the principle of sovereignty is a major factor in the conflict over extraterritorial discovery, it is important to ask why American courts have drawn the line so as to prohibit discovery which would take place in Germany, but not to prohibit an

---

158. For a discussion of the concept of sovereignty in the context of the issue of extraterritoriality, see generally Gerber, supra n. 5.

159. A special feature of U.S.-German legal relations relating to the gathering of foreign information is an exchange of diplomatic notes according to which each country agrees to allow diplomatic officials of the other country to take evidence in their territory under specific conditions. See Exchange of Notes between United States and Fed. Rep. of Germany, T.I.A.S. No. 9938 (11 Feb. 1955; 13 Jan. 1956; 8 Oct. 1956; 17 Oct. 1979).

160. See, e.g., In re Anschuetz & Co., 754 F.2d 602 (5th Cir. 1985).

161. See, e.g., Graco Inc. v. Kremlin, Inc. 101 F.R.D. 503 (N.D. Ill. 1984).

162. See, e.g., In re Anschuetz & Co., 754 F.2d 602, 615 (5th Cir. 1985); Graco Inc. v. Kremlin, Inc., 101 F.R.D. 503 (N.D. Ill. 1984); McLaughlin v. The Fellows Gear Shaper Co., 102 F.R.D. 956 (E.D. Pa. 1984); Adidas, Ltd. v. S.S. Seatrain Bennington, 80 Cir. 1911, 82 Cir. 375, Slip Op. (S.D.N.Y. May 30, 1984); Slauenwhite v. Bekum MaschinenFabriken GmbH, 104 F.R.D. 616 (D. Mass. 1985); In re Messerschmitt Bolkow Blohm GmbH, 575 F.2d 729 (5th Cir. 1985); In re Societe Nationale Industrielle Aerospatiale, 85 Civ. 2306, Slip Op. (8th Cir. 22 January 1986).

American court from ordering a person to leave Germany or to send documents out of Germany for discovery purposes. A key factor appears to be the role of "judicial sovereignty".

This concept, as used in the present context,[163] seems to have derived from the report of the U.S. delegation to the conference which prepared the Hague Evidence Convention.[164] According to that report:

> The act of taking evidence in a common law country from a willing witness, without compulsion and without a breach of the peace, in aid of a foreign proceeding, is a purely private matter, in which the host country has no interest and in which its judicial authorities have normally no wish to participate. To the contrary, the same act in a civil-law country may be a public matter, and may constitute the performance of a public judicial act by an unauthorized foreign person. It may violate the "judicial sovereignty" of the host country, unless its authorities participate or give their consent.[165]

The concept of judicial sovereignty was then used in several American cases for the same basic purpose—i.e., to explain the assertion by foreign governments that U.S. discovery practices violated sovereignty rights.[166] In these cases the U.S. courts used the concept to explain how what the U.S. considered an essentially private act could violate the sovereign rights of a foreign nation.

Having been used to explain that proposition, however, the concept acquired a life of its own, and it has recently been used to perform a different function—namely, to determine the scope of the concept of sovereignty. For example, in one recent U.S. district court case the court held that French sovereignty was not infringed by a U.S. discovery order requiring discovery to take place in the U.S., because the discovery itself did not take place on French soil. According to the court:

> What is required of [defendant] on French soil is certain acts preparatory to the giving of evidence. It must select

---

163. In English legal history the term "judicial sovereignty" was used to refer to the power of the King's Bench to supervise the inferior English courts by ordering writs of mandamus. III *Blackstone's Commentaries on the Laws of England*, 42 n.31 at 1056 (Lewis ed. 1922).

164. Report of the U.S. delegation to the 11th Session of the Hague Convention, 8 *Int'l Leg. Mat.* 785 (1969) [hereinafter cited as "the 1969 Delegation Report"].

165. 1969 Delegation Report, id. at 806.

