IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PURDUE PHARMA PRODUCTS L.P.,
NAPP PHARMACEUTICAL GROUP LTD.,
BIOVAIL LABORATORIES INTERNATIONAL,
SRL, and ORTHO-MCNEIL, INC.,

        Plaintiffs/Counterclaim Defendants,

        v.

PAR PHARMACEUTICAL, INC. and
PAR PHARMACEUTICAL COMPANIES, INC.,

        Defendants/Counterclaim Plaintiffs.

C.A. No. 07-255 (JJF)
(CONSOLIDATED)

**PURDUE'S AND NAPP'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL
PRODUCTION OF CERTAIN DISCOVERY AND AMEND SCHEDULING ORDER**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*OF COUNSEL:*

Robert J. Goldman
ROPES & GRAY LLP
525 University Avenue
Suite 300
Palo Alto, CA  94301
(650) 617-4000

Sona De
Richard A. Inz
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

Dated: June 30, 2008

*Attorneys for Plaintiffs*
  *Purdue Pharma Products L.P.*
  *and Napp Pharmaceutical Group Ltd.*

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS.........................................................1

II.  SUMMARY OF ARGUMENT .........................................................................................1

III. STATEMENT OF FACTS.................................................................................................5

    A.   Documents Relating To Testing in Europe Of The Merck Reference .....................5

        1.   The Malkowska Declarations And Those Of Napp's
             Adversaries In European Patent Office Proceedings Were
             Submitted To The United States PTO And Were Produced
             Early In Discovery ......................................................................................5

        2.   Napp Produced The Majority Of Documents Relating To Its
             Merck Testing From Its Own Files Before Par's Instant Motion ..................6

        3.   The Remaining Documents, From The Files Of Napp And It's
             Outside U.S. Patent Prosecution Counsel, Some Of Which Are
             Duplicative Of Documents Already Produced, Are Being
             Produced Today ...........................................................................................6

    B.   Privileged Documents Properly Withdrawn From Production Under
        The Protective Order..............................................................................................7

        1.   To Facilitate Discovery, The Parties Agreed To A Protective
             Order Including A Broad Provision For Recalling Discovery
             Materials That, Upon Further Review, Should Have Been
             Withheld .....................................................................................................8

        2.   Purdue And Napp Collected and Reviewed Approximately 5.2
             Million Pages Of Documents, Of Which Approximately 2.3
             Million Pages Were Produced......................................................................9

             (a)   Purdue and Napp properly reviewed the documents for privilege
                  prior to production...................................................................10

        3.   Purdue And Napp Recalled The Privileged Documents
             Immediately Upon Learning Of Their Production.........................................11

             (a)   The documents recalled are protected by attorney-client privilege
                  and/or work product immunity...............................................12

IV.  ARGUMENT .................................................................................................................13

    A.   Par's Motion To Compel Production Of Merck Testing Documents Is
        Moot.....................................................................................................................13

    B.   There Has Been No Waiver...................................................................................13

        1.   The Stipulated Protective Order Defeats Par's Claim....................................13

2.  The Controlling Authorities In This District Support Purdue
And Napp's Position, Not Par's ....................................................................14

(a)  Delaware follows the "strict" standard which requires gross
negligence to waive privilege based on inadvertent production ..........14

(b)  The "balancing" standard that Par points to for finding an
inadvertent waiver is followed by other jurisdictions .........................15

(c)  Reasonable precautions, large scale productions, and tight time
constraints argue against finding a waiver even under
the "balancing" standard........................................................................16

(d)  Inadvertent production does not waive work product if the
disclosure is immediately remedied .....................................................16

3.  Par's Motion For Finding Waiver Should Be Denied Because,
Under The Circumstances, Purdue And Napp Acted Reasonably.................17

V.  CONCLUSION ..............................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bensel v. Airline Pilots Association*,
    248 F.R.D. 177 (D.N.J. 2008)....................................................................................17, 18

*Berg Electronics, Inc. v. Molex, Inc.*,
    875 F. Supp. 261 (D. Del. 1995)...........................................................................4, 14, 16

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*,
    2001 WL 699850 (S.D. Ind. 2001) ..............................................................................4, 13

*Ciba-Geigy Corp. v. Sandoz Ltd.*,
    916 F. Supp. 404 (D.N.J. 1995) ......................................................................................17

*Helman v. Murry's Steaks, Inc.*,
    728 F. Supp. 1099 (D. Del. 1990)........................................................................4, 14, 16

*In re Hechinger Inv. Co. of Delaware*,
    303 B.R. 18 (D. Del. 2003).............................................................................................16

*Myers v. City of Highland Village*,
    212 F.R.D. 324 (E.D. Tex. 2003).............................................................................15, 18

*Novartis Pharm. Corp. v. Abbott Labs.*,
    203 F.R.D. 159 (D. Del. 2001) .......................................................................................16

*Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*,
    1997 WL 736726 (S.D.N.Y. 1997) ...............................................................................13

