IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PURDUE PHARMA PRODUCTS L.P., NAPP PHARMACEUTICAL GROUP LTD., BIOVAIL LABORATORIES INTERNATIONAL, SRL, and ORTHO-MCNEIL, INC., <br><br> Plaintiffs/Counterclaim-defendants, <br><br> v. <br><br> PAR PHARMACEUTICAL, INC. and PAR PHARMACEUTICAL COMPANIES, INC., <br><br> Defendants/Counterclaim-plaintiffs. | C.A. No. 07-255-JJF <br> (CONSOLIDATED) |

## CORRECTED DECLARATION OF SONA DE IN SUPPORT OF PURDUE'S AND NAPP'S OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF CERTAIN DISCOVERY AND AMEND SCHEDULING ORDER

I, Sona De, declare as follows:

1) I am a partner at the firm of Ropes & Gray LLP. I am resident in Ropes & Gray's New York office, located at 1211 Avenue of Americas, New York, NY 10036. My firm and I are of counsel in this action to plaintiffs Purdue Pharma Products, L.P. ("Purdue") and Napp Pharmaceuticals Group, Ltd. ("Napp"). I am a member of the bar of the State of New York and the State of California, and am admitted to the bar of this Court pro hac vice.

2) I make the following declaration in support of Purdue's and Napp's Opposition to Defendants' Motion to Compel Production of Certain Discovery and Amend Scheduling Order.

1

3) I make this declaration on information and belief, based on factual investigations that were performed in the preparation of Purdue's and Napp's opposition to defendants' ("Par's") motion.

4) Attached as Exhibit A is a true and correct copy of a April 27, 2008 e-mail from Robert Colletti, counsel for Par, to my colleague, Padmaja Chinta.

5) Attached as Exhibit B is a true and correct copy of a May 9, 2008 e-mail from Ms. Chinta to Mr. Colletti.

6) Attached as Exhibit C is a true and correct copy of a May 9, 2008 letter from Ms. Chinta to Mr. Colletti.

7) Attached as Exhibit D is a true and correct copy of a May 23, 2008 letter from my colleague, Thomas Wang, to Mr. Colletti. I understand that the production enclosed with this letter included Napp's raw test results based on the "Merck" reference, as well as memoranda, file notes, and e-mails regarding the tests based on the "Merck" reference.

8) Attached as Exhibit E is a true and correct copy of a June 2, 2008 e-mail from Mr. Colletti to Ms. Chinta.

9) Attached as Exhibit F is a true and correct copy of a June 4, 2008 e-mail from Mr. Colletti to Ms. Chinta.

10) Attached as Exhibit G is a true and correct copy of a June 10, 2008 e-mail from Angus Chen, counsel for Par, to Mr. Wang.

11) Attached as Exhibit H are true and correct copies of selected pages from the transcript of the September 6, 2007 Scheduling Conference in this case.

12) Document collection in this case involved three countries: the United States, where Purdue is headquartered; England, where Napp is headquartered; and in Germany,

at Mundipharma GmbH ("Mundipharma"), an associated company of Purdue. In addition, Ropes & Gray, counsel for Purdue and Napp, collected and produced documents from the Davidson, Davidson, and Kappel, LLC ("Davidson") law firm, which prosecuted the patents in suit. Plaintiffs Ortho McNeill and Biovail are represented by other law firms that, upon information and belief, collected and produced documents from those parties.

13) In response to Par's request to unredact certain pages of Napp's production that related to Napp's experiments based on the Merck reference, as reflected in Exhibit A, Napp reviewed its privilege logs in May 2008. Based on that review, Napp produced additional documents to Par on May 23, 2008, as described in paragraph 7.

14) During the first week of June 2008, Par asked Napp to produce any documents relating to Napp's Merck experiments from the Davidson privilege log as well as specific Napp documents identified during the depositions of Napp witnesses, as reflected in Exhibits E and F. When Par made this request, counsel for both parties were overseas in London for depositions of Napp's witnesses. The week of June 9, upon returning to the United States, Napp's counsel initiated the task of evaluating whether any Merck testing documents were withheld from the Davidson production and to locate the specific Napp documents requested by Par.

15) Accordingly, Napp reviewed the Davidson privilege log, which revealed that there were some documents relating to Napp's experiments based on the Merck reference that were initially withheld. Some of these documents were duplicates of documents that Napp had previously produced to Par. Napp also located some of the specific documents requested by Par. These documents will be produced to Par today.

16) Napp has reviewed all privilege logs – whether of Purdue, Napp, Mundipharma, or Davidson – to search for documents relating to Merck testing conducted by Napp in connection with European patent office proceedings or *Napp v. Asta* litigation that were withheld from production.

17) I am informed and believe that the development of the inventions claimed in the patents in suit occurred at Napp and Mundipharma in the early to mid-1990s. This meant that most of Purdue and Napp's documents resided outside the U.S. and had to be retrieved from archived storage files. Documents existed in both paper and electronic files. These documents were copied and scanned by an outside vendor and made available to Purdue and Napp in the U.S. starting in November 2007. A vendor in the U.S. further processed these documents to prepare them for review.

18) Purdue and Napp collected approximately 5.2 million pages from U.K., Germany, and U.S. I understand that more than 70% of these documents were electronic documents. The documents were housed in six distinct databases reflecting how they were collected – paper documents and electronic files from each of the three associated companies. Purdue and Napp had approximately three months to complete reviewing these documents for production.

19) Given the size of the document collection and the tight time frame, I am informed and believe that Purdue and Napp hired a team of about fifty outside contract attorneys to help review the documents. The team of contract attorneys was trained by Purdue's in-house litigation counsel as well as Ropes & Gray attorneys. The training explained how to identify responsive documents and privileged documents. The training also included instructions on issues specific to this case. I am further informed and believe that the team was also trained on

4

the mechanics of online document review. Purdue's in-house counsel and Ropes & Gray attorneys supervised the document review team on an on-going basis.