166. See, e.g., Volkswagen Aktiengesellschaft v. Superior Court, 33 Cal. App. 3d 503, 109 Cal. Rptr. 219 (3rd Dist., 1973); Volkswagenwerk Aktiengesellscheft v. Superior Ct., 123 Cal. App. 3d 787, 176 Cal. Rptr. 874 (1st Dist., 1982); and Pierburg GmbH & Co. KG v. Superior Ct. of Los Angeles County, 137 Cal. App. 3d 238, 186 Cal. Rpt. 876 (2d Dist. 1982).

appropriate employees to give depositions in the forum state: likewise it must select the relevant documents which it will reveal to its adversaries in the forum state. These acts do not call for French judicial participation. If [defendant] were preparing to bring litigation against United States adversaries in the United States courts, it would perform the same acts of selecting employee witnesses and evidentiary documents from its files without participation by a French judicial authority. In no way do those acts affront or intrude on French sovereignty.[167]

The court here uses the notion of judicial sovereignty to distinguish between those acts which violate French sovereignty—namely, those acts on French soil which constitute part of the state-regulated litigation process—and those which do not violate French sovereignty—i.e., those which are merely in preparation for the litigation process.[168]

In Germany, there has been little discussion of the relationship between sovereignty concepts and the validity of discovery, except in the context of the Hague Evidence Convention.[169] The assumption of writers as well as of the German government generally has been, however, that the concept of sovereignty is broader than it is assumed to be in the U.S. It is widely assumed that a discovery order by a U.S. court requiring conduct within Germany may violate German sovereignty, regardless of whether the conduct required is submission to discovery in Germany of the sending of documents or persons out of Germany for use in discovery in the U.S.[170] Thus where an American court orders a German national to leave German territory to submit to depositions in the U.S. or to produce documents in the U.S., this may violate German sovereignty because it

---

167. Adidas (Canada) Ltd. v. S/S (Seatrain Bennington) 80 Civ. 1911, slip op. at 5 (S.D.N.Y. May 30, 1984).

168. Under the American Law Institute's tentative draft of the *Restatement of the Foreign Relations Law of the United States*, the concept of sovereignty is considered to prohibit the U.S. from issuing discovery orders which are insufficiently specified and inadequately supervised. This position has not been followed, however, in the United States cases. See A.L.I., *Restatement of the Foreign Relations Law of the United States (Revised)*, Section 437 (Tentative Draft No. 6, 1985).

169. For discussion of the concept in the context of the Hague Evidence Convention, see e.g., Stuerner, supra n. 130 at 205-06.

170. According to the amicus brief of the Federal Republic of Germany in *In re Anschuetz & Co.*:

> Compliance in Germany with the order of the U.S. District Court mandating the taking of oral depositions in Kiel, Germany, *and the production of documents located* in Kiel, Germany, would be a violation of German sovereignty unless the order is transmitted and executed by the method of the Letter of Request under the Evidence Convention. (emphasis provided).

Brief of the Federal Republic of Germany, in In re Anschuetz & Co., 754 F.2d 602 (5th Cir. 1985), at 8.

involves coercion by the U.S. of conduct on German territory in violation of basic principles of the German legal system.[171] In the German approach, therefore, the concept of sovereignty is closely associated with the private international law concept of *ordre public*.

The conflict between U.S. and German views of the scope of the concept of sovereignty would, therefore, appear to be explained, in part at least, by differences between the domestic law concepts which are use to interpret the principle of sovereignty. In the U.S. that principle has largely been defined in this context by reference to the concept of judicial sovereignty. If the concept of judicial sovereignty is used to define the scope of sovereignty, a court may simply avoid interference with a state's sovereignty by ordering the removal from that country of persons and documents sought to be examined. Where the principle of sovereignty is defined by reference to *ordre public* concepts a court may not order any conduct on foreign soil pursuant to proceedings which violate basic principles of the foreign legal system.

The role of the concept of sovereignty in the controversy over extraterritorial discovery is of central importance, but the current lack of adequate analysis of this issue allows each side to take positions based on assumptions which derive from its domestic legal system and correspond to its own interests. Consequently, Germany utilizes concepts that favor a broad notion of sovereignty protection, while U.S. courts favor more limited sovereignty protections.

## D.   The Relevance of The Hague Evidence Convention

Ironically, the conflict over extraterritorial discovery has been exacerbated by a multinational convention designed to ameliorate it. Uncertainty and confusion concerning extraterritorial discovery led in 1969 to a multilateral conference aimed at finding a solution to the problems created by differences in legal systems, in particular, by differences between civil law and common law countries.[172] The result of this undertaking was the Hague Evidence Convention, opened for signature in 1970.

Prior to the Convention, international judicial assistance was generally not legally required.[173] Except where governed by bilateral arrangements, each state could in its own discretion determine whether its courts would render such assistance. A primary objec-

---

171. See id. at 5.

172. See Edwards, "Taking of Evidence Abroad in Civil or Commercial Matters," 18 *Int'l & Comp. L.Q.* 646 (1969).

173. For a discussion of the voluntary letters rogatory procedure, see 1 Ristau, *International Judicial Assistance* 106-16 (1985).

tive of the Convention was, therefore, to make such assistance mandatory under certain circumstances.