*U.S. ex rel. Bagley v. TRW, Inc.*,
    204 F.R.D. 170 (C.D. Cal. 2001)..........................................................................15, 17, 18

*Rainer v. Union Carbide Corp.*,
    402 F.3d 608 (6th Cir. 2005) .........................................................................................13

*Victor Stanley, Inc. v. Creative Pipe, Inc.*,
    2008 U.S. Dist. LEXIS 42025 (D. Md. 2008) ...............................................................18

## I.     NATURE AND STAGE OF THE PROCEEDINGS

In this action for relief from patent infringement, fact discovery closed on June 5, 2008, except for a limited number of depositions that were scheduled for after that date by agreement of the parties.  (Court's 5/16/08 Order, D.I. 130).  Briefing on claim construction has begun, and is set to conclude on July 2.  Initial expert reports are due on July 25, 2008.  (*Id.*). Trial is set for November 10, 2008.  (D.I. 23).

On June 12, 2008, defendants ("Par") moved the Court to:

  i.     extend the case schedule with respect to fact discovery and deadlines for expert reports;

 ii.     compel plaintiffs Purdue Pharma Products L.P. ("Purdue") and Napp Pharmaceutical Group Ltd. ("Napp") to produce allegedly withheld documents on Napp's experimental testing based on the "Merck" reference; and

iii.     find that any privilege has been waived with respect to a small fraction of Purdue and Napp's production, documents that were inadvertently and unintentionally produced in discovery and properly withdrawn pursuant to the Stipulated Protective Order.  (D.I. 41).

In response to Par's request for expedited consideration of the scheduling issues, the Court, after further briefing by the parties, granted in part and denied in part Par's request to extend dates.  (Par's 6/12/08 e-mail to Court, Court's 6/13/08 e-mail to parties, D.I. 156). Purdue and Napp submit this brief and the accompanying Declaration of Sona De in opposition to the remaining portions of Par's motion.

## II.     SUMMARY OF ARGUMENT

1.     **Documents relating to tests of the "Merck" reference:**  All reports of the experiments relating to the Merck reference were submitted to the U.S. Patent and Trademark Office ("PTO") during the prosecution of the patents in suit, including those submitted in European proceedings by Napp and those submitted by opponents of the European Napp patent

applications and patents.  All reports relating to the Merck experiments submitted during foreign litigation proceedings by Napp and its opponent were also submitted to the PTO.  The submitted reports specifically discussed the results of Napp's later tests that were "inconsistent" with the results of Napp's earlier tests.  These documents were produced to Par with the file histories and U.S. patent prosecution files of the patents in suit.  In March 2008, Par moved to compel the production of foreign proceeding documents from the files of Napp and its foreign patent counsel.  The Court denied that motion.  (D.I. 126).

Par's current motion is moot because Napp has produced all internal Napp documents requested by Par related to its experiments based on the Merck reference, except for sixteen additional documents that are being produced today.  *See infra* pp. 5-7.

2.  **Par's motion for a finding of waiver should be denied.**  The inadvertent production and subsequent recall, mostly for redaction, of a small fraction of Purdue and Napp's documents does not constitute a waiver of the attorney-client privilege or work product immunity for those documents or even portions of those documents.  The plain language of the agreed-upon Protective Order in this action and the controlling authorities in this Court support Purdue and Napp's position, not Par's.

2.1  Recognizing the need to collect and produce a significant volume of both paper and electronic documents expeditiously, Par and the Plaintiffs agreed to a Protective Order that permitted the recall of documents that, on further review, were subject to a claim of attorney-client privilege or work product immunity.  Paragraph 10(a) of the Stipulated Protective Order, entered by this Court on January 25, 2008, states:

> **Furnishing of documents** (including physical objects) **to the receiving party**; using documents in depositions, pleadings or any written discovery; or disclosing documents to the Court **shall not constitute a waiver** of the attorney-client privilege or work product immunity with respect to any document or

2

physical object so furnished, **if within ten (10) calendar days after learning of the inadvertent and/or unintentional production, the producing party designates any such documents as within either the attorney-client privilege or work product immunity and requests return of any such documents to the producing party.**  (Par Br., Colletti Ex. GG) (emphasis added).

2.2     Purdue and Napp also put in place reasonable procedures for reviewing documents for privilege prior to production within the time limits ordered by the Court.  Purdue and Napp collected over 5.2 million pages in both paper and electronic files.  (*See infra* pp. 8-9; De Decl. at ¶ 18).  A team of about fifty outside lawyers under the supervision of Purdue's in-house litigation counsel and its outside counsel of record, Ropes & Gray, reviewed these 5.2 million pages for privilege and production.  (*Id.* at ¶ 19).  To assist in the identification of potentially privileged documents, word searches were run on the electronic documents for names of attorneys and other indicators of privileged information.  (*Id.* at ¶ 20).  While this tool was not available for the paper files, reviewers still used the same search terms to identify and segregate potentially privileged documents manually.  (*Id.* at ¶ 21).  Purdue and Napp had approximately three months to complete this massive review.  (*Id.* at ¶ 18).  Purdue and Napp's review resulted in the production of more than 2.3 million pages to Par and identification of about 15,000 documents on its privilege log.  (*Id.* at ¶¶ 22-23).