20) Prior to any substantive document review, I am informed and believe that tailored searches were run on the documents to identify and segregate potentially privileged documents from non-privileged documents. Based on information and belief, I understand that the list of search terms used to identify privileged documents contained over 200 terms. I understand that the list was based on a standard list used and tested by Purdue in other litigations. It was generated by the vendor working with Purdue's in-house attorneys and Ropes & Gray attorneys. The list included names of attorneys and law firms who were involved with providing legal services to Purdue, Napp, and Mundipharma, including legal services relating to the patents-in-suit and their foreign counterparts. The list also included words commonly indicating privilege, e.g., "confidential" or "work product." The search terms included domain names and used Boolean operators.

21) Based on information and belief, I understand that after the electronic searches were run and the reviewers started reviewing the documents, they again used the search terms to confirm that privileged documents were identified. I understand that for paper documents that were not text-searchable, reviewers used the same criteria to identify privileged documents. The search terms were only a tool to help identify privileged documents for further review. They did not substitute for attorney review.

22) The potentially privileged documents identified by the searches and review were transferred to separate folders for further review. Approximately 90,000 documents were identified as potentially privileged. These documents were then segregated into responsive and non-responsive documents. All the responsive potentially privileged documents were then

reviewed by Ropes & Gray attorneys or the document review team. This resulted in identification of about 15,000 privileged responsive documents that were described on privilege logs.

23) The document review team reviewed the collected documents, which constitutes approximately 5.2 million pages. Based on that review, over 2.3 million pages were identified as responsive for production. Ropes & Gray attorneys further "spot-checked" (i.e., reviewed some but not all) the documents identified for production before they were produced to Par. Purdue and Napp produced approximately 2.3 million pages of documents to Par by January 4, 2008. Purdue and Napp produced an additional 43,000 pages of documents to Par by January 30, 2008. In addition, Purdue and Napp produced about 15,000 pages from the Davidson law firm and described about 1800 Davidson documents on a privilege log.

24) In February 2008, as part of preparing for depositions, Purdue and Napp started reviewing the Davidson production. In the week of February 11, during this review, Purdue and Napp realized that about thirty privileged documents were inadvertently produced. Purdue and Napp immediately wrote to Par requesting the return of these inadvertently produced documents pursuant to paragraph 10 of the Protective Order.

25) In April and May, Purdue and Napp started reviewing name sets in its own production in preparation for depositions of their witnesses. During this review, Purdue and Napp discovered that additional privileged documents were inadvertently produced.

26) When Purdue and Napp discovered that privileged documents were inadvertently produced, they immediately wrote to Par requesting the return of those documents. Purdue and Napp made this request within ten days of learning of the inadvertent disclosure,

often before the day of the witnesses' deposition. Purdue and Napp also promptly searched for any duplicates of the discovered documents in its production and recalled them as well.

27) Purdue and Napp recalled approximately 1000 documents under the Protective Order. The recalled documents amount to approximately 6500 pages which is less than 0.3% of Purdue and Napp's 2.3 million page production. Of the approximately 1000 recalled documents, about 100 were duplicates, and more than 600 were later reproduced with the inadvertently produced information redacted. Often, the redacted information was contained in a few lines or paragraphs of privileged information buried within a document. Several of the redactions, e.g., in meeting minutes, related to information other than tramadol, which is the drug at issue in this litigation. Approximately 50 of the recalled documents are protected by work product immunity.

28) Re-reviewing the entire 2.3 million pages of produced documents immediately upon learning of the inadvertently produced documents to identify if there were additional documents to be recalled was not practical. It would have required Purdue and Napp's outside trial counsel (not the contract attorneys who did the initial review) to manually review each of the 2.3 million produced pages. This would have stopped all other work on this lawsuit for weeks, if not months.

29) When Purdue and Napp recalled inadvertently produced documents during depositions, they allowed Par to proceed with deposition questions directed to non-privileged portions of any such documents.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: July 8, 2008

_____
SONA DE

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2008, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to:

>Frederick L. Cottrell, III, Esquire
>Steven J. Fineman, Esquire
>RICHARDS, LAYTON & FINGER, P.A.
>
>Richard D. Kirk, Esquire
>BAYARD, P.A.
>
>Mary W. Bourke, Esquire
>CONNOLLY BOVE LODGE & HUTZ LLP

I further certify that I caused to be served copies of the foregoing document on July 8, 2008, upon the following in the manner indicated:

| | |
|---|---|
| Frederick L. Cottrell, III, Esquire<br>Steven J. Fineman, Esquire<br>RICHARDS, LAYTON & FINGER, P.A.<br>One Rodney Square<br>Wilmington, DE  19801 | *VIA ELECTRONIC MAIL* |
| Edgar H. Haug, Esquire<br>Robert E. Colletti, Esquire<br>FROMMER LAWRENCE & HAUG LLP<br>745 Fifth Avenue<br>New York, NY  10151 | *VIA ELECTRONIC MAIL* |
| Richard D. Kirk, Esquire<br>BAYARD, P.A.<br>222 Delaware Avenue<br>Suite 900<br>Wilmington, DE  19801 | *VIA ELECTRONIC MAIL* |
| Mary W. Bourke, Esquire<br>CONNOLLY BOVE LODGE & HUTZ LLP<br>The Nemours Building<br>1007 North Orange Street<br>Wilmington, DE  19801 | *VIA ELECTRONIC MAIL* |

/s/ *Rodger D. Smith II*
---
Rodger D. Smith II (#3778)