Accordingly, each contracting state agreed that on proper request from a court in another contracting state its courts would take evidence within its territory for use in the foreign litigation. Although useful in many respects, the Convention left unclear certain issues which have become important aspects of the extraterritorial discovery conflict. The two main issues have been the treaty's scope and its relationship to domestic evidence-gathering procedures.

### 1. The Exclusivity Issue

The relationship between American discovery rules and the Hague Convention has been the main focus of the controversy. The issue is whether the Hague Evidence Convention is intended to be the exclusive or merely an additional means of obtaining evidence abroad.

Courts and commentators in the U.S. have taken divergent views.[174] Three basic positions have been represented: (1) that the Convention is intended to be the exclusive means of obtaining extraterritorial evidence, the exclusive theory; (2) that the Convention is merely an additional device to accomplish foreign discovery and does not limit American courts in applying U.S. discovery rules, the optional theory; and (3) that in the interests of comity a good faith effort must be made to obtain evidence through the Convention, and only if Convention procedures are not successful, may domestic discovery rules be applied, the comity theory.

Although the U.S. Supreme Court has yet to take a position on the issue and there is little federal appellate case law,[175] the courts have clearly rejected the mandatory approach. Courts and commentators generally have been divided between the optional theory and the comity theory. Followers of the optional theory have focused primarily on the fact that the Convention does not claim to be exclusive. Given the importance of the exclusivity issue, they say, it must be assumed that the treaty would state that it was intended to be exclusive, if, in fact, that had been the intention of the parties.[176]

---

174. For summaries of many of the cases in this area, see Hague Conference on Private International Law, *Practical Handbook on the Operation of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters*, pt. IV (1984) [hereinafter cited as "Hague Conference Handbook"].

175. This aspect of the Hague Evidence Convention is currently pending before the United States Supreme Court. See Societe Nationale Industrielle Aerospatiale, 106 S. Ct. 2888 (1986).

176. See, e.g., Lowenfeld, "Introduction: Discovering Discovery, International Style," 16 *N.Y.U.J. Int'l L. & Pol.* 957, 959 (1984).

Courts utilizing the comity theory agree that the U.S. is not obligated by the terms of the Hague Convention exclusively to utilize that Convention in securing foreign evidence.[177] They take the position, however, that the doctrine of comity provides a middle ground between the optional and mandatory theories by imposing an obligation on U.S. courts to use the treaty wherever possible in order to avoid conflict with the interests of foreign states. Thus, they say, U.S. discovery rules will be applied only after the party seeking discovery has made a good faith effort to secure evidence through the procedures of the Convention.

The European countries, including Germany, generally take the position that the Hague Convention is intended to be exclusive.[178] The states of Europe would have had no reason to sign the Convention, they argue, if it were simply another means for the United States to obtain discovery and involved no significant limitation on the rights of the United States. The U.S. would have achieved its objectives in the negotiations—namely, a means of securing the aid of foreign states in coercing the production of evidence, but surrendered very little. The Europeans, on the other hand, would have given up important sovereign rights and gained nothing.[179]

One explanation for the fact that the most fundamental issue related to the treaty — whether it was to be used exclusively or merely optionally — was left unclear relates to the differences between the respective systems and the values underlying them. Because of the conflict of procedural systems, the U.S. negotiators may not have realized how much the Europeans were surrendering in signing the agreement, and the Europeans may not fully have appreciated what the U.S. was attempting to achieve.

### 2.  U.S. Pre-Trial Discovery and The Scope of the Convention

The second major area of controversy relates to the Convention's scope—specifically, the extent to which U.S. pre-trial discovery procedures are covered by it. Here again the problem may be traced to the apparent failure of each side to comprehend critical aspects of the other's legal system.

Courts and commentators in the U.S. generally have taken the position that the Convention was intended to apply generally to pre-trial discovery and that the Convention would be virtually meaning-

---

177.  See, e.g., Philadelphia Gear Corp. v. American Pfauter Corp., 100 F.R.D. 58 (E.D. Pa. 1983).

178.  See, e.g., Brief of the Federal Republic of Germany as Amicus Curiae, in Volkswagenwerk v. Falzon, 461 U.S. 1303 (1983).