2.3     Notwithstanding this careful review procedure, about 1,000 privileged documents (*i.e.*, less than 0.3% of Purdue and Napp's 2.3 million page production) were inadvertently produced.  (De Decl. at ¶ 27).  The majority of these were multiple page documents that contained a few lines or paragraphs of privileged information buried within the document.  (*Id.*).  Once Purdue and Napp learned these documents were inadvertently produced, they asked for the documents back pursuant to the Protective Order and reproduced the documents to Par after redacting the privileged information.  (*Id.* at ¶¶ 26-27).  The redactions in several cases were of information not relevant to this litigation.  (*Id.* at ¶ 27).

3

2.4    Counsel for Purdue and Napp identified the documents that needed to be recalled during the course of reviewing documents in preparation for individual depositions. (De Decl. at ¶¶ 24-25). As these documents were identified, counsel promptly notified Par of the inadvertent production as required by the Protective Order. (*Id.*). For many of these documents, Purdue and Napp reproduced the document with the privileged information redacted and allowed Par to proceed with deposition questions on any non-privileged portions of those documents. (De Decl. at ¶ 29).

2.5    In litigations such as this, involving a large number of documents, privileged documents are sometimes inadvertently produced despite the best of efforts of the producing parties. That reality is reflected in the Protective Order in this action, which protects against waiver and allows a party to recall inadvertently produced documents. *See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 2001 WL 699850, *2 (S.D. Ind. 2001). That reality is also reflected in the standard used by this Court to determine whether an inadvertent production results in a waiver of privilege. This Court does not find waiver unless the production of privileged documents was so reckless that it is deemed to have been an intentional disclosure. *See Berg Electronics, Inc. v. Molex, Inc.*, 875 F. Supp. 261 (D. Del. 1995); *Helman v. Murry's Steaks, Inc.*, 728 F. Supp. 1099 (D. Del. 1990). That is simply not the case here. Purdue and Napp had no intent to waive privilege. Such intent is not present where, as here, attorneys themselves reviewed documents and implemented procedures to segregate privileged documents from non-privileged documents. *See infra* pp. 14-15.

2.6    Par disregards the Protective Order and the controlling authorities applied by this Court in favor of a "balancing" test used in other jurisdictions. (Par Br. at 12). But even if this balancing test were applied, and it should not, there cannot be a waiver here. Par

argues that upon learning of the first inadvertently produced documents, Purdue and Napp should then have re-reviewed their entire 2.3 million page production. Under the time deadlines of this action, this would not have been practicable; it would have brought discovery to a halt for weeks, if not months. (De Decl. at ¶ 28). Such a step is not required by either the Protective Order or the controlling authorities in this Court. *See infra* pp. 13, 18.

### III.    STATEMENT OF FACTS

#### A.    Documents Relating To Testing in Europe Of The Merck Reference

##### 1.    The Malkowska Declarations And Those Of Napp's Adversaries In European Patent Office Proceedings Were Submitted To The United States PTO And Were Produced Early In Discovery

During the prosecution of the European counterparts of the patents in suit, companies opposing the grant of these patents commenced inter partes proceedings in various forums. During these proceedings, declarations were submitted on behalf of Napp by one of the inventors, Ms. Malkowska, and by others on behalf of Napp's adversaries. The documents submitted by the adverse parties criticized Ms. Malkowska's tests based on the Merck reference. After the European counterpart patent was granted, it was litigated in the *Napp v. Asta* litigation. During the litigation proceedings, both Napp and Asta conducted tests based on the Merck reference and submitted reports relating to those tests.

During the prosecution of the patents in suit in this action, which are based on Napp's European patent applications, all of the evidence submitted in foreign proceedings by Napp and its adversaries was submitted to the PTO.[1] These documents were produced early in discovery.

---

[1]    Par argues that, during the prosecution of the patents in suit, Napp and its counsel mischaracterized the European experiments to the PTO. (Par Br. at 7). Par's arguments, which are for trial, not for this motion, are without merit. The pertinent facts were placed before the PTO.

In March 2008, Par moved to compel Napp to search the files of its internal law department and foreign outside counsel and to produce any documents relating to these tests. On May 9, 2008, the Court denied Par's motion. (D.I. 126).