179.  For discussion of the negotiations, see Amram, United States Ratification of the Hague Convention on the Taking of Evidence Abroad, 67 *Am. J. Int'l L.* 104 (1973).

less from the American perspective if it were not to appy to pre-trial discovery, because that is the means by which facts are acquired for purposes of the U.S. litigation process.[180]  On that basis, it has been widely assumed that a U.S. attorney could merely send discovery requests appropriate under U.S. law to the foreign court via a U.S. court and expect that such foreign court would order production of the evidence requested.

Civil law countries argue, however, that the Convention was not intended to provide a mechanism for the enforcement of U.S. pre-trial discovery rules as applied in the United States.[181]  In their view the Convention is a means of regulating international judicial cooperation among the contracting states.  Since international judicial assistance is provided only for requests issued and considered by a judge which seek *specified* information, the treaty is not applicable to requests not meeting these requirements.  Consequently, U.S. requests generally are considered not to qualify for international judicial assistance, because they are often not made and considered by a judge, *and* they often do not seek specific information.

The language of the Convention makes such conflict virtually inevitable.  The Convention provides, in Article 1, that "a Contracting State may . . . request the Competent Authority of another Contracting State, by means of a Letter of Request, to obtain evidence, or to perform some other judicial act."  It then states that "A Letter shall not be used to obtain evidence which is not intended for use in judicial proceedings, commenced or contemplated."

From the perspective of the American legal system, the language of the second quoted sentence would appear generally to include pre-trial procedures, because, by negative implication, it includes evidence "for use in judicial proceedings, *commenced or contemplated*", and the function of U.S. discovery is to provide information for judicial proceedings—namely, the trial.  From the German perspective, however, the critical point is that the quoted language specifically excludes "evidence which is *not intended for use* in judicial proceedings."  Thus, the language would appear to exclude evidence which has not been adjudged to meet generally applicable relevance standards for use in judicial proceedings.  Since U.S. pre-trial discovery standards of relevancy are not only lower than generally applicable relevancy standards in other countries, but also

---

180.  See, e.g., Report of the United States Delegation to the Special Commission on the Operation of the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters 12-15 June, 1978, 17 *Int'l Leg. Mat.* 1417, 1421 (1978).

181.  For the position of the German government, see Deutsche Denkschrift zu den Üebereinkommen, BT Drucksache VII Nr. 4892, reprinted in Schuetze, supra n. 166 at 715. See also Martens, supra n. 52 at 729, and Schlosser, supra n. 102 at 381.

lower than admissibility standards in U.S. courts, and since a judge need not rule on their applicability at the discovery stage, discovery according to U.S. rules would be precluded.

The ambiguity is compounded by Article 23 of the Convention, which was proposed by the United Kingdom late in the negotiations. This article permits a contracting state to "declare that it will not execute Letters of Request issued for the purpose of obtaining pre-trial discovery of documents as known in Common Law Countries", and virtually all contracting states have made reservations in accordance with it.[182]

The U.S. argues that the inclusion of this provision supports the negative inference that pre-trial discovery was intended generally to be covered by the Convention, since otherwise there would have been no need to include it. European countries argue, however, that this provision was merely added to secure the support of many countries which wanted specific language concerning the most objectionable aspect of U.S. discovery, namely, document production.[183]

Again, the controversy appears to result from a failure of each side to understand the perspective and, therefore, the legal argument of the other. From the European perspective, the Convention was drafted in such a way as to be applicable to U.S. discovery, provided that such discovery met generally applicable standards of relevancy and judicial supervision. Therefore, Article 23 merely allowed states the option of totally excluding a specific form of discovery—namely, discovery of documents. From this perspective, the inclusion of Article 23 does not permit a negative inference to be drawn with regard to the Convention's applicability to pre-trial discovery in general. Consequently, the American argument is based on a misapprehension of the position of the European negotiators.[184]

Similar problems of comprehension affect the role assigned by each side to Article 12 of the Convention, which provides, in relevant part, that a contracting party may refuse to execute an otherwise valid letter of request where "the State addressed considers that its sovereignty or security would be prejudiced thereby." In Germany, as in other European countries, this provision is interpreted to refer to *ordre public* principles.[185] Under this view, Article 12 authorizes a German court to refuse to honor a request for

---

182. For information concerning the declarations of each contracting state, see Hague Conference Handbook, supra n. 174 at pt. III.