**2.    Napp Produced The Majority Of Documents Relating To Its Merck Testing From Its Own Files Before Par's Instant Motion**

At issue on this motion are the internal technical documents at Napp relating to Napp's experiments on the Merck reference. On April 27, Par wrote to Napp requesting that it produce pages of laboratory notebooks relating to the Merck experimental work that were previously redacted. (De Decl., Ex. A). On May 9, Napp responded that although Napp disagreed with Par's characterization that there was a blanket waiver, Napp would produce the lab notebooks in unredacted form to "resolve this issue." (*Id.*, Ex. B). Napp further stated that it would continue "to investigate whether there are any additional documents that formed the basis for Ms. Malkowska's declarations." (*Id.*)

Accordingly, Napp unredacted pages of several Napp formulation lab notebooks identified by Par. (De Decl., Ex. C). Further, Napp reviewed its privilege logs for documents relating to Napp's experiments based on the Merck reference. (De Decl. at ¶ 13). Based on that review, on May 23, Napp produced several additional documents related to the Merck testing "conducted by Napp in connection with foreign patent office proceedings or foreign patent litigation" that it had previously withheld. (De Decl., Ex. D). Specifically, the produced documents included raw test data, e-mails, memoranda, and file notes. (De Decl. at ¶ 7).

**3.    The Remaining Documents, From The Files Of Napp And It's Outside U.S. Patent Prosecution Counsel, Some Of Which Are Duplicative Of Documents Already Produced, Are Being Produced Today**

On June 2, after Napp produced additional documents related to the Merck tests from its own files, Par asked Napp for the first time whether any documents "relating to the

6

Malkowska declarations or *Napp v. Asta* repeat experiment" were withheld from the documents produced by Napp's outside U.S. patent prosecution counsel ("the Davidson firm") and, if so, whether those documents too would be produced. (Decl., Ex. E).

Further, on June 4 and June 10, Par asked Napp to produce specific documents identified during the depositions of Napp witnesses. (De Decl., Exs. F-G)

Par's request for Davidson documents and specific Napp documents came while counsel for both parties were overseas in London for depositions of Napp's witnesses. (De Decl. at ¶ 14). The week of June 9, upon returning to the United States, Napp's counsel initiated the task of evaluating whether any Merck testing documents were withheld from the Davidson production and to locate the specific Napp documents requested by Par. (*Id.*). Before Napp could respond to Par's June 2, June 4, and June 10 e-mails, and without any further correspondence, Par filed the instant motion.

Napp's review of the Davidson privilege log revealed that there were some documents relating to Napp's experiments based on the Merck reference that were initially withheld. [2] (De Decl. at ¶ 15). Some of these documents were duplicates of documents that Napp had previously produced to Par. Napp also located some of the specific documents requested by Par. These remaining documents are being produced today. (*Id.*).

## B.    Privileged Documents Properly Withdrawn From Production Under The Protective Order

Document discovery in this action has been complex. In addition to the breadth of Par's discovery requests, responding to these requests involved document searches and

---

[2]    Napp has reviewed all privilege logs – whether of Purdue, Napp, Mundipharma, or Davidson – to search for documents relating to Merck testing conducted by Napp in connection with European patent office proceedings or *Napp v. Asta* litigation that were withheld from production. (De Decl. at ¶ 16).

collections in three countries: the United States, where Purdue is headquartered; England, where Napp is headquartered; and in Germany, at Mundipharma GmbH ("Mundipharma"), an associated company at which work was conducted leading to the patents in suit. In addition, Par served a subpoena on the Davidson law firm, which prosecuted the patents in suit. Ropes & Gray, counsel for Purdue and Napp, collected and produced documents from the Davidson firm as well.[3] (De Decl. at ¶ 12).

1.    **To Facilitate Discovery, The Parties Agreed To A Protective Order Including A Broad Provision For Recalling Discovery Materials That, Upon Further Review, Should Have Been Withheld**

At the September 6, 2007 scheduling conference in this action, after considering the complexity of the task facing Purdue and Napp, the Court ordered the plaintiffs to complete document discovery by January 4, 2008. (D.I. 23; De Decl., Ex. H at pp. 3-4, 15).

Recognizing the need to proceed on an expedited basis, the parties entered into a Stipulated Protective Order governing various issues related to document production, which the Court entered on January 25, 2008. Paragraph 10(a) of the Protective Order, quoted *supra* pp. 2-3, provides that the parties will not waive attorney-client privilege or work-product immunity with respect to any documents that were inadvertently or unintentionally produced if the producing party requests their return within ten days of learning of the inadvertent or unintentional production.

---

[3]    Ortho McNeill and Biovail are represented by other law firms, which collected and produced documents from those parties. (De Decl. at ¶ 12). Those document productions are not at issue on this motion.

2.      **Purdue And Napp Collected and Reviewed Approximately 5.2 Million Pages Of Documents, Of Which Approximately 2.3 Million Pages Were Produced**

The development of the inventions claimed in the patents in suit occurred in the U.K. at Napp, and in Germany at Mundipharma in the early to mid-1990s. (De Decl. at ¶ 17). This meant that most of Purdue and Napp's documents resided outside the U.S. and had to be retrieved from archived storage files. (*Id.*). Documents existed in both paper and electronic files. (*Id.*). Because of the association among Purdue, Napp, and Mundipharma, development documents existed in the files of all three companies.