183. It is generally agreed that this article was poorly drafted. See 1978 Commission Report, supra n. 180 at 1428.

184. See generally, Schlosser, supra n. 102 at 381.

185. See generally, von Huelsen, "Kanadische und Europäeische Reaktionen auf die U.S. 'pre-trial discovery,'" 28 *Recht der Internationalen Wirtschaft* 550 (1982).

judicial assistance which violates such principles.[186] Since, therefore, U.S. pre-trial discovery may, under some circumstances, violate Germany's *ordre public* principles, Article 12 provides an additional means of restricting the Convention's scope in relation to pre-trial discovery.

In the U.S., on the other hand, there has been virtually no mention of Article 12 in the case law and literature relating to the Hague Evidence Convention. A likely explanation is that American law has no *ordre public* concept and pays little attention to generally analogous concepts in its own system. Moreover, the American system does not relate such domestic law concepts to the international law principle of sovereignty. As a result, the U.S. has failed to appreciate a concept fundamental to the European understanding of the Convention.

The controversy surrounding the Hague Evidence Convention is thus derived, in large part, from failures on each side to understand, or accord significance to, the conceptual and institutional perspectives of the other side. This means, however, that recognition of the systemic differences which have led to the controversy should also provide a basis for improving the Convention.

## IV.  CONCLUDING PERSPECTIVES

The international conflict involving American extraterritorial discovery practices results from two facts. First, the procedural system in the United States acquires information through means which tend to be more intrusive and less carefully supervised than their foreign counterparts. And, second, the U.S. seeks to utilize its domestic information-gathering techniques with regard to information located outside the U.S. and in so doing often violates fundamental concepts of justice in the country in which the information is sought to be compelled. It is the combination of systemic differences with the attempt by one state — i.e., the United States — to utilize its system outside of its own territory which creates the conflict.

Resolving this conflict is made more difficult by the fact that the very systemic differences which underlie the conflict also impede each side's understanding of the other side's position. In this context, therefore, comparative analysis can perform two interrelated functions. First, it can explain the systemic differences that underlie the conflict and thus provide the basis for effective analysis, communication and cooperation. In addition, it can identify the interests of each side in the conflict and thereby indicate means of avoiding or reducing conflict in particular areas. In the extraterrito-

---

186. See, e.g., Stuerner, supra n. 130 at 205-06.

rial discovery conflict, as so often in international conflicts, major concepts acquire symbolic importance and tend to obscure recognition of the actual interests involved.

### 1.  Nature and Function of Pre-Trial Discovery

A critical element of the extraterritorial discovery conflict has been misunderstanding of the nature and function of American pre-trial discovery.[187]  In the extraterritorial discovery controversy the issue is often posed in all-or-nothing terms.  American lawyers often resist any limitations on discovery; Europeans often say it may not be used extraterritorially.  Closer analysis suggests, however, that only certain characteristics of pre-trial discovery create conflict.

Pre-trial discovery has become an integral and necessary part of the American litigation process.  Consequently, no international arrangement which completely eliminates the opportunity to gather information prior to trial can be accepted by the United States.

Pre-trial discovery need not, however, violate fundamental principles of German law.  The fact that evidence is gathered prior to trial does not appear to violate basic concepts of justice in the German system.  What is critical from a German perspective is the lack of principled judicial supervision of U.S. discovery procedures and their consequent potential for abuse.

Thus, by requiring increased supervision of the discovery process by its courts, the U.S. can eliminate an important element of the conflict.  Moreover, this can be done without requiring the sacrifice of fundamental interests.  From the American perspective, the central concerns are to maximize opportunities to acquire evidence for use in U.S. litigation as well as to assure that U.S. judgments are recognized and enforced.

### 2.  Scope of Pre-Trial Discovery

A second major aspect of the conflict relates to the scope of the U.S. discovery process.  The problem here is that U.S. discovery rules subject a significantly broader range of information to the litigation process than does German law, with the result that U.S. discovery procedures may significantly impinge on spheres of privacy protected by German law.  Conflict may be reduced, therefore, to the extent that the U.S. can, without sacrificing its own fundamental interests, limit the scope of discovery where it conflicts with fundamental German interests.

For example, by raising the standard of relevancy for extraterritorial discovery, the U.S. could substantially reduce conflict with

---

187.  See supra, text accompanying n. 23-30.

German interests. If the U.S. were to require that a party seeking extraterritorial discovery provide reasonable grounds to believe that the information sought would directly relate to proof of a material fact, the use of such a standard of relevancy would appear to satisfy the essential concerns of the German legal system, for it would minimize opportunities for parties to use discovery to "probe" for usable information. The resulting relevancy standard would not be as high as the German standard, but it would appear to be sufficiently high to protect Germany's basic interests.[188] Moreover, such a move would not appear to violate fundamental interests of the U.S. It would exclude only that discovery which is least likely to produce usable evidence—namely, discovery as to which the requesting party has no reasonable grounds to believe would yield material information.