The foreign documents were copied and scanned by outside vendors in the U.K. and Germany, after which Purdue and Napp were able to access them in the U.S. (De Decl. at ¶ 17). Purdue and Napp then used an outside vendor in the U.S. to process the documents and load them to databases for online review. (*Id.*). Purdue and Napp collected approximately 5.2 million pages. (*Id.* at ¶ 18). About 70% of these were electronic documents. (*Id.*). Given the size of the document collection and the tight time frame, Purdue and Napp hired a team of about fifty outside contract attorneys to help review the documents. (*Id.* at ¶ 19).

This team was trained by Purdue's in-house litigation counsel as well as Ropes & Gray attorneys in terms of how to identify responsive documents and further identify which of those documents were privileged. (De Decl. at ¶ 19). Purdue's in-house counsel and Ropes & Gray attorneys also supervised the document review team on an on-going basis. (*Id.*).

The documents continued to be maintained in six different databases reflecting how they were collected (paper documents and electronic files from each of the three associated companies). (De Decl. at ¶ 18). The document review team reviewed the collected documents which constituted approximately 5.2 million pages. (*Id.* at ¶ 23). Based on that review, over 2.3 million pages were identified as responsive for production. (*Id.*). Ropes & Gray attorneys

further "spot-checked" (i.e., reviewed some but not all) the documents identified for production before they were produced to Par.  (*Id.*).

> ### (a)    Purdue and Napp properly reviewed the documents for privilege prior to production

As part of the document review process, in addition to having the document reviewers check each document for privilege, Purdue and Napp took steps to identify and segregate potentially privileged documents to assist the review process.  (De Decl. at ¶ 20). Purdue and Napp created a list of over 200 search terms for this purpose.  (*Id.*).  The list included names of attorneys and law firms, including domain names, who were involved with providing legal services to Purdue, Napp, and Mundipharma, including legal services relating to the patents in suit and their foreign counterparts.  (*Id.*).  The list also included words commonly indicting privilege, such as, "privilege," "confidential," "work product," etc.  (*Id.*).  The list was generated based on a standard pre-tested list used by Purdue in other litigations and then tailored to this case with the help of Purdue's in-house counsel and Ropes & Gray attorneys.  (*Id.*).  All reviewers were given a copy of this list.

Before the reviewers began their review, advanced searches (including Boolean operators) for the various search terms were run on the electronic documents in order to segregate any privileged documents.  (De Decl. at ¶ 20).

After the electronic searches were run at the outset of review, the reviewers again used the search terms to confirm that privileged documents were identified.  (De Decl. at ¶ 21). For paper documents that were not text-searchable, reviewers used the same criteria to identify privileged documents manually.  (*Id.*).  The search terms were used as a helpful tool to assist in identifying privileged documents for further review, but not as a substitute for attorney review. (*Id.*).

Once potentially privileged documents were identified, they were transferred to separate folders for further review. (De Decl. at ¶ 22). There were approximately 90,000 documents so identified as potentially privileged. (*Id*.). The reviewers went through these documents to further identify which of those documents were responsive. The responsive potentially privileged documents were then re-reviewed by Ropes & Gray attorneys and/or the document review team. (*Id*.). The resulting more than 15,000 privileged, responsive documents were then described on Purdue and Napp's privilege logs.[4] (*Id*.).

### 3. Purdue And Napp Recalled The Privileged Documents Immediately Upon Learning Of Their Production

After Purdue and Napp completed their document production to Par in January 2008, the parties began preparing for depositions. As part of that preparation, Purdue and Napp began reviewing the documents from the Davidson firm in February. (De Decl. at ¶ 24). During this review in the week of February 11, Purdue and Napp realized that about thirty privileged documents from the Davidson firm were inadvertently produced. (*Id*.). Purdue and Napp immediately wrote to Par requesting their return pursuant to paragraph 10 of the Protective Order. (De Decl. at ¶ 24; *see* Par Br., Colletti Exs. O, P).

After completing their review of the Davidson production, in April and May, Purdue and Napp turned to reviewing name sets in their own production in preparation for depositions of their witnesses. (De Decl. at ¶ 25). During this review, Purdue and Napp discovered that additional documents, properly subject to claims of privilege, were inadvertently produced. (*Id*.). Accordingly, as provided for in the Protective Order, Purdue and Napp, within that ten day period, requested the return of any inadvertently produced documents for each

---

[4]    This is in addition to about 1800 documents withheld from the Davidson production of 15,000 pages. (De Decl. at ¶ 23).

witness, often before the day of the witness' deposition.  (De Decl. at ¶ 26).  Further, Purdue and Napp promptly searched for any duplicates of the discovered documents in its production and recalled them as well.  (*Id.*).

Purdue and Napp invoked the procedure of paragraph 10(a) of the Protective Order for about 1000 documents (approximately 65,000 pages), which represents less than 0.3% of the 2.3 million pages produced by Purdue and Napp.  (De Decl. at ¶ 27).  Of these approximately 1000 documents, about 100 were duplicates, and approximately 600 were then reproduced with the inadvertently produced information redacted.  (*Id.*).  Several of the redactions related to information other than tramadol, which is the drug at issue in this litigation. (*Id.*).  In April, Par asked Purdue and Napp to explain "how [they] learn[ed] of the inadvertently produced documents."  (Par Br., Colletti Decl, Ex. HH).  Purdue and Napp specifically noted the extensive production they made and explained that they had learned of these produced documents as they were "reviewing documents for depositions."  (Par Br., Colletti Decl, Ex. JJ).