Confidentiality issues also provide opportunities for conflict reduction. For example, the German system recognizes the lack of direct interest of a non-party in litigation by providing significantly greater protection from the intrusions of the litigation process for non-parties than for parties.[189] In the U.S. there is often relatively little difference in the scope of obligations between parties and non-parties, and the protection of both is generally less than in Germany.

The United States could, therefore, reduce conflict by broadening the confidentiality protection accorded to non-parties. It could, for example, provide that discovery would be permitted against foreign non-parties only where some relationship (such as a business or familial relationship) exists between the party seeking discovery and the foreign non-party. This would reduce the opportunity for plaintiffs in U.S. courts to use discovery to probe for foreign business information.

Germany, on the other hand, could reduce conflict by reducing or eliminating protection from U.S. discovery where the person seeking such protection is a plaintiff in the litigation in which discovery is sought. The possibility that a foreign plaintiff may carry out discovery of his domestic opponent without himself being subjected to discovery affects fundamental fairness interests of the U.S. and has been a cause of great concern in the U.S. Germany could, therefore, consider the use of U.S. courts to constitute a waiver of some or all of those rights which a person may otherwise have for protection against U.S. discovery orders in the same litigation. Germany would not have to allow discovery on its territory. It could

---

188. The German justice department has drafted regulations which essentially allow pre-trial discovery of documents, provided there is no such "probing". Unpublished draft regulation of German Federal Ministry of Justice, dated 15 June 1983. For a brief description of the contents, see Martens, supra n. 52 at 128.

189. See supra, text accompanying n. 111-116.

merely decline to view orders for the removal of documents or persons from Germany as violations of its sovereignty. Such a step would not appear to impair fundamental German interests, because persons affected would have voluntarily relinquished sovereignty protections.

Reducing conflicts along the lines indicated by these examples can be accomplished in one or both of two ways. Such conflict reduction could be achieved by revising the Hague Evidence Convention. Almost a decade of experience and analysis has revealed systemic conflicts and operating difficulties which were not apparent when the Convention was drafted in 1968. Utilizing this experience and knowledge, a multinational conference to amend the Hague Convention may now be in a position to achieve substantial improvements in that Convention.

Provided that this experience can be brought to bear on the relevant negotiations, such a conference is likely to be the most effective means of resolving existing conflicts, not least because it would eliminate the conflicts which flow directly from the existing Convention and because it would provide a context for resolving a variety of conflicts at the same time. Moreover, it may be politically more acceptable for one state to make modifications of its own rules where this is part of a *quid pro quo* for changes from other states.

Alternatively, the U.S. might "adapt" certain of its discovery principles for use in the international context. The U.S. has chosen to adopt practices that other states do not allow and to apply them to conduct within the territory of other states. It is, therefore, in a position unilaterally to reduce the conflicts that result from its action, provided, however, that in so doing it does not thereby sacrifice its own fundamental interests.

The primary goal of the U.S. should be to move toward a system of international legal relationships which serves the essential objectives and values of the American litigation system. In this context those would appear to be maximum access to relevant facts, relative efficiency in U.S. litigation, and maximum foreign recognition of U.S. judgments.

Each of these goals can be achieved only with the support of the foreign countries involved. In addition to measures such as blocking statutes which have already been taken, there are many steps which a foreign government can take to thwart U.S. discovery within its territory. Foreign courts can, for example, refuse to recognize U.S. judgments based on excessive discovery, and foreign legislatures can provide legal remedies within their own jurisdictions against American citizens or corporations who utilize such discovery.[190]

---

190. This type of measure is represented by the so-called "claw back" provision of

788          THE AMERICAN JOURNAL OF COMPARATIVE LAW          [Vol. 34

Consequently, failure to move toward resolution of the existing conflicts can be expected to lead to extreme uncertainty surrounding internation litigation in U.S. courts and impairment of the system of private law relationships between the U.S. and other foreign countries. Such a development would benefit no one, least of all American litigants.

---

the British Protection of Trading Interests Act, 1980, ch. 11. For discussion, see Lowe, "Blocking Extraterritorial Jurisdiction: The British Protection of Trading Interests Act," 1980, 75 Am. J. Int'l E. 257 (1981)