### (a)    The documents recalled are protected by attorney-client privilege and/or work product immunity

Some of the documents that Purdue and Napp recalled pursuant to the Protective Order are protected not just by the attorney-client privilege but also the work product immunity. Purdue and Napp initially indicated this to Par in the letters requesting back the documents.  (*See e.g.*, Par Br., Colletti Ex. P).  Thereafter, when Purdue and Napp provided a supplemental privilege log describing the recalled documents, they identified the specific protections for each document.  Approximately fifty of the recalled documents are protected by work product immunity.  (De Decl. at ¶ 27).

## IV.    ARGUMENT

### A.    Par's Motion To Compel Production Of Merck Testing Documents Is Moot

As discussed *supra* pp. 6-7, the documents that Par seeks by this motion were produced before the motion was filed, except for sixteen additional documents that are being produced today.  Par has tried to create a mountain out of a molehill.  Par's motion, which was unnecessary in the first place, is moot.

### B.    There Has Been No Waiver

#### 1.    The Stipulated Protective Order Defeats Par's Claim

Paragraph 10(a) of the Stipulated Protective Order expressly protects against any waiver based on inadvertent and/or unintentional disclosures provided the producing party recalls the documents within ten days of discovering the inadvertent production.  Where parties have agreed to such a protective order, courts have deferred to that protective order in determining whether privilege was waived:

> ***If not for the terms of the protective order, plaintiffs' inadvertent production*** of privileged documents to defendants ***would amount to a waiver*** of the privilege ... Defendants have not shown any persuasive reason for not enforcing the clear terms of the agreed protective order.  The ***protective order was the product of negotiations among able counsel who deliberately chose to modify the otherwise applicable law*** concerning inadvertent disclosure of privileged documents.

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 2001 WL 699850, *2 (S.D. Ind. 2001) (emphasis added) (no waiver even though party failed to review documents for privilege prior to production).  *See also Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.*, 1997 WL 736726, at *4 (S.D.N.Y.); *Rainer v. Union Carbide Corp.*, 402 F.3d 608, 625 (6th Cir. 2005).

Par contends that, once the first inadvertently produced documents were identified, Purdue and Napp should have immediately re-reviewed the 2.3 million pages of produced documents to see whether any others need to be recalled.  (Par Br. at 8, 15).  This

argument not only ignores the Protective Order, which includes no such requirement, but is also an impracticable proposal. It would have required Purdue and Napp's outside trial counsel (not the contract attorneys who did the initial review) to manually review each of the 2.3 million produced pages. This would have stopped all other work on this lawsuit for weeks, if not months. (De Decl. at ¶ 28). Under the circumstances, it was completely reasonable for Purdue and Napp's counsel to do what they did: continue to prepare for depositions and identify the documents for which there was an issue at or before each deposition, consistent with the terms of the Protective Order.

Par's complaint that this interfered with Par's preparation for those same depositions is unsound. (Par Br. at 14). Paragraph 10(a) would have allowed Purdue or Napp to recall inadvertently or unintentionally produced documents during depositions themselves. As drafted, the Protective Order provided that the protection of privileged documents would outweigh any resulting inconvenience to the receiving party at a deposition. In any event, Purdue and Napp allowed Par to proceed with deposition questions directed to non-privileged portions of any such documents, and Par does not contend otherwise. (De Decl. at ¶ 29).

The parties agreed to the recall provision of paragraph 10(a) of the Protective Order to protect privileged and work product information in precisely situations such as this. Purdue and Napp have followed the procedure set forth in the Order, *supra* pp. 2-3. The Court should deny Par's motion for this reason alone.

### 2. The Controlling Authorities In This District Support Purdue And Napp's Position, Not Par's

#### (a) Delaware follows the "strict" standard which requires gross negligence to waive privilege based on inadvertent production

Courts have followed one of three different approaches in deciding whether an inadvertent production of privileged documents waives the privilege – "always waiver" standard,

14

"balancing" standard, and "strict/intent" standard.  The strict/intent standard is the most difficult test to find waiver.  Although the Delaware Court has considered all three approaches, it has rejected the first two approaches in favor of the strict/intent standard to determine whether an inadvertent production should waive privilege.  *See Berg Electronics, Inc. v. Molex, Inc.*, 875 F. Supp. 261, 263 (D. Del. 1995) (after discussing all three standards, "the court finds the rule of law established by these cases that look to intent best serves the interests of the attorney-client privilege . . .").

The strict/intent standard recognizes that the client holds the privilege, not the attorney.  Under this standard, the test used is "whether the disclosure was unintentional but was ***so negligent or reckless*** that the court should deem it intentional."  *Berg Electronics, Inc.*, 875 F. Supp. at 263 (emphasis added) (finding no waiver when documents clearly marked as privileged got produced); *see also Helman v. Murry's Steaks, Inc.*, 728 F. Supp. 1099, 1104 (D. Del. 1990) ("counsel can hardly be deemed to have acted 'with more than negligence'" when he took all precautions reasonably expected).

> **(b)    The "balancing" standard that Par points to for finding an inadvertent waiver is followed by other jurisdictions**

The "balancing" standard that Par relies on is neither followed by the Delaware Court nor the Third Circuit.  This standard, used in other courts, considers the circumstances surrounding the disclosure and balances five factors:  (1) reasonableness of precautions taken to prevent disclosure, (2) time taken to remedy the error, *i.e.*, time taken to restore the confidentiality of the disclosed documents, (3) scope of discovery, *i.e.*, the total document production, (4) extent of disclosure, *i.e.*, "ratio of privileged documents produced to all documents produced," and (5) fairness considerations.  *See Myers v. City of Highland Village*, 212 F.R.D. 324, 327-28 (E.D. Tex. 2003).

          **(c)**       **Reasonable precautions, large scale productions, and tight time constraints argue against finding a waiver even under the "balancing" standard**

Even assuming that Par is correct in using the balancing standard to determine waiver, and it is not, courts have refused to find a waiver where parties have taken reasonable precautions to prevent disclosure of privileged information given the extent of production and the time frame for making that production,. *See, e.g.*, *U.S. ex rel. Bagley v. TRW, Inc.*, 204 F.R.D. 170, 179 (C.D. Cal. 2001) (finding that an initial review of documents by non-lawyers followed by a review by lawyers is reasonable given the large production of over 200,000 pages); *Myers*, 212 F.R.D. at 327-28 (no waiver where party promptly recalled the privileged document upon becoming aware of it even though opposing counsel relied on it during deposition).

          **(d)**       **Inadvertent production does not waive work product if the disclosure is immediately remedied**

In asserting that the production of the approximately 1000 documents has resulted in a waiver, Par also ignores the distinction between the protection afforded by attorney-client privilege and the work product immunity. The attorney-client privilege and the work product doctrine are subject to different analyses when considering the propriety of finding a waiver. *See In re Hechinger Inv. Co. of Delaware*, 303 B.R. 18, 23 (D. Del. 2003). To determine whether work product immunity is waived based on an inadvertent production, the court should consider the "steps taken by a party to remedy the disclosure and any delay in doing so." *Novartis Pharm. Corp. v. Abbott Labs.*, 203 F.R.D. 159, 165 (D. Del. 2001) (no waiver of work product since party immediately demanded return of the disclosed document during a deposition).

### 3.     Par's Motion For Finding Waiver Should Be Denied Because, Under The Circumstances, Purdue And Napp Acted Reasonably

This Court follows the strict/intent standard that requires gross negligence in order to find waiver. There is no dispute that the approximately 1000 documents were produced unintentionally. Purdue and Napp took multiple steps to identify and segregate privileged documents, but some privileged information was inadvertently produced despite these efforts. Purdue and Napp's conduct is far from being negligent, let alone grossly negligent. *See Berg Electronics, Inc. supra*; *Helman supra*. Indeed, Par does not even address inadvertent production under the strict/intent standard of this Court.

Instead, Par turns to the balancing standard of other courts. But even assuming that the balancing standard applies, and it should not, all five factors militate against finding a waiver.

Purdue and Napp took reasonable precautions. Par assumes Purdue and Napp "did not take reasonable precautions" because according to Par, Purdue and Napp did not respond to Par's "requests for an explanation concerning the measures taken to prevent 'inadvertent' disclosure" and produced privileged documents "several times." (Par Br. at 13). That is incorrect. First, Par's requests only asked for an explanation of how Purdue and Napp "learned" of the inadvertent disclosure, *not* what measures were taken to "prevent" such disclosure. (*Id.*). Second, by concluding that the precautions were not reasonable simply because privileged documents were produced, Par puts the cart before the horse. Courts have cautioned against doing so:

> Carelessness should not be inferred merely because an inadvertent production of privileged documents occurred. The reasonableness of the precautions adopted by the producing party must be viewed principally from the **standpoint of customary practice** in the legal profession at the time and in the location of the production, **not with 20-20 vision of hindsight.**

17

*U.S. ex rel. Bagley*, 204 F.R.D. at 179-80 (emphasis added). Indeed, Purdue and Napp put in place several steps to ensure that privileged documents were segregated from non-privileged documents, as discussed *supra* pp. 9-10.

Par's own authority makes plain that these elaborate steps undertaken by Purdue and Napp to review documents prior to production are more than reasonable. *See Bensel v. Airline Pilots Association*, 248 F.R.D. 177, at *8 (D.N.J. 2008) (finding the reasonable precautions factor weighs against the party producing privileged documents because it was unclear if any attorneys had reviewed the documents or generated an attorney-list to identify privileged documents); *Ciba-Geigy Corp. v. Sandoz Ltd.*, 916 F. Supp. 404, 412 (D.N.J. 1995) (precautions taken not reasonable where producing party failed to review any documents prior to production).

<u>Purdue and Napp immediately withdrew the documents upon learning of the disclosure</u>. In addition to taking adequate precautions to prevent disclosure of privileged information, Purdue and Napp took immediate action to restore the confidentiality of the disclosed documents upon learning of the inadvertent production. Par's complaint that Purdue and Napp failed to re-review their entire production immediately after learning of the inadvertent disclosures misinterprets the "delay" factor. The pertinent delay is delay in rectifying the confidentiality of the inadvertently *disclosed* document, not delay in detecting any additional such disclosures. *See Myers supra* p. 15.[5] In all instances, Purdue and Napp requested the return

---

[5]     *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 2008 U.S. Dist. LEXIS 42025, at *29 (D. Md. 2008), which Par relies on, is inapposite. The court there found a one week delay significant because the receiving party, *not* the producing party, discovered the inadvertent production. Moreover, there was no protective order in place. *See also Bensel*, 248 F.R.D. at 180-81 (delay factor neutral where party waited more than a year to restore confidentiality of the disclosed document).

of privileged documents within ten days of learning of the disclosure, as required under the Protective Order.  This factor hence favors against finding a waiver.[6]

The inadvertent disclosure totaled less than one half of one percent of the more than 2.3 million pages produced.  The scope of Purdue and Napp's document discovery was massive by any standard.  Purdue and Napp reviewed about 5.2 million pages of documents and ended up producing over 2.3 million pages.  In this context, production of 1000 privileged documents totaling about 65,000 pages, i.e., less than 0.3%, is negligible.  *See U.S. ex rel. Bagley*, 204 F.R.D. at 181 (200-300 documents out of 200,000 is small).  This is especially so given that most of the privileged information was buried in a few paragraphs or sentences inside the documents which Purdue and Napp redacted, leaving the majority of the document available for Par's use.  *See supra* pp. 3-4.

Fairness.  Finally, fairness considerations do not favor Par simply because Par "reviewed the [privileged] information in preparation for the depositions" but was unable to use it.  (Par Br. at 14).  *See Myers*, 212 F.R.D. at 328 ("the potential value of the inadvertently produced document to the receiving party is not dispositive . . . although the harm the City has suffered due to its inadvertent disclosure cannot be undone, that is not an adequate reason why the Court should refrain from doing what it can to limit its use.").  Par's complaint that the documents in question were called back in batches is unfounded.  Purdue and Napp were required by the Protective Order to notify Par as they became aware of inadvertently produced documents instead of waiting until all inadvertently produced documents were identified.  Nor was Par prejudiced given that Purdue and Napp allowed Par to proceed with questions on any

---

[6]    This is especially so for the approximately 50 documents protected by work product immunity.  *See supra* p. 16.

non-privileged portions of documents at the depositions. Thus, the remaining factors in the balancing test also militate against finding a waiver.

## V.    <u>CONCLUSION</u>

Napp has produced all documents relating to its Merck testing and therefore there is nothing further to compel. Purdue and Napp's inadvertent production of 1000 privileged documents out of 2.3 million pages does not result in any waiver. Purdue and Napp acted in accordance with the Protective Order to preserve privilege for inadvertent production. Purdue and Napp were neither grossly negligent nor unreasonable in ensuring against such disclosures.

Par's motion should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

———————————————————————
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
rsmith@mnat.com

*Attorneys for Plaintiffs*
  *Purdue Pharma Products L.P.*
  *and Napp Pharmaceutical Group Ltd.*

OF COUNSEL:
Robert J. Goldman
ROPES & GRAY LLP
525 University Avenue
Suite 300
Palo Alto, CA 94301
(650) 617-4000

Sona De
Richard A. Inz
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Dated: June 30, 2008
2389690

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2008, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to:

> Frederick L. Cottrell, III, Esquire
> Steven J. Fineman, Esquire
> RICHARDS, LAYTON & FINGER, P.A.
>
> Richard D. Kirk, Esquire
> BAYARD, P.A.
>
> Mary W. Bourke, Esquire
> CONNOLLY BOVE LODGE & HUTZ LLP

I further certify that I caused to be served copies of the foregoing document on June 30, 2008, upon the following in the manner indicated:

Frederick L. Cottrell, III, Esquire                    *VIA ELECTRONIC MAIL*
Steven J. Fineman, Esquire
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Wilmington, DE  19801

Edgar H. Haug, Esquire                    *VIA ELECTRONIC MAIL*
Robert E. Colletti, Esquire
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY  10151

Richard D. Kirk, Esquire                    *VIA ELECTRONIC MAIL*
BAYARD, P.A.
222 Delaware Avenue
Suite 900
Wilmington, DE  19801

Mary W. Bourke, Esquire                    *VIA ELECTRONIC MAIL*
CONNOLLY BOVE LODGE & HUTZ LLP
The Nemours Building
1007 North Orange Street
Wilmington, DE  19801

*/s/ Rodger D. Smith II*
_____
Rodger D. Smith II (#3778)